UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

ARMSTRONG PUMP, INC.,

    Plaintiff,

v.

MR. THOMAS HARTMAN d/b/a THE
HARTMAN COMPANY and OPTIMUM
ENERGY LLC,

    Defendants.

Civil Action No. _____

**COMPLAINT FOR
BREACH OF CONTRACT AND
TORTIOUS INTERFERENCE
WITH CONTRACT**

**JURY TRIAL DEMANDED**

## COMPLAINT FOR BREACH OF CONTRACT AND TORTIOUS INTERFERENCE WITH CONTRACT

Plaintiff Armstrong Pump, Inc. ("Armstrong"), by and through its undersigned attorney, complains of Defendants Mr. Thomas Hartman d/b/a The Hartman Company ("Hartman") and Optimum Energy LLC ("Optimum") as follows:

### I. THE PARTIES

1. Plaintiff Armstrong Pump, Inc. is a New York corporation with a principal place of business at 93 East Avenue, North Tonawanda, NY 14120.

2. Defendant Thomas Hartman, d/b/a The Hartman Company, is a Texas company with a principal place of business at 755 County Road 247, Georgetown, TX 78628.

3. Defendant Optimum Energy LLC is a Washington limited liability company with a principal place of business at 411 First Avenue South, Suite 620, Seattle, WA 98104.

## II. JURISDICTION AND VENUE

4. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1332(a). The amount in controversy exceeds the minimum for the Court's jurisdiction, and Armstrong and Hartman are citizens of different states.

5. On information and belief, this Court has personal jurisdiction over Hartman, as Hartman has established minimum contacts with this District. On information and belief, Hartman has transacted business in this District and otherwise purposely availed itself of the privileges and benefits of the laws of the state of New York. In particular, Hartman has negotiated a license agreement with a New York corporation with a principal place of business in Tonawanda, New York, has granted intellectual property rights to the New York corporation which holds them in New York, and has signed an agreement containing a New York choice of law provision.

6. On information and belief, this Court has personal jurisdiction over Optimum, as Optimum has minimum contacts with this District. Optimum has transacted business in this District and otherwise purposely availed itself of the privileges and benefits of the laws of the state of New York. In particular, on information and belief, Optimum has conducted business in the State of New York, has had and/or is currently seeking sales representatives in the State of New York, and has an office in New York, NY.

7. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(a), (b) and/or (c).

## III. FACTUAL AVERMENTS

8. Founded in 1934, Armstrong is a family run business that has pioneered a range of products for customers in residential, commercial and industrial markets.

9. Armstrong's name has been a benchmark for quality in design, engineering and

2

manufacturing. A significant part of Armstrong's business revolves around the development and manufacture of the highest quality HVAC chilled water and boiler water systems, pumps, and other components ("chilled water products").

10. In the last year alone, Armstrong invested over $1,000,000 in research and development costs in association with chilled water products.

11. Because Armstrong devotes such substantial cost and man-power to its continued development of chilled water products, its continuing vitality as a business largely depends on the sales of its chilled water products.

### Negotiations with Hartman and Consummation of License Agreement

12. In the late 1990s, Hartman began to apply for, and has since obtained, a series of U.S. patents in methods, systems, and devices that improved the overall efficiency in chilled water cooling systems such as those that are used in commercial and industrial buildings. These patents include U.S. Patent Nos. 5,946,926 (variable flow chilled fluid cooling system), 6,257,007 (method of control of cooling system condenser fans and cooling tower fans and pumps), and 6,185,946 (system for sequencing chillers in a loop cooling plant and other systems that employ all variable-speed units). According to their teachings, these patents disclose methods for sequencing the chillers, pumps, fans and other components in loop HVAC (or heating, ventilation, air conditioning) systems order to optimize the overall operating efficiency of such systems even if the individual components are operated at less than optimum efficiency. In other words, Hartman's patents teach that while conventional wisdom would suggest that each component in the loop should be operated at maximum efficiency to maximize the efficiency of the system as a whole, the overall efficiency can be significantly improved by monitoring the system

3

as a whole and adjusting the individual components in some cases at less than peak efficiency (the "Hartman Loop Technology").

13. Armstrong entered into negotiations with Hartman in 2003 to obtain rights to utilize the Hartman Loop Technology in Armstrong's chilled water products.

14. Obtaining a license to the Hartman Loop Technology was particularly critical to Armstrong's business, as the Hartman patents covered significant aspects of the sequencing and control of chilled water systems, that would provide Armstrong credibility to enter the plant automation business in a differentiated fashion.

15. After nearly two years at the negotiating table, Armstrong finally signed a license agreement with Hartman (the "License Agreement") to utilize the Hartman Loop Technology in its chilled water plant automation products. A copy of the License Agreement is attached as Exhibit A to the Complaint.

16. Because of the substantial investments that Armstrong made – both in terms of its own research and development and its commitment to pay substantial royalties to Hartman – Armstrong specifically contracted for and obtained several provisions in the contract granting Armstrong exclusive rights (with one very narrow exception) to develop chilled water products incorporating the licensed technology.

17. Armstrong also negotiated to obtain rights to improvements in the underlying Hartman Loop Technology.

18. The License Agreement specifically granted Armstrong a right of first refusal to any improvements made more than two years after the date of the License Agreement.

19. In the last year alone, a number of patent applications have been filed on improvements to the Hartman Loop Technology, improvements in which Armstrong personnel were

20. Since the consummation of its deal with Hartman, Armstrong has incorporated the Hartman Loop Technology into a large portion of the chilled water products that it manufactures, and Armstrong has featured the Hartman Loop Technology in all of its industry promotional events.

21. The Hartman Loop Technology is a primary cornerstone to Armstrong's chilled water product line.

## Performance Under the License Agreement

22. Hartman does not dispute that the License Agreement exists and is valid.

23. Since the consummation of the License Agreement in 2005, Armstrong has fully performed under the License Agreement. Armstrong has met all royalty payments as required by License Agreement. To date, these have totaled approximately $375,000 USD.

## Hartman's Negotiations with Optimum and Hartman's Intended Sale to Optimum

24. At approximately the same time that Hartman was negotiating with Armstrong, Optimum was also negotiating with Hartman to obtain limited rights to the patented Hartman Loop Technology relative to its business needs.

25. At the time of the negotiation, Optimum was in the business of providing energy savings services, monitoring services and redesign services, whereby Optimum was in a position to implement the Hartman Loop Technology into existing building management systems that would control the chilled water systems and provide on-going monitoring and engineering services for which it would be paid a portion of the savings that would be realized by the increased system efficiency that resulted from the use of the Hartman Loop Technology.

5

26. Moreover, at the time the Armstrong was negotiating its License Agreement with Hartman, Optimum was a startup company whose software applications could improve system efficiency and realize substantial savings for its customers by installing the Hartman LOOP technology in the preexisting building automation system software.

27. Given Optimum's status as a non-manufacturing entity, Hartman carved-out only a narrow right for Optimum in the License Agreement.

28. Specifically, Optimum received limited rights to use the patented Hartman Loop Technology provided it did not compete with Armstrong's intended product offering.

29. Several years after the consummation of the agreement, Optimum appears to have expanded its business model.

30. Optimum now actively manufactures and installs control systems on chilled water systems in direct competition with Armstrong, a right which Hartman promised not to grant to Optimum. In particular, Optimum now sells a controller that utilizes Hartman Loop Technology to increase the chilled water plant operating efficiency. Whereas before, Optimum would install the technology (code), into the preexisting building automation systems where it would then operate the plant and increase operating efficiency. This controller directly competes with Armstrong's current product offering.

31. Optimum now seeks an assignment of all patents under the License Agreement. Hartman has indicated that it will proceed with the sale of the patents despite the explicit license provisions to the contrary.

## Summary of License Provisions

32. To protect the substantial rights that Armstrong acquired, Hartman included numerous specific exclusivity provisions in the License Agreement. Indeed, the nature of the

6

33. exclusivity provisions are explicitly defined by what Hartman cannot grant under the License Agreement.

33. For example, section 3.3(a) provides that Hartman cannot grant a license for "factory" implementation of the licensed technologies to any third party involved in the manufacture of pumps, any factory packaged chilled water systems, chillers, building controls, or cooling towers.

34. Similarly, Hartman promised Armstrong, with one narrow exception, that it would not grant a license to any other manufacturer or assembler of pumps or for cooling systems and equipment that employ chilled water distribution. Specifically, Hartman carved out narrow rights to grant a license to Optimum for the purpose of incorporating the licensed technology into certain products. Critically, Hartman excluded "products . . . that include the manufacture or assembly of pumps chillers, towers, chilled water plant controls or pumping or chiller systems that could compete with [Armstrong's] intended product offering" from the Optimum carve out. License Agreement § 3.2(b).

35. Additionally, given the criticality of the exclusivity provisions, Hartman promised Armstrong that it would make no agreements with third parties that were inconsistent with the grant of rights under the License Agreement. License Agreement § 10.2.

36. Because of the substantial investment that Armstrong would be making in the development and marketing of the Hartman Loop Technology, Hartman additionally promised to give Armstrong a right of first refusal on future improvements. Specifically, Hartman promised that Armstrong would be offered exclusivity on any improvements made to the licensed technology more than two years after the date of the License Agreement. License Agreement § 8.

7

37. Finally, Hartman promised Armstrong that it would provide certain unique consulting services regarding the patented technology during the term of the License Agreement. License Agreement § 12.7. Given the importance of the Hartman Loop Technology to Armstrong's business, this provision was particularly critical.

### Armstrong Will Suffer Irreparable Injury if the Sale is Completed

38. If Hartman is permitted to sell the Hartman Loop Technology patents (and the pending improvement applications) to Optimum, Armstrong will suffer several distinct, immediate harms that will not be compensable by monetary damages.

39. First, Armstrong will lose the exclusivity it was specifically promised in the License Agreement.

40. Second, Armstrong will lose the unique consulting services it was promised in the License Agreement. Over the years and in accordance with the License Agreement, Mr. Hartman has helped Armstrong with technical issues regarding product design for Armstrong's control products. Additionally, Mr. Hartman provided technical support in helping Armstrong develop a new monitoring system. If the License Agreement is transferred to Optimum, Armstrong will no longer have a contract with Mr. Hartman such that Mr. Hartman will no longer be obligated to provide consulting services to Armstrong.

41. Third, if the sale is allowed to proceed on June 7, 2010, Armstrong would lose relationships with customers and effectively lose an indeterminate amount of business in the coming years. Armstrong's factory rights include the scope of supply through OEM accounts, such as building automation system companies, or chiller companies. Optimum has already approached these organizations, including customers of Armstrong,

to offer Optimum's competing controller at the OEM branch offices even though the Armstrong's License Agreement is intended to prevent competition with Armstrong's intended product offerings.

42. For example, Optimum has informed me that Optimum's representatives have called upon Trane, Johnson Controls, and Delta Controls (all customers of Armstrong) and told them that Optimum is offering an Optimum Loop Solution which includes a chilled water plant controller, Hartman Loop technology, and a monitoring service. The Optimum Loop Solution would compete directly with Armstrong's product offerings.

43. Fourth, Armstrong is supposed to have a right of first refusal on the improvement patents, and if Hartman is allowed to sell the pending improvement patent applications to Optimum, this right is irrevocably lost. To expand the offering into foreign markets with patent protection, Armstrong, Hartman and Optimum have worked together to identify and develop improvement patent applications, agreed to share the costs of patent applications, and define the right technology for claim in those foreign markets and the USA. If Optimum develops new improvements, Armstrong would no longer have the right of first refusal.

### The Balance of Hardships Tip Decidedly in Favor of Armstrong

44. Armstrong has repeatedly indicated to Hartman that its intended sale to Optimum will breach various provisions of the License Agreement.

45. Despite its knowledge of that fact, Hartman has expressly stated his intent to sell the patents and assign the License Agreement to Optimum on June 7, 2010.

### COUNT I
### (Breach of Contract)

9

46. Paragraphs 1-45 are incorporated herein by reference.

47. The License Agreement between Armstrong and Hartman is valid and enforceable.

48. Armstrong has fully performed under the License Agreement. In particular, Armstrong has met all royalty payments as required by License Agreement. To date, these have totaled approximately $375,000 USD.

49. There is an actual and justiciable controversy between the parties as to whether Hartman has breached the License Agreement.

50. By entering the agreement to transfer the rights to Optimum on June 7, 2010, Hartman breached the License Agreement, including without limitation, the restrictions not to grant certain rights and the provision against entering inconsistent agreements.

51. Armstrong has suffered and will suffer substantial monetary damages in an amount yet to be determined as a result of Hartman's breach.

52. Armstrong has suffered and will suffer harm, including irreparable harm, as a result of Hartman's breach.

53. Armstrong will continue to suffer harm, including irreparable harm, as a result of Hartman's breach.

## COUNT II
### (Anticipatory Breach of Contract)

54. Paragraphs 1-53 are incorporated herein by reference.

55. The License Agreement between Armstrong and Hartman is valid and enforceable.

56. Armstrong has fully performed under the License Agreement. In particular, Armstrong has met all royalty payments as required by License Agreement. To date, these have totaled approximately $375,000 USD.

57. There is an actual and justiciable controversy between the parties as to whether Hartman has anticipatorily breached the License Agreement.

58. When Hartman asserted that it would sell the issued patents and improvements to Optimum on June 7, 2010, Hartman breached the License Agreement, including without limitation, the express prohibitions against granting certain rights to Optimum, the provision giving Armstrong the right of first refusal on the improvements, and the provision obligating the Licensor to provide unique consulting services that could only be fulfilled by Mr. Hartman as the Licensor.

59. Armstrong will suffer substantial monetary damages in an amount yet to be determined if Hartman transfers the patents and pending patent applications to Optimum.

60. Armstrong will suffer harm, including irreparable harm, as a result of Hartman's breach.

61. Armstrong will continue to suffer harm, including irreparable harm, as a result of Hartman's breach.

## COUNT III

### (Tortious Interference with Contract)

62. Paragraphs 1-61 are incorporated herein by reference.

63. The License Agreement between Armstrong and Hartman is valid and enforceable.

64. Optimum had a copy of the License Agreement and thus had full knowledge of the License Agreement.

65. Despite its knowledge of the License Agreement and the exclusivity provisions contained therein, Optimum has been in negotiations with Hartman to buy Hartman's patents despite the express license provisions to the contrary.

66. Optimum's interference has caused Hartman to breach the License Agreement. In

particular, by entering the agreement to transfer the rights to Optimum on June 7, 2010, Hartman breached the License Agreement, including without limitation, the restrictions not to grant certain rights and the provision against entering inconsistent agreements.

67. Armstrong has suffered and will suffer substantial monetary damages in an amount yet to be determined as a result of Optimum's interference.

68. Armstrong has suffered and will suffer harm, including irreparable harm, as a result of Optimum's interference.

69. Armstrong will continue to suffer harm, including irreparable harm, as a result of Optimum's interference.

**WHEREFORE**, Armstrong prays that this Court grant the following relief:

A. Enter judgment in favor of Armstrong on all of its claims;

B. Adjudge that Hartman breached the License Agreement;

C. Adjudge that Hartman anticipatorily breached the License Agreement;

D. Adjudge that Optimum tortiously interfered with Armstrong's License Agreement with Hartman;

E. Entering a temporary restraining order to restrain Hartman from selling the patents-at-issue and the improvement patent applications-at-issue to Optimum on June 7, 2010;

F. Preliminarily and permanently restrain Hartman from selling the patents-at-issue and the improvement patent applications-at-issue to Optimum;

G. Award Armstrong its attorneys fees, costs, and expenses; and

H. Award Armstrong any such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Armstrong demands a trial by jury on all issues so triable.

DATED: May 28, 2010

*Attorneys for Plaintiff Armstrong Pump, Inc.*

HODGSON RUSS LLP

*Paul I. Perlman*

Paul I. Perlman
Jodyann Galvin
Robert J. Fluskey, Jr.
The Guaranty Building
140 Pearl Street, Suite 100
Buffalo, NY 14202-4040
Tel: 716.856.4000
Fax: 716.849.0349
*pperlman@hodgsonruss.com*
*jgalvin@hodgsonruss.com*
*rfluskey@hodgsonruss.com*

WILEY REIN
Floyd Chapman
David Kulik
1776 K Street NW
Washington, DC 20006
Tel: 202.719.7000
Fax: 202.719.7049
*fchapman@wileyrein.com*
*dkulik@wileyrein.com*