UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

ARMSTRONG PUMP, INC.,

Plaintiff,

v.

**DECISION AND ORDER**
10-CV-446S

THOMAS HARTMAN d/b/a THE HARTMAN
COMPANY and OPTIMUM ENERGY, LLC,

Defendants.

## I. INTRODUCTION

In this action, commenced on May 28, 2010, Plaintiff Armstrong Pump, Inc. ("Armstrong") is suing Defendant Hartman, the owner of three patents to which Armstrong has a license, for breach of contract and anticipatory breach of contract related to its intended assignment of the three patents and a pending patent application to Defendant Optimum Energy. Optimum Energy is sued for tortious interference with contract. The Court previously concluded that personal jurisdiction exists over both Defendants and that venue in this District is proper. A temporary restraining order was issued on September 10, 2010. Now before the Court are Defendants' respective motions to dismiss for failure to state a claim and Plaintiff's motion for a preliminary injunction.

## II. BACKGROUND

In adjudicating Defendants' Motions to Dismiss, this Court assumes the truth of the following factual allegations contained in Plaintiff's complaint. *See* Hosp. Bldg. Co. v. Trs. of Rex Hosp., 425 U.S. 738, 740, 96 S. Ct. 1848, 1850, 48 L. Ed. 2d 338 (1976); *see also*,

Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton Coll., 128 F.3d 59, 62–63 (2d Cir. 1997).

Armstrong is in the business of developing and manufacturing HVAC chilled water and boiler water systems, pumps, and other components ("chilled water products"). (Complaint ¶ 9.)  In 2003, Armstrong commenced negotiations with Defendant Hartman for the right to use methods for sequencing chillers, pumps, fans, and other components in loop HVAC systems as disclosed in a series of patents issued to Hartman.  These include U.S. Patent Nos. 5,946,926 (variable flow chilled fluid cooling system), 6,257,007B1 (method of control of cooling system condenser fans and colling tower fans and pumps), and 6,185,946 (system for sequencing chillers in a loop cooling plant and other systems that employ all variable-speed units).  (¶ 12.)  The negotiations culminated in a License Agreement dated February 4, 2005 ("the Agreement").  (¶ 15, Ex. A.)

## A.    The Agreement

The License Agreement states that "[Hartman] is the sole owner of the Licensed Technologies and the Licensed Patents and has the full right, title, interest and power to extend the rights granted hereunder."  (Ex. A, § 10.1.)

The Agreement then grants to Armstrong "a license, to make, have made, use, sell, and otherwise distribute factory packaged chilled water systems, pumping and/or other mechanical products that incorporate the Licensed Technologies at the factory implementation level, and to use and otherwise practice the Licensed Technologies in Licensed Products."  (§ 2.1.)  Armstrong's grant is for "limited exclusive rights to the Licensed Technologies and the Licensed Patents" (§ 3.2(a)) and those "limited exclusive rights shall be worldwide . . . and expire only when this Agreement expires or is terminated

according the [sic] provisions of this Agreement" (§ 3.2(b)).  This limited exclusivity is "intended to protect [Armstrong] against implementations of the Licensed Technologies that would compete with their [sic] intended product offerings."  (§ 3.3.)  The Agreement expressly provides that as long as the license remains exclusive, Hartman will "not grant a license for factory implementation of the Licensed Technologies or the Licensed Patents as they apply to hydronic elements to any third party involved in the manufacture of pumps, and factory packaged chilled water systems, chillers, building controls or cooling towers." (§ 3.3(a).)

During the term of the Agreement, Hartman is required to "first offer to license any and all improvements in or to the Licensed Technologies to [Armstrong] for exclusive rights in the markets [Armstrong] already enjoys exclusivity, and to the extent of the existing exclusivity rights."  (§ 8.)  "Improvements to the Licensed Technologies" is defined as "Technologies developed after the effective date of this Agreement that will or could make the Licensed Technologies or Licensed Products more effective or valuable."  (§ 1.)

The Agreement goes on to state that Hartman "has not made and will not make any agreements with or commitments to third parties that are inconsistent with the grant of rights to [Armstrong]."  (§ 10.2.)

Hartman expressly retains certain rights relative to the Licensed Technologies.  The Agreement provides for Hartman's retention of "full rights to grant licenses for 'field' implementation of the Licensed Technologies when such technologies . . . are not integrated into the chiller, pumping, control or tower products until they are field assembled. (§ 3.3(b).)  Hartman also retains "full rights to grant licenses for implementation of the Licensed Technologies when the implementation of such Licensed Technologies do not

in any way compete with" Armstrong's product offerings, one example being "the licensing of the technologies applied to variable speed DX / air cooled rooftop airconditioning systems." (§ 3.3(d).) The Agreement provides that Hartman "shall not be precluded from licensing the Licensed Technologies or the Licensed Patents to Optimum Energy Corporation or others for the purpose of incorporating the Technologies into products excluding those that include the manufacture or assembly of pumps, chillers, towers, chilled water plant controls or pumping or chiller systems that could compete with [Armstrong's] intended product offering." (§ 3.2(b).)

**B.      The Claims**

At about the same time Armstrong was negotiating with Hartman, so was Defendant Optimum Energy. (Complaint ¶ 24.) It sought rights to the Hartman Loop Technology for its business, which involved the provision of energy saving services, monitoring services, and redesign services in connection with preexisting systems. (¶ 25.) This use is consistent with the rights Hartman expressly retained in the License Agreement—*i.e.* rights that did not compete with Armstrong's use in manufacturing and assembly of the specified products. (¶¶ 26-28.)

According to Armstrong, Optimum now is selling a controller that utilizes the Licensed Technologies to increase chilled water plant efficiency, in direct competition with its product. (¶30.) Hartman intends to assign to Optimum the patents identified in the License Agreement and a pending patent improvement application, and has advised Armstrong that he is ready to proceed with the sale. (¶¶ 31, 38, 43.) It is this imminent assignment that is at the heart of Armstrong's claims of breach of contract, anticipatory

breach, and tortious interference with contract.

Specifically, Armstrong claims that such assignment will breach the License Agreement's exclusivity provisions with respect to both factory implementation of the Licensed Technologies (§§ 3.2(b), 3.3(a)), and its right of first refusal on subsequent improvements (§ 8). (Complaint ¶¶ 39, 43.) In addition, Armstrong claims the assignment will cause it to lose Hartman's unique consulting services promised in the License Agreement. (¶¶ 37, 40; Ex. A § 12.7.) Finally, Armstrong urges that the assignment would violate Hartman's promise to make no agreements with third parties that are inconsistent with the License Agreement's grant of rights to Armstrong. (¶ 35; Ex. A § 10.2.)

## III. DISCUSSION

### A. The Motions to Dismiss

#### 1. <u>Standard of Review</u>

Hartman and Otptimum Energy have each moved, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, for judgment on the pleadings. A Rule 12(c) motion is evaluated under the same standards that apply to a Rule 12(b)(6) motion to dismiss for failure to state a claim. <u>Patel v. Contemporary Classics of Beverly Hills</u>, 259 F.3d 123, 126 (2d Cir. 2001); <u>Caudle v. Towers, Perrin, Forster & Crosby, Inc.</u>, 580 F. Supp. 2d 273, 277 (S.D.N.Y. 2008). Thus, on a Rule 12(c) motion, the court must "accept . . . all factual allegations in the complaint [as true] and draw . . . all reasonable inferences in the plaintiff's favor." *See* <u>Ruotolo v. City of New York</u>, 514 F.3d 184, 188 (2d Cir. 2008) (internal quotation marks omitted).

When a defendant tests the sufficiency of a complaint by motion, "the plaintiff must

provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" ATSI Commc'ns, Inc. v. Shaar Fund. Ltd., 493 F.3d 87, 98 (2d Cir. 2007)(quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)).  In order to withstand dismissal, a "complaint must contain sufficient factual matter, [ ], to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (quoting Twombly, 550 U.S. at 570). This "does not require heightened fact pleading of specifics. . . ." In re Elevator Antitrust Litig., 502 F.3d 47, 50 (2d Cir. 2007). It does, however, "require enough facts to 'nudge [plaintiff's] claims across the line from conceivable to plausible.'" Id. (quoting Twombly, 550 U.S. at 557).  Although all facts are accepted as true, the district court is "not bound  to accept as true a legal conclusion couched as a factual allegation." Iqbal, 129 S. Ct. at 1949-50 (citations and quotations omitted).

"'[T]he complaint is deemed to include any written instrument attached to it as an exhibit or any statement or documents incorporated in it by reference.'" Int'l Audiotext Network, Inc. v. Am. Tel. Co., 62 F.3d 69, 72 (2d Cir. 1995) (quoting Cortec Indus., Inc. v. Sum Holdings L.P., 949 F.2d 42, 47 (2d Cir. 1991)).  Here, the License Agreement is attached to the Complaint and is considered along with the pleading.

### 2.    The Breach of Contract Claim

Defendant Hartman moves to dismiss the breach of contract claim on the grounds that Armstrong has failed to allege the specific contract provisions upon which its claim is based, there is no provision in the License Agreement that limits Hartman's ability to assign

his rights, and Hartman's assignment of his rights will not alter Armstrong's rights under the License Agreement.

Armstrong urges that the motion to dismiss must be denied because it has adequately met federal pleading standards, Hartman's assignment of rights to Optimum is prohibited by multiple provisions of the License Agreement, and an assignment to Optimum will permit Optimum to practice the patents in direct competition with Armstrong and also deprive Armstrong of its rights to future improvements and to Hartman's services.

To state a viable breach of contract claim, New York law requires that a plaintiff allege: (1) the existence of an enforceable agreement; (2) the plaintiff's adequate contractual performance; (3) the defendant's breach of the agreement; and (4) damages. Broughel v. Battery Conservancy, 07-CV-7755, 2010 U.S. Dist. LEXIS 25496, at *15 (S.D.N.Y. Mar. 16, 2010) (citing Advanced Mktg. Group, Inc. v. Business Payment Sys., 300 Fed. Appx. 48, 49 (2d Cir. 2008)).

Here, Armstrong's allegations, which specifically identify the provisions purportedly breached—*i.e.* §§3.2(b), 3.3(a), 8, 10.2 and 12.7, are sufficient to meet federal notice-pleading standards under Rule 8.  *See* Wolff v. Rare Medium, Inc., 171 F. Supp. 2d 354, 358-59 (S.D.N.Y. 2001) (granting motion to dismiss breach of contract claim, with leave to replead, where complaint failed to provide defendant notice of contractual provision allegedly breached).  However, to successfully oppose Hartman's Rule 12(c) motion, Armstrong also must have a viable breach of contract claim that survives dismissal as a matter of law.  Wolff v. Rare Medium, Inc., 210 F. Supp. 2d 490, 496 (S.D.N.Y. 2002) (amended complaint dismissed as a matter of law where, *inter alia*, plain language of the agreement did not support existence of obligation allegedly breached by defendant).

Judgment as a matter of law on a breach of contract claim is appropriate if the contract language is unambiguous.  Photopaint Techs., LLC v. Smartlens Corp., 335 F.3d 152, 160 (2d Cir. 2003).  "Whether or not a writing is ambiguous is a question of law to be resolved by the courts."  Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Col of N.Y., 375 F.3d 168, 178 (2d Cir. 2004) (internal quotation marks omitted).  Unambiguous contract language is not rendered ambiguous by the parties' advancement of competing interpretations.  Hugo Boss Fashions, Inc. v. Fed. Ins. Co., 252 F.3d 608, 616 (2d Cir. 2001).  "Ambiguity exists where a contract term could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business."  World Trade Ctr. Props., L.L.C. v. Hartford Fire Ins. Co., 345 F.3d 154, 184 (2d Cir. 2003) (internal quotation marks omitted).  Inasmuch as the License Agreement and intended assignment involve United States patents, this Court also will look to federal decisions interpreting similar license agreements for guidance.  Each of the purported breaches is examined under these standards.

### a.   *The Scope of Armstrong's Exclusive License*

Hartman generally contends that a change in patent ownership will not affect the scope of Armstrong's rights under the License Agreement.  Armstrong argues that assignment of the Licensed Patents will transfer Hartman's right to practice his inventions to Optimum, and Armstrong will thereby lose the exclusivity with regard to factory implementation promised in §§ 3.2(b) and 3.3(a) of the Agreement.  (*See also*, § 2.1.)

"A patent 'is, in effect, a bundle of rights which may be divided and assigned, or retained in whole or part.'" Alfred E. Mann Found. for Sci. Research v. Cochlear Corp., 604 F.3d 1354, 1360 (Fed. Cir. 2010) (quoting Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A., 944 F.2d 870, 875 (Fed. Cir. 1991)).  It is a species of property which grants "to the patentee, his heirs or assigns, [ ] the right to exclude others from using, offering for sale or selling" the invention for a period of time.  35 U.S.C. § 154(a).  Where a patent owner assigns the whole of his or her patent right, or an undivided part of that right, or all rights in a specified geographic area, legal title to that whole or part of the patent is transferred to the assignee.  Any less complete transfer of rights is a license, rather than an assignment, and title remains with the patent owner.  Abbott Labs v. Diamedix Corp., 47 F.3d 1128, 1131 (Fed. Cir. 1995) (citing Waterman v. Mackenzie, 138 U.S. 252, 255, aa S. Ct. 334, 34 L. Ed. 923 (1891)).

It is well-settled, however, that an assignee of a patent takes title to the patent subject to existing licenses.  Boehringer Ingelheim Vetmedica, Inc. v. Merial, Ltd., 2010 U.S. Dist. LEXIS 6819 (D. Conn. Jan. 14, 2010) (citing, *inter alia*, L. L. Brown Paper Co. v. Hydroiloid, Inc., 118 F.2d 674, 677 (2d Cir.), *cert. denied*, 314 U.S. 653 (1941)); *see also*, In re Cybernetic Servs., Inc., 252 F.3d 1039, 1052 (9th Cir. 2001) ("'It had long passed into the text-books that . . . an assignee acquired title subject to prior licenses of which the assignee must inform himself as best he can, and at his own risk.'") (quoting Keystone Type Foundry v. Fastpress Co., 272 F. 242, 245 (2d Cir. 1921)).  In short, if Hartman has retained the right to practice factory implementation, that right will pass to Optimum on assignment, and if Hartman has granted that right solely to Armstrong, it will not.

In urging the latter, Hartman simply asserts that because he granted Armstrong a "[limited] exclusive license" for factory implementation, he necessarily agreed to exclude all others, including himself. This cursory argument is unpersuasive. The scope of Armstrong's "limited exclusive license" and Armstrong's retained rights is defined by the terms of the parties' License Agreement. *See, e.g.*, <u>Ortho Pharm. Corp. v. Genetics Inst., Inc.</u>, 52 F.3d 1026, 1032 (Fed. Cir. 1995) (use of the word "exclusive" is not controlling and court must ascertain intent of parties by the terms of their agreement); <u>Abbott Labs.</u>, 47 F.3d at 1132 (appellant's exclusive license for worldwide rights to make, use and sell products incorporating invention was subject to patentee's retained rights to make, use and sell and also to previously granted licenses); <u>United States v. Masonite Corp.</u>, 316 U.S. 265, 273 n.3, 62 S. Ct. 1070, 86 L. Ed. 1461 (1942) (Masonite's exclusive license under patents expressly excluded patentee from using the patents).

The question here, then, is whether Hartman has expressly or impliedly promised not to practice the patented technologies at the factory implementation level, as he claims, or whether he has retained that right, as Armstrong believes. "Any right not specifically granted by the licensor remains with the licensor, and the rights granted in the license cannot expand beyond the boundaries delineated in the agreement." <u>Cook Inc. v. Boston Sci. Corp.</u>, 208 F. Supp. 2d 874, 879 (N.D. Ill. 2002); *see also*, <u>Textile Prods., Inc. v. Mead Corp.</u>, 134 F.3d 1481, 1484-85 (Fed. Cir. 1998) (where agreement is silent as to patentee's ability to grant further licenses to others, court must assume patentee reserved that right).

This License Agreement expressly provides that Hartman will not grant a license for the Licensed Technologies or the Licensed Patents to any other manufacturer or assembler, and will not grant a license for factory implementation to any third party

involved in the manufacture of pumps, factory packaged chilled water systems, chillers, building controls or cooling towers. (Complaint, Ex. A §§ 3.2(b) and 3.3(a)). These promises alone do not speak to Hartman's ability to practice in the licensed area. However, the Agreement further defines the grant of "limited exclusivity" as "intended to protect [Armstrong] against implementations of the Licensed Technologies that would compete with their [sic] intended offerings." (§ 3.3.) This definition implicitly includes Hartman's promise not to practice the technologies in any manner described in the license grant to Armstrong. (§ 2.1.) This conclusion is further supported by the fact that the License Agreement goes on to expressly identify the rights Hartman does retain; specifically, for field implementation (§ 3.3(b)), and for manufacturing or assembly of products other than those manufactured or assembled by Armstrong (§§ 3.2(b), 3.3(d)).

Because the License Agreement grants to Armstrong the sole right to practice the technologies in the manner described in section 2.1 of the License Agreement, Hartman's assignment of the patents necessarily will be subject to that right. As a matter of law, then, the intended assignment will include only the rights Hartman could have exercised without violating the License Agreement. Accordingly, Hartman's motion to dismiss is granted to the extent Armstrong's breach of contract claim is based on an alleged breach of sections 3.2(b) and 3.3(a) of the License Agreement.

**b.** ***Armstrong's Right to Improvements***

Armstrong alleges that Hartman intends to assign to Optimum a pending patent application for an improvement on the Licensed Technologies, and that such assignment is a breach of section 8 of the License Agreement.

Hartman concedes his intent to sell the patent improvement application, but argues

that any right Armstrong may have to the technology described in the application is inchoate because a patent application does not constitute an "improvement" until the patent is granted.  In support of his position, Hartman relies solely on United States v. Cookson Group plc, which sets forth the terms of a consent judgment.  Civ. No. 92 2206, 1993 WL 735029 (D.D.C. Feb. 5, 1993).  In that case, the parties defined "wave soldering technology" as all intellectual property, including rights under patents, patent applications, and patent improvements.  Id. at *1.  Based on this case-specific, stipulated definition, Hartman urges that, as a matter of law, patent applications are distinct from patent improvements and Armstrong has no present right.

Armstrong urges that nothing in the License Agreement supports Hartman's narrow definition of "improvement" and that it has a right to negotiate to license the technology described in the patent application.  Armstrong correctly argues that the extent of its rights in this case is determined by the terms of the License Agreement; in other words, not by terms agreed to by unrelated parties in an unrelated case.

Section 1 of the License Agreement states that:

"Improvements to the Licensed Technologies" means Technologies developed after the effective date of this Agreement that will or could make the Licensed Technologies or Licensed Products more effective or valuable.

Section 8 provides, in relevant part, that:

[P]roviding the Licensee continues to meet the minimum annual license fee in 3.2a, Licensor shall first offer to license any and all improvements in or to the Licensed Technologies to the Licensee for exclusive rights in the markets the Licensee already enjoys exclusivity, and to the extent of the existing exclusivity rights.  Licensee and Licensor shall negotiate in good faith the license fee and terms of such license.  If Licensor and Licensee are unable to negotiate a mutually acceptable license fee and terms, then, during the Term and prior to Licensor accepting any offer to license any improvements to any third party, Licensor shall offer Licensee the right to license such

improvements at a license fee and upon such terms that are no less favorable than those offered by or to Licensor.

The parties here have defined "Improvements to the Licensed Technologies" broadly, without referring to, or differentiating between, applications and patents. The only express limitation on Armstrong's right of first refusal is with regard to Technologies "developed" prior to the License Agreement's effective date. (§ 1.) Furthermore, use of the term "will or could" unambiguously implies that Armstrong's right of first refusal exists before there is certainty as to whether the application will be granted. *Id.* Indeed, contrary to Hartman's suggestion, it is not at all uncommon for parties to negotiate a license for an "improvement" while a patent application is pending. *See, e.g.*, Lear, Inc. v. Adkins, 395 U.S. 653, 657, 89 S. Ct. 1902, 23 L. Ed. 610 (1969) (parties negotiated license while patent application was pending where inventor promised in underlying agreement that, upon reaching satisfactory royalty agreement, he would grant licensee a license for any idea he might "develop" related to vertical gyros); Beraha v. Baxter Health Care Corp., 956 F.2d 1436, 1437 (7th Cir. 1992) (parties negotiated for grant of a license under the patent application and any resulting patent).

In sum, under the License Agreement's plain terms, Armstrong has a present right to negotiate a license for the improvement disclosed in the patent application to the extent of its existing exclusivity rights. Accordingly, Hartman's motion to dismiss this aspect of the breach of contract claim on the ground that Armstrong's right is inchoate or unripe is denied.

Hartman's further argument that his sale of the patent application will not affect Armstrong's rights under section 8 is likewise predicated on his assertion that Armstrong's

right of first refusal does not arise until a patent is granted.  Having rejected that premise, this Court also denies Hartman's motion to dismiss to the extent that Armstrong's breach of contract claim is based on section 10.2 of the License Agreement, which provides that:

> Licensor has not made and will not make any agreements with or commitments to third parties that are inconsistent with the grant of rights hereunder.

### c.   *Hartman's Consulting Services*

Section 12.7 of the License Agreement provides, in pertinent part, that:

> During the Term, Licensor agrees to provide services in connection with the development and support of products by Licensee employing the Licensed Technologies incorporated in this Agreement with additional compensation for such services (the "Consulting Services").

In its Complaint, Armstrong alleges that "[i]f the *License Agreement* is transferred to Optimum, Armstrong will no longer have a contract with Mr. Hartman such that Mr. Hartman will no longer be obligated to provide consulting services to Armstrong." (Complaint ¶ 40 [emphasis supplied].)

Hartman correctly notes that the Complaint does not allege that he intends to assign his obligations to perform under the License Agreement.  Rather, Armstrong's claims arise from Hartman's intent to transfer his property rights in patents named in the License Agreement.  Upon review, this Court finds that no provision of the License Agreement supports the conclusion that assignment of Hartman's retained patent rights will, in and of itself, prevent him from fulfilling his promise to provide consulting services during the term of the Agreement.  Accordingly, Hartman's motion to dismiss is granted to the extent Armstrong's breach of contract claim is based on section 12.7 of the License Agreement.

* * * * * *

In sum, Hartman's motion to dismiss the breach of contract claim is granted in part, and denied in part. It is denied to the extent the alleged breach is based on sections 8 and 10.2 of the License Agreement.

### 3. The Anticipatory Breach of Contract Claim

In its second count, Armstrong claims that Hartman's plan to sell the issued patents and improvements to Optimum constitutes an anticipatory breach.

Hartman first urges that the claim for anticipatory breach should be dismissed for the same reasons that the breach of contract claims fail. *See* Peter F. Gaito Architecture, LLC v. Simone Dev. Corp., No. 22157/05, 2006 WL 6091832, at *4 (N.Y. Sup. Ct. Nov. 3, 2006) (dismissing anticipatory breach cause of action that was predicated upon the already dismissed breach of contract action). This Court agrees that, to the extent it has been determined that Armstrong's breach of contract claim fails, the parallel claim for anticipatory breach fails as well. Thus, the anticipatory breach claim is dismissed to the extent it is based on the breach of sections 3.2(b), 3.3(a), and 12.7 of the License Agreement.

Next, Hartman urges that Armstrong has not alleged facts sufficient to support a claim of anticipatory breach. "Anticipatory repudiation occurs when, before the time for performance has arisen, a party to a contract declares his intention not to fulfill a [future] contractual duty." Lucente v. Int'l Bus. Mach. Corp., 310 F.3d 243, 258 (2d Cir. 2002). Once repudiation occurs, the non-breaching party is entitled to immediately claim damages. American List Corp. v. U.S. News and World Preport, Inc., 75 N.Y.2d 38, 44 (1989). "For a statement to constitute an anticipatory breach, "the announcement of an

intention not to perform [must be] positive and unequivocal.'" Argonaut P'shp., L.P. v. Grupo Sidek, S.A. de C.V., No. 96 Civ. 1967, 1996 U.S. Dist. LEXIS 15925, at *16 (S.D.N.Y. Oct. 25, 1996) (quoting Tenavision, Inc. v. Neuman, 45 N.Y.2d 145, 150 (N.Y. 1978)). Hartman urges that Armstrong has not alleged such an unequivocal statement. This Court disagrees.

Armstrong alleges that "Hartman has indicated that it will proceed with the sale" (Complaint ¶ 31), "enter[ed into an] agreement to transfer the rights to Optimum on June 7, 2010" (¶ 50), "asserted that it would sell the issued patents and improvements to Optimum on June 7, 2010," (¶ 58), and that the intent to sell the improvement rather than give Armstrong its contractual right of first refusal breached the License Agreement (¶ 58). Reading these allegations in the light most favorable to Armstrong, the Court concludes the allegations are sufficient to state a claim for relief.

Finally, citing Lucente, Hartman contends Armstrong's allegation that the License Agreement is "valid and enforceable" is fatal to its claim:

> When confronted with anticipatory repudiation, the non-repudiating party has two mutually exclusive options. He may (a) elect to treat the repudiation as an anticipatory breach and seek damages for breach of contract, thereby terminating the contractual relation between the parties, or (b) he may continue to treat the contract as valid and await the designated time for performance before bringing suit.
>
> * * * * *
>
> In determining which election the non-repudiating party has made, the operative factor . . . is whether the non-breaching party has taken an action (or failed to take an action) that indicated to the breaching party that he had made an election. There is no specific time limit within which to make this election and generally, an election need not be made until the time comes when the party making the election must render some performance under the terms of the contract. At this point, either performing or failing to perform will indicate an election.

310 F.3d at 258-59 (internal citations and quotation marks omitted). Hartman has cited no case in which dismissal on this basis was granted at the pleading stage, and Lucente indicates that such election is a fact-based determination best suited for summary judgment. *Id.* at 259 (finding there was "overwhelming evidence" that plaintiff elected to treat defendant's act as a breach, not as a repudiation which he ignored).

Here, the Complaint does not specify the date of Hartman's alleged breach or allow for any determination as to whether further performance by Armstrong was due and rendered thereafter. Accordingly, it is not possible at this juncture to make a determination as to Armstrong's election, if any, and the motion to dismiss on this basis is denied.

\* \* \* \* \* \*

In sum, Hartman's motion to dismiss the anticipatory breach of contract claim is granted in part, and denied in part. It is denied to the extent that the alleged anticipatory breach is based on sections 8 and 10.2 of the License Agreement.

### 4. *The Tortious Interference with Contract Claim*

Armstrong's final claim is against Optimum Energy for tortious interference with contract. Under New York law,[1] the elements of a tortious interference claim are: (1) the existence of the plaintiff's valid contract with a third party; (2) the defendant's knowledge

---

[1] Optimum and Armstrong both cite to New York law with regard to this tort claim. "Under New York law, [ ] tort claims are outside the scope of contractual choice-of-law provisions that specify what law governs construction of the terms of the contract . . . ." Financial One Pub. Co. v. Lehman Bros. Special Fin., Inc., 414 F.3d 325, 336-37 (2d Cir. 2005). Nonetheless, based on the parties' apparent agreement to its applicability, the Court will analyze this claim under New York law. Mangual v. Pleas, No. 02 Civ. 8311, 2005 U.S. Dist. LEXIS 19785, at *6 n.1 (S.D.N.Y. Sept. 8, 2005) ("[S]ince neither party has raised any choice of law issues, it can be said that they have consented to the application of the forum state's law."); *see also*, Clarkson Co. Ltd. v. Shaheen, 660 F.2d 506, 512 n.4 (2d Cir. 1981) (same); Henneberry v. Sumitomo Corp. of Am., No. 04 Civ. 2128, 2005 U.S. Dist. LEXIS 7475, at *14 n.3 (S.D.N.Y. Apr. 27, 2005) (same).

of the contract; (3) the defendant's intentional procurement of the third party's breach without justification; and (4) damages. <u>Advanced Mktg. Group, Inc. v. Business Payment Sys., LLC</u>, 300 Fed. Appx. 48, 50 (2d Cir. Nov. 12, 2008); <u>White Plains Coat & Apron Co., Inc. v. Cintas Corp.</u>, 8 N.Y. 3d 422, 426 (2007).

Optimum first urges that the tortious interference claim must be dismissed because Armstrong fails to state a cognizable claim against Hartman for breach of contract. As determined above, a portion of Armstrong's breach of contract claim survives, and so complete dismissal on this basis is denied. However, this Court already has determined that Hartman's transfer of his rights in the patents and a patent application will not, as a matter of law, violate §§ 3.2(b), 3.3(a), and 12.7 of the License Agreement. Thus, these alleged breaches cannot support a tortious interference claim.

Next, Optimum contends Armstrong has not sufficiently pled a tortious interference claim because it merely alleges that Optimum "persuaded" Hartman to sell it the patents. According to Optimum, Armstrong must further allege that Optimum used wrongful or improper means to procure Hartman's breach.

The Second Circuit has recognized that "procurement" in this context means that a defendant induced or prevailed upon a third party to breach its contract with the plaintiff. <u>Highland Mgmt. LP v. Schneider</u>, 198 Fed. Appx. 41, 46 (2d Cir. Aug. 16, 2006) (citations omitted). By acknowledging that Armstrong alleges "persuasion" by Optimum, Optimum apparently concedes that it has sufficiently alleged "procurement." (Docket No. 17-5 at 11.) The dispute then, is whether the Complaint must be dismissed due to Armstrong's failure to expressly characterize that "persuasion" as improper or without justification. *See* <u>Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.</u>, 50 N.Y. 2d 183, 189-90 (1980) (terms

"improperly" and "without justification" are used interchangeably; determining whether interference is "improper" is fact specific inquiry requiring consideration of several factors and their relative significance in each case).

Here, Armstrong alleges that Optimum sought to negotiate for the purchase of the Hartman patents and patent application with full knowledge of the terms of the License Agreement and for the purpose of competing directly with Armstrong, which it already has begun to do. (Complaint ¶¶ 30, 31, 64). The Court finds these allegations sufficiently plead improper procurement.

Third, Optimum contends dismissal is warranted because Armstrong's allegations support the conclusion that Optimum's actions were economically justified.[2] Economic justification is a recognized defense to a tortious interference claim wherein the defendant asserts "that it acted to protect its own legal or financial stake in the breaching party's business." White Plains Coat, 8 N.Y. 3d at 426. According to the New York Court of Appeals, this defense has been applied, for example:

> where defendants were significant stockholders in the breaching party's business; where defendant and the breaching party had a parent-subsidiary relationship; where defendant was the breaching party's creditor; and where the defendant had a managerial contract with the breaching party at the time defendant induced the breach of contract with plaintiff.

Id. (citations omitted). To overcome the economic interest defense, a plaintiff must demonstrate that the defendant acted with malice or employed fraudulent or illegal means to procure the breach of contract. Foster v. Churchill, 87 N.Y.2d 744, 751 (1996).

---

[2] Optimum also urges that, to state a claim for relief, Armstrong must affirmatively allege an absence of economic justification on Optimum's part. This premise is not supported by the authority Optimum cites, nor has this Court otherwise found support for this argument.

According to Optimum, because Armstrong has pleaded facts supporting an economic justification defense and has not also alleged malice, dismissal is required. At the pleading stage, however, dismissal on this basis would be appropriate only if Armstrong's fact allegations establish, as a matter of law, that Optimum's actions were taken to protect an economic interest. *See* New Yuen Fat Garments Factory Ltd. v. August Silk, Inc., 07 Civ. 8304, 2009 U.S. Dist. LEXIS 45857, at *20 (S.D.N.Y. June 1, 2009).

In this regard, Optimum points to: Armstrong's acknowledgment that, when it was negotiating its License Agreement with Hartman, Optimum also was negotiating with Hartman; the fact that the Armstrong License Agreement anticipated Optimum's use of Hartman's technology in ways that did not compete with Armstrong; and the allegation that Armstrong, Hartman and Optimum have worked together to identify and develop improvement patent applications and have agreed to share the cost of patent applications. (Complaint ¶¶ 24, 27, 28, 43.) These allegations do suggest that Armstrong and Optimum had simultaneous, discrete agreements with Hartman, and that they worked together in furtherance of their respective agreements. However, Optimum's alleged contractual relationship with Hartman is so dissimilar from those described in White Plains Coat that this Court cannot conclude, as a matter of law, that Optimum is entitled to the economic justification defense. Accordingly, Armstrong's Complaint is not subject to dismissal for failure to allege malice or the use of illegal means.

Finally, Optimum urges that Armstrong has not sufficiently alleged causation and damages. In response, Armstrong points to its allegations that Optimum is now competing directly with Armstrong in manufacturing (Complaint ¶ 30), Optimum and Hartman already have entered into an agreement to transfer rights to the patent and patent application (¶

50), and Optimum's interference caused Hartman to breach the License Agreement (¶ 66). The first allegation sounds in patent infringement, rather than tortious interference. As for the second, it already has been determined that the transfer of Hartman's retained rights in existing patents does not constitute a breach. The third allegation is conclusory. Thus, the only question is whether Armstrong sufficiently pleads damages arising from Optimum's alleged interference with regard to transfer of the patent application.

Reading the Complaint in the light most favorable to Armstrong, the Court concludes that it does. Armstrong alleges that Optimum sought rights to the patent application and entered into an agreement with Hartman for those rights despite knowing of Hartman's contractual promise to first negotiate with Armstrong. This Court already has determined that Armstrong's right of first refusal is not inchoate or unripe. Thus, the allegation that Optimum persuaded Hartman to first negotiate with Optimum instead, sufficiently implicates impairment of Armstrong's contractual right and attendant harm.

* * * * *

In sum, Optimum's motion to dismiss the tortious interference with contract claim is granted in part, and denied in part. It is denied to the extent that the alleged tortious interference is based on a breach of sections 8 and 10.2 of the License Agreement.

**B.    Armstrong's Motion for a Preliminary Injunction**

Armstrong seeks to enjoin Hartman from consummating his agreement to transfer his rights in the patents and patent application to Optimum. Absent an injunction, Armstrong contends it will be instantly stripped of contractual rights it spent two years negotiating and several years developing, and will suffer significant harms. Both Hartman and Optimum oppose Armstrong's motion.

## 1.    **Standard of Review**

"A preliminary injunction 'is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion.'" Sussman v. Crawford, 488 F.3d 136, 139-40 (2d Cir. 2007) (quoting Mazurek v. Armstrong, 520 U.S. 968, 972, 117 S. Ct. 1865, 138 L. Ed. 2d 162 (1997) (emphasis in original)).  In this Circuit, a party seeking such relief must show: (1) irreparable harm in the absence of the injunction and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor. County of Nassau, N.Y. v. Leavitt, 524 F.3d 408, 414 (2d Cir. 2008) (citation omitted).  A preliminary injunction is never awarded as of right.  Winter v. Natural Res. Def. Council, Inc., __ U.S. __, 129 S. Ct. 365, 376, 172 L. Ed. 2d 249 (2008) (citation omitted).  Its purpose "is to preserve the status quo between parties pending a final determination of the merits."  Alliance Bond Fund v. Grupo Mexicano de Desarrollo, S.A., 143 F.3d 688, 692 (2d Cir. 1998).

"'To satisfy the irreparable harm requirement, [p]laintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm.'" Grand River Enter. Six Nations, Ltd. v. Pryor, 481 F.3d 60, 66 (2d Cir. 2007) (quoting Freedom Holdings, Inc. v. Spitzer, 408 F.3d 112, 114 (2d Cir. 2005) (internal quotation marks omitted)).  Moreover, an irreparable injury is one "that cannot be remedied by an award of monetary damages."  Hoblock v. Albany County Bd. of Elections, 422 F.3d 77, 97 (2d Cir. 2005) (citation omitted).  Irreparable harm is the

most important prerequisite, and the moving party must first demonstrate that such injury is likely before the court will consider the other requirements for issuance of an injunction. Grand River Enter., 481 F.3d at 67.

In determining whether a plaintiff has demonstrated a likelihood of success on the merits, the district court is not called upon to finally decide the merits of the claims. Rather, it need only find that the plaintiff has presented a sufficiently strong case to justify discretionary issuance of injunctive relief. Synergy Advanced Pharms., Inc. v. CapeBio, LLC, 10 Civ. 1736, 2010 U.S. Dist. LEXIS 53252, at *12 (S.D.N.Y. June 1, 2010) (citation omitted).

## 2. **Discussion**

Armstrong contends it will suffer irreparable harm for six reasons: (1) the patent sale will permit Optimum to directly compete with Armstrong's product offerings, (2) the patent sale will strip Armstrong of the License Agreement's exclusivity provisions, (3) Optimum already is competing with Armstrong's product offerings and already has solicited Armstrong clients, (4) the patent sale will strip Armstrong of Hartman's consulting services because Hartman's obligations under the License Agreement will transfer to Optimum, (5) courts in the Second Circuit generally err on the side of granting injunctive relief with regard to corporate transactions, and (6) Hartman's sale of the patent application to Optimum will cause Armstrong's right of first refusal to be irrevocably lost.

Armstrong's first and second reasons are premised on its belief that Hartman's sale of his retained patent rights will allow Optimum "to make, have made, use, sell, and otherwise distribute factory packaged chilled water systems, pumping and/or other mechanical products that incorporate the Licensed Technologies at the factory

implementation level . . . . " (Complaint, Ex. A § 2.1.)  However, this Court already has determined, as a matter of law, that Hartman retained no such rights, and has dismissed Armstrong's claims to the extent they are premised on the alleged loss of exclusivity in manufacturing and assembly.  Accordingly, Armstrong cannot demonstrate irreparable harm in this regard.

In support of its third reason, Armstrong offers two affidavits stating that Optimum competed with Armstrong on two projects, one in California and one in New York, in which Optimum ultimately supplied a controller.  (Docket Nos. 19-3 ¶¶ 3-7; 24-2 ¶¶ 3-4.)  As discussed briefly above, this past conduct by Optimum sounds in patent infringement, a claim not asserted in this case.  Enjoining Hartman's sale of his rights in the at-issue patents will not prevent harm arising from Optimum's past or future infringement of Armstrong's exclusive license; Armstrong's licensing rights are precisely the same no matter who holds title to the patent.  And conversely, the failure to issue the injunction will not cause harm arising from Optimum's purported infringement.  <u>Salinger v. Colting</u>, 607 F.3d 68, 82 (2d Cir. 2010) (plaintiff must show that, on the facts of their case, failure to issue an injunction will actually cause the irreparable harm).

As to the fourth reason, this Court already has rejected the argument that a sale of Hartman's retained patent *rights* will necessarily transfer to Optimum all of Hartman's contractual *obligations* under the License Agreement.  And in opposition to Armstrong's motion, Hartman has proffered a copy of his patent purchase agreement with Optimum, which expressly provides that Optimum "does not assume and does not agree to assume any obligations or Liabilities accrued under the Armstrong Agreement or any other License at any time before or after the Closing Date." (Docket No. 26-3 at 37, Amendment 3, ¶

-24-

4.4.)  In sum, by their terms, neither the License Agreement nor the proposed Hartman/Optimum patent purchase agreement support the conclusion that a sale of Hartman's patent rights will result in a transfer of his personal obligations under the License Agreement.

In reply, Armstrong points to the independent contractor agreement attached to the Hartman/Optimum patent purchase agreement, which prohibits Hartman from "perform[ing] Product Design Services for a business within the [United States and any other country where Optimum conducts business] in connection with the development, manufacture, marketing, or sale of" . . . "any Product that competes with any [Optimum] Product sold, provided, offered for sale, or intended to be sold, provided, or offered for sale by Optimum." (Docket Nos. 31-2 26-3 at 23 §§ 5.8(a) and 5.7.)  However, under its License Agreement, Armstrong has the exclusive right to implement the Licensed Technologies "in the manufacture of pumps, any factory packaged chilled water systems, chillers, building controls or cooling towers."  As has already been determined, Optimum has no such right, and will receive no such right under a patent title transfer.  Armstrong has not attempted to explain how the patent purchase agreement will exclude Hartman from providing his promised consulting services relative to the Licensed Technology as applied to product categories that are exclusive to Armstrong.  Indeed, the independent contractor agreement acknowledges Hartman's ability to otherwise solicit and continue his consulting work in the HVAC field.  (*Id*. §§ 5.9 and 5.10.)  Moreover, even assuming Hartman intends to enter into an inconsistent agreement, Armstrong has offered no support for the conclusion that such action will render his earlier contractual promises to provide services to Armstrong void and unenforceable, or irretrievably lost.

For all of the reasons stated, Armstrong has not demonstrated that the intended transfer of Hartman's patent rights will divest it of its contractual right to Hartman's services. Accordingly, it has failed to demonstrate irreparable harm in this regard.

By its fifth reason, Armstrong appears to suggest that irreparable injury may be presumed in cases involving "corporate transactions." Neither the single case Armstrong relies on, nor that case's citations, support the proposition that irreparable harm may be presumed absent an evidentiary showing. Irving Bank Corp. v. Bank of New York Co., 692 F. Supp. 163, 169-70 (S.D.N.Y. 1988) (preliminary injunction issued upon evidence that absent an injunction, shareholders would be forced to make decisions without full and accurate disclosure of information material to transaction); Bancroft Convertible Fund, Inc. v. Zico Inv. Holdings, Inc., 825 F.2d 731, 738 (3d Cir. 1987) (upholding finding of irreparable harm based on evidence that change in corporate control would alter firm investment philosophy and distribution policy to shareholders' detriment). Accordingly, Armstrong's fifth reason is rejected.

Finally, Armstrong claims irreparable harm based on its right to improvements to the Licensed Technologies as provided in section 8 of the License Agreement. That provision states, in pertinent part, that:

> Licensor shall first offer to license any and all improvements in or to the Licensed Technologies to the Licensee for exclusive rights in markets the Licensee already enjoys exclusivity, and to the extent of the existing exclusivity rights. Licensee and Licensor shall negotiate in good faith the license fee and terms of such license. If Licensor and Licensee are unable to negotiate a mutually acceptable license fee and terms, then, during the Term and prior to Licensor accepting any offer to license any improvements to any third party, Licensor shall offer Licensee the right to license such improvements at a license fee and upon such terms that are no less favorable than those offered by or to Licensor.

As already discussed, Hartman apparently intends to assign a pending patent improvement application to Optimum. This Court has determined that Armstrong has a present right to negotiate a license for any pending application and resulting patent that improves upon the Licensed Technology. There is no indication such negotiations have occurred. In short, Hartman continues to hold all rights in the patent application.

The patent purchase agreement provides that Optimum will acquire Hartman's rights, but will not assume any of Hartman's obligations under the Armstrong License Agreement. It appears then, that Armstrong's interests will be harmed by a transfer to Optimum that does not provide for the fulfillment of Hartman's section 8 obligation. The question, then, is whether such harm is irreparable such that a preliminary injunction is warranted. This Court concludes that it is not, as the harm is both speculative and remote.

First, Armstrong has no obligation to exercise its right of first refusal and has provided no information from which it can be concluded that it would do so with respect to the pending application. Second, the application may never result in a patent, or a patent may issue years from now. As such, the nature and extent of Armstrong's future rights and the harm attendant to their potential loss is entirely speculative.

There also is no indication that the alleged harm is imminent. There is no certainty as to when, or even if, Armstrong will be able to incorporate a patented improvement into its own products. Nor is there any indication that Optimum will be able to manufacture and assemble competing products in the near term based on an improvement patent alone. As repeatedly stated, Armstrong has exclusive rights for factory implementation of the Licensed Technologies with respect to certain products. Even assuming Optimum obtains full rights to improvements, nothing in the record indicates that Optimum could use those

rights to engage in factory implementation with respect to those same products without the ability to exploit the underlying patents, to which Armstrong holds exclusive rights for that purpose. In other words, even if it purchases potential improvements, there is nothing to suggest Optimum could engage in factory implementation of the Licensed Technologies as they apply to hydronic elements in the manufacture of pumps, any factory packaged chilled water systems, chillers, building controls or cooling towers, without infringing on Armstrong's license. That license does not expire until in or about 2020. Armstrong has not identified, nor can this Court ascertain from the record, any imminent harm from a loss of rights to potentially patentable improvements.

* * * * *

For the reasons stated, the Court finds that Armstrong has failed to demonstrate that it will be irreparably harmed absent a preliminary injunction. As such, there is no need to consider the likelihood of success on the merits, and Armstrong's motion for a preliminary injunction is denied.

## IV. CONCLUSION

For the reasons stated above, both Hartman's and Optimum Energy's motions to dismiss are granted in part and denied in part. They are denied to the extent Armstrong's claims are based on sections 8 and 10.2 of the License Agreement. Armstrong's motion to shorten time is denied as moot, and its motion for a preliminary injunction is denied for failure to demonstrate irreparable harm.

## V. ORDER

IT HEREBY IS ORDERED that Defendant Hartman's Motion to Dismiss (Docket No.

15) is GRANTED IN PART and DENIED IN PART;

FURTHER that Defendant Optimum Energy's Motion to Dismiss (Docket No. 17) is GRANTED IN PART and DENIED IN PART;

FURTHER that Plaintiff Armstrong's Motion for a Preliminary Injunction (Docket No. 18) is DENIED; and

FURTHER that Plaintiff Armstrong's Motion to Shorten Time (Docket No. 19) is DENIED as moot.

SO ORDERED.


Dated:   October 7, 2010
             Buffalo, New York

/s/William M. Skretny
WILLIAM M. SKRETNY
Chief Judge
United States District Court