UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

─────────────────────────────────

ARMSTRONG PUMP, INC.,

                       Plaintiff,

    v.

THOMAS HARTMAN d/b/a
  The Hartman Company and
OPTIMUM ENERGY LLC,

                       Defendants.

**DECISION AND ORDER**

10-CV-446S

─────────────────────────────────

**I) INTRODUCTION**

      Pending before the Court is a motion (Dkt. No. 198) by defendant Optimum Energy LLC ("Optimum") for miscellaneous discovery relief, including 1) further responses to discovery requests that it served on plaintiff Armstrong Pump, Inc. ("Armstrong"); 2) an extension of discovery deadlines for the case; 3) an additional deposition of a witness named Peter Thomsen ("Thomsen"); and 4) sanctions for failure to produce discovery earlier. Optimum argues that the July 25, 2014 deposition of Thomsen and the documents that Armstrong has provided since then indicate that still other documents exist that would be responsive to Optimum's discovery requests; and that the documents that Armstrong furnished in the last few weeks and months should have been furnished a few years ago. Armstrong counters that Optimum should not have filed the motion before reviewing all of the documents produced; that Armstrong has complied with all of

its discovery obligations; and that at least some of Optimum's representations about discovery failures are false.

The Court had scheduled oral argument on October 23, 2014. That day, the parties requested additional briefing instead. The Court now deems the motion submitted on papers under Rule 78(b) of the Federal Rules of Civil Procedure. For the reasons below, the Court grants Optimum's motion in part and orders additional discovery as explained below.

## II) BACKGROUND

### A) *Optimum's Claims*

For the sake of brevity, the Court presumes general familiarity with the docket and focuses only on background information pertinent to Optimum's pending motion. On February 4, 2005, defendant Thomas Hartman ("Hartman") and Armstrong entered a License Agreement concerning three patents that Hartman owned.[1] (*See, e.g.*, Dkt. No. 55-1.) Section 1 of the License Agreement contains definitions for several terms, including the terms "factory implementation" and "field implementation." "'Factory Implementation' means implementing the Licensed Technologies into chiller, pumping, control systems and/or tower products as a part of the factory production process." (*Id.* at 3.) "'Field Implementation' means implementing the Licensed Technologies into the chiller, pumping, control systems and/or tower products after the products have

---

[1] The reader can find extensive detail about Hartman's patents at Docket No. 136.

been delivered to the site." (*Id.*)  Put another way, to the Court's best understanding, factory implementation means that an HVAC product rolls out of Armstrong's factory with Hartman's patent technology fully installed and ready for use.  Field implementation, in contrast, means that an HVAC product rolls out of Armstrong's factory fully compatible with Hartman's patent technology, but that the technology would be added to the product at the place where the product would be installed.  Section 2.1 of the License Agreement gave Armstrong "a license, to make, have made, use, sell, and otherwise distribute factory packaged chilled water systems, pumping and/or other mechanical products that incorporate the Licensed Technologies at the factory implementation level, and to use and otherwise practice the Licensed Technologies in Licensed Products." (*Id.*)  Under Section 3.3(c), Armstrong, without special permission from Hartman, "has no rights granted under this agreement to field implemention of the Licensed Technologies (e.g. implementing the Licensed technologies without an integrated equipment/control package)." (*Id.* at 5.)

The restriction that the License Agreement imposed on Armstrong regarding field implementation served as the basis for Optimum's counterclaims in this case.  Optimum filed an answer to Armstrong's first amended complaint on March 22, 2011 (Dkt.  No. 57); the answer included five counterclaims.  Three of the counterclaims pertain more to the patent-related history of this case and are not relevant here.  The first and fifth counterclaims are particularly relevant to the

3

pending motion. In the first counterclaim, Optimum asserted that "[u]pon information and belief, Armstrong has committed multiple breaches of the Armstrong License Agreement." (*Id.* at 15.) Optimum then specified several projects involving Armstrong that went beyond factory implementation into field implementation:

- Field implementation at the Erieview office building and retail mall in downtown Cleveland, Ohio in 2009;

- Sales of Armstrong's IPC 11550 Control System for the Massachusetts College of the Arts project in Cambridge, Massachusetts in 2010;

- Marketing of the IPC 11550 Control System for three real estate projects on Binney Street in Cambridge, Massachusetts, the marketing apparently having occurred in late 2010; and

- General sales and marketing of the IPC 11550 Control System on a "stand alone" basis, that is, selling the control system apart from a fully factory-assembled HVAC product.

(Dkt. No. 57 at 15–17.) In the fifth counterclaim, Optimum accused Armstrong of "actively engag[ing] in activities directed toward making, using, offering for sale, and selling the IPC 11550 as a stand-alone product in a manner that is outside the limited scope of its license rights under the Licensed Patents, and which therefore breaches and / or threatens to breach the [License Agreement]." (*Id.* at 22.)

4

### B)     *The Parties' Discovery Requests*

Among other actions that it may have taken to explore its counterclaims for breach of the License Agreement, Optimum served Armstrong with two sets of discovery requests.  Optimum served the first set of discovery requests on April 20, 2011.  (Dkt. No. 99-2.)  Generally, the 16 numbered requests asked, *inter alia*, for "all documents" pertaining to the License Agreement, communications between Hartman and Armstrong, the alleged field implementations mentioned in the counterclaims, and the IPC 11550 Control System.  After a dispute over document production prompted Optimum to file a motion to compel (Dkt. No. 99), the Court granted the motion on June 11, 2012 (Dkt. No. 114) and cautioned Armstrong "not to engage in piecemeal production of materials it has located that are responsive to Optimum Energy's unobjectionable requests.  For example, responsive documents from correspondence of other plaintiff's employees should be produced, if it has not been produced already.  Plaintiff has not filed a motion for a Protective Order." (*Id.* at 10.)  Optimum served the second set of discovery requests on August 3, 2012.  The second set included requests for documents concerning marketing efforts and customers that might yield relevant information regarding Optimum's counterclaims.  The second set of discovery requests appears not to have generated any motion practice before now, though the parties traded other motions to compel (Dkt.  Nos. 176, 180) that led to another order from the Court requiring discovery production (Dkt. No. 191).

### C)    *Optimum's Pending Motion*

The latest discovery dispute contains allegations of delays, omissions, and misrepresentations, and threatens to make this case more about document production than about a breach of a contract.  According to Optimum, after the Court's June 11, 2012 Order, "Armstrong made at least nine separate document productions in August and November 2012, January and November 2013, and February and March 2014.  Armstrong eventually produced over 34,000 documents[2] prior to the first deposition in this case on July 25, 2014."  (Dkt. No. 203 at 8.)  In that first deposition, Optimum questioned Thomsen, who was Armstrong's Global Director of the Systems Customer Solutions Group for at least some of the relevant timeline for this case.  Among other information from the deposition, Thomsen allegedly revealed to Optimum for the first time that any Armstrong product using the patents relevant to this case—collectively known as "Hartman LOOP Technology"—went through a five-step development process known as a "[REDACTED]"[3] process.  Thomsen summarized the [REDACTED] process as follows:

   [REDACTED]

(Dkt. No. 203 at 10.)

---

[2] The record is not clear as to whether Optimum means 34,000 pages of documents, or 34,000 distinct documents that might total more than 34,000 pages.

[3] In an abundance of caution to protect the parties' confidentiality arrangements, the Court has redacted the name of the process in question and the block quote two lines later that describes it.  The Court will file an unredacted version of this Decision and Order under seal.

To summarize a series of contentious correspondence, the Thomsen deposition prompted Optimum to accuse Armstrong of withholding documents showing how many products had something to do with the Hartman LOOP Technology, and withholding information about the [REDACTED] process for these products.  Presumably, details of the [REDACTED] process would reveal the extent to which Armstrong directly or indirectly marketed the Hartman LOOP Technology to potential clients.  Optimum accused Armstrong also of underestimating the number of employees who might have had something to do with marketing products that somehow incorporated the Hartman LOOP Technology.  Armstrong pushed back, contending that Optimum was both downplaying the amount of discovery provided already and exaggerating as to how many Armstrong employees had useful information concerning Optimum's claims.  Armstrong did not deny making nine separate document productions since the Court's June 11, 2012 Order.

The correspondence between the parties eventually led to the pending motion.  In support of the motion, Optimum argues that documents provided recently were responsive to discovery requests and orders served as early as 2011 and should have been provided much earlier than now.  Thomsen and other employees, according to Optimum, need to undergo further depositions that reflect the additional information that Optimum has received.  Optimum argues further that much of the discovery that Armstrong provided recently

provides just a window into an extensive marketing process, including the [REDACTED] process, that Armstrong used for each new product that it developed and sold.  Optimum concludes that Armstrong is hiding or at least delaying information about unauthorized sales that violate the License Agreement, and that Armstrong's conduct warrants both sanctions and an order to compel further responses.  Optimum also is resisting any call to proceed with any more depositions until Armstrong produces all responsive documents.

Armstrong opposes Optimum's motion and challenges Optimum's characterization of its conduct.  Armstrong claims that it has been fulfilling its discovery obligations by producing documents following searches of specific products and specific employees whom Optimum has identified.  In fact, Armstrong criticizes Optimum for filing the pending motion the same day when Armstrong provided an additional few thousand pages of documents and for filing without reviewing that batch of discovery.  (*See* Dkt. No. 204 at 5–6 ("Armstrong has also produced more than 2,500 additional documents that defendants received only today, August 19, and have not yet had an opportunity to review.").)  In its second set of discovery requests, Optimum had requested, albeit for patent-related purposes, "all documents concerning any Product made, customized or altered for a particular Customer, group of Customers or any potential Customer or group of Customers."  Nonetheless, Armstrong asserts that "Optimum did *not* request documents concerning the advertising, sale,

installation and servicing of the IPC 11000 product" and that it "had no knowledge that responsive documents were located under the IPC 11000 product name or filed in the laptop hard drive, then diligently searched for any responsive [REDACTED] documents, and produced responsive documents in three batches within three weeks of notification." (Dkt. No. 206 at 6.) With respect to employee files, Armstrong asserts that it searched the employee files for the 22 employees that Optimum considered connected to the License Agreement and products using the Hartman LOOP Technology. Armstrong sees no reason to search employee files of hundreds of other employees who had nothing to do with the Hartman LOOP Technology. Armstrong also argues that Optimum did not follow Rule 37 of the Federal Rules of Civil Procedure by meeting with Armstrong to confer about its concerns prior to filing the pending motion. Finally, Armstrong argues that it already has offered to produce Thomsen for a second deposition, albeit a limited deposition that prevents Optimum from having a second chance at exploring topics that, in Armstrong's view, have been covered.

     Just as briefing for the pending motion ended and the Court was ready to proceed with oral argument and a decision, the parties decided that the pending motion—with its hundreds of pages of arguing over three-year-old discovery requests never quashed by protective order—had proceeded much too civilly and needed to fall more in line with this case's history of nasty conduct. On October

21, 2014, two days before the oral argument scheduled for the motion, the Court received an unsolicited 12-page letter from Armstrong. (Dkt. No. 213.) Among other points, Armstrong asserted that Optimum was wrong to suggest that it had no document retention policy; that Optimum was trying "to confuse the Court" by blurring the distinction between two different products, the IPC 11550 and the IPP 11000; and that Optimum mischaracterized deposition testimony, raising new issues and prejudicing Armstrong in the process. On this basis, Armstrong asked to have Optimum's reply papers stricken or at least to have the chance to file a sur-reply. At oral argument, the parties bickered about misrepresentations in each other's papers, the need for sur-replies, and who would get the last word. The Court permitted Armstrong to file a sur-reply and Optimum to file a response. In its sur-reply, Armstrong accused Optimum of false and misleading representations based on the points in its prior letter and the contention that Optimum claimed falsely that Armstrong never produced its Leadership Board meeting minutes. Armstrong concluded that Optimum's motion is nothing more than the proverbial fishing expedition tainted by "a casual disregard for the truth and accuracy of its representations to this court." (Dkt. No. 217 at 7.) Curiously, Armstrong's sur-reply contains citations to the Rules of Professional Conduct and to *Kleehammer v. Monroe Cnty.*, No. 09-CV-6177-CJS, 2013 WL 1182968 (W.D.N.Y. Mar. 20, 2013), along with *Rankin v. City of Niagara Falls*, No. 09-CV-00974A, 2012 WL 3886327 (W.D.N.Y. Sept. 6, 2012), *report and*

*recommendation adopted in part, rejected in part*, 293 F.R.D. 375 (W.D.N.Y. 2013), cases involving a local attorney suspended by the New York State Supreme Court, Appellate Division.  The Court interprets these cites as a disingenuous hint that Optimum's counsel warrants suspension without actually saying so; numerous other cases would have contained the same principles about alleged misrepresentations.[4]

In its response, Optimum clarified that Armstrong produced a grand total of one meeting's worth of minutes and questions why no other meeting minutes had been produced.  Optimum addressed the issue of records custodians by asserting that it named current or former employees based on names that actually appeared in those [REDACTED] reports that Armstrong produced.  As for product distinction, Optimum argued that it has sought documents pertaining to the IPC 11000 controller, which "will heavily leverage the Hartman Loop technology for its market launch/release and it[s] strategic positioning against competitive alternates."  (Dkt. No. 198 Ex. J at ARM00034820, filed manually). These arguments dovetail with Optimum's insistence that Armstrong's discovery responses cannot be complete when, *inter alia*, it produces reports for only one or two stages of the [REDACTED] process for certain products; and when it has

---

[4] As just one example, *see U.S. v. Int'l Bd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO*, 948 F.2d 1338, 1344 (2d Cir. 1991) ("Pleadings, motions, and other papers must be justifiable at the time they are signed; this Court will not countenance belated rationalizations concocted to conceal chicanery.") (citation omitted).

11

not fully identified each employee's possible role in improper field implementation.

## III) DISCUSSION

The Court notes its frustration with the continual and growing animosity between the parties, an animosity that has slowed the progress of the case and that has required repeated judicial intervention.  This case is about 4-1/2 years old.  During the history of the case, the parties have generated hundreds of pages of motion papers relating to discovery obligations and the failure to fulfill them.  The Court granted a motion to compel twice before and specifically warned Armstrong to avoid piecemeal production of documents.  The Court also has had to manage the parties' inclinations to raise the stakes.  At various times, the Court had to consider amended pleadings to transform this contract case into a patent infringement case; to hold claim construction hearings that lacked expert testimony and wasted the Court's time (*see* Dkt. No. 136 at 4 ("The hearing itself, however, lasted little more than two hours and featured no proffers, arguments, or testimony concerning any of the terms disputed in the parties' briefing.")); and to resist belated attempts to amend pleadings that could have sent the case back to the proverbial Square One after years of proceedings (*see generally* Dkt. No. 150).  Four and a half years later, discovery is far from complete, depositions have barely begun, and this case is nowhere near ready for trial.

Now, Armstrong would have the Court overlook that it has ignored the explicit prohibition on piecemeal discovery and excessive delay. The parties also would have the Court ignore that no one, in the history of the case, has objected to any discovery requests enough to make a motion for a protective order under Rule 26(c).[5] *Cf. Travel Sentry, Inc. v. Tropp*, 669 F. Supp. 2d 279, 286 (E.D.N.Y. 2009) (affirming a discovery sanction and noting that, in a discovery dispute, "no reasonable person, especially an attorney, could dispute that the *initial* step in resolving any such conflict would be to seek the guidance of the Court rather than pick a route of its own unilaterally."). Nor has any party foregone passive-aggressive snarking and filed a formal motion under Rule 11 or 28 U.S.C. § 1927 to complain about material misrepresentations in motion papers. Instead, the parties would prefer that the Court forget what the actual claims are in this case and start obsessing over details such as the number of meeting minutes that should be produced; whether one product were of the same "line" as another product, regardless of the real issue of field implementation; and whether a five-step product development process doesn't really count as a five-step

---

[5] For purposes of this discussion, the Court is disregarding the meaningless boilerplate objection that all pretrial discovery in all civil litigation is "overly broad" and "unduly burdensome." (Dkt. No. 99-3 at 6 and *passim*.) *Cf. Freydl v. Meringolo*, No. 09 CIV. 07196 BSJ, 2011 WL 2566087, at *3 (S.D.N.Y. June 16, 2011) ("Boilerplate objections that include unsubstantiated claims of undue burden, overbreadth and lack of relevancy while producing no documents and answering no interrogatories are a paradigm of discovery abuse.") (internal quotation and editorial marks omitted); *see also* Fed. R. Civ. P. 37(a)(4) ("For purposes of this subdivision (a), an evasive or incomplete disclosure, answer, or response must be treated as a failure to disclose, answer, or respond."). The Court also is not counting the Joint Protective Order (Dkt. No. 66) that the parties entered to address confidentiality and not discovery requests in themselves.

development process if some employees weren't involved, and maybe some other employees have changed employment, and maybe some additional reports will show up in some future document dump.

Enough.  "A lawsuit is supposed to be a search for the truth, and the tools employed in that search are the rules of discovery.  Our adversary system relies in large part on the good faith and diligence of counsel and the parties in abiding by these rules and conducting themselves and their judicial business honestly." *Metro. Opera Ass'n, Inc. v. Local 100, Hotel Employees & Rest. Emps. Int'l Union*, 212 F.R.D. 178, 181 (S.D.N.Y. 2003) (internal quotation marks and citations omitted).  Rule 37 helps enforce proper conduct.  "Rule 37 sanctions serve a threefold purpose: (1) To ensure that a party not profit from failure to comply with discovery obligations; (2) To specifically deter parties from avoiding discovery obligations and ensure compliance with a particular order; and (3) To provide general deterrence to other parties in the same or different litigation considering similar behavior."  *Air-India v. Goswami*, No. 91 CIV. 7290 (JSM), 1993 WL 403999, at *6 (S.D.N.Y. Oct. 5, 1993) (citations omitted). Fundamentally, Optimum's contract-related counterclaims accuse Armstrong of field implementation and stand-alone sales without Optimum's permission. Optimum's counterclaims also suggest that Armstrong might have contemplated field implementation and stand-alone sales even while negotiating the License Agreement.  Optimum has the right to explore these allegations and, through its

14

prior motions to compel and its email correspondence since the Thomsen deposition, has made a good-faith effort the last several years to address deficiencies in Armstrong's discovery.  *Cf. U.S. Bancorp Equip. Fin., Inc. v. Babylon Transit, Inc.*, 270 F.R.D. 136, 140–41 (E.D.N.Y. 2010) (finding that email exchanges and other communications can fulfill the "meet and confer" requirement of Rule 37).  Meanwhile, Armstrong has not sufficiently explained its continuation of piecemeal discovery in the face of a Court order, including the disclosure in 2014 of [REDACTED] reports dated in 2004 and 2005.  In response, the Court now will fashion a new and simpler approach to discovery that keeps the core of Optimum's counterclaims in mind.  In the various discovery documents attached to the motion papers, the Court has noticed that certain phrases appear that inevitably refer to or hint at the Hartman LOOP Technology:

- Hartman
- Hartman Loop
- Hartman Loop Technology
- Loop Technology
- Integrated plant control
- Integrated operation
- Integrated mechanical control systems
- IPC

15

- IPC controller

- Variable speed

- Variable frequency drives

- Natural curve

- Natural curve sequencing

These phrases open the door to a more objective discovery process that leaves Armstrong no room for gamesmanship.  For a period starting from January 1, 2004 through the present time, Armstrong must search ALL corporate documents, files, communications, and recordings for EACH of the above phrases.  Armstrong will maintain a list of every server, computer, file room, or other place searched, and a list of all positive search results.  For each positive result, Armstrong will procure a full copy of the document in question.  Armstrong also will furnish a complete and sworn description of its document retention policies, if any, from January 1, 2004 through the present time.  In the specific instance of [REDACTED] reports, if for any reason a product did not have a written report for a  certain stage or did not go through all five stages then someone at Armstrong with appropriate knowledge or expertise will provide a sworn statement explaining why.  When the search is complete, a representative of Armstrong and all of Armstrong's counsel of record will file a sworn statement confirming that Armstrong made a good-faith effort to identify sources of documents; that a complete search of those sources for each of the above

phrases occurred; and that the search results have been furnished to Optimum. All of this must occur on or before April 1, 2015, with absolutely no exceptions or extensions. Failure to comply will lead to sanctions under Rule 37(b)(2)(A).

The Court is focusing on Armstrong for now because it is ruling on Optimum's motion, but Optimum is hereby on notice that the Court will not hesitate to apply the same approach to its document production. On or before January 14, 2015, all counsel of record for Optimum will either 1) file a joint sworn statement that Optimum has fulfilled ALL outstanding discovery requests from Armstrong; or 2) file a motion for a protective order to quash any outstanding discovery requests that Optimum opposes.

A status conference will occur on **April 15, 2015 at 10:00 AM** to plan how to start all over with depositions and how to set further scheduling. Any counsel who wish to participate must attend in person.

## IV) CONCLUSION

For all of the foregoing reasons, the Court grants Optimum's motion to compel (Dkt. No. 198) in part, to the extent that it has ordered further discovery as explained above. The Court denies Optimum's motion to the extent that it seeks any other relief.

SO ORDERED.

                                                    /s Hugh B. Scott
                                                  HONORABLE HUGH B. SCOTT
                                                  UNITED STATES MAGISTRATE JUDGE

DATED: December 9, 2014