UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

Armstrong Pump, Inc.,

                                        Plaintiff,

                                                                    **DECISION AND ORDER**
                                                                    10-CV-446S

                    v.

Mr. Thomas Hartman *d/b/a* The Hartman
        Company and
Optimum Energy LLC,

                                        Defendants.

## I.    INTRODUCTION

Pending before the Court is a non-dispositive motion by plaintiff Armstrong Pump, Inc.

("Armstrong") to compel production of documents and review of software source code under

Rules 34 and 37 of the Federal Rules of Civil Procedure ("FRCP").  (Dkt. No. 242.)  In an effort

to bring discovery to a close, Armstrong and defendant Optimum Energy LLC ("Optimum")

arranged for a document and source code review at the office of Optimum's counsel, Foster

Pepper, in Seattle, Washington.  The document review occurred on January 16, 2016.  The parties

know the full details, but the gist of the arrangement was that Optimum's counsel would prepare a

computer loaded with source code and related documents and make it available at its office.  (*See*

Dkt. No. 254 at 33–34.)  Armstrong could bring up to two counsel and two experts and would

follow prearranged restrictions on electronic devices and printing.  Although the parties set up the

details of the document and source code review in advance, Armstrong left the review unhappy

about password protections and how much access it really had to the information on the prepared computer.  Optimum protests that it offered Armstrong advance training in the software running on the prepared computer, that Armstrong had all day for the review but took only a few hours, and that Armstrong made no inquiry during the review about information that it supposedly could not access.

The Court held oral argument on May 12, 2016.  For the reasons below, the Court grants Armstrong's motion in part to require a repetition of the January 19, 2016 document and source code review, at Armstrong's cost.

## II.      BACKGROUND

For the sake of brevity, the Court will skip details about the case that appear elsewhere in the docket and will focus on the facts most relevant to the pending motion.  At its core, this case is a breach of contract case.  Co-defendant Thomas Hartman ("Hartman") owned several patents claiming innovations in the control and sequencing of chillers, pumps, fans, and other components of heating, ventilating, and air conditioning ("HVAC") systems.  On February 4, 2005, Hartman and Armstrong entered a license agreement (the "Armstrong License Agreement") that allowed Armstrong limited use of the technology in Hartman's patents.

For purposes of the pending motion, the most important parts of the Armstrong License Agreement concern the distinction between the terms "factory implementation" and "field implementation."  "'Factory Implementation' means implementing the Licensed Technologies into chiller, pumping, control systems and/or tower products as a part of the factory production process."  (Dkt. No. 55-1 at 3.) "'Field Implementation' means implementing the Licensed

Technologies into the chiller, pumping, control systems and/or tower products after the products have been delivered to the site." (*Id.*)  Put another way, to the Court's best understanding, factory implementation means that an HVAC product rolls out of Armstrong's factory with Hartman's patent technology fully installed and ready for use.  Field implementation, in contrast, means that an HVAC product rolls out of Armstrong's factory fully compatible with Hartman's patent technology, but that the technology would be added to the product at the place where the product would be installed.  Under Section 2.1 of the Armstrong License Agreement, Armstrong had "a license, to make, have made, use, sell, and otherwise distribute factory packaged chilled water systems, pumping and/or other mechanical products that incorporate the Licensed Technologies at the factory implementation level, and to use and otherwise practice the Licensed Technologies in Licensed Products." (*Id.*)  Under Section 3.2(b), Hartman was allowed to give Optimum[1] a license "for the purpose of incorporating the Technologies into products excluding those that include the manufacture or assembly of pumps, chillers, towers, chilled water plant controls or pumping or chiller systems that could compete with [Armstrong's] intended product offering." (*Id.* at 4.)  Section 3.3 created the mutually exclusive roles of factory and field implementation.  In short, Hartman was prohibited from licensing factory implementation to anyone other than Armstrong, and Armstrong had no rights to field implemention without advance permission.  (*See id.* at 5.)  Armstrong believes that Hartman's subsequent sale of the patents to Optimum (*see generally* Dkt. Nos. 55-2, 55-3) breached the Armstrong License Agreement and allowed Optimum to compete with it improperly with respect to factory implementation.  At the same time,

---

[1] Technically a corporate predecessor to Optimum; the distinction is not relevant here.

Optimum filed counterclaims accusing Armstrong of improper field implementation.  (*See* Dkt. No. 57 at 15–17.)

The case has had a long history of discovery disputes, most of which need no repetition here.  Only one dispute warrants some attention for purposes of the pending motion.  On January 14, 2015, Optimum sent Armstrong a letter addressing some of Armstrong's lingering discovery requests.  (Dkt. No. 251-4.)  One request concerned viewing source code that Optimum developed for different building projects; Armstrong's theory was that the source code itself would yield clues as to whether Optimum had been engaging in factory implementation that would violate the Armstrong License Agreement.  Though skeptical of the relevance of the source code, Optimum proposed arrangements at its counsel's office to have representatives from Armstrong view the source code on a computer prepared for that purpose.  In this proposal, Optimum disclosed that it developed and managed source code with a particular application called Niagara AX, an application that "does take training to use."  (*Id.* at 5–6.)  Approximately 10 months later, Armstrong signaled that it wanted to take Optimum up on the offer for a viewing of source code and related documents.  (Dkt. No. 251-5.)  While still skeptical of the relevance of the source code, Optimum agreed to a viewing under controlled conditions.  (Dkt. No. 251-6 at 3–4; Dkt. No. 251-9 at 3.)  Optimum set forth all the conditions in a letter to Armstrong dated December 3, 2015.  (Dkt. No. 254 at 33–34.)

The parties do not directly contradict each other regarding the results of the January 19, 2016 document review, but they have different perspectives on what happened that day. Armstrong sent one attorney and one expert.  The expert, James McKeever ("McKeever"), "was

looking to confirm whether any logic was included in the source code to automatically configure the controller based on the order details for a specific building project.  From my review of the Armstrong License Agreement in this case (Exhibit 1 ), this would indicate if a Field or Factory Implementation was intended, as those terms are used in the Armstrong License Agreement." (Dkt. No. 246 at 2.)  McKeever reviewed the complete source code for one particular version of software that Optimum developed.  "Based on my evaluation of the software that I had access to, I was not able to identify any such configuration efficiencies that were designed for automated factory installation of the software . . . . The one software source code file I was able to evaluate indicates no clear distinction on parameters that require either factory or field adjustments."  (*Id.* at 3.)  McKeever claims, however, that password protections blocked him from reviewing numerous other files and folders, including the source code used for 136 different building projects.  According to McKeever, viewing all of the files and folders that had been loaded on the prepared computer would have been important because, *inter alia*, he was able to see portions of a possible user guide that referred to "preconfigured" Optimum products.  (*Id.* at 4–5.) "To a skilled software programmer, the term 'preconfigured' used in this context indicates that the JACE controller with the Optimum LOOP software, or the software imbedding the Hartman LOOP algorithms, is produced and at least partially completed prior to installing it at a building site.  The degree to which any additional onsite configuration is required is not made clear by the software source code."  (*Id.* at 5.)  McKeever did not compare the information that he saw to information in the record indicating that "OptimumLoop$^{TM}$ is deployed on-site at the customer's facility . . . .  The OptimumLOOP$^{TM}$ Application is an add-on device to the building sensor /

control / optimization layer . . . ." (Dkt. No. 246-6 at 2.) Armstrong's counsel and expert supposedly left the document review after no more than three hours, without making any on-site requests or objections to Optimum's counsel. (*See* Dkt. No. 254 at 6–7.) There is also an accusation of a violation of the conditions prohibiting extra copies from being made and prohibiting electronic devices in the same room as the document review. (*Id.*)

Armstrong filed the pending motion on February 12, 2016. Armstrong advances two different arguments in support of its motion. First, Armstrong insists that it did not have access to numerous files and folders during the January 19, 2016 document review, despite Optimum's strong insistence that Armstrong would have had full access if it had taken the time to learn how to use Niagara AX. (*See, e.g.*, Dkt. Nos. 252, 253.) Second, Armstrong protests that at least some of the documents made available on January 19, 2016 were responsive to prior discovery requests and should have been produced apart from any arrangement to view them on a computer screen. Optimum counters that, other than actual source code and immediately related documents, it disclosed information about methods of programming long ago. Optimum also expresses some bitterness that "there appear to have been a number of deficiencies in Armstrong's compliance with the Court's December 9, 2014 order and those deficiencies certainly would warrant further discovery. But given the age of the case, the tight discovery deadline in place at the time, and the Court's expressed desire that the parties focus on the core merits issues and complete discovery, Optimum has not pursued them." (Dkt. No. 251 at 11; *see also* Dkt. No. 251-17; *but see* Dkt. No. 251-18.) The goal of the pending motion seems to be an order "that Armstrong be given the

6

opportunity to review the entire contents of [a certain] folder with the expert they intend to use at trial, Mr. Conover." (Dkt. No. 259 at 6.)

## III. DISCUSSION

Taken together, FRCP 34 and 37 allow the Court to compel discovery including documents or other things. "Motions to compel and motions to quash a subpoena are both entrusted to the sound discretion of the district court. This principle is in keeping with the traditional rule that a trial court enjoys wide discretion in its handling of pre-trial discovery, and its rulings with regard to discovery are reversed only upon a clear showing of an abuse of discretion." *Am. Sav. Bank, FSB v. UBS PaineWebber, Inc.*, 330 F.3d 104, 108 (2d Cir. 2003) (internal quotation and editorial marks and citations omitted). Here, the parties have presented a number of tangled discovery issues, scattered across numerous letters that they have sent each other over the past year or so. There is an issue regarding the extent of compliance with the Court's prior discovery order of December 9, 2014 (Dkt. No. 220). There is a separate, and at least for now, somewhat speculative issue as to whether one side or the other might want to amend expert reports or experts who would appear at trial. Apart from those issues, there is yet another separate issue regarding what did or did not happen on January 19, 2016 and whether the document and source review on that day uncovered new information. Another broad discovery order like the last one might become necessary at some point, but the parties seem to have shown some willingness to work through their discovery concerns and to forgo lesser issues in the spirit of proportionality now embodied in the Federal Rules of Civil Procedure.

Accordingly, the Court will try a focused, stepwise approach that uses the parties' common ground as a point of departure. That point of departure is the January 19, 2016 document and source code review. Whatever reservations or demurrals they expressed, the parties did agree to a document and source code review on January 19, 2016 under specific conditions. A full review seems as if it would have had some relevance to the parties' claims and counterclaims. The Court would not know the technical details of source code writing, but conceptually, it can understand how the differences between factory and field implementation might manifest themselves in source code. The Court thus is grateful that the parties were able to arrange for the review. That said, Armstrong did a lot to undermine its position through its approach to the review. Armstrong does not contest that it sought no training for the Niagara AX application, that it made no objection to having to use that application, and that it did not seek any passwords for that application while on-site during the review. The argument about documents that should have been produced prior to January 19, 2016 is a separate issue and not a direct rebuttal to the failure to try to remedy password access or other problems on-site. This situation is analogous to the situation addressed by FRCP 32(b)(3)(B), which considers objections to deposition irregularities waived if those irregularities could have been corrected at the time of the deposition. To the extent that McKeever did review information on January 19, 2016, he admitted that he found no information that would be consistent with Armstrong's claims.

Under these circumstances, the best way to balance the importance of the document and source code review with Armstrong's approach to the previous opportunity is to have a Armstrong sponsor a second opportunity. On or before July 22, 2016, the parties will repeat the document

and source code review under the same conditions to which they had agreed previously.  No

extensions will be permitted.  Armstrong will bear all reasonable costs related to the preparation of

the materials, computer, and conference room in accordance with the agreed conditions; to its

own attendance at the review; and to the time that one attorney, one staffer or paralegal, and one

technical expert for Optimum might have to spend monitoring the review and addressing any

problems that arise while the review proceeds.  As for the duration of the review, the rules for

depositions will apply, except that Armstrong will have up to two days of seven hours each instead

of one.  *See* FRCP 30(d)(1).  In ordering a second review at Armstrong's cost, the Court is mindful

that under normal circumstances, "the party responsible for production generally bears the cost."

*Clever View Investments, Ltd. v. Oshatz*, 233 F.R.D. 393, 394 (S.D.N.Y. 2006) (citation omitted).

The situation at hand is different, though, because of the occurrence of the first review.      The

Court will hold a status conference on July 27, 2016 at 10:30 AM EDT to discuss the results of

the review with the parties and to plan any other steps that might be needed before the filing of

dispositive motions.  Any attorney participating in the status conference must appear in person.

## IV.    CONCLUSION

The Court grants Armstrong's motion to compel (Dkt. No. 242) in part as explained

above.  The Court denies the motion to the extent that it seeks any other relief.

SO ORDERED.

_/s Hugh B. Scott_
HONORABLE HUGH B. SCOTT
UNITED STATES MAGISTRATE JUDGE

DATED: June 3, 2016