UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

Armstrong Pump, Inc.,

                    Plaintiff,

    v.

Mr. Thomas Hartman *d/b/a* The Hartman
    Company and
Optimum Energy LLC,

                    Defendants.

**Decision and Order**

10-CV-446S

---

I.    INTRODUCTION

    Pending before the Court is a motion (Dkt. No. 271) by plaintiff Armstrong Pump, Inc. ("Armstrong") to compel formal production of certain documents that defendant Optimum Energy LLC ("Optimum") considers functionally equivalent to its proprietary source code. By "formal production," the Court means that Armstrong already has viewed all 46 documents and 305 pages in question, through two document and source code reviews that occurred on January 19 and July 14–15, 2016. Armstrong further has had a chance to print approximately half of the total pages, but under strict protocols to which the parties agreed prior to any review of source code. Armstrong now argues that the documents do not contain actual programming and can be produced under the parties' protective order for discovery, without any additional protections accorded to source code. Armstrong also objects that Optimum could have produced the documents much earlier since they need no special protection. Optimum counters that the documents in question contain enough technical information to allow a software engineer to build its proprietary source code based on that information. The documents, according to Optimum,

thus are functionally equivalent to source code, which means in turn that Optimum has not been deceptive when failing to disclose the documents at any prior time.

The Court has deemed the motion submitted on papers under Rule 78(b) of the Federal Rules of Civil Procedure.  For the reasons below, the Court grants the motion in part.

## II. BACKGROUND

For the sake of brevity, the Court will assume familiarity with the long history of this case.  The Court will focus here on events that have occurred roughly since its last Decision and Order of June 3, 2016. (Dkt. No. 267.)

In its last Decision and Order, the Court directed the parties to repeat a document and source code review that they initially agreed to conduct on January 19, 2016.  The first document and source code review ended unexpectedly quickly and with inadequate attempts by Armstrong to remedy certain problems that it had navigating Niagara AX, the software that Optimum used for its source code and related documents.  To address a prior motion to compel by Armstrong (Dkt. No. 242) and to take a stepwise approach to lingering discovery issues, the Court gave Armstrong another chance to learn Niagara AX and to review source code and related documents under previously agreed conditions.  Because Armstrong needed a second review to do what it could have done at the first review, the Court required Armstrong to pay all reasonable costs related to the second review.

The second document and source code review occurred on July 14 and 15, 2016.  The Court allowed the second document and source code review to occur as the parties had arranged the first one, which, *inter alia*, meant that Armstrong could bring two outside counsel and two experts. (*See* Dkt. No. 251-9 at 3.)  The Court wanted to allow Armstrong to bring two experts

because of Armstrong's compartmentalized approach to expert review. Armstrong had told the Court that it had one expert, James McKeever ("McKeever"), who "was engaged specifically to review the Optimum software code on site . . . . Mr. McKeever was not engaged to sit and review documents that should have been produced to Armstrong years ago." (Dkt. No. 259 at 5.) A second expert, John Conover ("Conover"), is the expert who will testify at trial. Armstrong retained Conover to "deal with the same issues that appear to be included in the DevelopmentDocuments[1] folder—how the Optimum product is prepared and set up for the customer." (*Id.* at 6; *see also* Dkt. No. 268 at 11 ("So our position is Armstrong is entitled to have its testifying expert, a different expert, Mr. Conover, review all the contents of that developmentdocuments folder, and if necessary, supplement his expert report that already talks to the Optimum and Armstrong products.").) Since Armstrong seems to be treating pure source code and code-related documents as distinctly different categories of discovery, the Court's arrangement would have allowed Armstrong to bring its source code expert for source code review and its document expert for document review. Having both experts complete their review would have brought a definitive resolution to whether any of Optimum's source code or related documents could affect the core claims and counterclaims in this case. (*See* Dkt. No. 242-8 at 3 ("[D]ocuments relating to the Optimum LOOP software, its development, and its potential use by third parties, especially those third parties that that compete with Armstrong's products or that use the technology of the Hartman patents, have always been clearly relevant to the issues in this case.").)

---

[1] Hereinafter "DevDoc," a folder containing 46 documents spanning about 305 pages (Dkt. No. 275-2). The folder was available for inspection at both reviews together with Optimum's source code. The Court will write more about this folder later.

3

As the parties now have informed the Court, the second document and source code review played out differently than the Court intended. Conover did not attend the review at all. (*See* Dkt. No. 283 at 2 ("I have not personally reviewed all the files in that folder [*i.e.*, DevDoc].").) McKeever, the source-code expert, did attend, and Armstrong now has printed about 150 out of 305 pages in the DevDoc folder. McKeever has submitted two affirmations about the DevDoc folder in support of the pending motion. (Dkt. No. 280 at 21–24; Dkt. No. 284.) Those affirmations are silent about any actual review of source code. The Court is left to infer that McKeever's prior complaints about access to source code were addressed through the second document and source code review; the Court infers further that a full review of source code has not changed McKeever's opinion that "I was not able to identify any such configuration efficiencies that were designed for automated factory installation of the software . . . . The one software source code file I was able to evaluate indicates no clear distinction on parameters that require either factory or field adjustments." (Dkt. No. 246 at 3.) With respect to the DevDoc folder, McKeever asserted that he personally reviewed its entire contents (Dkt. No. 284 at 1) but has commented only on those pages that Armstrong printed in hard copy. After two reviews, the Court still does not know what this DevDoc folder as a whole contains, how the contents compare to the entirety of other discovery in the case, and why the remaining 150 or so unprinted pages (*see* Dkt. No. 275-1 at 1) matter compared to the approximately 150 pages already printed. McKeever has not made clear what he saw in the unprinted pages that warrants further production.

Armstrong filed the pending motion on August 10, 2016. Armstrong argues that the documents in the DevDoc folder are critical to its claims because they contain terms such as

"preconfigured" and "off-the-shelf product." Again arguing as if it has not already seen the entirety of the DevDoc folder, Armstrong asserts that documents in that folder might prove that Optimum shipped products from the factory with fully operational software in them. If so then Optimum would have engaged in "factory implementation" (Dkt. No. 55-1 at 3) in violation of the license agreement between the parties. Armstrong asserts further that the contents of the DevDoc folder do not constitute source code because they contain neither linear nor graphical programming and thus cannot lead to the reconstruction of the exact source code that Optimum uses. If the contents of the DevDoc folder do not constitute source code then, according to Armstrong, the restrictions to which the parties agreed for source code do not apply. Armstrong consequently would be allowed to use the entirety of the DevDoc folder like any other discovery exchanged in the case and subject to the protective order between the parties. As a corollary to its more substantive arguments, Armstrong wants Optimum to bear the costs and fees pertaining to the pending motion and wants the Court to revisit its prior decision that Armstrong had to bear the reasonable costs of the second document and source code review.

  Optimum opposes Armstrong's motion in all respects. Optimum defends its treatment of the contents of the DevDoc folder by arguing that "[t]hese documents, although not source code themselves, are stored with the source code in a subfolder entitled 'DevelopmentDocuments' because they explain in detail the functions, logic, and algorithms implemented in Optimum's products. A person skilled in software development could use these documents to recreate Optimum's products." (Dkt. No. 275 at 8.) Optimum points out that Armstrong already has printed about half of the DevDoc folder and that Conover has missed two chances to review

5

the DevDoc folder directly.  Additionally, Optimum believes that the pending motion constitutes an improper attempt at reconsideration of arguments that the Court already rejected, including an argument for a supplemental report from Conover and an argument for production of the contents of the DevDoc folder.

### III.   DISCUSSION

"Motions to compel and motions to quash a subpoena are both entrusted to the sound discretion of the district court.  This principle is in keeping with the traditional rule that a trial court enjoys wide discretion in its handling of pre-trial discovery, and its rulings with regard to discovery are reversed only upon a clear showing of an abuse of discretion.  A district court abuses its discretion when (1) its decision rests on an error of law or a clearly erroneous factual finding, or (2) its decision—though not necessarily the product of a legal error or a clearly erroneous factual finding—cannot be located within the range of permissible decisions."  *Am. Savings Bank, FSB v. UBS PaineWebber, Inc. (In re Fitch, Inc.)*, 330 F.3d 104, 108 (2d Cir. 2003) (internal quotation and editorial marks and citations omitted).  "The burden of demonstrating relevance is on the party seeking discovery.  Once relevance has been shown, it is up to the responding party to justify curtailing discovery.  The objecting party must show specifically how, despite the broad and liberal construction afforded the federal discovery rules, each request is not relevant or how each question is overly broad, burdensome or oppressive.  Even when the requested information sought is relevant, the court must limit the frequency or extent of discovery where it is unreasonably cumulative or duplicative or when the burden or expense of the proposed discovery outweighs its likely benefit.  Courts have significant flexibility and discretion to assess the circumstances of the case and limit discovery accordingly to ensure that the scope and duration of discovery is

reasonably proportional to the value of the requested information, the needs of the case, and the parties' resources." *Chen-Oster v. Goldman, Sachs & Co.*, 293 F.R.D. 557, 561–62 (S.D.N.Y. 2013) (internal quotation marks and citations omitted).

Proportionality has assumed greater importance in discovery disputes since last year's amendments to Rule 26 of the Federal Rules of Civil Procedure. Rule 26(b)(1) now sets forth that discovery must be "relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." "Under the amended Rule, relevance is still to be construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on any party's claim or defense. However, the amended Rule is intended to encourage judges to be more aggressive in identifying and discouraging discovery overuse by emphasizing the need to analyze proportionality before ordering production of relevant information." *Walker v. H & M Henner & Mauritz, L.P.*, No. 16 CIV. 3818 (JLC), 2016 WL 4742334, at *2 (S.D.N.Y. Sept. 12, 2016) (internal quotation and editorial marks and citations omitted). The effort to discourage discovery overuse usually will occur at the earliest stages of a case, when courts will try to develop an effective case management plan; in fact, the Chief Justice has noted that the 2015 amendments "emphasize the crucial role of federal judges in engaging in early and effective case management." Chief Justice's 2015 Year-End Report on the Federal Judiciary, at 7, http://www.supremecourt.gov/publicinfo/year-end/2015year-endreport.pdf (last visited Dec. 13,

7

2016). Discouraging discovery overuse does not end with the early stages of a case, however. Implicit in both the language and the spirit of the 2015 Amendments is the obligation, at any stage of a case, to prevent parties from expending increasing time and energy pursuing diminishing returns. Calling a halt to the pursuit of diminishing returns often will overlap with an assessment of duplicate or cumulative discovery. Sometimes the additional discovery sought technically would provide nominally probative information not yet in the parties' hands. Either way, when adding a few more pages of documents requires five or six inches of motion papers, and when those few more pages would be added to over one million pages of total discovery, numerous pages of expert reports, and transcripts from depositions of all of the relevant players, there exists a point beyond which courts have to tell the parties that if they cannot yet prove their claims then they probably never will. *See Alaska Elec. Pension Fund v. Bank of Am. Corp.*, No. 14-CV-7126 (JMF), 2016 WL 6779901, at *3 (S.D.N.Y. Nov. 16, 2016) ("Rule 26(b)(1)'s proportionality requirement means [that a document's] 'marginal utility' must also be considered.") (citations omitted); *Updike v. Clackamas County*, No. 3:15-CV-00723-SI, 2016 WL 111424, at *1 (D. Or. Jan. 11, 2016) ("There is a tension, however, among the objectives of Rule 1. As more discovery is obtained, more is learned. But at some point, discovery yields only diminishing returns and increasing expenses. In addition, as more discovery is taken, the greater the delay in resolving the dispute. Finding a just and appropriate balance is the goal, and it is one of the key responsibilities of the court in managing a case before trial to assist the parties in achieving that balance.").

Discovery in this case has reached the point of diminishing returns. During six years of discovery, Armstrong has furnished approximately 1.5 million pages of documents (Dkt. No. 225

at 3) while Optimum has furnished over 160,000 pages of documents. (Dkt. No. 275 at 7.) The parties have conducted at least a dozen depositions of engineers and other employees (*see* Dkt. No. 231) who would have direct personal knowledge of facts that would prove or rule out improper factory implementation by Optimum or improper field implementation by Armstrong. The parties have retained experts who have been working diligently on all of the information available so far. From the parties' initial agreement and the Court's previous Decision and Order, Armstrong has had two opportunities to view all of Optimum's source code—covering approximately 180 different building projects (Dkt. No. 242-6 at 2)—and everything in the DevDoc folder. Armstrong also has had two opportunities to print limited quantities of the contents of the DevDoc folder and by now has printed about half of that folder's contents. As for other discovery opportunities, Armstrong has had six years to identify and to take depositions of key employees of the clients that Optimum had for its 180 building projects. Armstrong has had six years to demand and to review email messages, memoranda, and other documents to or from Optimum employees or clients, any of which might have contained direct discussions of executing any plans for factory implementation. Armstrong has had six years to send its experts to whatever factories Optimum might be using (its own or third-party) to satisfy orders to its clients, to determine how products actually are rolling off the assembly line. With that massive amount of discovery at its disposal, Armstrong could have made a compelling case for sanctions—and maybe even summary judgment—by lining up other documents, deposition testimony, factory inspections, and other information and showing that Optimum intentionally hid explicit admissions of conduct exposed by all that other information.

Armstrong has done no such thing. The pending motion points to no other evidence from six years of discovery that leans in the direction of improper factory implementation by Optimum. Instead, Armstrong tells the Court that the DevDoc folder contains a few terms, like "preconfigured" and "off-the-shelf product," that apparently are "highly probative" of improper factory implementation all by themselves. (*See* Dkt. No. 271-1 at 6.) *Cf. Vaigasi v. Solow Mgmt. Corp.*, No. 11CIV5088RMBHBP, 2016 WL 616386, at *14 (S.D.N.Y. Feb. 16, 2016) (rejecting document requests in a discrimination case that "are at the outer fringes of relevance with little probative value to the claims"). Armstrong then veers into a strangely ironic argument that some documents already included in Conover's expert report (*see id.*), and already produced under the parties' protective order (*see id.* at 10), now need to be produced. Armstrong points to Conover's opinion—based on a few documents already produced and not based on the two document and source code reviews, an inspection of any factories, or an inspection of the actual buildings in question—that certain Optimum software might allow building owners to run their own customization. At most, Conover has brought to the Court's attention an issue to watch if enough facts establish any scenario other than 100% software and other technology installation at each building project: Whether "factory implementation" or "field implementation" under the relevant license agreement refers to installation alone, or installation plus configuration for the particular building in question. The Court considers the interpretation of those terms in the license agreement to be a legal issue that does not require any expert opinion. (*See* Dkt. No. 280 at 65). In the face of all of these apparent deficiencies in the development of the case, Armstrong wants the Court to believe that about 150 pages not yet printed but already reviewed—305 pages if, as

10

Armstrong wants, printouts from the document and source reviews do not count—will definitively prove what six prior years of discovery could not.  Really?

That said, the Court does see one very narrow path to a limited, and final, production of discovery.  The Court agrees with Optimum, based on what it has seen of the DevDoc folder, that most material in that folder is of a sufficiently technical nature that it should be protected like source code.  Nonetheless, Optimum's letters of January 14 and December 3, 2015 (Dkt. Nos. 251-4 and 251-9) could have been more explicit in advising Armstrong that "source code" really meant both "honest-to-goodness source code" and "documents functionally equivalent to source code." The Court does not believe that Optimum acted in bad faith, nor does it have any reason to believe that Optimum began treating the DevDoc folder differently when litigation became likely.  Earlier clarification, though, could have led to earlier discussions between the parties and, if necessary, earlier judicial intervention.  To make up for Optimum's insufficient clarity, the Court has reviewed all of the pages made available under seal from the DevDoc folder.  While many of the pages are of a very technical nature, some of the pages are not and contain these terms that could pertain to field or factory implementation:

- integration
- start-up
- implementation
- self-configured
- step-by-step
- OEM
- off-the-shelf
- add-on

Optimum is directed to review the DevDoc folder for any page that contains any of the above terms.  On or before January 18, 2017, Optimum will produce those pages to Armstrong under the protocol in the protective order for "highly confidential, attorney eyes only" material.  Any pages that contain definitions of input or output variables are exempted from this production, even if they contain any of the above terms.  Also on or before January 18, 2017, Optimum's counsel will file an affirmation that its discovery has not otherwise been affected by any heretofore undisclosed distinctions that it made between literal source code and other internally created categories like quasi-source code, or functionally equivalent source code, or kinda-sorta source code, or they're-really-documents-but-the-math-looks-hard source code.

For three reasons, the Court denies Armstrong's request to allow Conover to prepare an amended expert report.  First, as the Court mentioned above, the pages of the DevDoc folder that will be produced speak for themselves on the issue of intent to violate the license agreement.  The interpretation of the license agreement will be a legal issue for the Court.  Second, if Armstrong considered a full review of the DevDoc folder critical to Conover's expert report then Conover should have traveled to Seattle to see the folder for himself.  Whether Conover can be impeached at trial for never having reviewed the entirety of the DevDoc folder is a matter that Judge Skretny can address at a later time.  Third, if other facts exist that point to improper factory implementation by Optimum then those facts were or should have been known to Conover at the time of the current version of his report.

With the final document production described above, discovery in this case will be closed.  Any other relief that Armstrong seeks is denied with prejudice.  Except possibly for any new

information in Optimum's forthcoming affirmation, this Court will not entertain any more discovery motions in this case under any circumstances.  Neither will the Court review its prior assessment of costs for the second document and source code review.

As for future scheduling, the parties will file any dispositive motions on or before May 5, 2017.  No extensions will be granted.

IV.    **CONCLUSION**

The Court grants Armstrong's motion to compel (Dkt. No. 271) in part as explained above.  The Court denies the motion, with prejudice, to the extent that it seeks any other relief.

SO ORDERED.

                                                              __/s Hugh B. Scott_____.
                                                               Honorable Hugh B. Scott
                                                              United States Magistrate Judge

DATED: December 13, 2016