UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

Armstrong Pump, Inc.,

Plaintiff,

v.

Mr. Thomas Hartman *doing business as*
    The Hartman Company and

Optimum Energy LLC,

Defendants.

**Report and Recommendation**

(Redacted Version)

10-CV-446S

## I.  PRELUDE TO REDACTED VERSION

This redacted version of the Court's Report and Recommendation accompanies the full

version that the Court will file on the same day, under seal.  This redacted version retains all of the

structure of the unredacted version.  Smaller redactions simply use brackets to mark omitted

information; larger redactions contain a brief, general summary of what was omitted.

In preparing the redacted version of its Report and Recommendation, the Court gave

considerable thought to how much information really needed protection.  The parties entered a

joint protective order (Dkt. No. 66) to govern discovery; the protective order allowed the parties to

designate discovery documents as confidential or highly confidential based on the extent to which

those documents contained trade secrets or certain other proprietary information pertaining to

marketing, sales, and finances.  The Court has wanted to respect the sensitive nature of the parties'

discovery materials and, along the way, has allowed the parties to file exhibits to motion papers

under seal.  At the same time, the Court has had to pay attention to two strong arguments in favor

of public access to the docket.  The first argument is the overarching policy behind public access to federal court dockets:

> The presumption of access is based on the need for federal courts, although independent—indeed, particularly because they are independent—to have a measure of accountability and for the public to have confidence in the administration of justice.  Federal courts exercise powers under Article III that impact upon virtually all citizens, but judges, once nominated and confirmed, serve for life unless impeached through a process that is politically and practically inconvenient to invoke.  Although courts have a number of internal checks, such as appellate review by multi-judge tribunals, professional and public monitoring is an essential feature of democratic control.  Monitoring both provides judges with critical views of their work and deters arbitrary judicial behavior.  Without monitoring, moreover, the public could have no confidence in the conscientiousness, reasonableness, or honesty of judicial proceedings.  Such monitoring is not possible without access to testimony and documents that are used in the performance of Article III functions.

*United States v. Amodeo*, 71 F.3d 1044, 1048 (2d Cir. 1995).  The second argument is a more practical distinction between the purpose of a protective order during discovery and the disclosures that inevitably must occur when a case reaches dispositive motions or trial:

> Protective orders are useful to prevent discovery from being used as a club by threatening disclosure of matters which will never be used at trial.  Discovery involves the use of compulsory process to facilitate orderly preparation for trial, not to educate or titillate the public.  Private matters which are discoverable may, upon a showing of cause, be put under seal under Rule 26(c), in the first instance.  *Martindell v. International Tel. & Tel. Corp.*, 594 F.2d 291 (2d Cir. 1979), says no more than that.
>
> At the adjudication stage, however, very different considerations apply.  An adjudication is a formal act of government, the basis of which should, absent exceptional circumstances, be subject to public scrutiny.

*Joy v. North*, 692 F.2d 880, 893 (2d Cir. 1982).

To try to find the right balance between disclosure and redaction, the Court has considered that the parties' motions were dispositive in nature and potentially could have ended

the case in whole or in part.  The Court also looked ahead to what information inevitably would

have to be disclosed in a trial on the ultimate merits.  Any information that safely could be

considered an inevitable disclosure—information relating primarily to the formation of the

contracts in questions—has remained unredacted in this version, even if the information came to

the Court from a document filed under seal.  The underlying documents themselves will remain

under seal.  In contrast, the Court has redacted information that either was of a very technical and

proprietary nature or contained highly sensitive internal information about potential sales and

marketing efforts.  The redactions took two forms.  As the parties will see below, the analysis that

the Court ultimately employed did not require extensive discussion of highly technical

information, and technical details were simply avoided where possible.  Where sensitive sales or

marketing information required some discussion, the Court has removed identifiable information

and left the discussion more generic.

## II.    INTRODUCTION

In the 1990s, defendant Thomas Hartman ("Hartman") made an important discovery in

the field of heating, ventilation, and air conditioning ("HVAC") systems.  Engineers have

conducted studies that indicate that HVAC and similar air-conditioning systems consume as much

as 20% of all electricity generated in the United States.  Hartman believed that the electricity

consumption of air-conditioning systems was high in part because HVAC systems were designed to

operate at a constant chilled fluid flow rate, with building temperature control coming in other

ways.  Hartman realized that he might be able to lower electricity consumption if he designed an

HVAC system with much more flexibility to adjust flow rate, compressor and tower fan speed, and

other components in ways that would maximize efficiency under a given set of cooling conditions. Accordingly, Hartman filed three patents that would establish a variable-speed HVAC system: Patent No. 5,946,926 (the "'926 Patent"); Patent No. 6,257,007 (the "'007 Patent"); and Patent No. 6,185,946 (the "'946 Patent"). Read together for background purposes only, the patents claim a flexible type of HVAC system that will meet a building's cooling needs with the lowest electricity consumption necessary to meet those needs.

Hartman's patents soon drew the attention of two companies that wanted to use the technology in the patents for commercial gain. Plaintiff Armstrong Pump, Inc. ("Armstrong"), a subsidiary of S.A. Armstrong, Ltd. (Dkt. No. 2), manufactures mechanical equipment for HVAC systems in residential, commercial, and industrial markets. Defendant Optimum Energy LLC ("Optimum") is a software company started in 2004 by Nathan Rothman ("Rothman") and Jim Hanna ("Hanna") to develop applications that would take advantage of Hartman's patented technology. Hartman entered licensing agreements with each company—Armstrong on February 4, 2005 and Optimum on November 28, 2005. The Court will say a lot more about these licensing agreements below, but the agreements tried to let both companies use Hartman's patented technology while giving them different market rights to keep them from competing directly with each other.

Within a few years, the relationship between Armstrong and Optimum soured as Hartman struggled to keep each company within the boundaries of the licensing agreements. For example, Armstrong had to defuse an incident in which a sales representative in the field courted a potential multimillion dollar contract for a project that, at least arguably, would fall to Optimum under the

licensing agreements.  Optimum teamed up with a third party to preload its software on controllers in a way that Armstrong considered a violation of the licensing agreements.  Questions began to arise about how the licensing agreements addressed hybrid situations in which a client would order all new HVAC equipment except for a controller, or in which a client would order some new equipment and wanted it integrated with some existing equipment.  Then in 2010, Hartman sold his three licensed patents and some others to Optimum, over Armstrong's vehement objection.  Armstrong became concerned about how the sale would affect its rights under its licensing agreement, given that a co-licensee also mentioned in the agreement now became—at least to Armstrong—the licensor as well.

This litigation soon followed.  The case has a long, seven-year history that the Court will not revisit except when necessary to explain its analysis in this writing.  Judge William Skretny has referred the case to this Court under 28 U.S.C. § 636(b).  (Dkt. No. 74.)  The case returns to the Court now on summary-judgment motions filed by each party under Rule 56 of the Federal Rules of Civil Procedure ("FRCP").  (Dkt. Nos. 290, 291, 292.)  Armstrong believes that Hartman breached his responsibilities to refer customers diligently, and that his sale of the patents broke his promise not to assign certain licensor rights to Optimum.  Armstrong also argues that Optimum has encroached on its license rights by teaming up with a third party to preload its software in a way that the licensing agreements do not contemplate.  Hartman counters that he gave proper respect to the various license rights that Armstrong and Optimum each had.  Hartman argues that he did make referrals to Armstrong based on a potential client's needs and his best interpretation of how those needs fit under the licensing agreements.  Optimum, meanwhile, asserts that any

referral obligations stayed with Hartman after the patent sale. Optimum argues further that its method of delivering software to clients respects the boundaries of the licensing agreements and that Armstrong has adopted an excessively restrictive interpretation of Optimum's rights under those agreements. With respect to any claim for tortious interference, Optimum argues that the claim is untimely and that Armstrong cannot show the necessary intent to interfere with its licensing rights. Finally, Optimum asserts that Armstrong would be entitled to no more than nominal damages because of a failure to disclose alleged damages during discovery.

The Court held oral argument on August 10, 2017. For the reasons below, the Court respectfully recommends denying the motions without prejudice. The Court further recommends submitting Optimum's counterclaim for declaratory judgment (Dkt. No. 57 at 19, 23) to an immediate trial to determine the rights of the parties and where they stand under the agreements in question.

## III.    BACKGROUND

The licensing and patent sale agreements that the parties have referenced throughout this case and in their motion papers are central to every argument that they have made. Accordingly, whether just for background or for a possible examination of extrinsic evidence, the Court will review events leading to each agreement as well as the agreements themselves.

### A.  *Prelude to the Licensing Agreements*

As early as late 2003, Hartman began communicating with Brent Ross ("Ross") and others at Armstrong about the possibility of a license that would let Armstrong use technology from the '926 Patent, the '007 Patent, and the '946 Patent (collectively, the "LOOP Technology"). (Dkt.

No. 319 at 323.)  Hartman advised Ross that he was communicating with Optimum at the same time about Optimum's plans for the LOOP Technology.  (Dkt. No. 319 at 49.)  As Hartman understood Optimum's plans, Optimum would design software that converted the LOOP Technology into a series of decision-making algorithms, install that software on a blank, third-party controller,[1] and then sell that controller to customers who wanted to improve energy efficiency in their buildings.  (*Id.* at 50–51.)  Hartman had to take care, though, not to describe Optimum's plans as a "retrofit" strategy for existing buildings.  Hartman had to avoid the word "retrofit" because Armstrong would want to participate in the retrofit market as well.  (*Id.* at 53.)  Hartman then came up with the idea of instead defining the market as "factory implementation" versus "field implementation."  (*Id.* at 54.)  In trying to define the market, Hartman wanted to avoid direct competition between Armstrong and Optimum.  (*Id.* at 73–74.)  Optimizing an existing plant generally would go to Optimum; a new plant under design generally would go to Armstrong.  (*Id.* at 74.)  Hartman knew, though, that hybrid scenarios would arise.  "[W]hat concerned me was that there might be applications that would come up where there would be an uncertainty as to which type of solution would be the proper one.  And I didn't—I wanted to be sure that we understood the possibility of neither application being applied, so that projects might go by where neither of the two parties here felt that was in their periphery, or that perhaps both of them did, and could cause some disagreement among the two as to what type of project it was."  (*Id.* at 81.)

---

[1] The Court will borrow language from the claim construction phase of the case; here, a "controller" means a "common controller," which in turn generally means "a single master control device, separate from other controllers, used to govern all chillers in the system."  (Dkt. No. 136 at 58; *adopted in part, and set aside in part on other grounds, at* Dkt. No. 145.)

A number of communications circulated among the parties before the final licensing agreements fell into place.  Hartman prepared a first draft agreement that he sent to Armstrong on February 2, 2004.  (Dkt. No. 319 at 329.)  The original draft would have given Armstrong exclusive right to use the LOOP Technology for the manufacture of pumps or pumping systems.  (Dkt. No. 319 at 331.)  Around March 1, 2004, Armstrong proposed expanding the licensing rights to include chillers[2] as well as pumps.  (Dkt. No. 319 at 338.)  Armstrong also wanted exclusivity as against all other manufacturers.  (Dkt. No. 212-1 at 8; *see also id.* at 33 (representing that it was in the final stages of becoming "the exclusive manufacturer supplier" while also describing contract negotiations with Hartman as "frustrating").)  On April 22, 2004, Hartman expressed doubt to Armstrong that they had "a meeting of the minds on the terms for such an agreement."  (Dkt. No. 319 at 349.)  Hartman elaborated on his concerns in an email message dated April 26, 2004 which apparently repeated details from a message dated April 9, 2004.  (Dkt. No. 319 at 351.)  The concerns continued on May 25, 2004, when Hartman summarized to Armstrong that "[w]e now have an agreement with a startup company [*i.e.*, Optimum] that intends to package integrated controls and VFDs[3] to apply Hartman LOOP technologies to *new and existing* plants.  Because this company does not intend to sell chillers, pumps, or any other equipment beyond VFDs and controls, I think that it will be straightforward to place a suitable boundary such that Armstrong will not be closed to any opportunities based on this current agreement, but

---

[2] A "chiller" is "a device that uses a compressor, evaporator, and condenser to circulate refrigerant for use in a chilled water generating system."  (Dkt. No. 136 at 22.)

[3] A variable-frequency drive (VFD) circuit is a "device that can adjust the speed of an electrical motor by adjusting the frequency of alternating current reaching the motor, combined with the wiring and other connections necessary to couple the device to the motor."  (Dkt. No. 136 at 40.)

instead may find even more willing participants for the delivery model Armstrong has developed."

(Dkt. No. 319 at 355 (emphasis added).)  Armstrong seemed frustrated with Hartman's attempts to

balance his relationships with it and Optimum; Ross wrote on May 25, 2004 that "I'm having a

tough time with Hartman and this agreement.  I've persuaded him to deal first with the large

issues as he's been very concerned about the what if scenario's associated with any changes to the

wording of his original agreement."  (Dkt. No. 319 at 358.)  The parties started to approach

mutual understanding around June 1, 2004; among other points, Armstrong acknowledged the

possibility of letting Optimum have a license.  (Dkt. No. 319 at 366.)  On June 18, 2004, however,

Hartman continued to express concern to Armstrong that negotiations were taking longer than

expected.  (Dkt. No. 319 at 369.)  As much as Armstrong wanted access to the LOOP Technology,

Hartman proposed delaying the introduction of the technology to Armstrong equipment for a year

and letting Optimum supply controllers for Armstrong equipment while a licensing agreement

took shape.  (*Id.*)  Hartman also put Armstrong on notice that his thoughts about long-term

ownership of the patents were evolving:

> I originally thought Armstrong would be in the role of our partner in exploiting
> these technologies.  Because this has not developed as I wished and because of the
> increased complexity of this agreement, I am at this time considering having
> [Optimum] become that partner and take assignment of the patents and if we can
> agree, [Optimum] may become the Licensor for this agreement.  In this case, all
> rights to the licenses not specifically transferred to Armstrong under this agreement
> would remain with [Optimum].

(*Id.* at 373; *see also id.* at 173–74.)  On August 17, 2004, Armstrong wrote that projects under an

agreement could refer to the technology generally; the exact source of a controller could be

determined later, though "one source supply will be a trend in the future."  (Dkt. No. 319 at 377.)

On September 13, 2004, Hartman responded to Ross with several comments. (Dkt. No. 319 at 106.) Hartman had a concern that Ross wanted to give Armstrong exclusive rights to manufacture both pumps and "factory packaged systems," as if those systems would not include pumps. Hartman tried to clarify what Armstrong's role would be under any agreement. "What this exclusivity is not intended to permit is for Armstrong to purchase equipment[,] install the controls with LOOP technologies[,] and resell it, with the controls as the main Armstrong value added product." (*Id.*) Hartman can be seen here viewing distinctions between Armstrong and Optimum from the perspective of the equipment itself—pumps and chillers versus controllers. Hartman did not want Armstrong selling controllers alone. Also, Hartman clarified that he did "not intend that the Optimum product would never be implemented in new installations. Optimum agrees to make no proposals for new plants or plants that will have much of their equipment replaced without first contacting Armstrong. If Armstrong declines to pursue the project, or if the Owner turns down the Armstrong solution, then Optimum would be free to pursue such a new plant." (*Id.*) Negotiations took a step backward in October 2004, when Hartman wrote that too many extensive revisions were occurring to provisions to which the parties already had agreed. (Dkt. No. 319 at 413.) Around late November 2004, Armstrong revisited the issue of license exclusivity and expressed concern "that we're not competing tomorrow with a factory implemented product from [REDACTED: certain other companies]." (Dkt. No. 212-1 at 35 / Dkt. No. 319 at 429.) Armstrong acknowledged that the parties had not yet reached a meeting of the minds on the scope of Armstrong's rights. (*Id.*) Hartman responded that he understood Armstrong's concerns but that "we have to be careful to ensure we don't in any way limit Optimum Energy Corp's ability to

make and market their controls product that incorporates Hartman LOOP technologies." (*Id.*) On January 24, 2005, just days before the parties signed the agreement, Hartman wrote to Armstrong with his assessment of what likely was a final draft of the agreement. (Dkt. No. 319 at 433.) Hartman expressed the understanding that the agreement gave Armstrong rights as to "'prepackaged' versions of the technology and assign[ed] those rights to Armstrong for new chiller plants in which the technology is included with some of the equipment being supplied. It also outlines the rights of Optimum for retrofit applications in which mechanical equipment already exists." (*Id.*) At the same time, though, Hartman noted—perhaps presciently—that the agreement did not set forth exactly how Armstrong and Optimum would play their roles. Hartman expressed his hope that Armstrong and Optimum would work to develop clear understandings of their roles. About an hour later, Ross responded that "I don't have a major problem with anything you've written below. I'm very comfortable with working with both you and Nathan and think as long as we can get the darn agreement signed with acceptable wording (i.e. does not contradict anything below) the rest will work it's [sic] way out." (Dkt. No. 319 at 437.)

### B. The Armstrong Licensing Agreement

Over a year of negotiations between Hartman and Armstrong finally culminated in a license agreement (the "Armstrong Agreement") that the parties entered on February 4, 2005. (Dkt. No. 55-1 and *passim.*) The Armstrong Agreement contains several provisions that relate to the claims and counterclaims in this case. The first paragraph identified Hartman as the "Licensor" and Armstrong as the "Licensee." In Section 1, the parties defined "Factory Implementation" as "implementing the Licensed Technologies into chiller, pumping, control

systems and/or tower products as a part of the factory production process." The parties defined "Field Implementation" as "implementing the Licensed Technologies into the chiller, pumping, control systems and/or tower products after the products have been delivered to the site." Section 2.1 gave Armstrong its primary license rights and reads as follows in its entirety:

> Licensor hereby grants to Licensee a license, to make, have made, use, sell, and otherwise distribute factory packaged chilled water systems, pumping and/or other mechanical products that incorporate the Licensed Technologies at the factory implementation level, and to use and otherwise practice the Licensed Technologies in Licensed Products.

(Dkt. No. 55-1 at 3.) Section 3.2(b) gave Armstrong some of the exclusivity that it sought during contract negotiations:

> Licensor shall not grant a license for the Licensed Technologies or the Licensed Patents to any other manufacturer or assembler of pumps or for cooling systems and equipment that employ chilled water distribution; *provided, however,* that Licensor shall not be precluded from licensing the Licensed Technologies or the Licensed Patents to Optimum Energy Corporation or others for the purpose of incorporating the Technologies into products excluding those that include the manufacture or assembly of pumps, chillers, towers, chilled water plant controls or pumping or chiller systems that could compete with the Licensee's intended product offering. Licensee's limited exclusive rights shall be worldwide, begin [*sic*] on the date of this Agreement and expire only when this Agreement expires or is terminated according to the provisions of this Agreement.

(*Id.* at 4.) Section 3.3 defined Armstrong's limited exclusivity more carefully and contains language that the limited exclusivity "is intended to protect Licensee against implementations of the Licensed Technologies that would compete with their intended product offerings. Such offerings include factory integrated chiller, pumping or cooling tower equipment with controls where in the basis of the system is chilled water cooling systems, or pumping systems." Section 3.3 contained five subsections that further explained the nature of Armstrong's limited exclusivity:

a.      As long as the license grant remains exclusive, Licensor shall not grant a license for factory implementation of the Licensed Technologies or the Licensed Patents as they apply to hydronic elements to any third party involved in the manufacture of pumps, any factory packaged chilled water systems, chillers, building controls or cooling towers.

b.      During the exclusive license grant period, Licensor shall retain full rights to grant licenses for "field" implementation of the Licensed Technologies when such technologies are applied to the hydronic systems but are not integrated into the chiller, pumping, control or tower products until they are field assembled.

c.      Licensee has no rights granted under this agreement to "field["] implementation of the Licensed Technologies (e.g. implementing the Licensed technologies without an integrated equipment/control package). However, for special circumstances, Licensee may apply to Licensor for permission to implement a field level implementation, the licensed terms of which shall be determined on a case by case basis.

d.      During the exclusive license grant period, Licensor shall retain full rights to grant licenses for implementation of the Licensed Technologies when the implementation of such Licensed Technologies do not in any way compete with the product offerings of the Licensee. Examples are the licensing of the technologies applied to variable speed DX / air cooled rooftop air conditioning systems and the control of condenser fans of air cooled chillers.

e.      During the exclusive grant period, Licensor shall be diligent in referring to the Licensee all potential applications the Licensor learns about that require new chillers or pumps. Only if Licensee declines to pursue such projects, or the Owner declines Licensee's proposed solution will Licensor permit other potential licensees over which Licensor exerts control to pursue such projects.

(*Id.* at 5.) Later in the Armstrong Agreement, Section 10.2 contained a provision that "Licensor has not made and will not make any agreements with or commitments to third parties that are inconsistent with the grant of rights hereunder." Section 12.1 declared the Armstrong Agreement the entire agreement between the parties, with no modifications or waivers allowed unless made in writing and signed by both parties. Section 12.3 set forth that the Armstrong Agreement "shall be binding upon and enure to the benefit of the parties hereto and their successors; provided,

however, that this Agreement and the license granted hereunder shall not be assignable by Licensee except to a parent, subsidiary or affiliate of Licensee . . . ."  Section 12.10 contained a choice of law provision that placed the Armstrong Agreement under New York law.

### C.  The Optimum Licensing Agreement

A few months later, on November 28, 2005, Hartman developed his relationship with Optimum further by entering a separate licensing agreement with that company (the "Optimum Agreement").  (Dkt. No. 55-2 and *passim*.)  Like the Armstrong Agreement, the Optimum Agreement contained a number of provisions, several of which affect the pending motions.  Section 1.5 defined "Factory Implementation" as "implementation into chiller, pumping, and control systems and/or tower products as a part of the original factory production process."  Section 1.6 defined "Field Implementation" as "implementation into chiller, pumping, and control systems and/or tower products after the products have been delivered to the site where they will be used for HVAC purposes.  Field Implementation and Factory Implementation shall be construed as mutually exclusive."  Section 2.1 gave Optimum a "worldwide, irrevocable, sublicensable, transferable, and exclusive license under the Loop Patents to make, have made, use, offer for sale, sell and import products and equipment (Loop Products), and to render services to customers, all in connection with Field Implementations, the only exception being DX Equipment per Section 3."  Under Section 2.2, Optimum was "not permitted under this Section 2, with the exception of that DX Equipment covered under Section 3, to make, have made, use, offer for sale, sell, or import any products for Factory Implementations."  Section 2.9 explained that Optimum had a limited exclusivity under the agreement that "is intended to protect OEC

against implementations of Loop Products that would compete with OEC's intended product offerings. Such offerings include Field Implementation of the licensed technologies as applied to existing chiller plants or systems." Section 3 generally gave Optimum an exclusive license for DX equipment, defined back in Section 1.3 as "'direct expansion' cooling equipment covered by a Loop Patent, *i.e.*, a packaged air-conditioning system that employs refrigerant coils exposed to air for cooling and heat rejection, commonly referred to as 'rooftop units,' 'heat pumps,' 'PTACS,' and 'unitary air conditioners.' DX Equipment stands in contradistinction to chilled-water or other fluid-based cooling systems generally of the type described in the Loop Patents." In Section 11.2, Hartman promised that he made no inconsistent agreements or commitments with anyone else. Section 12.11 placed the Optimum Agreement under Washington state law.

Optimum used its agreement with Hartman to pursue its particular method of field implementation. Optimum chose a third-party controller called [REDACTED] from a company called [REDACTED]. Optimum installed the software into the [REDACTED] at its office and then shipped the controller to the building site. (*See* Dkt. No. 299 at 16; Dkt. No. 319 at 51.) Optimum also agreed to install its software in a [REDACTED] controller called [REDACTED]. (Dkt. No. 176-2 at 39.)

### D. Dealings Under the Licensing Agreements

Armstrong set to work developing a controller with LOOP Technology within months of entering the Armstrong Agreement. (Dkt. No. 212-9.) Around February 7, 2006, Armstrong and Optimum communicated about Armstrong's [REDACTED] controller, a "pre-fabricated configurable assembly." (Dkt. No. 294-6 at 55.) Armstrong expressed hope that Optimum "can

utilize our 'productized' solution for the more simplistic retrofit projects that Optimum Energy encounters." (*Id.*) This communication is notable for several reasons. As of early 2006, a year after the Armstrong Agreement took effect, Armstrong was using the word "retrofit" to describe at least some of Optimum's work and implicitly was acknowledging that "retrofit projects" belong to Optimum under the licensing agreements. This communication also indicates that Armstrong understood that Optimum's product was only software and needed some kind of physical controller device in which to operate. Armstrong was hoping that its [REDACTED: controller] would do the job. Finally, the use of the word "simplistic" foreshadowed a problem that arose later and that the Court discusses below: Armstrong's attempt to create different levels of retrofits and to decide which of those levels belonged to itself.

Around September 2006, a potential client approached Armstrong and Optimum about "three different scenarios" that would include the LOOP Technology in a project bid. (Dkt. No. 294-6 at 127–28.) Armstrong informed the potential client, in short, that there were only two ways to bring the LOOP Technology into a project: Use Armstrong for an OEM "packaged solution," or use Optimum for a field implementation to an existing system. This communication demonstrated that Armstrong understood generally how the licensing agreements separated new, packaged systems from existing systems that would start operating under the algorithms created by the LOOP Technology.

Around October 2006, a potential client approached Hartman with interest in the LOOP Technology. (Dkt. No. 294-6 at 117.) Hartman promoted Armstrong as having "far away the most cost effective implementation of the Hartman LOOP." (*Id.*) If the client wanted to pursue

16

installing technology in an existing building system then "[w]e suggest you discuss this with our retrofit technology partners, Optimum Energy Company." (*Id.*) This communication demonstrated Hartman's willingness to abandon his hesitation, during contract negotiations, to use the word "retrofit" to try to keep Armstrong and Optimum from competing with each other.

Although the parties had some occasions when they worked in tandem as Hartman had hoped, lucrative business opportunities started justifying Hartman's worry that his agreements with Armstrong and Optimum did not finish defining each company's role. Around March 2006, Hartman and Optimum became aware of an Armstrong sales representative in [REDACTED: a certain location] who was courting a potential client, [REDACTED], for a retrofit project. (Dkt. No. 294-6 at 131–53.) The sales representative told [REDACTED: the potential client] that "[t]he Armstrong Hartman Loop controller is viable on retrofit projects without packaging with pumps, it does contain Hartman Loop Algorithms, it will be very cost effective compared to 'the alternative.' I have re-confirmed that we are allowed to pursue HVAC market for these controls in whatever form they come." (*Id.* at 132.) The reference in quotes to "the alternative" seems to be a rather obvious and dismissive reference to Optimum. The use of the word "re-confirmed" implies that someone in Armstrong made the choice to issue a confirmation. The incident drew a response from Hartman that encouraged Armstrong and Optimum to repair whatever harm in client relations ensued and to recommit to the distinction between controller sales that are "part of a substantial pumping or plant package" and those that are retrofit applications. (*Id.* at 135.) Notably, however, the word "retrofit" never appears in the Armstrong or Optimum Agreements. The incident also prompted a conversation and a disagreement over what would happen in a

hybrid scenario when a client bought some new equipment, combined it with some existing

equipment, and then wanted the LOOP Technology in charge. (*Id.* at 139.) The sales

representative who sparked the incident joined in the conversation when Armstrong clarified that

its controller never could be sold alone and, at a minimum, had to be sold with the pumps that it

would control. (*Id.* at 148.) The sales representative reacted somewhat incredulously to the

prospect of lost sales and left the door open to pursuing retrofit projects as follows:

> This means that [REDACTED: certain projects] will always be on the
> Optimum Energy Path. [REDACTED] This statement does take away a couple of
> options I considered viable, but still leaves us open as a retrofit product.

(*Id.* at 148.) Armstrong ultimately resolved the incident by sending a letter to its sales force that

included the following distinction:

> It is important that we remind and clarify to our sales channels
> [REDACTED: about the obligations under the Armstrong Agreement].

(*Id.* at 151.) Armstrong felt obligated to issue the letter to hold its sales agents at bay. "The feeling

and the interpretation [was] that if we had not included that, our sales organization would push us

for positions that would not reflect the agreements that we had above and beyond the license

agreement with Optimum and Hartman." (Dkt. No. 319 at 256.) Interestingly, Hartman never

adopted Armstrong's position that pumps plus a controller sufficed for a factory-implemented new

system:

> I think we all agree that a complete pumping package is the requirement for
> Armstrong to market its solution. I can tell you (and you probably already know) it
> is not very often that pumps are changed/upgraded without a change in chillers
> and/or other plant equipment. No question that the other equipment could be
> supplied by others. OEC is very supportive that when a plant needing such new
> equipment is encountered, the project needs to be referred to Armstrong. They are
> not in the equipment replacement business.

What I don't want to see happen is Armstrong reps trying to replace pumps just to compete with OEC's marketing effort (the case at hand) nor OEC holding on to outdated plant equipment just to avoid the Armstrong solution. This will take cooperation, but I am sure based on my many years of experience that such situations are unlikely to develop on their own, so both Armstrong and OEC simply need to keep their true markets in focus to avoid such possible instances.

(Dkt. No. 319 at 451.) Ross, on behalf of Armstrong, signed off on Hartman's position, responding that "I agree with your comments Tom. Yes I wish to continue to work with Optimum and will do so. I don't see any reason for conflicts which can't be solved and will work hard to ensure we don't have any." (*Id.*) Nonetheless, Armstrong now submits a declaration from a [REDACTED] representative, Brett Gaviglio, in support of its motion for summary judgment. (Dkt. No. 19-3 / Dkt. No. 292-2 at 317–18.) Gaviglio's declaration explains the [REDACTED] incident from that company's perspective. In short, the building in question had outdated HVAC equipment. Armstrong proposed a comprehensive factory implementation of the LOOP Technology that would replace all of the pumps and would include an Armstrong controller. The building owner ultimately purchased new pumps from Armstrong; apparently left other HVAC equipment in place; and purchased a controller from Optimum to run the upgraded system. The Court draws three lessons from the Gaviglio declaration. First, Ross's comments to Hartman were insincere; Armstrong really wanted this project in full, and the attitude of the sales representative toward Optimum and the Armstrong Agreement was closer to Armstrong's real sentiment about that agreement. Second, the parties never really contemplated what would happen in "hybrid" scenarios that combined some new hardware from Armstrong with some existing hardware and a controller from Optimum. Hartman was right to be worried that the companies might employ gamesmanship if factory implementation were reduced to a purchase of pumps as a minimum

19

requirement. And third, Armstrong's bitterness about a loss of over $100,000 on the sale reinforces to the Court that money is a subplot to all of the arguments that the parties have submitted.

Around October 2006, Armstrong encountered real estate developers in [REDACTED] who expressed interest in having Armstrong's controller installed in "newer" but existing building systems—field implementation under the Armstrong Agreement. (Dkt. No. 319 at 114.) Armstrong approached Hartman for permission to pursue the projects, but Hartman encouraged Armstrong to negotiate with Optimum since these projects would be considered "retrofit" projects. (*Id.* at 113.) Armstrong clarified that "[t]he intent is not to participate in the retrofit market, but to get an IPC system installed for reference in that local market as soon possible. From Nathan's perspective we are obviously taking away from one of his opportunities . . . ." (*Id.*) This communication suggests that Armstrong knew that the [REDACTED] real estate projects might encroach on Optimum's rights under the licensing agreements. The phrase "from Nathan's perspective" suggests further that Armstrong was contemplating the costs of that encroachment and the benefits of proceeding with the projects anyway. Notably, again, the parties here were reverting to a word—"retrofit"—that they avoided during negotiations in favor of language that reads differently as explained below.

On November 29, 2006, just months after the [REDACTED] incident, Armstrong issued a document titled a [REDACTED] for its [REDACTED] controller. (Dkt. No. 319 at 477–79.) Armstrong distributed the [REDACTED] internally to its employees and representatives. The [REDACTED] ended with the disclaimer that "[o]rders for the [REDACTED] system must include

an order tor pumps that are part of the chilled water plant." (*Id.* at 479.) The first page, in contrast—under a heading titled "Target market(s)"—stated unequivocally that "[t]he [REDACTED] system is ideal for *both* the new construction *and* MRO/retrofit marketplaces." (*Id.* at 477 (emphasis added).) The issuance of this [REDACTED] just months after the [REDACTED] incident highlights an issue that became increasingly apparent as the Court examined the record. As a manufacturer of HVAC hardware components, Armstrong necessarily had to develop its own controller to be able to sell comprehensive HVAC systems to customers who wanted new equipment. Optimum, in contrast, did not have to develop HVAC hardware components like pumps and chillers to pursue its strategy of maximizing efficiency in existing equipment. The nature of each company's strategy gave Armstrong a natural advantage if intense competition broke out: With its own controller, Armstrong had the ability and, from this record, the incentive to swat Optimum away once it had a license for the LOOP Technology.

Around April 2008, Armstrong explored another opportunity that it was eager to seize in [REDACTED: a certain location]. (Dkt. No. 319 at 467–68.) The potential client had started building a large HVAC infrastructure when encountering Armstrong. The client apparently decided that it would stick with whatever equipment it had purchased up to that point but wanted Armstrong equipment for the rest of the project. The parties thus faced a different hybrid scenario here—existing equipment that was probably only a few months old, combined with other equipment from Armstrong. The client also was very interested in having LOOP Technology control the entire infrastructure. Armstrong recognized the situation as an unusual hybrid scenario in which all of the equipment for the facility would be new, but only part of it would

come from Armstrong. Armstrong considered the overall project to be "factory packaged" (*id.* at 468) but nonetheless recognized that it might overstep the boundaries of the Armstrong Agreement. Accordingly, Armstrong approached Hartman for permission "under this 'special circumstance' to essentially do a[n] 'implemention' [] portion of 'demand based control' and 'natural curve' technology into our proposal on this project, that does not include 'integrated equipment/control package.'" (*Id.*) In essence, then, Armstrong recognized that the project had at least partial characteristics of a field implementation. Armstrong told Hartman explicitly that "we do want to proceed without engaging Optimum." (*Id.*) Armstrong also wanted Hartman's approval by the next day. (*Id.*) Hartman responded by describing a number of details that he would need to know about the project to assess its complexity. Hartman concluded that "I do not see how we can resolve this issue contractually in the time span you desire. The ONLY way I can see this could be done is to reach an agreement with Optimum that we could all sign off on as a one time change. If you are not willing to do this, then it seems to me that the process will have to be much more complex as what you are proposing does seem to me to conflict with rights granted to Optimum." (*Id.* at 467.)

In early 2009, an Armstrong sales representative in [REDACTED] developed a huge potential sales lead with [REDACTED]; "[t]he potential business here runs in the millions." (Dkt. No. 319 at 488.) However it happened, [REDACTED]'s design contractor wound up talking to Hartman as well. Hartman followed the protocol of the Armstrong Agreement. "[W]hen they asked how I would recommend implementing the technology, I asked the individual if the plant they were considering it for was a new or an existing plant. He told me that it was a large existing

plant. So, in accordance with our protocol, I referred them to OEC [*i.e.*, Optimum]." (*Id.* at 487.)

Armstrong was upset that Hartman followed standard protocol. "I suspect that when you (Tom) received the call from the client [REDACTED], that it wasn't made clear that Armstrong had brought them to this point in their decision making . . . . There is probably a higher level sell that Optimum can make for the whole building networking of the entire building's energy systems, however, we see the IPC / Hartman LOOP as a key method of delivering an integrated plant solution to differentiate us—so we need assurance for the sales team to continue to use that strategy." (*Id.* at 487–88.)

Around December 2013, Armstrong announced a new controller called [REDACTED] aimed explicitly at retrofit projects in addition to new projects. "Armstrong [REDACTED] is a relational control solution for the operation of an all-variable-speed chiller plant. [REDACTED] is an excellent solution for retrofit in buildings [REDACTED: under certain conditions]" (Dkt. No. 252-6 at 2.)

### E.  The Patent Purchase Agreement

Hartman eventually followed through with the thoughts about patent ownership that he first expressed to Armstrong in June 2004. On January 21, 2010, Hartman informed Armstrong that he was proceeding with the sale of the patents to Optimum. Hartman gave Armstrong several reasons for wanting to sell:

> There are many reasons for this step, among them are [REDACTED]. Of course
> this sale will not result in any change with regard to Armstrong's rights or
> obligations under our current license agreement. But as a part of the sale, all
> royalties from our agreement will go to Optimum. There is not a prohibition
> about the assignment of this agreement by the Licensor, and my preference would
> be simply to assign this agreement to Optimum and have you work directly with

23

Optimum on royalty payments and on any changes that may be made to your mutual benefit over the years. However, there is also a commitment in the agreement by me to support Armstrong with consulting services and promotion as may be desired and I will certainly adhere to those commitments no matter what structure we follow going forward.

(Dkt. No. 294-7 at 52.) Armstrong was not happy—it did not like the idea of paying royalty fees to a company viewed as a competitor, and it had concerns about what would happen to its licensing rights when a co-licensee became the owner of the patents. (*See* Dkt. No. 319 at 472; *see also* Dkt. No. 292-2 at 336–38.) Nonetheless, Armstrong knew that "there is no specific term in the agreement to prevent Hartman from transferring the patents." (*Id.*) Of some note, as late as March 15, 2010—over five years after the Armstrong Agreement took effect—the parties were still searching for "a starting point in developing a mutual understanding as to the intent of difference between Factory and Field implementations, Optimum and Armstrong offerings, and how such an understanding might lead to cooperation at this critical point." (Dkt. No. 292-2 at 335.)

On February 9, 2010, Hartman entered an agreement (the "Patent Agreement") with Optimum to sell the three patents comprising the LOOP Technology plus six others. (Dkt. No. 55-3 at 2.) Of note, Section 3.4 terminated the Optimum Agreement. Section 4.1 gave Optimum all of Hartman's rights in and obligations for the patents except for certain financial obligations that might have accrued as of the effective date of the agreement. Section 4.4 gave Optimum all of Hartman's rights in and obligations for the Armstrong Agreement except for certain financial obligations that might have accrued as of the effective date of the agreement. In Section 6.1, Hartman promised that he had full authority to sell the patents. In Section 6.3, Hartman asserted

that he would not retain any rights in the patents and that Armstrong had not breached the Armstrong Agreement in any way up to that point. Section 10.3 set forth that Washington state law governed the Patent Agreement.

After signing, the Patent Agreement underwent three amendments, the most significant amendment occurring on May 19, 2010. (Dkt. No. 55-3 at 34.) Hartman and Optimum had sought Armstrong's consent to the sale of the LOOP Technology patents. (Dkt. No. 294-6 at 7.) When Armstrong objected, Hartman and Optimum entered Amendment Three, which eliminated references to consent by Armstrong and the Armstrong Agreement. Section 4.4 amended the original Section 4.4 of the Patent Agreement by freeing Optimum of any obligations or liabilities under the Armstrong Agreement if they accrued before the Patent Agreement took effect.

### F. This Litigation

On May 28, 2010—a few months after the Patent Agreement took effect and just days after the third amendment to that agreement—Armstrong commenced this case by filing its original summons and complaint. (Dkt. No. 1.) On July 27 and 28, 2010, Hartman and Optimum filed motions to dismiss, while Armstrong filed a motion for a Temporary Restraining Order and a preliminary injunction blocking the sale of Hartman's patents to Optimum. (Dkt. Nos. 15, 17, 18.) The July 2010 motion practice included an issue that Armstrong raised at the outset and that presents itself again in the pending motions: whether Hartman's sale of the LOOP Technology to Optimum, *in itself*, breached Sections 3.2(b) and 3.3(a) of the Armstrong Agreement. (*See* Dkt. No. 317 at 34–39.) Judge Skretny said no and explained as follows:

> The question here, then, is whether Hartman has expressly or impliedly
> promised not to practice the patented technologies at the factory implementation

25

level, as he claims, or whether he has retained that right, as Armstrong believes. "Any right not specifically granted by the licensor remains with the licensor, and the rights granted in the license cannot expand beyond the boundaries delineated in the agreement." *Cook Inc. v. Boston Sci. Corp.*, 208 F. Supp. 2d 874, 879 (N.D. Ill. 2002); *see also, Textile Prods., Inc. v. Mead Corp.*, 134 F.3d 1481, 1484–85 (Fed. Cir. 1998) (where agreement is silent as to patentee's ability to grant further licenses to others, court must assume patentee reserved that right).

This License Agreement expressly provides that Hartman will not grant a license for the Licensed Technologies or the Licensed Patents to any other manufacturer or assembler, and will not grant a license for factory implementation to any third party involved in the manufacture of pumps, factory packaged chilled water systems, chillers, building controls or cooling towers. (Complaint, Ex. A §§ 3.2(b) and 3.3(a)). These promises alone do not speak to Hartman's ability to practice in the licensed area. However, the Agreement further defines the grant of "limited exclusivity" as "intended to protect [Armstrong] against implementations of the Licensed Technologies that would compete with their [sic] intended offerings." (§ 3.3.) This definition implicitly includes Hartman's promise not to practice the technologies in any manner described in the license grant to Armstrong. (§ 2.1.) This conclusion is further supported by the fact that the License Agreement goes on to expressly identify the rights Hartman does retain; specifically, for field implementation (§ 3.3(b)), and for manufacturing or assembly of products other than those manufactured or assembled by Armstrong (§§ 3.2(b), 3.3(d)).

Because the License Agreement grants to Armstrong the sole right to practice the technologies in the manner described in section 2.1 of the License Agreement, Hartman's assignment of the patents necessarily will be subject to that right. As a matter of law, then, the intended assignment will include only the rights Hartman could have exercised without violating the License Agreement. Accordingly, Hartman's motion to dismiss is granted to the extent Armstrong's breach of contract claim is based on an alleged breach of sections 3.2(b) and 3.3(a) of the License Agreement.

(Dkt. No. 39 at 10–11.) Judge Skretny's conclusion that the patent sale in itself would not alter the relationship between Hartman and Armstrong formed one of the bases for his decision not to grant Armstrong a preliminary injunction. (*Id.* at 25–26.)

On March 8, 2011, Armstrong filed its amended complaint. (Dkt. No. 55.) The amended complaint contains two counts. In Count I, Armstrong accused Hartman and Optimum of breach of contract. Part of Armstrong's claim concerned the Patent Agreement:

> By entering the agreement to transfer the rights to Optimum, Hartman breached the Armstrong License Agreement, including without limitation, the restrictions not to grant certain rights to other parties, the express prohibitions against granting certain rights to Optimum, the provision giving Armstrong the right of first refusal on the improvements, and the provision against entering inconsistent agreements. For example, the Patent Purchase Agreement at section 4 assigns to Optimum all right, title and interest in the Patents, defined at page 2 of the Patent Purchase Agreement, which includes the Patents licensed to Armstrong as well as the pending improvement applications, for which Hartman promised a right of first refusal to Armstrong at section 8 of the Armstrong License Agreement. The Patent Purchase Agreement was executed by Hartman on February 10, 2010.

(Dkt. No. 55 at 9.) The rest of Armstrong's claim concerned the impact of the Optimum Agreement on the Armstrong Agreement:

> By entering into an inconsistent license agreement with Optimum, Hartman breached the Armstrong License Agreement, including without limitation, the restrictions not to grant certain rights to other parties, the express prohibitions against granting certain rights to Optimum, the provision giving Armstrong the right of first refusal on the improvements, and the provision against entering inconsistent agreements. For example, the Optimum License Agreement (Exhibit B) grants to Optimum a transferable right to make products (Loop Products) at section 2.1, which is inconsistent with and violates Hartman's promise not to grant those rights to manufacturers of pumps and cooling systems in section 3.2(b) of the Armstrong License Agreement, and/or is inconsistent with and violates Hartman's promise not to grant rights to parties that implement the Hartman Loop Technology in competition with Armstrong's product offerings in section 3.3(d) of the Armstrong License Agreement.

(*Id.* at 10.) In Count II, Armstrong accused Hartman and Optimum of tortious interference with the Armstrong Agreement:

> With the knowledge of the terms of the Armstrong License Agreement, Optimum manipulated definitions and terms in its own license agreement with

27

Hartman to make the grant of rights to Optimum inconsistent with the rights that Hartman had previously licensed to Armstrong. Optimum's interference has caused a loss in sales to Armstrong and specifically a loss in sales of products intended to be used with the Hartman Loop Technology. Optimum's interference has damaged Armstrong's ability to capitalize on its investments.

Optimum's interference has caused Hartman to breach the Armstrong License Agreement. In particular, by entering the agreement to transfer the rights to Optimum (the Patent Purchase Agreement), Hartman breached the Armstrong License Agreement, including without limitation, the restrictions not to grant certain rights to others and the provision against entering inconsistent agreements.

(*Id.* at 11.) Armstrong reiterated these allegations in its cumulative counterclaim / cross-claim against Hartman and Optimum. (Dkt. No. 58 at 8–9; Dkt. No. 68 at 8; Dkt. No. 111 at 8.) Armstrong's counterclaim made explicit reference to Sections 3.2(b), 3.3(d), 3.3(e), and 10.2 of the Armstrong Agreement. (Dkt. No. 58 at 8–9; Dkt. No. 68 at 8; Dkt. No. 111 at 8.)

Hartman answered the amended complaint and the cumulative counterclaim without filing any counterclaims of his own. (Dkt. Nos. 56, 59.) Optimum included counterclaims with its answer. (Dkt. No. 57.) Of the counterclaims that remain,[4] Optimum accused Armstrong of breaching the Armstrong Agreement by engaging in improper field implementation at building projects in Ohio, Massachusetts, and California. (*Id.* at 15–16.) Optimum also seeks a declaratory judgment that would clarify the scope of each party's rights under the Armstrong Agreement. (*Id.* at 19, 23.)

On May 5, 2017, the parties filed motions for summary judgment with respect to Armstrong's first amended complaint, counterclaims, and cross-claims. (Dkt. Nos. 290, 291, 292.)

---

[4] Optimum had a total of five counterclaims. Two of the counterclaims involved allegations of patent infringement. Without revisiting the history of patent allegations in this case, the parties effectively abandoned any patent-related claims on April 17, 2014. (Dkt. No. 175.)

The parties agree that no one has moved for summary judgment with respect to Optimum's counterclaims. (Dkt. No. 321 at 1.)

Armstrong seeks summary judgment on several issues that have arisen in this case. Armstrong's overarching theme against Hartman is that "Hartman knew his sale of the patents would cause grave harm to Armstrong and have the effect of destroying or drastically reducing Armstrong's expected fruits of the contract Hartman signed in 2005—the Armstrong License Agreement." (Dkt. No. 317 at 29.) As for more specific arguments, Armstrong contends that Hartman breached his obligation, under Section 3.3(e) of the Armstrong Agreement, to refer customers to Armstrong diligently. Much of this argument rests on Hartman's alleged interpretation of Section 3.3(e): Hartman had an obligation to refer customers diligently; he had a change of mind about his understanding of his obligations, and this change of mind was "a calculated way to avoid the plain language of the Armstrong License Agreement" (Dkt. No. 317 at 32); therefore, he failed to show proper diligence and breached the Armstrong Agreement. The part of the argument most based on evidence effectively reduces to a different syllogism: Hartman had an obligation to refer customers diligently; diligence required asking potential customers details about projects that they had in mind; Hartman instead read email messages from potential customers at face value and did not inquire whether new pumps or chillers would be needed (*see id.* at 33–34); therefore, he failed to show proper diligence and breached the Armstrong Agreement. Armstrong turns to a different argument, despite Judge Skretny's prior rulings, when attacking the sale of the LOOP Technology patents as an inherent breach of Sections 3.2(b) and 3.3(d) of the Armstrong Agreement. This argument also reduces to a syllogism: Armstrong and

29

Optimum are not supposed to be competitors under the Armstrong Agreement; if they are competitors then Sections 3.2(b) and 3.3(d) are breached; some people say that the Armstrong and Optimum controllers are equivalent products that can compete with each other (*see id.* at 34–36); therefore, Hartman and Optimum have breached Sections 3.2(b) and 3.3(d). As for the right to practice the patents, Armstrong asserts a breach of Section 3.3(a) of the Armstrong Agreement. According to Armstrong, Section 3.3(a) prohibited Hartman from granting anyone else a license for factory implementation involving hydronic HVAC systems. Hartman, however, reserved for himself the right to practice his own patents. When Hartman sold his patents to Optimum, he necessarily included his reservation of rights in the sale. As a result, Optimum now has acquired the right to practice the patents in violation of Section 3.3(a). Armstrong has not pointed to a specific instance of Optimum "practicing the patents" in a way distinct from specific and actual instances of factory implementation of hydronic HVAC systems. Finally, Armstrong makes a brief argument that Hartman and Optimum violated Section 10.2 of the Armstrong Agreement and its prohibition on subsequent agreements that would be inconsistent. "By assigning Optimum the very patents and pending applications that are the subject of the License Agreement, Hartman not only gave Optimum rights in contravention of the promises Hartman made to Armstrong, Hartman significantly harmed Armstrong's business." (*Id.* at 39.) In support of this argument, Armstrong cites to a particular building project in which the customer initially contemplated a product proposal from Armstrong but settled on a competing proposal from Optimum.

Optimum has a different view of Armstrong's issues and raises some of its own as well. Optimum argues that Armstrong's arguments about referral obligations do not reach it because

Hartman expressly retained all responsibilities regarding referrals. As for Count II of the amended complaint and any claims of tortious interference, Optimum begins by asserting that the claims are untimely under N.Y. CPLR 214(4) and the three-year limitations period set forth in that provision. For both counts of the amended complaint, Optimum argues that no breach of the Armstrong Agreement occurred because of the way in which that agreement tried to keep the two companies in separate spheres. According to Optimum, the Armstrong Agreement, with its concepts of factory and field implementation, did not distinguish parts of the HVAC market so much as it distinguished methods for implementing the LOOP Technology:

> It is important to note that while both Armstrong and Optimum were given certain exclusive rights with respect to the method of implementing the LOOP Technologies, they were not given exclusive rights with respect to particular *markets*. Both Armstrong and Optimum could offer their method of implementation in both the "retrofit" and "non-retrofit" markets as they were sometimes referred to. In other words, Hartman, Armstrong and Optimum all intended and understood that the Factory Implementation method and the Field Implementation method might both be permissible on the same job site.

(Dkt. No. 291-3 at 23.) From there, Optimum concludes that "the reference in §3.2(b) to 'intended product offering' is not a general blanket prohibition, but rather is a limitation on an exception, and that limitation, by its plain terms, is itself quite narrow. It does not prevent Hartman from granting license rights with respect to any and all products that could compete with Armstrong's products." (*Id.* at 28.) Optimum contends that the plain language of the Armstrong Agreement can resolve this case but that, in the alternative, extrinsic evidence fails to demonstrate that it intended any interference with the Armstrong Agreement or that any interference that occurred was improper. Optimum concludes with an argument that Armstrong would be limited to nominal damages only if the case went to trial. According to Optimum, Armstrong's Rule 26

initial disclosures made only a general assertion of actual damages and showed no specific figure or computation that would lead to a specific figure. Armstrong also has failed, allegedly, to set forth any information about lost perspective sales that could be traced to Optimum and that would establish consequential damages. Without specific figures and computations, argues Optimum, Armstrong has left itself with nominal damages only if the Court or a jury found in its favor.

Hartman advances several arguments of his own in favor of summary judgment. According to Hartman, the plain language of the Armstrong Agreement—Section 3.2(b) in particular—gave Armstrong and Optimum distinct roles in the HVAC market with respect to factory and field implementation. Combined with Section 3.3, Armstrong had licensing rights for factory implementation of hydronic, or water-based, HVAC equipment that incorporated the LOOP Technology. Armstrong also could request, on a case-by-case basis, permission to conduct field implementations of the LOOP Technology. Hartman, in his view, retained full rights to license the LOOP Technology for factory implementation of non-hydronic, or air-based, HVAC equipment and for field implementation of the LOOP Technology. Hartman also retains the responsibility for diligence in referring potential factory implementations to Armstrong. Neither the Optimum Agreement nor the Patent Agreement changed the rights that Armstrong had and the responsibilities that Hartman retained. Under these circumstances, Hartman concludes that no inconsistencies have arisen that would violate Section 10.2 of the Armstrong Agreement. With respect to rights of first refusal, Hartman notes that the Patent Agreement preserved Armstrong's rights on its face. Hartman notes further that Armstrong has not shown any evidence of actual conduct that breached Armstrong's rights of first refusal. Hartman thus sees no violation of

Section 8 of the Armstrong Agreement.  As for diligence in referrals, Hartman cites evidence that

he has in fact made referrals to Armstrong, when potential clients approached him with projects

that sounded like factory implementations.  Hartman maintains his positions primarily based on

the plain language of the Armstrong Agreement but also cites to a number of pieces of evidence

that would, in the alternative, establish the parties' intent in the face of ambiguous language.

Finally, Hartman joins Optimum's argument that Armstrong has limited itself to nominal damages

at any trial due to a failure to disclose exactly what damages it has suffered as a result of any alleged

tortious conduct.

IV.    DISCUSSION
### A.  Summary Judgment Generally

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FRCP

56(a).  "As to materiality, the substantive law will identify which facts are material.  Only disputes

over facts that might affect the outcome of the suit under the governing law will properly preclude

the entry of summary judgment . . . . More important for present purposes, summary judgment

will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 248 (1986) (citation omitted).  "The party seeking summary judgment has the burden to

demonstrate that no genuine issue of material fact exists.  In determining whether a genuine issue

of material fact exists, a court must examine the evidence in the light most favorable to, and draw

all inferences in favor of, the non-movant . . . . Summary judgment is improper if there is any

evidence in the record that could reasonably support a jury's verdict for the non-moving party."
*Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted).

### B. Contract Law Generally

At least some of the parties' arguments rest very heavily on how the Court interprets the language of key portions of the Armstrong Agreement. To help assess that contract, the Court should take a little time to review applicable principles of contract interpretation. For substantive principles, the Court will look at New York law in accordance with Section 12.10 of the Armstrong Agreement. Federal cases cited below interpreted New York law unless otherwise noted.

"The objective in any question of the interpretation of a written contract, of course, is to determine what is the intention of the parties as derived from the language employed. At the same time the test on a motion for summary judgment is whether there are issues of fact properly to be resolved by a jury. In general the courts have declared on countless occasions that it is the responsibility of the court to interpret written instruments. This is obviously so where there is no ambiguity. If there is ambiguity in the terminology used, however, and determination of the intent of the parties depends on the credibility of extrinsic evidence or on a choice among reasonable inferences to be drawn from extrinsic evidence, then such determination is to be made by the jury. On the other hand, if the equivocality must be resolved wholly without reference to extrinsic evidence [then] the issue is to be determined as a question of law for the court." *Hartford Acc. & Indem. Co. v. Wesolowski*, 305 N.E.2d 907, 909 (N.Y. 1973) (internal quotation marks and citations omitted). "Contract language is unambiguous if it has a definite and precise meaning, unattended

by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion. Language whose meaning is otherwise plain is not ambiguous merely because the parties urge different interpretations in the litigation. The court should not find the language ambiguous on the basis of the interpretation urged by one party, where that interpretation would strain the contract language beyond its reasonable and ordinary meaning. The parties' rights under an unambiguous contract should be fathomed from the terms expressed in the instrument itself rather than from extrinsic evidence as to terms that were not expressed or judicial views as to what terms might be preferable. In its efforts to preserve the parties' rights and the status quo, the court must be careful not to alter the terms of the agreement. The parties having agreed upon their own terms and conditions, the courts cannot change them and must not permit them to be violated or disregarded." *Metro. Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir. 1990) (internal quotation and editorial marks and citations omitted).

"However, when the contract language is ambiguous, meaning that there may be more than one reasonable interpretation, its construction will be left to the fact finder for a determination as a matter of fact. Nevertheless, even ambiguous contracts may be interpreted by a court as a matter of law where the parties fail to supply extrinsic evidence to support their respective interpretations. In such a case, a court must consider the available writings and the undisputed circumstances of execution so as to discern the parties' intentions. In short, summary judgment is appropriate where either, 1) the contract is unambiguous, 2) the contract is ambiguous but extrinsic evidence presented by the parties resolves any ambiguity, or 3) the contract is ambiguous but the opposing party fails to tender extrinsic evidence supporting its proposed

interpretation." *82-11 Queens Blvd. Realty, Corp. v. Sunoco, Inc. (R & M)*, 951 F. Supp. 2d 376, 382

(E.D.N.Y. 2013) (internal quotation marks and citations omitted); *see also Lightfoot v. Union Carbide*

*Corp.*, 110 F.3d 898, 906 (2d Cir. 1997) ("Contract terms are considered ambiguous if they are

capable of more than one meaning when viewed objectively by a reasonably intelligent person who

has examined the context of the entire integrated agreement and who is cognizant of the customs,

practices, usages and terminology as generally understood in the particular trade or business.")

(internal quotation marks and citations omitted).

 Ambiguities in a contract can be deep or shallow.  Deeper ambiguities include whether the

parties to a purported contract ever really reached a meeting of the minds on essential terms:

> [A] contract is a private 'ordering' in which a party binds himself to do, or not to
> do, a particular thing.  This liberty is no right at all if it is not accompanied by
> freedom not to contract.  The corollary is that, before one may secure redress in
> our courts because another has failed to honor a promise, it must appear that the
> promisee assented to the obligation in question.  It also follows that, before the
> power of law can be invoked to enforce a promise, it must be sufficiently certain
> and specific so that what was promised can be ascertained.  Otherwise, a court, in
> intervening, would be imposing its own conception of what the parties should or
> might have undertaken, rather than confining itself to the implementation of a
> bargain to which they have mutually committed themselves.  Thus, definiteness as
> to material matters is of the very essence in contract law.  Impenetrable vagueness
> and uncertainty will not do.
>
>  Dictated by these principles, it is rightfully well settled in the common law
> of contracts in this State that a mere agreement to agree, in which a material term is
> left for future negotiations, is unenforceable.

*Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher*, 417 N.E.2d 541, 543 (N.Y. 1981) (internal

quotation marks and citations omitted).  "In determining whether the parties intended to enter a

contract, and the nature of the contract's material terms, we look to the objective manifestations of

the intent of the parties as gathered by their expressed words and deeds.  Disproportionate

emphasis is not to be put on any single act, phrase or other expression, but, instead, on the totality of all of these, given the attendant circumstances, the situation of the parties, and the objectives they were striving to attain." *Stonehill Capital Mgmt., LLC v. Bank of the West*, 68 N.E.3d 683, 689 (N.Y. 2016) (internal quotation and editorial marks and citations omitted). "Moreover, at some point virtually every agreement can be said to have a degree of indefiniteness, and if the doctrine is applied with a heavy hand it may defeat the reasonable expectations of the parties in entering into the contract. While there must be a manifestation of mutual assent to essential terms, parties also should be held to their promises and courts should not be pedantic or meticulous in interpreting contract expressions. Before rejecting an agreement as indefinite, a court must be satisfied that the agreement cannot be rendered reasonably certain by reference to an extrinsic standard that makes its meaning clear. The conclusion that a party's promise should be ignored as meaningless is at best a last resort." *Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp.*, 548 N.E.2d 203, 206 (N.Y. 1989) (internal quotation marks and citations omitted).

### C. Application of Contract Law Principles to the Armstrong Agreement

With the above principles of contract law in mind, the Court now turns to the portions of the Armstrong Agreement that are central to the parties' dispute. Section 2.1—a section that seemed unchanged through most if not all negotiations (*see, e.g.*, Dkt. No. 212-3 at 3 (March 17, 2004 draft))—gave Armstrong a license to take two categories of actions. In the first category, Armstrong had "a license, to make, have made, use, sell, and otherwise distribute factory packaged chilled water systems, pumping and/or other mechanical products that incorporate the Licensed Technologies at the factory implementation level." (Dkt. No. 55-1 at 3.) The use of the terms

"packaged," "system," and "products" imply that Armstrong had to roll a more complete HVAC solution out of its factory than just a controller and a pump, a position that it took for sales purposes and that Hartman opposed. "'Factory Implementation' means implementing the Licensed Technologies into chiller, pumping, control systems and/or tower products as a part of the factory production process." (*Id.*) "Implementation," to avoid being superfluous to the other contract language quoted above, has to mean something other than basic manufacture or production; it has to have a meaning to the effect of deployment or being fully ready for action. *See, e.g., Sambataro v. Comm'r of Soc. Sec.*, No. 13-CV-8953 KBF, 2015 WL 1539046, at *7 (S.D.N.Y. Apr. 6, 2015) (defining "implement" as, "*inter alia*, 'carry out, accomplish; especially: to give practical effect to and ensure of actual fulfillment by concrete measures'") (citation omitted); *In re Park Ave. Radiologists, P.C.*, 450 B.R. 461, 468 (Bankr. S.D.N.Y. 2011) (describing three phases of a Chapter 11 bankruptcy plan—"its meaning, its implementation or its consummation"). The Court's prior understanding of the first category of Section 2.1 thus stands unchanged: "Put another way, to the Court's best understanding, factory implementation means that an HVAC product rolls out of Armstrong's factory with Hartman's patent technology fully installed and ready for use." *Armstrong Pump, Inc. v. Hartman*, No. 10-CV-446S, 2014 WL 6908867, at *1 (W.D.N.Y. Dec. 9, 2014). The record contains some examples of project bids in accordance with the first category of Section 2.1. (*See, e.g.,* Dkt. No. 212-14 at 4.) Rothman provided what is probably the clearest explanation of factory versus field implementation in the entire record:

> The Hartman Technology manifests itself in algorithms that control and determine the optimal sequences of all the equipment (chillers, pumps and cooling towers) in the chiller system.

In Armstrong's case, it buys the controller and loads the algorithm into the controller at its factory to *directly* interface with all the chiller equipment in the plant. Armstrong then ships the controller with what equipment has previously been agreed to, such as a minimum of a pumping package. In short, Armstrong programs the controller with the algorithm at its factory and its controller directly controls the plant equipment.

Optimum, on the other hand, sends a generic controller (what we refer to as an "appliance" or "[REDACTED]") to the project site, and the controls contractor installs it. We verify the contractor's work, and only then does Optimum implement the technology in the field/at the site. Optimum's controller or appliance does not directly control the chiller plant equipment. Optimum's appliance signals the existing BAS/BMS what the optimal control setting or set points are that would result in the best energy performance. Using these optimal settings or set points, the BAS/BMS determines how to control the chiller plant equipment. The system control function remains in the BAS/BMS.

(Dkt. No. 294-6 at 9–10.) If Section 2.1 ended at the first category then Armstrong's

manufacturing license would be fairly easy to understand. Unfortunately, the second category in

Section 2.1 throws the scope of the license into doubt. Under the second category, Armstrong can

"use and otherwise practice the Licensed Technologies in Licensed Products." This second

category appears only in the Armstrong Agreement; the analogous section of the Optimum

Agreement lacks this language. The term "otherwise" has to be read as creating a distinction from

"use," but because the word "use" follows only a comma, "otherwise" has to be read as a

distinction from the entire first category. "Practice," meanwhile, is a very broad word in the patent

world. *See Practice (patents)*, Black's Law Dictionary (10th ed. 2014) ("1. To make and use (a

patented invention)."). There is no limit to what a "Licensed Product" is; it "means *any* product

which would infringe one or more valid claims of the Licensed Patents in the absence of this

Agreement if sold in the U.S." (Dkt. No. 55-1 at 3 (emphasis added).) To avoid rendering the

second category duplicative of the first category, the second category would have to mean that

Armstrong can deploy the LOOP Technology beyond specified factory packaged products at the factory implementation level. Under this natural reading, the second category would be much more expensive than the first category and then would render all or part of the first category superfluous. *See Galli v. Metz*, 973 F.2d 145, 149 (2d Cir. 1992) ("Under New York law an interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless is not preferred and will be avoided if possible.") (internal quotation and editorial marks and citation omitted); *cf. Encyclopedia Brown Prods. v. Home Box Office, Inc.*, No. 91 CIV. 4092 (PKL), 1998 WL 734355, at *9 (S.D.N.Y. Oct. 15, 1998) (rejecting an interpretation of a copyright license that would render a provision about content distribution superfluous). Essentially, then, Section 2.1 on its face gives the Court two equally possible interpretations that it cannot reconcile: 1) Armstrong can make complete, ready-to-use HVAC solutions; or 2) Armstrong can take *any* action—manufacturing, restoration, or retrofits of new, used, or hybrid HVAC equipment—that "practices" the LOOP Technology.

Worse yet, extrinsic evidence of the parties' intent during and after negotiations is inconclusive about the expansive scope of the second category of Section 2.1. Hartman wanted to limit Armstrong to straightforward manufacture of factory packaged systems, which he never defined but seemed to want to define as something more than a controller plus a pump. At the same time, though, Hartman knew that Armstrong wanted to participate in the "retrofit" market, meaning that Armstrong wanted in on upgrades and improvements to older equipment that potential customers already had. Armstrong knew from Hartman as far back as 2004 that Hartman intended Optimum to be an eventual partner for both new and existing HVAC projects.

40

Armstrong also wanted to be the supplier of controllers for Optimum's software. At one point, Hartman himself expressed concern that he and Armstrong had not reached a meeting of the minds on the scope of Armstrong's license, to the point where he pushed back against Armstrong's eagerness to get the LOOP Technology and wanted to delay entering an agreement for a year. The parties never truly resolved Hartman's concern; Hartman continually pushed Armstrong past a "controller plus pumps" minimum manufacturing requirement, while Armstrong courted the [REDACTED] and [REDACTED] projects while giving more weight to the second category in Section 2.1 than the first category. In fact, Armstrong internal notes indicate that, within months of entering the Armstrong Agreement, its engineers were contemplating how to "field install" the LOOP Technology controller under development. (*See* Dkt. No. 212-9 at 5; *see also* Dkt. No. 212-10 at 3.) And again, the parties repeatedly fell back on the word "retrofit" when distinguishing the word "factory," even though they avoided referring to retrofit projects during contract negotiations.

The record additionally contains evidence that Armstrong understood how much more expansive the second category was than the first and took advantage of that expansiveness. The Court already has described some of the email messages that the parties exchanged in the wake of the [REDACTED] incident. The Court now will emphasize one particular comment from Ross to Rothman regarding how broadly Armstrong thought that it could use the LOOP Technology under the guise of factory implementation. Among other comments during their email conversation, Rothman wrote to Ross that

> We discussed each company's rights to sell the Hartman LOOP specifically
> as it relates to centrifugal chiller plants. Our understanding is that your product

offering is focused on new chiller plants; the contracts relate to this by identifying it as a *factory built* package which contains equipment and a controller, manufactured and ready to install as shipped. We understand that you might not supply all of the components of a new plant, but our common understanding, and intentions as you and I discussed as far back as August 2005, is that Armstrong's focus is on new plants. During our conversation I felt as if you were implying the sale of a couple of pumps with the controller to an existing plant was within your scope. I do not agree.

I feel that is outside the scope and intention of all the parties and would not qualify as a factory implementation.

(Dkt. No. 99-2 at 15 / Dkt. No. 294-6 at 139.) Ross's response succinctly highlights the absence of a common understanding of what "factory implementation" meant: "WE DISAGREE HERE. ARMSTRONG HAS INVESTED A LOT OF MONEY [REDACTED] IN MAKING OUR [REDACTED] CONTROLLER A FACTORY IMPLEMENTED SOLUTION TO BE USED IN CONJUNCTION WITH OUR PUMPS WHICH IT CONTROLS ALONG WITH CHILLERS AND COOLING TOWERS WHICH MAY BE SUPPLIED BY OTHERS." (*Id.*) If the [REDACTED] incident of 2006 did not fully show the consequences of the Section 2.1 ambiguities, the [REDACTED] incident of 2009 did. Armstrong discovered a potential multimillion dollar project that it really, really wanted. When [REDACTED] contacted Hartman about what it had in mind, Hartman did exactly what Armstrong currently argues that he should have done: He asked [REDACTED] whether the potential project involved new or existing equipment; [REDACTED] answered that it involved an existing plant; and Hartman followed the protocol of the Armstrong Agreement and referred [REDACTED] to Optimum. Armstrong criticized him anyway. Yet the [REDACTED] incident escapes any sort of judgment as a matter of law because it technically demonstrated how Armstrong was "otherwise practicing" the LOOP

42

Technology under Section 2.1, which would be acceptable on the face of that section. Additionally, the ensuing email exchange between Armstrong and Hartman revealed that the [REDACTED] project likely would be a hybrid scenario, and the parties never figured out how hybrid scenarios fit under the factory versus field distinction. By the time of the [REDACTED] announcement in late 2013, Armstrong dropped any pretense of trying to work within Hartman's intentions and openly started taking advantage of ambiguities in the Armstrong Agreement. The alternative readings and the ambiguities of Section 2.1 thus, in turn, exposed alternative readings to the concepts of factory and field implementation. To be consistent with the language of the Armstrong Agreement as a whole, factory and field implementation would have to be consistent with the scope of Armstrong's rights under Section 2.1. Factory implementation thus could mean what the Court thought that it meant, if the first category in Section 2.1 were to prevail. If the second category prevailed, though, the concept of factory implementation would have to expand in proportion and would have to cover retrofit projects or other hybrid scenarios where only a part of the overall project consisted of brand-new equipment rolling out of the factory. Right now, the Court sees either reading of factory implementation as equally likely.

To be clear, the Court's point in highlighting the above incidents is not to demonstrate some sort of malice by Armstrong. Rather, the point is to show that the Court cannot even determine whether malice exists here. The parties have spent the last seven years paying a terrible price for not working out a few extra details back in 2004 and 2005. Since the parties did not do enough to clarify Section 2.1 and to negotiate what factory implementation meant before the Armstrong Agreement, they naturally were unclear as to what that term meant when the

[REDACTED] and [REDACTED] incidents occurred. And again to be clear, the Court of course respects the well-known principle that a contract's failure to address a particular scenario does not create an ambiguity as to that scenario; there is simply no agreement at all about that scenario. *See, e.g., Technest Holdings, Inc. v. Deer Creek Fund LLC*, No. 06CIV.1665HBP, 2008 WL 3449941, at *14 (S.D.N.Y. Aug. 12, 2008) (citations omitted). That principle applies whenever a contract fails to contemplate a scenario unrelated to any scenario addressed by the contractual language. The problem here is that Section 2.1 on its face might contemplate hybrid scenarios, and it just as equally might not; the parties have presented no extrinsic evidence that justifies rendering one half or the other of that section superfluous. *Cf. Town of Southampton v. Jessup*, 65 N.E. 949, 951 (N.Y. 1903) ("An ambiguity, in order to authorize parol evidence, must relate to a subject treated of in the paper, and must arise out of words used in treating that subject. Such an ambiguity never arises out of what was not written at all, but only out of what was written so blindly and imperfectly that its meaning is doubtful."); *see also Saccucci Auto Grp., Inc. v. Am. Honda Motor Co.*, 617 F.3d 14, 22 (1st Cir. 2010) ("To be sure, some courts have said that silence creates ambiguity when it involves a matter naturally within the scope of the contract.") (citing *Jessup*; internal quotation marks and citations omitted).

As a result, under either the plain language or the extrinsic evidence leading up to it, the two categories in Section 2.1 are in irreconcilable conflict with each other. The Court simply cannot tell how expansively Armstrong was allowed "to use and otherwise practice" the LOOP Technology.

The next portion of the Armstrong Agreement that affects the parties' claims and arguments is Section 3.2(b). Section 3.2(b) clarified that Armstrong's license had worldwide effect but otherwise put limits on Hartman. Specifically, Section 3.2(b) prohibited Hartman from granting any LOOP Technology licenses 1) "to any other manufacturer or assembler of pumps," which presumably would mean a competitor of Armstrong such as [REDACTED] without regard to any particular product; and 2) to anyone at all "for cooling systems and equipment that employ chilled water distribution." (Dkt. No. 55-1 at 4.) The restrictions on Hartman in Section 3.2(b) had one exception: Hartman could license the LOOP Technology to Optimum "or others for the purpose of incorporating the Technologies into products excluding those that include the manufacture or assembly of pumps, chillers, towers, chilled water plant controls or pumping or chiller systems that could compete with the Licensee's intended product offering." (*Id.*) In other words, the two main restrictions on Hartman in Section 3.2(b) did not apply in one circumstance: Hartman could issue LOOP Technology licenses to anyone at all for factory implementation of HVAC equipment that was somehow distinguished from Armstrong's product lineup. Factory implementation is implied here by use of the words "manufacture" and "assembly"; Optimum would not be manufacturing or assembling anything in the field. Also, the avoidance of Armstrong's product lineup theoretically would allow for licenses for hydronic HVAC equipment. Functionally, though, the design of a hydronic HVAC system that did not compete with Armstrong's products probably would be difficult, and the reference to Armstrong's product lineup can be understood more naturally to mean non-hydronic systems. The Court's understanding of Section 3.2(b) gains support from Section 3.3(a), a somewhat repetitive section

45

that clarified protection for anything in Armstrong's product lineup "wherein the basis of the system is chilled water cooling systems, or pumping systems." (*Id.* at 5.) Section 3.3(a) also reiterated limits on Hartman; Hartman was prohibited from licensing the LOOP Technology to anyone for factory implementation of hydronic HVAC equipment. Notably, though, the emphasis here is on Armstrong's exclusivity—the section defines what others *cannot do*, and that does not help with determining what Section 2.1 allows Armstrong *to do*.

The next portion of the Armstrong Agreement that affects the parties' claims and arguments is Section 3.3(b). Section 3.3(b) essentially made explicit a negative implication of Section 2.1 (putting aside for a moment the ambiguity in Section 2.1 that the Court described above). If Armstrong, under Section 2.1, had a certain license for factory implementation then, by implication, Hartman was under no restrictions with regard to issuing LOOP Technology licenses for "field implementation." "'Field Implementation' means implementing the Licensed Technologies into the chiller, pumping, control systems and/or tower products after the products have been delivered to the site." (*Id.* at 3.) Theoretically, if the definition of field implementation were applied to Armstrong then it would be pretty easy to understand: "Field implementation, in contrast, means that an HVAC product rolls out of Armstrong's factory fully compatible with Hartman's patent technology, but that the technology would be added to the product at the place where the product would be installed." *Armstrong Pump*, 2014 WL 6908867, at *1. A field implementation scenario for Armstrong could occur under Section 3.3(c), if Hartman granted permission on a case-by-case basis. Armstrong understood that scenarios could exist in which it could face competition for implementations outside of factory implementation. (*See* Dkt. No. 319

46

at 264 ("Yes, I imagine there could be circumstances where a product with Hartman LOOP technologies that was not a factory implementation could compete against an Armstrong offering.").) As applied to Optimum, however, the definition of field implementation is confusing. Hartman made clear during negotiations for the Armstrong Agreement that he envisioned Optimum as a software company that would tweak the settings of existing HVAC systems to improve their efficiency. Optimum, in Hartman's understanding, would work on "retrofit" projects. (*See* Dkt. No. 246-6 at 2 (Optimum document describing its controller as "deployed on-site at the customer's facility").) During negotiations of the Armstrong Agreement, an early version of Section 3.3(b) reflected Hartman's understanding by specifying that the LOOP Technology would be "implemented by a separate system." (Dkt. No. 212-1 at 39.) In existing HVAC systems, though, the equipment would have been assembled weeks, months, or years earlier. What, then, is the significance of the limitation that field implementation could not take place until the HVAC equipment had been field *assembled*? The parenthetical phrase in Section 3.3(c) does not offer much guidance; it modifies the definition of "field implementation" to mean "implementing the Licensed technologies without an integrated equipment/control package." (Dkt. No. 55-1 at 5.) The parenthetical phrase offers some clarification of Hartman's original intent, that Optimum arrive at the site of an existing HVAC system and install its controller over any existing controller to provide modified settings. If field implementation, however, truly refers to existing HVAC systems then Optimum always would be implementing the LOOP Technology with a standalone controller and not any integrated equipment.[5] The parties also never made time

---

[5] The record contains information about the algorithm that Optimum's software uses to increase efficiency

47

to discuss an issue that Armstrong considered on its own as far back as January 2004:

[REDACTED: another logistical issue not decided in advance]. (*See* Dkt. No. 212-1 at 3.) In his

efforts to appease Armstrong's desire to compete for retrofit projects, Hartman wound up creating

a definition of field implementation that blurs his own distinction between Armstrong and

Optimum's roles. The definition either contains superfluous language; or it implies that

Optimum could watch for scenarios in which a potential client replaced some or all of its HVAC

equipment with new equipment, minus a controller, and then jump in to plant its controller into

that system.

Next, the Court will examine the language of Section 3.3(d). This section effectively is a

repetition of the exception described in Section 3.2(b). Under Section 3.3(d), Hartman remained

free to grant LOOP Technology licenses to anyone "for implementation of the Licensed

Technologies when the implementation of such Licensed Technologies do not in any way compete

with the product offerings of the Licensee. Examples are the licensing of the technologies applied

to variable speed DX / air cooled rooftop air conditioning systems and the control of condenser

fans of air cooled chillers." (Dkt. No. 55-1 at 5.) Put another way, Hartman remained free to

grant licenses to anyone who did not interfere with Armstrong's product lineup. Again, factory

implementation is implied. A very narrow reading of this language could create some confusion

here; if Armstrong considered its controller to be a standalone "product offering" then Section

3.3(d) would restrict Hartman from granting licenses to use the LOOP Technology and rival

controllers. Reading the examples in this section in conjunction with other sections, however, the

---

in an existing HVAC system. (*See, e.g.*, Dkt. No. 212-1 at 53; Dkt. No. 254 at 36–53.)

Court is comfortable interpreting Section 3.3(d) as a restatement of the idea that Hartman could issue licenses for any aspect of non-hydronic HVAC equipment.

Next, the Court examines Section 3.3(e). This section established an obligation for Hartman and a right for Armstrong. Hartman had the obligation to "be diligent in referring to the Licensee all potential applications the Licensor learns about that required new chillers or pumps." (Dkt. No. 55-1 at 5.) This section does not define "diligent," though a common understanding along the lines of "constant in effort" or "persistent" should suffice. The section required Hartman to refer certain potential clients whom he "learns about." The phrase "learns about" has a passive tone to it compared to a phrase like "seeking out." Hartman was under no obligation to initiate searches for potential clients for Armstrong, but if information about a potential client came to him then he needed to pass it along to Armstrong. Even then, though, Hartman had no obligation to pass along all potential clients that came to him—only those clients who "require new chillers or pumps." That phrase in itself is probably some of the more specific language in the entire Armstrong Agreement, but in light of other ambiguities that the Court identified above, Hartman's obligation under Section 3.3(e) raises questions. Who decides when a potential client "requires" new chillers or pumps? How much leeway did Hartman, Armstrong, or Optimum have to advise a potential client about viable solutions that did or did not require new chillers or pumps? Suppose that a potential client wants some new chillers or pumps but wants them integrated with older equipment. Does that hybrid scenario count as factory or field implementation? Would Hartman have to refer a hybrid scenario to Armstrong?

The second half of Section 3.3(e) gave Armstrong a right of first refusal. Hartman could refer potential clients to Optimum or to other licensees if Armstrong did not want the potential business or if the potential client rejected an offering from Armstrong. Any licensee that picked up potential business rejected by Armstrong presumably would have to be a manufacturer of non-hydronic HVAC equipment, since the client would need new chillers or pumps and since Armstrong had an exclusive license for hydronic HVAC equipment.

The last section of the Armstrong Agreement that the Court will review is Section 10.2. This section contained certain promises that Hartman made with respect to patent infringement. The part of this section pertaining to the pending motions in this case is the part in which Hartman promised that he "has not made and will not make any agreements with or commitments to third parties that are inconsistent with the grant of rights hereunder." (Dkt. No. 55-1 at 9.) Section 10.2 did not grant Armstrong any new rights and did not give Hartman any new responsibilities. The section reads more like an explicit rendering of an implication from other sections of the Armstrong Agreement: If Hartman promised to give Armstrong certain exclusive licensing rights then, by extension, he also promised not to do anything going forward that would undermine those licensing rights.

### D. Intersection of Contract Language and Pending Claims and Motions

Mindful of the obligation to salvage an enforceable contract if plain language and extrinsic evidence permit, the Court finds, upon reading all sections of the Armstrong Agreement together, that some of Hartman and Armstrong's intentions are reasonably certain. Armstrong had a product lineup of HVAC components and controllers that it manufactured, and it wanted to

enhase that lineup with the LOOP Technology. Hartman wanted to promote his LOOP
Technology by licensing to companies that wanted it, but he did not want to damage the
reputation of his technology by having any corporate partners compete against each other. The
ensuing negotiations and the Armstrong Agreement that resulted show a general intent to be
bound and an attempt to draw a perimeter around Armstrong, within which Armstrong could
pursue business as aggressively as it wanted. Since Armstrong primarily is a manufacturer of
HVAC equipment, Hartman tried to give Armstrong limits that played to its core competencies:
manufacture and assembly, new equipment, and hydronic systems. Outside of those limits,
Hartman wanted a role for Optimum, a software startup known as far back as 2004 as a potential
purchaser of the LOOP Technology. Reduced to essential details, Optimum wanted to be able to
go into existing buildings with existing HVAC systems, diagnose inefficiencies in how those
systems are operating, and then adjust the settings of those systems to wring as much efficiency out
of them as possible. (*See, e.g.*, Dkt. No. 262 at 12 (Optimum document discussing [REDACTED].)
These general principles can be seen fairly easily in the Armstrong Agreement. The Court does
not want to give the impression that the parties could not agree on anything at all.

That said, the parties never really agreed on how to translate general principles into a
specific course of conduct. Armstrong wanted access to the LOOP Technology and wanted to sell
it to the fullest extent of its core competencies. Armstrong's eagerness is why it expressed
frustration about finishing the Armstrong Agreement in any form to "get the darn agreement
signed." Hartman struggled to reconcile Armstrong's ambition with his possibly naïve vision of
multiple licenses with multiple partners, each of which would remain happily within its own

51

perimeter.  First Hartman tried to define Armstrong's limits in terms of a straight-up manufacture

of pumps, but Armstrong wanted to be able to sell controllers and integrated systems.  Hartman

tried to distinguish between new equipment and retrofits of old equipment, but Armstrong

wanted to compete in the retrofit market.  Hartman himself threw up his hands at one point and

doubted that he and Armstrong could reach a meeting of the minds.  Hartman then tried to refine

a new concept, unheard-of in the industry,[6] of factory versus field implementation.  Factory

implementation was close to straight-up manufacture, but no one wanted to say that, and no one

could really articulate what the difference was.  Similarly, field implementation sounded just like

retrofit projects, but no one wanted to use the word retrofit, and yet no one could really articulate

what the difference was.  To the end of negotiations, Hartman fretted about what factory or field

implementation would mean in scenarios with different mixes of new and old equipment:

> [W]hat concerned me was that there might be applications that would come up
> where there would be an uncertainty as to which type of solution would be the
> proper one.  And I didn't—I wanted to be sure that we understood *the possibility of*
> *neither application being applied*, so that projects might go by where neither of the two
> parties here felt that was in their periphery, or that perhaps both of them did, and
> could cause some disagreement among the two as to what type of project it was.

(Dkt. No. 319 at 81 (emphasis added); *see also id.* at 483 (reference to Hartman referring a potential

---

[6] Armstrong's expert John Conover ("Conover") has conceded that the term "implementation" is not
known in the industry.  (*See* Dkt. No. 317-1.)  Conover nonetheless has offered an opinion of what he
thinks "factory implementation" and "field implementation" should mean.  (*Id.* at 10.)  The first problem
with Conover's assertions is that he is overtly attempting to usurp the Court's role in interpreting the
Armstrong Agreement.  *Cf., e.g., F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d 1250, 1258 (2d Cir.
1987) (affirming exclusion of expert testimony about the enforceability of a contract because "[i]t is not for
witnesses to instruct the jury as to applicable principles of law, but for the judge") (internal quotation marks
and citation omitted).  The second problem is that Conover's discussion of the more industry-familiar terms
"installed" and "integrated" would not help the Court with the ambiguities in Section 2.1 or with the
parties' failure to define their rights under any number of scenarios involving all new equipment, all old
equipment, mixtures of new and old equipment, and the temporality of installations.  Accordingly, the
Court has chosen to give Conover's opinion little weight for summary-judgment purposes.

retrofit project to Armstrong, not Optimum).)  As much as Armstrong wanted to push ahead to at least get a hold of the LOOP Technology, even Armstrong realized that the parties eventually would have to figure out exactly how these new terms of factory and field implementation would manifest themselves in a course of conduct.  Of course, as the [REDACTED] incident demonstrated, once Armstrong had access to the LOOP Technology, sales agents were pushing Optimum aside as "the alternative" controller choice.  (Dkt. No. 99-2 at 12 / Dkt. No. 294-6 at 136.)

As the Court has explained above, the parties' inability to figure out what they really wanted comes through in the language of the Armstrong Agreement that Armstrong has put into play in this case.  As described above, Section 2.1 either gives Armstrong unlimited room to "otherwise practice" the LOOP Technology, or it does not, and both possibilities are equally likely. The scope of the concept of factory implementation similarly is susceptible to multiple interpretations that are equally likely.  The definition of field implementation, as applied to Optimum, makes no sense.  The definition has no temporal limitation as to how far in the past any HVAC equipment has to "have been delivered to the site."  The definition does not describe who would be doing the delivering; Optimum, again, is a software company delivering nothing more than a controller with its software in it.  Also left unaddressed is Armstrong's ability to provide long-term support to its existing customers.  If an Armstrong customer bought what was considered a state-of-the-art HVAC solution 15 years earlier, and then wanted to use the LOOP Technology to improve efficiency, then what would happen?  Should Optimum receive the sale because of the involvement of existing equipment?  Or should Armstrong receive the sale because

of the existing customer relationship?  Section 2.1 forks deeply here, with a broad license "to use

and otherwise practice the Licensed Technologies" that overwhelms the more technical limitations

in the first half of the section.  The confusion in Section 2.1 infects Sections 3.2 and 3.3.  The

parties tried to limit Hartman's ability to grant licenses that would encroach on Armstrong's

exclusivity, but Hartman potentially would not be able to grant any licenses at all under Sections

3.2 and 3.3 if, under the second category of Section 2.1, Armstrong has an unlimited worldwide

license to "use and otherwise practice" the LOOP Technology.  Additionally, one of the primary

mechanisms for protecting Armstrong's exclusivity is the phrase "intended product offering."

Intended as of when?  Manufacturers of various products change their product lineups all the time,

sometimes seasonally or annually.  Would all of Hartman's other licensees have to change their

product lineups every time Armstrong changes its own?  Even the referral obligation in Section

3.3(e) is surrounded by ambiguity.  As the Court described before, the parties never discussed

during negotiations what "diligent" meant, who would determine a potential customer's

requirements, or whether a potential customer's stated desires had to be taken at face value

without any room for discussion or advice.  Section 3.3(e) discusses referrals, but during and after

negotiations, Hartman consistently saw himself as playing a sort of benefactor role coordinating

the division of the HVAC market between his corporate licensees.  (*See, e.g.*, Dkt. No. 99-2 at 11 /

Dkt. No. 294-6 at 135 (addressing the [REDACTED] incident by urging a "spirit of cooperation"

between Armstrong and Optimum).  In practice, Hartman frequently found himself refereeing

between Armstrong and Optimum's ambitions.  Again, the Court is not trying to suggest that the

Armstrong Agreement is completely unintelligible.  There is some discernible general desire to

confine Armstrong to the manufacture of whatever hydronic chillers and pumps that it was making circa 2005. Armstrong, however, appears never to have wanted to be restricted that much, and the Court has to be careful not to bind the parties as a matter of law to obligations that they never intended.

The circumstances that the Court has tried to explain above should make obvious by now that there is no way that the pending motions can be resolved as a matter of law. *See Golden Pac. Bancorp v. F.D.I.C.*, 273 F.3d 509, 516 (2d Cir. 2001) (vacating summary judgment for contractual language susceptible to multiple interpretations); *Mellon Bank, N.A. v. United Bank Corp. of New York*, 31 F.3d 113, 116 (2d Cir. 1994) (reversing summary judgment and remanding in the face of contractual language with equally likely and reasonable interpretations). On top of that, the Court cannot even begin to assess the details of some of the pending arguments—*e.g.*, the propriety of the Optimum Agreement, or the propriety of the Patent Agreement—without receiving help from a factfinder as to what exactly the parties tried to accomplish in the Armstrong Agreement. Not even Optimum's argument about the expiration of Count II of the amended complaint can be resolved right now. Optimum is correct generally that claims for tortious interference with a contract accrue at the time of injury, have a three-year limitations period, and are not tolled until a date of discovery. *See, e.g.*, N.Y. CPLR 214(4) (Westlaw 2017); *Ferring B.V. v. Allergan, Inc.*, 932 F. Supp. 2d 493, 509 (S.D.N.Y. 2013) (citations omitted); *Rosemeier v. Schenker Int'l, Inc.*, 895 F. Supp. 65, 66 (S.D.N.Y. 1995) (citations omitted). The problem right now, however, is not a problem of discovery. The problem is that the Court is not certain that an enforceable contract exists that

could have suffered tortious interference, which in turn means that the Court cannot yet determine what injuries might have occurred or when they might have accrued.

Accordingly, the Court finds that Sections 2.1, 3.2, and 3.3 are ambiguous as to each party's rights and obligations, and that a factfinder's help is needed. To obtain a factfinder's help, the Court recommends bringing Optimum's counterclaim for declaratory judgment to the forefront—no one sought summary judgment on that counterclaim anyway—and sending that claim to an immediate trial to determine where everyone stands. *See* 28 U.S.C. § 2201(a) ("[A]s determined by the administering authority, any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."); FRCP 57 ("The court may order a speedy hearing of a declaratory-judgment action."); *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 504 (1959) ("That statute, while allowing prospective defendants to sue to establish their nonliability, specifically preserves the right to jury trial for both parties."); *Catlin Specialty Ins. Co. v. QA3 Fin. Corp.*, 629 F. App'x 127, 129 (2d Cir. 2015) (summary order) (addressing without comment a jury verdict in a declaratory judgment action involving a contract). The Court recommends either denying without prejudice or holding in abeyance every other aspect of the pending motions. As for the actual questions that the jury would consider at trial, Judge Skretny of course can shape those questions as he sees fit. This Court will suggest, though, that a jury should vote on the following questions or something like them:

1) Whether Hartman and Armstrong reached a meeting of the minds on a definition for the term "factory implementation";

56

2)    Whether Hartman and Armstrong reached a meeting of the minds on a
      definition for the term "field implementation";

3)    Whether Hartman and Armstrong reached a meeting of the minds on the
      scope of Armstrong's license to use the LOOP Technology;

4)    Whether Hartman and Armstrong reached a meeting of the minds on the
      exclusive nature of Armstrong's license; and

5)    Whether Hartman and Armstrong reached a meeting of the minds on
      Hartman's referral obligations.

"[A] court must entertain a declaratory judgment action: (1) when the judgment will serve a

useful purpose in clarifying and settling the legal relations in issue, or (2) when it will terminate

and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.  If

either prong is met, the action must be entertained." *Cont'l Cas. Co. v. Coastal Sav. Bank*, 977 F.2d

734, 737 (2d Cir. 1992) (citation omitted).  Clarifying the contours of the Armstrong Agreement

will be critical to addressing all of the other claims and defenses from the parties and relieving

them of the uncertainties in this case.  To take one example, Armstrong took the position at oral

argument that Optimum's rights to field implementation ended at visiting a given building and

installing its software into the building's existing equipment.  Optimum, in Armstrong's view,

could not pre-install its software in any controller or else it would be engaging in improper factory

implementation.  (*See* Dkt. No. 294-6 at 16; Dkt. No. 319 at 461.)  Putting aside that Armstrong

took this position only after losing a chance to be a supplier for Optimum's controllers, the Court

cannot address this claim with the current ambiguities surrounding factory versus field

implementation.   Once a factfinder at trial clarifies what the parties actually intended when

defining factory or field implementation, the Court will be in a much better position to determine

what level of software pre-installation would constitute a contractual breach. (*See, e.g.*, Dkt. No. 263 at 3 (mention of Optimum and Johnson Controls coordinating on controller testing).) To take just one more example, Judge Skretny decided previously that the Patent Agreement does not, in itself, violate the Armstrong Agreement. (Dkt. No. 39 at 10–11.) Armstrong nonetheless has argued in its pending motion that Optimum now has acquired the right to practice the patents in violation of Section 3.3(a). If a factfinder determined, however, that the parties never reached a meeting of the minds on the scope of Armstrong's license—a license that apparently will expire around 2020 anyway (Dkt. No. 39 at 28)—then Armstrong's license would be unenforceable, and Optimum would own the LOOP Technology patents outright with no restrictions on their use. In short, the clarity that a factfinder will bring to the status of the Armstrong Agreement could put this case on very different paths to resolution. The Court should wait for that clarity. The Court also urges the parties to consider whether negotiating a new or supplemental agreement on their own would spare them results from a factfinder that they would not be able to control.

## V.    CONCLUSION

For all of the foregoing reasons, the Court respectfully recommends denying the parties' motions for summary judgment (Dkt. Nos. 290, 291, 292) without prejudice. The Court further recommends submitting Optimum's counterclaim for declaratory judgment (Dkt. No. 57 at 19, 23) to an immediate trial to determine the validity of the Armstrong Agreement and the rights of the parties under that agreement.

## VI.    OBJECTIONS

A copy of this Report and Recommendation will be sent to counsel for the parties by electronic filing on the date below.  Any objections to this Report and Recommendation must be electronically filed with the Clerk of the Court within 14 days.  *See* 28 U.S.C. § 636(b)(1); FRCP 72.  "As a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point."  *Cephas v. Nash*, 328 F.3d 98, 107 (2d Cir. 2003) (citations omitted).

SO ORDERED.

_/s Hugh B. Scott_____
Honorable Hugh B. Scott
United States Magistrate Judge

DATED: September 8, 2017