UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

Armstrong Pump, Inc.,

                               Plaintiff,

     v.

Mr. Thomas Hartman *doing business as*
     The Hartman Company and

Optimum Energy LLC,

                              Defendants.

**Decision and Order**

10-CV-446S

---

I.    INTRODUCTION

On May 5, 2017, the parties in this case filed motions for summary judgment. (Dkt. Nos. 290, 291, 292.) Most of the arguments in the motions, and most of the claims and counterclaims in this case, depended heavily on the operation of certain sections of 1) the licensing agreement between plaintiff Armstrong Pump, Inc. ("Armstrong") and defendant Thomas Hartman ("Hartman"), dated February 4, 2005 (the "ALA"); and 2) the licensing agreement between Hartman and defendant Optimum Energy LLC, dated November 28, 2005 (the "OLA"). The contractual sections in play, in turn, depended heavily on terminology unknown in the HVAC industry that the parties attempted to create to define their respective roles: "factory implementation" and "field implementation." "The distinction between Field Implementation and Factory Implementation is central to the ALA and the OLA." (Dkt. No. 293 at 2; *see also* Dkt. No. 294-3 at 26 ("The Factory/Field Implementation distinction, however, is critical to correctly

interpreting §3.2(b) and §3.3(d) of the ALA . . . .").) The record contains the following examples

of how the parties have attempted to define their roles and those two terms:

- "The parties had 'new construction versus retrofit' and a 'number of different roads' before arriving at the field/factory distinction." (Dkt. No. 319 at 21; *but see* Dkt. No. 294-6 at 55 ("We [Armstrong] are hopeful that you [Optimum] can utilize our 'productized' solution for the more simplistic retrofit projects that Optimum Energy encounters.").)

- "Armstrong wanted to participate in the retrofit market." (Dkt. No. 319 at 53.)

- "Implementation of the Licensed Technologies requires certain mechanical equipment and a means of providing specific sequences in the Building Automation System ('BAS') that operates the equipment. Factory implementation means that the Licensed Technologies are implemented with certain mechanical equipment in the factory before it is shipped to a customer, whereas Field Implementation means that the Licensed Technologies are implemented with certain mechanical equipment after such equipment is at the project site (i.e., in the field)." (Dkt. No. 293 at 2.)

- "The Hartman LOOP methods could be inserted into an existing building cooling system by modifying the existing building controls (a building's computer for the control of the HVAC and other maintenance programs, sometimes called a Building Automation System—BAS) and adding new sequences that make the Hartman LOOP steps operate to efficiently run the cooling system. Or, new equipment incorporating the Hartman LOOP sequences could be added to a new or existing building cooling system, such as a new Hartman LOOP controller or building control device." (Dkt. No. 318 at 2; *but see* Dkt. No. 299 at 3 ("Optimum disputes that these are the only two methods of applying the LOOP Technologies into a building. Also, Armstrong's description does not track the 'Factory Implementation' and 'Field Implementation' definitions and distinctions set forth in the ALA and OLA."); *see also* Dkt. No. 302 at 2 ("Armstrong's description glosses over the primary question at issue: where was the mechanical equipment located when the Licensed Technologies were implemented? If the mechanical equipment was in the factory, then it is a factory implementation, and if it was in the field, then it is a field implementation.").)

- "I [Hartman] believe I sent an e-mail to Brent Ross suggesting that this would be an effective delineation that enabled Armstrong to fully utilize the products they were developing at the time." (Dkt. No. 319 at 54.)

- "Armstrong's letter summarizes the market division that I [Hartman] created between Field and Factory implementation that is set forth in the Agreements. Armstrong's license is limited to '*factory integrated* chiller, pumping or cooling tower equipment' (§ 3.3) (emphasis

2

- added). As long as Armstrong's license remains exclusive, I agreed to 'not grant a license for factory implementation of the Licensed Technologies or the Licensed Patents as they apply to hydronic elements to any third party involved in the manufacture of pumps, any factory packaged chilled water systems, chillers, building controls or cooling towers.' (§ 3.3(a)). In § 3.3(b), however, I carved out full rights for "'field' implementation" where the Licensed Technologies 'are applied to hydronic systems but are not integrated into the chiller, pumping, control or tower products until they are field assembled.' This carve out was done in order to license 'field implementations' to Optimum to achieve the agreed upon competitive balance." (Dkt. No. 290-2 at 10.)

- "During those meetings Tom Hartman verbally stated to me [Peter Thomsen of Armstrong] and Charles [Armstrong], 'after spending last night reviewing the [Armstrong] license agreement in great detail' there is nothing in the license agreement that prevents Armstrong from selling a stand-alone controller with Hartman LOOP technology. Attached as Exhibit 3 are my notes from that meeting. There is no part, section, wording, or language in the Armstrong license agreement that limits Armstrong's ability to sell its factory produced controller products that employ the Hartman LOOP technology to include any additional equipment. Hartman has never pointed to any such part of the Armstrong license agreement that supports this assertion. To the contrary, the Armstrong License Agreement clearly protects Armstrong's market and ability to offer controllers that use the Hartman LOOP technologies without any competition from others with a similar Hartman LOOP product. In fact, the Armstrong license agreement states Armstrong will be protected from *any and all* competition that employs the Hartman LOOP technologies." (Dkt. No. 292-3 at 5.)

As it reviewed the motion papers, the Court became concerned not just about how these terms might apply to various business opportunities that the parties encountered over the years, but also about whether the parties ever really agreed about what the central terms meant. Further examination of the record showed that the parties themselves, during negotiations for the ALA, doubted whether they had reached a meeting of the minds over the terms of factory implementation and field implementation:

- "[W]hat concerned me [Hartman] was that there might be applications that would come up where there would be an uncertainty as to which type of solution would be the proper one. And I didn't—I wanted to be sure that we understood the possibility of neither application being applied, so that projects might go by where neither of the two parties here felt that

3

was in their periphery, or that perhaps both of them did, and could cause some disagreement among the two as to what type of project it was." (Dkt. No. 319 at 81.)

- "Based on my last conversation and materials from Armstrong regarding a possible agreement, I do not think we have a meeting of the minds on the terms for such an agreement." (Dkt. No. 319 at 349 (statement from Hartman dated April 22, 2004).)

- "This agreement leaves open the possibility for engineers or contractors to 'field implement' the technologies using conventional methods of implementation (installing the sequences as part of the installation or retrofit on a one-at-a-time custom programming basis) by licensing the technologies directly from me or whomever I may assign the task of organizing such support, which is a path I would like to minimize over the next few years. The agreement does not, however, include practical direction in so far as how these various applications of the technology would actually take place, nor does it precisely define the limits of each possible method of implementation." (Dkt. No. 303 at 168 (statement from Hartman dated January 24, 2005, 10 days before the date of the ALA).)

Even after entering the ALA and OLA, disputes arose suggesting again that the parties were not on the same page as to what factory implementation and field implementation meant:

- "The intent [of Armstrong] is not to participate in the retrofit market, but to get an IPC system installed for reference in that local market as soon possible. From Nathan [Rothman of Optimum]'s perspective we are obviously taking away from one of his opportunities, or even worse may just generate competition for a project that he started . . . ." (Dkt. No. 319 at 113.)

As late as five years after the ALA took effect, in 2010, the parties still were not on the same page about those central terms:

- "I recommend a meeting with Optimum as a next step. I have sent a copy of this diagram to Nathan Rothman and I suggest that it be used *as a starting point in developing a mutual understanding as to the intent of difference* between Factory and Field implementations, Optimum and Armstrong offerings, and how such an understanding might lead to cooperation at this critical point." (Dkt. No. 292-2 at 335 (statement from Hartman dated March 15, 2010) (emphasis added).)

The possibility that the parties were never on the same page about terms central to the ALA and OLA presented the Court with a dilemma. The Court could adjudicate the arguments

4

in the motion papers immediately; for those arguments that required clarity about the terms factory implementation and field implementation, the Court could use the record not only to determine how those terms applied to various business opportunities that arose from time to time but also to fill in what the parties probably intended on Day One of the ALA and the OLA. The Court essentially would have to look at the very different views of those terms presented by the parties and craft definitions that fit its own sense of what the parties were trying to accomplish. The risk of this approach would have been that the Court, in filling out definitions that made sense to itself, would have altered those terms to mean something that the parties never would have endorsed in the first place.

Instead, the Court decided to recommend a stepwise approach. In its Report and Recommendation of September 8, 2017 (Dkt. No. 324), the Court decided that the best way to avoid pushing the parties into obligations that they never intended was to have a factfinder review the evidence and settle what the parties' understanding of factory implementation and field implementation was when they entered the ALA and the OLA. The Court explained the importance of a factfinder's assistance in the Report and Recommendation:

> Clarifying the contours of the Armstrong Agreement will be critical to addressing all of the other claims and defenses from the parties and relieving them of the uncertainties in this case. To take one example, Armstrong took the position at oral argument that Optimum's rights to field implementation ended at visiting a given building and installing its software into the building's existing equipment. Optimum, in Armstrong's view, could not pre-install its software in any controller or else it would be engaging in improper factory implementation. (*See* Dkt. No. 294-6 at 16; Dkt. No. 319 at 461.) Putting aside that Armstrong took this position only after losing a chance to be a supplier for Optimum's controllers, the Court cannot address this claim with the current ambiguities surrounding factory versus field implementation. Once a factfinder at trial clarifies what the parties actually intended when defining factory or field implementation, the Court will be in a

5

much better position to determine what level of software pre-installation would constitute a contractual breach.

(Dkt. No. 324 at 55-56.) Procedurally, the Court decided that the safest and easiest way to enlist a factfinder's assistance was to use one of the parties' own requests—specifically, Optimum's counterclaim for declaratory judgment, which no one sought to adjudicate through the summary judgment motions—and to send that request to an immediate trial. *See* 28 U.S.C. § 2201(a) ("[A]ny court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, *whether or not further relief is or could be sought*.") (emphasis added); *cf. Starter Corp. v. Converse, Inc.*, 170 F.3d 286, 299 (2d Cir. 1999) (finding an injunction overbroad but finding no abuse of discretion in the decision to grant an injunction *sua sponte* in a declaratory judgment action); *Field Enters. Educ. Corp. v. Cove Indus., Inc.*, No. 66-C-742, 1969 WL 9573, at *10 (E.D.N.Y. Feb. 14, 1969) (court may grant a declaration of rights *sua sponte* in lieu of awarding injunctive relief) (citation omitted); *see also Travelers Indem. Co. of Illinois v. Hardwicke*, 339 F. Supp. 2d 1127, 1134 (D. Colo. 2004) ("Moreover, since both the declaratory judgment sought by [one party] and the first counterclaim for reformation sought by [another party] are matters tried to the Court without a jury, this Court deems that the most efficient way to proceed is to brings those claims to trial first [*sua sponte*]."). Nonetheless, the Court took great care to emphasize that it was not trying to undermine the ALA or the OLA as a whole:

> Mindful of the obligation to salvage an enforceable contract if plain language and extrinsic evidence permit, the Court finds, upon reading all sections of the Armstrong Agreement together, that some of Hartman and Armstrong's intentions are reasonably certain. Armstrong had a product lineup of HVAC

6

> components and controllers that it manufactured, and it wanted to enhance that lineup with the LOOP Technology. Hartman wanted to promote his LOOP Technology by licensing to companies that wanted it, but he did not want to damage the reputation of his technology by having any corporate partners compete against each other. The ensuing negotiations and the Armstrong Agreement that resulted show a general intent to be bound and an attempt to draw a perimeter around Armstrong, within which Armstrong could pursue business as aggressively as it wanted. Since Armstrong primarily is a manufacturer of HVAC equipment, Hartman tried to give Armstrong limits that played to its core competencies: manufacture and assembly, new equipment, and hydronic systems. Outside of those limits, Hartman wanted a role for Optimum, a software startup known as far back as 2004 as a potential purchaser of the LOOP Technology. Reduced to essential details, Optimum wanted to be able to go into existing buildings with existing HVAC systems, diagnose inefficiencies in how those systems are operating, and then adjust the settings of those systems to wring as much efficiency out of them as possible. (*See, e.g.*, Dkt. No. 262 at 12 (Optimum document discussing a "Controller Self-configuration wizard on every Optimum energy controller that will allow the software to configure itself to any building it is installed into.").) These general principles can be seen fairly easily in the Armstrong Agreement. The Court does not want to give the impression that the parties could not agree on anything at all.

(Dkt. No. 324 at 48–49.) In fact, never at any time in the Report and Recommendation did the Court recommend anything to the effect that the ALA or the OLA *ought to* be declared unenforceable. The closest that the Court came to any such suggestion was part of its discussion of why a factfinder's assistance would be important in sorting out the meaning of factory implementation versus field implementation:

> If a factfinder determined, however, that the parties never reached a meeting of the minds on the scope of Armstrong's license—a license that apparently will expire around 2020 anyway (Dkt. No. 39 at 28)—then Armstrong's license would be unenforceable, and Optimum would own the LOOP Technology patents outright with no restrictions on their use. In short, the clarity that a factfinder will bring to the status of the Armstrong Agreement could put this case on very different paths to resolution. The Court should wait for that clarity.

(Dkt. No. 324 at 56.) In other words, a factfinder *could* decide that the parties never reached a meeting of the minds about those terms, and *if* a factfinder did so then there *could be* serious

repercussions for the ALA and the OLA. The need to eliminate such a possibility through a factfinder's assistance justified, in the Court's view, an immediate trial that resolved the five questions that the Court posed in the end of the Report and Recommendation. The Court recommended that the summary judgment motions then be revisited; adjudicating the parties' arguments would be much easier with the clarity that a factfinder would provide. Judge Skretny since has decided, in his discretion, that the adjudication of the summary judgment motions should proceed in one step instead of multiple steps (Dkt. No. 350), and the Court will proceed accordingly.

Sadly, the recommendation to enlist the help of a factfinder drew the kind of overheated response from the parties that is typical of how they have litigated throughout the history of this case. The parties did not request reconsideration for any procedural or factual errors that they perceived. Instead, the parties launched an accusation that the Court has damaged the principle of party representation. (Dkt. No. 333 at 5.) The parties have accused the Court of "punting" (Dkt. No. 334 at 5) on the issues in their motions, of "blaz[ing] new trails" (*id.* at 7), and of "wish[ing] this case away" (*id.* at 10), when it made clear that it only wanted a factfinder's help in setting up a resolution of the motions. The parties also have attacked the Court for using the Report and Recommendation as a ploy to force them into negotiations during the District's recent Settlement Week (*id.* at 5, 7)—an attack that is essentially an attack on Judge Skretny, since Judge Skretny issued the order, independently of this Court, to refer this case to Settlement Week.[1]

---

[1] And even if "[t]he R&R presumably sought to encourage Settlement Week negotiations" (Dkt. No. 334 at 5), so what? Finding common ground on critical contractual definitions would have been much more useful than, say, billing clients for over a year in connection with a claim construction hearing that had no substantive testimony for 56 contested terms. (*See* Dkt. Nos. 111, 112, 113, 122–128, 131–133, 136, 138, 139, 141–145.)

8

(Dkt. No. 322.)  Amidst all these attacks, did the parties make any effort to address the Court's worries about the intent behind Armstrong's license and the factory/field distinction?  No: "Armstrong and Hartman are still unable agree on the meaning of Section 2.1, and Armstrong simply rejected Judge Scott's interpretation without supplying its own proposed construction." (Dkt. No. 350 at 2 n.1.)  In looking over the histrionic tone of the arguments in the objections, this Court is baffled as to How We Got There from Here.

But no matter; here we are, and discussing recent events any further would be a waste of time.  In the interest of a fresh start that brings the pending motions to a prompt and appropriate resolution, the Court will prepare a new Report and Recommendation that, *inter alia*, assesses the errors that the parties alleged in their objections.  The Court remains worried about imposing obligations on the parties that they never contemplated when they entered the ALA and the OLA. *See Metro. Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir. 1990) ("The parties' rights under an unambiguous contract should be fathomed from the terms expressed in the instrument itself rather than from extrinsic evidence as to terms that were not expressed or judicial views as to what terms might be preferable.  In its efforts to preserve the parties' rights and the status quo, the court must be careful not to alter the terms of the agreement.  The parties having agreed upon their own terms and conditions, the courts cannot change them and must not permit them to be violated or disregarded.") (internal quotation marks and citations omitted); *Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher*, 417 N.E.2d 541, 543 (N.Y. 1981) ("[A] contract is a private 'ordering' in which a party binds himself to do, or not to do, a particular thing.  This liberty is no right at all if it is not accompanied by freedom not to contract.  The corollary is that, before one

may secure redress in our courts because another has failed to honor a promise, it must appear that the promisee assented to the obligation in question. It also follows that, before the power of law can be invoked to enforce a promise, it must be sufficiently certain and specific so that what was promised can be ascertained. Otherwise, a court, in intervening, would be imposing its own conception of what the parties should or might have undertaken, rather than confining itself to the implementation of a bargain to which they have mutually committed themselves.") (citation omitted). Step One in preparing a new Report and Recommendation thus will be to invite the parties to offer further clarity about their intentions when they defined the scope of Armstrong's and Optimum's licenses and when they tried to create the distinction between factory implementation and field implementation. This supplemental briefing is optional, but the parties will have through December 21, 2017 to file if they accept the invitation; they also have permission to file documents under seal to the extent necessary by the protective order in place. Any length and any format (letter, affidavit, memorandum of law, joint stipulation, some combination thereof) will be acceptable. The Court will deem the summary judgment motions submitted after December 21, 2017.

    SO ORDERED.

                                           /s Hugh B. Scott
                                           Honorable Hugh B. Scott
                                           United States Magistrate Judge

DATED: December 7, 2017