UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

Armstrong Pump, Inc.,

                                        Plaintiff,

                v.

Mr. Thomas Hartman *doing business as*
        The Hartman Company and

Optimum Energy LLC,

                                        Defendants.

**Report and Recommendation**

10-CV-446S

# I.    INTRODUCTION

The Hon. William M. Skretny has referred this breach-of-contract case to this Court under 28 U.S.C. § 636(b).  (Dkt. No. 74.)  Pending before the Court are motions by plaintiff Armstrong Pump, Inc. ("Armstrong"), defendant Thomas Hartman ("Hartman"), and defendant Optimum Energy LLC ("Optimum"), for summary judgment under Rule 56 of the Federal Rules of Civil Procedure ("FRCP").  (Dkt. Nos. 290, 291, 292.)  The Court held oral argument on August 10, 2017.

In preparing this Report and Recommendation, the Court gave considerable thought to whether any of its contents should be redacted.  The parties entered a joint protective order (Dkt. No. 66) to govern discovery; the protective order allowed the parties to designate discovery documents as confidential or highly confidential based on the extent to which those documents contained trade secrets or certain other proprietary information pertaining to marketing, sales, and finances.  The Court has wanted to respect the sensitive nature of the parties' discovery materials

and, along the way, has allowed the parties to file exhibits to motion papers under seal. At the

same time, the Court has had to pay attention to two strong arguments in favor of public access to

the docket. The first argument is the policy behind public access to federal court dockets:

> The presumption of access is based on the need for federal courts, although
> independent—indeed, particularly because they are independent—to have a measure
> of accountability and for the public to have confidence in the administration of
> justice. Federal courts exercise powers under Article III that impact upon virtually
> all citizens, but judges, once nominated and confirmed, serve for life unless
> impeached through a process that is politically and practically inconvenient to
> invoke. Although courts have a number of internal checks, such as appellate review
> by multi-judge tribunals, professional and public monitoring is an essential feature
> of democratic control. Monitoring both provides judges with critical views of their
> work and deters arbitrary judicial behavior. Without monitoring, moreover, the
> public could have no confidence in the conscientiousness, reasonableness, or
> honesty of judicial proceedings. Such monitoring is not possible without access to
> testimony and documents that are used in the performance of Article III functions.

*United States v. Amodeo*, 71 F.3d 1044, 1048 (2d Cir. 1995). The second argument is a more

practical distinction between the purpose of a protective order during discovery and the disclosures

that inevitably must occur when a case reaches dispositive motions or trial:

> Protective orders are useful to prevent discovery from being used as a club by
> threatening disclosure of matters which will never be used at trial. Discovery
> involves the use of compulsory process to facilitate orderly preparation for trial, not
> to educate or titillate the public. Private matters which are discoverable may, upon
> a showing of cause, be put under seal under Rule 26(c), in the first instance.
> *Martindell v. International Tel. & Tel. Corp.*, 594 F.2d 291 (2d Cir. 1979), says no
> more than that.
>
> At the adjudication stage, however, very different considerations apply. An
> adjudication is a formal act of government, the basis of which should, absent
> exceptional circumstances, be subject to public scrutiny.

*Joy v. North*, 692 F.2d 880, 893 (2d Cir. 1982).

To try to find the right balance between disclosure and redaction, the Court has considered that the parties' motions were dispositive in nature and potentially could have ended the case in whole or in part. The Court also looked ahead to what information inevitably would have to be disclosed in a trial on the ultimate merits. As the parties will see, the Court has quoted extensively from their communications and from their motion papers to capture the full detail of the arguments that they have presented. These communications, and any arguments in the motion papers, are fair game for public access. In contrast, the Court has quoted little if any technical information from the sealed documents and will leave those documents under seal at this time. As it turns out, resolving the parties' motions required some conceptual discussion of the technology in question—information probably known in the industry anyway—but did not require disclosure of algorithms, specific internal strategies, or other such sensitive information.

As for a summary of the arguments that the parties have presented, introductions such as this typically contain some kind of short digest of the issues that were in play. With so many issues that the parties presented in their motions, an introductory summary is not possible. The reader is referred to the Background section below, with the table of contents appearing on the next page offered as guidance.

I.    INTRODUCTION .................................................................................................... 1

II.    BACKGROUND ..................................................................................................... 5

    A.    HVAC TECHNOLOGY AND INITIAL EVENTS ............................................. 5
    B.    NEGOTIATIONS LEADING UP TO THE ALA AND OLA ............................... 13
    C.    THE ALA AND ITS TERMS ......................................................................... 22
    D.    THE OLA AND ITS TERMS ......................................................................... 26
    E.    FACTORY VERSUS FIELD IMPLEMENTATION ............................................. 31
        i.    Novelty of the terms ............................................................................. 32
        ii.    Mutual exclusivity ................................................................................ 32
        iii.    Overlap with "retrofit" and "non-retrofit" ........................................ 33
        iv.    Is the Optimum product a "controller"? ............................................ 35
        v.    Preparation of the Optimum product ................................................... 43
        vi.    Meaning of "implement" or "implementation" ................................... 48
    F.    THE PPA AND ITS TERMS ......................................................................... 50
    G.    DEALINGS UNDER THE AGREEMENTS ....................................................... 52

III.    DISCUSSION ...................................................................................................... 64

    A.    SUMMARY JUDGMENT GENERALLY ........................................................... 64
    B.    CONTRACT LAW GENERALLY ................................................................... 66
    C.    ARMSTRONG'S PRINCIPAL CLAIMS FROM THE AMENDED COMPLAINT (DKT. NO. 55)
        AND THE COUNTERCLAIMS (DKT. NO. 68) .............................................. 70
        i.    Breach of Contract Against Hartman ................................................... 70
        ii.    Tortious Interference Against Optimum ............................................... 116
    D.    ARMSTRONG'S DECLARATORY JUDGMENT COUNTERCLAIM FOR PATENT INVALIDITY
        (DKT. NO. 68 AT 9, DKT. NO. 111 AT 9) .................................................. 123
    E.    OPTIMUM'S COUNTERCLAIMS FOR DECLARATORY JUDGMENT (DKT. NO. 57) ... 124
    F.    OPTIMUM'S ARGUMENT TO LIMIT ARMSTRONG TO NOMINAL DAMAGES ............ 125
    G.    ARMSTRONG'S REQUEST FOR AN ACCOUNTING ....................................... 133

IV.    CONCLUSION ................................................................................................... 136

V.    OBJECTIONS ..................................................................................................... 137

## II.   BACKGROUND

### A.  HVAC Technology and Initial Events

This case concerns an ongoing dispute over who is allowed to market novel climate-controlled technology, and under what circumstances.  The inventor in question is Hartman.  "Thomas Hartman is a professional engineer, inventor, and the original owner of the three patents at issue in this case, i.e., United States Patent No. 5,946,926, No. 6,257,007 and No. 6,185,946 (the 'LOOP Patents')."  (Dkt. No. 294-4 at 1.)  The technology in question concerns heating, ventilation and air conditioning ("HVAC") equipment in office, industrial, and other types of buildings.  The record contains a concise description of the state of HVAC technology and how Hartman changed it:

> Heating, ventilating, and air conditioning ("HVAC") systems are used in buildings to provide comfort for occupants.  Commercial HVAC systems utilized in large buildings usually contain a heating system, ventilation system, cooling system, humidification system, dehumidification system, and/or air filtration system.  In addition to these mechanical systems, electronic control systems manage the operation of the various mechanical systems to ensure smooth operation and to maintain desired comfort levels among all the relevant variables such as temperature, humidity, amount of fresh air, and so forth.

> In the late 1990's, inventor Thomas Hartman ("Hartman") discovered novel ways to control chilled water cooling systems.  Hartman's insight countered conventional wisdom of HVAC control, but implementation of his novel control schemes results in significant efficiency gains.  As a result, buildings controlled according to Hartman's invention use less energy to maintain desired comfort levels than those controlled according to traditional schemes.  Hartman applied for a series of patents which claim his invention.  In the '926 Patent,[1] issued on September 7, 1999, Hartman taught a novel use of variable flow chilled fluid cooling systems.  The '946 Patent,[2] issued on February 13, 2001, provides a system

---

[1] U.S. Patent No. 5,946,926.
[2] U.S. Patent No. 6,185,946.

for sequencing chillers in a loop cooling plant and other systems that employ all variable-speed units. Finally, the '007 Patent,[3] issued July 10, 2001, teaches a method for control of cooling system condenser fans and cooling tower fans and pumps. The systems of the three Hartman patents are marketed under the registered trademark Hartman LOOP™.

Hartman's work demonstrated that large HVAC chiller systems could be optimized for efficiency even if the individual components of the system were operated at less than their individual optimum efficiency. In other words, the LOOP Patents teach that, while conventional wisdom would suggest that each component in the loop should be operated at its own individual optimal efficiency point for the desired comfort level, Hartman realized that instead maximum system-wide efficiency can be significantly improved by monitoring the system as a whole and adjusting the individual components. The energy efficiency of the total system may be highest even where some individual components operate at less than individual peak efficiency. Thus, systems using the Hartman LOOP technology maximize their cooling efficiency even when such a system might operate one or more subcomponents at less than individual peak efficiency, providing system-wide greater energy savings and improved system performance.

(Dkt. No. 125 at 1–3; *see also* Dkt. No. 318 at 2 ("The Hartman patents teach that while conventional wisdom would suggest that each component in a chilled water loop should be operated at maximum efficiency to maximize the efficiency of the system as a whole, the overall efficiency can be significantly improved by monitoring the system as a whole and adjusting the individual components and in some cases to a point that is less than peak efficiency. Hartman calls this the 'Hartman LOOP Technology.'").) In very broad terms, buildings could acquire the LOOP Technology in two ways. "The Hartman LOOP methods could be inserted into an existing building cooling system by modifying the existing building controls (a building's computer for the control of the HVAC and other maintenance programs, sometimes called a Building Automation

_____
[3] U.S. Patent No. 6,257,007.

System—BAS) and adding new sequences that make the Hartman LOOP steps operate to efficiently run the cooling system. Or, new equipment incorporating the Hartman LOOP sequences could be added to a new or existing building cooling system, such as a new Hartman LOOP controller or building control device." (Dkt. No. 318 at 2.)

At this point, two companies enter the picture with their interest in marketing the LOOP Technology. One company is Optimum. "Optimum Energy LLC is a Washington limited liability company with its principal place of business located in Seattle, Washington. In mid-2006, the assets of Optimum Energy Corporation, including the Optimum License Agreement, were transferred to Optimum Energy LLC. Optimum was started in 2004 by Nathan Rothman and Jim Hanna. In about 2003, Rothman and Hanna, who were neighbors, began exploring opportunities in energy efficiency and related fields. Rothman was Optimum's President and CEO from its formation until he became Chairman and Founder in late 2010. Rothman left Optimum at the end of 2011. Jim Hanna was a co-founder of Optimum. Until he retired as an Optimum employee in 2013, Hanna's titles had included Vice President, Vice President of Product Development and Vice President of Technology. Optimum now has 58 employees. Optimum's 2016 revenue of about $8.7 million was its highest ever to date. Optimum has yet to be profitable *i.e.*, it has not had net income, in any year of its existence." (Dkt. No. 294-4 at 2–3.) Optimum has explained its business model as follows:

> The Optimum business model was, from the outset, to implement the Licensed Technologies using a separate appliance, the Tridium JACE product, that along with Optimum's software could be integrated with the Building Automation System (BAS) (also known as the Building Management System (BMS)) as an addon

to facilitate field implementation of the Licensed Technologies pursuant to Optimum's license. Optimum has consistently built its business on the concept of delivering the Licensed Technologies using an appliance, such as the Tridium JACE product, that is an add-on to the BAS/BMS and not a replacement for the chiller plant control provided by the BAS/BMS.

(Dkt. No. 294-4 at 3.)

The other company is Armstrong. "Founded in 1934, Armstrong is a family owned business that has pioneered an uncompromising range of products for customers in residential, commercial and industrial markets. The Armstrong name has been a benchmark for quality in design, engineering and manufacturing. A significant part of Armstrong's business revolves around the development and manufacture of the highest quality HVAC chilled water and boiler water systems, pumps, and other components." (Dkt. No. 318 at 1.) Optimum has disputed that Armstrong is a family-owned business. "Armstrong Pump, Inc., is a wholly-owned subsidiary of S.A. Armstrong, Ltd. Armstrong, which was established in 1934 as a pump manufacturer, has about 1,000 employees throughout the world, and had 2014 revenue of over $200 million, probably about $230 million-$240 million." (Dkt. No. 294-4 at 3.) Optimum also has disputed the association of the word "quality" with Armstrong:

Optimum disputes that Armstrong's range of products has been "uncompromising" and that the Armstrong name has been a "benchmark for quality and design in engineering and manufacturing," at least with respect to its products that incorporate the LOOP Technologies. For example, Armstrong's implementation of its IPC 11550 on the San Diego County Health Services project in 2007 was substandard, problematic and deficient. In an October 16, 2007 e-mail to Peter Thomsen, and others, Armstrong's representative Steve Lewis of Vertical Systems cited "the fact that Armstrong was probably somewhat negligent in its support of the sale" and that "the county have [sic] a bad taste of Armstrong and fences need mending." In a responding e-mail on October 17, 2007, to a number

8

of Armstrong personnel, including Peter Thomsen, Alfred Dubier, Armstrong's Regional Sales Manager, stated that "[w]e need to resolve these issues at the earliest, Armstrong does not have a good name in the San Diego County as stated below." In addition, Armstrong was successfully sued for breach of contract in connection with Armstrong's attempted sale and installation of an IPC 11550 in the Galleria and Tower at Erieview office building and retail mall in Cleveland, Ohio in 2009. Armstrong was found to have breached its contract of sale by not providing a functioning controller and failing to fully commission the system. (*See* Findings of Fact and Conclusions of Law, filed on March 29, 2013, in *Armstrong Pumps Inc. v. Brewer-Garrett Company*, Case No. 1:10cv492 (N.D. Ohio) and Satisfaction of Judgment filed by Brewer-Garrett on November 8, 2013 in that action.)

Optimum disputes that Armstrong's HVAC chilled water and boiler water systems, pumps and other components, are of the highest quality, at least with respect to its products that incorporate the LOOP Technology.

(Dkt. No. 299 at 1–2.) Armstrong has explained its interest in the LOOP Technology as follows:

"While Armstrong already had control systems and plant automation as products at the time, obtaining a license to the Hartman Loop Technologies and building a business with Hartman was particularly critical to developing new business opportunities. The Hartman patents covered significant aspects of the sequencing and control of chilled water systems, providing Armstrong credibility to enter the plant automation and controller business in a differentiated fashion." (Dkt. No. 318 at 3.) Hartman has disputed that Armstrong had control systems as products when it took an interest in the LOOP Technology:

When Brent Ross negotiated the ALA [Armstrong License Agreement, discussed *infra*], Armstrong did not have a "control only" product; Hartman told Charles Armstrong and Brent Ross, and all three agreed, that it would be unwise for Armstrong to attempt to be a controller manufacturer unless it added a network of thousands of technicians to service controller products. Hartman Decl. ¶ 32. Such a network would be needed because, if a controller is nonoperational, a controller customer (i.e., a business or building owner) would need to repair the controller within a matter of hours, not days, in order to avoid having its facility go

9

"offline." *Id.* Since Armstrong did not have such a network, it did not make sense for them to market a "controller only" product. *Id.* Thomsen's use of "control systems" is ambiguous. Armstrong did not have a control product that operated entire plants. *Id.* Accordingly, Mr. Thomsen appears to use the phrases "control systems" and "plant automation and controller business" to reference products that controlled a specific piece of equipment only. *Id.* When the ALA was being negotiated, such a control product was never referenced by Armstrong. *Id.* Rather, Ross discussed automation as being introduced as part of the factory assembled mechanical package that was to be Armstrong's product. *Id.*

(Dkt. No. 302 at 3.) Hartman's contention, in turn, is contradicted by a January 6, 2004 email message from Ross to Hartman. (Dkt. No. 292-2 at 312.) In this email message, Ross explained to Hartman that

> Our development program is continuing quite fast. We are progressing in providing pumping packages in the field with more and more components. We have two variable primary pumping packages where we are providing the controls currently in submittal. We've sold these before we've standardized our offering so definitely the market is pushing us for these. We introduced two new controllers in 2003 and will be introducing at least two more in 2004.

(*Id.*)

Armstrong eventually approached Hartman to express its interest in obtaining a license to use the LOOP Technology. Communications began in 2003; Armstrong considered the communications to be negotiations. (Dkt. No. 318 at 3.) Optimum disputes the use of the term "negotiations." "First, although Armstrong began discussions with Hartman in 2003, Optimum disputes that such discussions constituted negotiations. Second, Optimum disputes the statement to the extent Armstrong is suggesting any specific manner or details about Armstrong's intention at the time with respect to expanding its product line and potential customer base and means of leveraging LOOP Technologies in Armstrong's products." (Dkt. No. 299 at 3.) In any event,

"Ross was Armstrong's director of marketing and engineering and was responsible for all marketing and all engineering in the global firm. (Ross Dep. at 8:20-9:20; Appendix Exh. G). Ross had the lead role for Armstrong in its discussions and negotiations with Hartman that resulted in the ALA. (C. Armstrong Dep. at 55:19-56:19; Appendix Exh. H) (*See* 7/25/14 and 9/17/15 deposition of Peter Thomsen ('Thomsen Dep.') at 19:5-20; 20:13-19; Appendix Exh. D). Ross had the authority to negotiate agreements for Armstrong and to sign agreements for Armstrong, subject to approval from Charles Armstrong or Paul Novello, Armstrong's CFO. (C. Armstrong Dep. at 36:7-37:20; Appendix Exh. H)." (Dkt. No. 294-4 at 4.) The year 2003 also saw Optimum begin communications with Hartman. "In 2003, while pursuing due diligence about a Chinese company that specialized in optimization of HVAC equipment, Rothman and Hanna became aware of the work that had been done by Tom Hartman and contacted him. (Hanna Dep. at 15:20-16:10; Appendix Exh. E). Hartman had already deployed the LOOP Technologies at some sites in San Diego. (Hanna Dep. at 16:19–24; Appendix Exh. E). At that time, Rothman and Hanna had discussions with Hartman about forming a company with Hartman and how that might work. (Hanna Dep. at 16:11-18; Appendix Exh. E)." (Dkt. No. 294-4 at 5.) As the parties began to flesh out their interests, Rothman played the main negotiating role for Optimum. "Rothman was involved in negotiations and business dealings among Hartman, Armstrong and Optimum as far back as the summer of 2004. (Rothman Decl., ¶2; Appendix Exh. A). Among other things, Rothman met with Brent Ross of Armstrong in the summer of 2004. (*Id.* and Exh. A). Hartman and Rothman met with Armstrong, at Armstrong's invitation, at an Armstrong

conference in Toronto in September 2004.  Rothman participated at times in discussions and

negotiations between Hartman and Armstrong from that time through the February 4, 2005 ALA.

(*Id.*)."  (Dkt. No. 294-4 at 6.)

Armstrong and Hartman eventually entered a licensing agreement, the ALA, on February

4, 2005.  "Optimum does not dispute that Armstrong and Hartman entered into the license

agreement, referred to herein as the 'Armstrong License Agreement' or 'ALA' on or about

February 4, 2005.  Optimum disputes that the ALA was signed 'after nearly two years at the

negotiating table,' to the extent that Armstrong is suggesting that it was two years of continuous

negotiations."  (Dkt. No. 299 at 4.)  On November 28, 2005, Hartman and Optimum entered

their own license agreement, the Optimum License Agreement or "OLA."  The Court will discuss

these two license agreements in more detail below.

One other document is worth a brief mention.  On March 26, 2004, Hartman and an

Optimum predecessor called GETCO LLC signed a Binding Letter of Intent.  Rothman signed as

president of GETCO LLC.  (Dkt. No. 292-2 at 125–27.)  In the Binding Letter of Intent, Hartman

used the following language to describe the scope of a potential license to GETCO LLC to use the

LOOP Technology: The license would be "for the purpose of creating, marketing, promoting,

selling and otherwise commercializing Products aimed at utilizing the Technology in retrofit

(existing construction) applications (the 'Retrofit Product License')."  (*Id.* at 125.)  The Binding

Letter of Intent, in the next sentence, uses the same language to describe a potential license to

GETCO LLC for "non-retrofit (e.g., new construction) applications."

***B. Negotiations Leading up to the ALA and OLA***

In the months leading up to February 2005, Armstrong and Hartman began to craft a

formal agreement that would give Armstrong license rights to the LOOP Technology.  As Hartman

has stated,

> In 2004, I began negotiating with (A) Armstrong's director of marketing
> and engineering, Brent Ross, and (B) Optimum's founder, President and CEO,
> Nathan Rothman.  Both Armstrong and Optimum were fully aware of each other.
> In fact, all three parties negotiated the method of dividing the Licensed
> Technologies as between Armstrong and Optimum.  Optimum knew that I
> intended to grant a license to Armstrong for certain rights and Armstrong knew
> that I was licensing different rights to Optimum, and would eventually partner with
> Optimum and ultimately intended to sell the patents to Optimum.
>
> Neither Armstrong nor Optimum objected to the existence of the other
> party, or their proposed role, during the negotiation of their respective license
> agreements.  Both parties understood that I sought multiple licensees in order to
> bring the Licensed Technology to market in the most comprehensive and efficient
> manner possible, by providing Armstrong and Optimum with mutually exclusive
> rights.
>
> It was critical that the Licensed Technologies be available from at least two
> sources (i.e., Optimum and Armstrong) because much of the market would require
> competitive bids that prevented sole-source products (i.e., products that were only
> available from one source).  Messrs. Ross and Rothman were well aware of this
> "competition" that would exist between them.  The goal was to provide all potential
> customers with a solution that included the Licensed Technologies, even if a
> particular licensee's offering was not ideal for a given customer.

(Dkt. No. 290-2 at 3–4.)  Armstrong has disputed what it considers merely Hartman's opinion

about the importance of having two or more sources to supply the HVAC market.  Brent Ross

from Armstrong has asserted the following:

> Paragraph 10 of Hartman's Declaration asserts that it was "critical" that the
> Hartman LOOP technology be available from two or more sources.  This is merely

Hartman's opinion. Armstrong's preference was to have all the exclusive rights in the technology. Accordingly, Armstrong never believed that competition for the Hartman LOOP was in any way "critical." Hartman made it clear early on that an exclusive license with all the rights to Armstrong was not going to happen. Eventually, Hartman insisted on dividing the rights between: 1) a project specific license for the Hartman LOOP customized program for a specific building site; 2) field implementation performed in the field at the building site; and 3) producing products or "product sizing" the technology in a factory setting. For Armstrong, this was not a preferred separation of rights but it is what Hartman insisted on. Prior to the separation of field and factory markets, Hartman used the terms "retrofit" and "new construction" as a separation of the market and the same terms were used by the parties even after the field and factory terms arose in the license agreement, and retrofit and new construction were removed.

(Dkt. No. 303 at 308.) Armstrong has elaborated further as follows:

> Several emails between Hartman and Armstrong's Brent Ross exist during the time period of the license negotiations. Optimum can point to not one that references an alleged "requirement" for multiple parties or competitive bidding. Hartman's May 3, 2017 declaration merely sets forth an opinion, and that opinion was not even expressed at the time of the negotiations. Hartman's opinion had no role in the development of the Armstrong license or any of its terms or clauses. Brent Ross' Declaration (Declaration of Brent Ross in Support of Plaintiff's Opposition to Defendants Hartman and Optimum Motions for Summary Judgment dated June 16, 2017 ("Ross Declar.")) directly addresses the newly alleged "required competitive bidding" opinion. (Ross Declar. ¶¶ 12, 19, and 23). Armstrong desired exclusive rights to use the patents, all of the rights. Hartman was not willing to exclusively license to Armstrong all the rights. Obviously, Armstrong did not believe competitive bidding was at all required or even desirable. Hartman's Declaration and Optimum's statements reflect today's opinion, not even an opinion expressed contemporaneously with the license or any negotiations. This opinion from Hartman's and Optimum's Statement of Facts should be given no weight at all.

(Dkt. No. 303 at 8.) Hartman countered by pointing to the following email message that he sent

to Ross on January 24, 2005:

> From our two perspectives and understanding of the legal language, we believe it [the draft ALA] to be a reasonable description of how we have agreed

upon various issues involved in this effort to license and "productize" Hartman LOOP™ technologies in chiller plant systems. It does address the "prepackaged" versions of the technology and assign those rights to Armstrong for new chiller plants in which the technology is included with some of the equipment being supplied. It also outlines the rights of Optimum for retrofit applications in which mechanical equipment already exists. This agreement leaves open the possibility for engineers or contractors to "field implement" the technologies using conventional methods of implementation (installing the sequences as part of the installation or retrofit on a one-at-a-time custom programming basis) by licensing the technologies directly from me or whomever I may assign the task of organizing such support, which is a path I would like to minimize over the next few years.

(Dkt. No. 319 at 437.) "This paragraph outlines three possible methods of implementation of the Licensed Technologies: (1) Armstrong's factory ('prepackaged versions . . . in which the technology is included with some of the equipment being supplied'; (2) Optimum's field ('retrofit applications in which mechanical equipment already exists'); and (3) 'conventional methods of implementation' for one-at-a-time projects specifically licensed by Hartman. Hartman Decl. ¶ 31. The fact that the conventional 'one-at-a-time custom programming basis' method was retained by Hartman is demonstrated by the fact that this e-mail states that it would be used 'by licensing the technologies directly from me [Hartman].' *Id.*" (Dkt. No. 302 at 8.)

As some of the above language already demonstrates, two related topics dominated the negotiations: whether Optimum would be allowed to compete against Armstrong; and whether the two companies that wanted to use the LOOP Technology, Armstrong and Optimum, would be assigned to different types of projects. For example, the Binding Letter of Intent mentioned above made reference to "retrofit" and "non-retrofit" projects. Hartman has described the history of the retrofit and non-retrofit designations as follows:

Hartman admits that the original division of license rights was between retrofit (Optimum) and non-retrofit (Armstrong).  Hartman Decl. ¶ 33. Armstrong, however, wanted to participate in the retrofit market (i.e., existing plants or systems) to the extent that new equipment was needed (i.e., replacing existing equipment or an expansion that required new equipment).  *Id.*  As a result, Brent Ross and Hartman agreed to the "Field Implementation" and "Factory Implementation" division of rights, which allows Armstrong to participate in retrofit projects when new mechanical equipment is required.  *Id.*  The parties operated under this division of rights for years until Hartman announced his intent to sell the LOOP Patents to Optimum, which resulted in Armstrong taking adversarial positions that departed from the ALA language.  *Id.*

(Dkt. No. 302 at 4.)

A number of communications circulated among the parties before the final licensing agreements fell into place.  Hartman prepared a first draft agreement that he sent to Armstrong on February 2, 2004.  (Dkt. No. 319 at 329.)  The original draft would have given Armstrong exclusive right to use the LOOP Technology for the manufacture of pumps or pumping systems. (Dkt. No. 319 at 331.)  Around March 1, 2004, Armstrong proposed expanding the licensing rights to include chillers[4] as well as pumps.  (Dkt. No. 319 at 338.)  Armstrong also wanted exclusivity as against all other manufacturers.  (Dkt. No. 212-1 at 8; *see also id.* at 33 (representing that it was in the final stages of becoming "the exclusive manufacturer supplier" while also describing contract negotiations with Hartman as "frustrating").)  On April 22, 2004, Hartman expressed doubt to Armstrong that they had "a meeting of the minds on the terms for such an agreement."  (Dkt. No. 319 at 349.)  Hartman elaborated on his concerns in an email message dated April 26, 2004 which apparently repeated details from a message dated April 9, 2004.  (Dkt.

_____

[4] A "chiller" is "a device that uses a compressor, evaporator, and condenser to circulate refrigerant for use in a chilled water generating system."  (Dkt. No. 136 at 22.)

No. 319 at 351.)  The concerns continued on May 25, 2004, when Hartman summarized to

Armstrong that "[w]e now have an agreement with a startup company [*i.e.*, Optimum] that intends

to package integrated controls and VFDs[5] to apply Hartman LOOP technologies to *new and existing*

plants.  Because this company does not intend to sell chillers, pumps, or any other equipment

beyond VFDs and controls, I think that it will be straightforward to place a suitable boundary such

that Armstrong will not be closed to any opportunities based on this current agreement, but

instead may find even more willing participants for the delivery model Armstrong has developed."

(Dkt. No. 319 at 355 (emphasis added).)  Armstrong seemed frustrated with Hartman's attempts to

balance his relationships with it and Optimum; Ross wrote on May 25, 2004 that "I'm having a

tough time with Hartman and this agreement.  I've persuaded him to deal first with the large

issues as he's been very concerned about the what if scenario's associated with any changes to the

wording of his original agreement."  (Dkt. No. 319 at 358.)  The parties started to approach

mutual understanding around June 1, 2004; among other points, Armstrong acknowledged the

possibility of letting Optimum have a license.  (Dkt. No. 319 at 366.)  On June 18, 2004, however,

Hartman continued to express concern to Armstrong that negotiations were taking longer than

expected.  (Dkt. No. 319 at 369.)  As much as Armstrong wanted access to the LOOP Technology,

Hartman proposed delaying the introduction of the technology to Armstrong equipment for a year

and letting Optimum supply controllers for Armstrong equipment while a licensing agreement

---

[5] A variable-frequency drive (VFD) circuit is a "device that can adjust the speed of an electrical motor by adjusting the frequency of alternating current reaching the motor, combined with the wiring and other connections necessary to couple the device to the motor."  (Dkt. No. 136 at 40.)

took shape.  (*Id.*)  Hartman also put Armstrong on notice that his thoughts about long-term

ownership of the patents were evolving:

> I originally thought Armstrong would be in the role of our partner in
> exploiting these technologies.  Because this has not developed as I wished and
> because of the increased complexity of this agreement, I am at this time considering
> having [Optimum] become that partner and take assignment of the patents and if
> we can agree, [Optimum] may become the Licensor for this agreement.  In this case,
> all rights to the licenses not specifically transferred to Armstrong under this
> agreement would remain with [Optimum].

(*Id.* at 373; *see also id.* at 173–74.)  On August 17, 2004, Armstrong wrote that projects under an

agreement could refer to the technology generally; the exact source of a controller could be

determined later, though "one source supply will be a trend in the future."  (Dkt. No. 319 at 377.)

On September 13, 2004, Hartman responded to Ross with several comments.  (Dkt. No. 319 at

106.)  Hartman had a concern that Ross wanted to give Armstrong exclusive rights to manufacture

both pumps and "factory packaged systems," as if those systems would not include pumps.

Hartman tried to clarify what Armstrong's role would be under any agreement.  "What this

exclusivity is not intended to permit is for Armstrong to purchase equipment[,] install the controls

with LOOP technologies[,] and resell it, with the controls as the main Armstrong value added

product."  (*Id.*)  Hartman can be seen here viewing distinctions between Armstrong and Optimum

from the perspective of the equipment itself—pumps and chillers versus controllers.  Hartman did

not want Armstrong selling controllers alone.  Also, Hartman clarified that he did "not intend that

the Optimum product would never be implemented in new installations.  Optimum agrees to

make no proposals for new plants or plants that will have much of their equipment replaced

without first contacting Armstrong. If Armstrong declines to pursue the project, or if the Owner turns down the Armstrong solution, then Optimum would be free to pursue such a new plant." (*Id.*) Negotiations took a step backward in October 2004, when Hartman wrote that too many extensive revisions were occurring to provisions to which the parties already had agreed. (Dkt. No. 319 at 413.) Around late November 2004, Armstrong revisited the issue of license exclusivity and expressed concern "that we're not competing tomorrow with a factory implemented product from Johnson controls, Honeywell etc." (Dkt. No. 212-1 at 35 / Dkt. No. 319 at 429.) Armstrong acknowledged that the parties had not yet reached a meeting of the minds on the scope of Armstrong's rights. (*Id.*) Hartman responded that he understood Armstrong's concerns but that "we have to be careful to ensure we don't in any way limit Optimum Energy Corp's ability to make and market their controls product that incorporates Hartman LOOP technologies." (*Id.*) On January 24, 2005, just days before the parties signed the agreement, Hartman wrote to Ross with the following description of what mutual understanding the parties still had not reached about how the ALA actually would operate:

> The agreement does not, however, include practical direction in so far as how these various applications of the technology would actually take place, nor does it precisely define the limits of each possible method of implementation. I see this as a potential problem, but also as an enormous opportunity for us to cooperate and support one another. To start, I have made a decision to focus my support of the technology on Armstrong and Optimum, and not on individual engineers, contractors or others[.] However, I am concerned that in this industry where substitutes are common and many do not hesitate to make exaggerated claims regarding the level of performance they can attain, manufacturers, controls contractors, etc. may leverage our promotion of the Hartman LOOP technologies to persuade owners to use some other optimization scheme if these technologies are not readily available to any and all projects. And I am concerned that we would

then be creating our own competition. To avoid this possibility I would like
Armstrong and Optimum to develop clear understandings of the roles of each and
to work together to be sure Hartman LOOP™ technologies are supported by one
of the two entities throughout the many twists and turns projects may take, and
throughout the changes that may take place in this industry over the term of this
agreement.

(Dkt. No. 319 at 437.)

The parties have different perspectives as to what division of the HVAC market actually

occurred or was intended. Armstrong has pointed to Rothman's focus on retrofit projects and has

inferred that he focused on retrofit projects because the ALA prohibited him from engaging in

other projects. (*See* Dkt. No. 318 at 5.) Optimum has disputed Armstrong's interpretation of

Rothman's comments. (*See* Dkt. No. 299 at 7.) Optimum also has elaborated on its view of

market division:

Optimum disputes that the "Field Implementation" and "Factory
Implementation" language was used in the Armstrong License Agreement and
Optimum License Agreement to "divide the market". Hartman intended, and
Armstrong and Optimum acknowledged, that there could be competition between
Optimum and Armstrong for the same project. (*See* 5/5/17 Optimum SOF ¶¶64–
71). The ALA and OLA therefore did not divide the potential market but rather
divided the license rights according to the method of implementing the LOOP
Technologies. Optimum also disputes that the definitions of "Field
Implementation" and "Factory Implementation" differed between the Armstrong
License Agreement and Optimum License Agreement, as evidenced by the stated
definitions as well as their use in the Armstrong License Agreement and Optimum
License Agreement.

(Dkt. No. 299 at 6–7.)

The Court should make note of one other significant conflict in the record—whether the

parties intended that Armstrong would be allowed at some point to sell a controller with LOOP

Technology as a stand-alone product. As noted above, Hartman never wanted or intended

Armstrong to have the ability to sell just a controller. In Hartman's view, "Armstrong would have

to include their integrated mechanical products as a part of their implementation and would have

a competitive advantage only when such new or replacement mechanical products were also

required as part of the retrofit." (Dkt. No. 354 at 5.) Armstrong vehemently has argued otherwise:

> The Patents licensed to Armstrong in the ALA specifically refer to building
> controls, means for control, and controllers like the Armstrong IPC 11550
> controller product. Dkt. No. 303 at pages 282-283 (at ¶7). The Exhibit B to the
> ALA explicitly requires applying a Hartman LOOP logo to "System Controllers
> incorporating Licensed Technologies." At least that part of the text of the ALA
> makes it very clear that controllers, such as the Armstrong IPC 11550, were
> intended by all parties to be licensed to Armstrong and be part of the "Licensed
> Products."

> Armstrong's documents and meetings at the time the ALA was finalized
> and signed show that Armstrong specifically intended to make and sell a stand-
> alone controller product as well as sell controllers with other equipment, like
> Armstrong pumps. Dkt. No. 303 pages 294–319 (Ex. C) at ARM00035766 (page
> 295). Specifically, Armstrong's management listed as a "Project Goal" the "stand
> alone offering" of a controller as one of the intended products from the Hartman
> LOOP technology. *Id.* at ARM0035766 (page 295). Thus, Armstrong's explicitly
> expressed goal on entering the ALA was to develop the "Integrated Plant
> Controller" [IPC] product line, which "will incorporate the patented control
> philosophies of the Hartman[sic] Loop." *Id.* at ARM0035765 (page 294). This
> contemporaneous document, dated October 2004 to March 2005, manifestly
> demonstrates Armstrong's intent to produce a Hartman LOOP controller and sell
> them as a stand-alone product under the terms of the ALA. *Id.*

(Dkt. No. 353 at 8; *see also* Dkt. No. 303 at 295 ("The project goal is to have a target market

coordinated release for IPC as a stand alone offering, and as a sub-component of an IPP chiller

plant on a skid for April 2005 and July 2005 respectively. This must include: a demonstration of

the proto-type in a simulation manner, a sales plan agreed by COB global, a service support

mechanism / infrastructure."); *id.* at 309 ("Hartman is well aware that Armstrong's IPC product, later called the IPC 11550, was never a piece of mechanical equipment. Marketing materials for the IPC 11550, which is a computer-based controller not mechanical equipment, were freely available at industry conferences and on Armstrong's website. In fact, Hartman participated in the development of Armstrong's IPC product as a consultant to Armstrong. No one in the industry would refer to the IPC 11550 as mechanical equipment. Again, any suggestion from Hartman or others that Armstrong's rights are somehow limited to the Hartman LOOP incorporated into 'mechanical equipment' is plainly wrong."). )

### C. The ALA and Its Terms

As noted above, Hartman and Armstrong entered the ALA on February 4, 2005. (Dkt. No. 292-2 at 2–12 and *passim.*) The ALA contains several provisions that relate to the claims and counterclaims in this case. The first paragraph identified Hartman as the "Licensor" and Armstrong as the "Licensee." (Dkt. No. 292-2 at 2.) In Section 1, the parties defined "Licensed Technologies" as "any or all of the technologies described and claimed in the Patents." (*Id.*) The parties defined "Factory Implementation" as "implementing the Licensed Technologies into chiller, pumping, control systems and/or tower products as a part of the factory production process." The parties defined "Field Implementation" as "implementing the Licensed Technologies into the chiller, pumping, control systems and/or tower products after the products have been delivered to the site."

Section 2.1 gave Armstrong its primary license rights and reads as follows in its entirety:

Licensor hereby grants to Licensee a license, to make, have made, use, sell, and otherwise distribute factory packaged chilled water systems, pumping and/or other mechanical products that incorporate the Licensed Technologies at the factory implementation level, and to use and otherwise practice the Licensed Technologies in Licensed Products.

(Dkt. No. 292-2 at 3.) Section 3.2(b) addressed exclusivity and reads in its entirety as follows:

Licensor shall not grant a license for the Licensed Technologies or the Licensed Patents to any other manufacturer or assembler of pumps or for cooling systems and equipment that employ chilled water distribution; *provided, however,* that Licensor shall not be precluded from licensing the Licensed Technologies or the Licensed Patents to Optimum Energy Corporation or others for the purpose of incorporating the Technologies into products excluding those that include the manufacture or assembly of pumps, chillers, towers, chilled water plant controls or pumping or chiller systems that could compete with the Licensee's intended product offering. Licensee's limited exclusive rights shall be worldwide, begin [*sic*] on the date of this Agreement and expire only when this Agreement expires or is terminated according to the provisions of this Agreement.

(*Id.* at 4.) Section 3.3, titled "Limited Exclusivity Defined," added more language to the exclusive nature of Armstrong's license. The opening paragraph to Section 3.3 stated that the limited exclusivity "is intended to protect Licensee against implementations of the Licensed Technologies that would compete with their intended product offerings. Such offerings include factory integrated chiller, pumping or cooling tower equipment with controls wherein the basis of the system is chilled water cooling systems, or pumping systems." (*Id.* at 5.) Section 3.3 contained five subsections that further explained the nature of Armstrong's limited exclusivity:

a. As long as the license grant remains exclusive, Licensor shall not grant a license for factory implementation of the Licensed Technologies or the Licensed Patents as they apply to hydronic elements to any third party involved in the manufacture of pumps, any factory packaged chilled water systems, chillers, building controls or cooling towers.

23

b.      During the exclusive license grant period, Licensor shall retain full rights to grant licenses for "field" implementation of the Licensed Technologies when such technologies are applied to the hydronic systems but are not integrated into the chiller, pumping, control or tower products until they are field assembled.

c.      Licensee has no rights granted under this agreement to "field["] implementation of the Licensed Technologies (e.g. implementing the Licensed technologies without an integrated equipment/control package).  However, for special circumstances, Licensee may apply to Licensor for permission to implement a field level implementation, the licensed terms of which shall be determined on a case by case basis.

d.      During the exclusive license grant period, Licensor shall retain full rights to grant licenses for implementation of the Licensed Technologies when the implementation of such Licensed Technologies do not in any way compete with the product offerings of the Licensee.  Examples are the licensing of the technologies applied to variable speed DX / air cooled rooftop air conditioning systems and the control of condenser fans of air cooled chillers.

e.      During the exclusive grant period, Licensor shall be diligent in referring to the Licensee all potential applications the Licensor learns about that require new chillers or pumps.  Only if Licensee declines to pursue such projects, or the Owner declines Licensee's proposed solution will Licensor permit other potential licensees over which Licensor exerts control to pursue such projects.

(*Id.* at 5.)

Section 8, titled "Improvements," reads as follows:

Licensor shall have no obligation under this Agreement to develop any Improvements to the Licensed Technologies.  However, any such improvements that the Licensor may develop within the next two (2) years from the date hereof to the Licensed Technologies shall be deemed included within the Licensed Technologies subject to the terms of this Agreement.  Following such two-year period and providing.the Licensee continues to meet the minimum annual license fee in 3.2a, Licensor shall first offer to license any and all improvements in or to the Licensed Technologies to the Licensee for exclusive rights in the markets the Licensee already enjoys exclusivity, and to the extent of the existing exclusivity rights.  Licensee and Licensor shall negotiate in good faith the license fee and terms of such license.  If Licensor and Licensee are unable to negotiate a mutually

acceptable license fee and terms, then, during the Term and prior to Licensor accepting any offer to license any improvements to any third party, Licensor shall offer Licensee the right to license such improvements at a license fee and upon such terms that are no less favorable than those offered by or to Licensor.

(*Id.* at 8.) Meanwhile, Section 10.2, titled "No Inconsistent Agreements; No Infringement," to find certain rights and obligations as follows:

Licensor has not made and will not make any agreements with or commitments to third parties that are inconsistent with the grant of rights hereunder. Licensor is not aware of any infringing use of the Licensed Technologies by third parties or any claim that the Licensed Technologies and/or the Licensed Patents infringe upon the rights of any third party. Furthermore, Licensor is not aware of any challenge or threatened challenge of the Licensed Patents.

(*Id.* at 9.)

Section 12 of the ALA contained several provisions grouped together as "General Terms." Among these provisions, Section 12.1 was titled "Entire Agreement/Modification" and reads as follows:

This Agreement contains the entire agreement between the parties with respect to the subject matter hereof, and unless otherwise provided in this Agreement, no modification or waiver of any of the provisions, or any future representation, promise, or addition, shall be binding upon the parties unless made in writing and signed by both parties.

(*Id.* at 10.) Section 12.3 set forth that the ALA "shall be binding upon and enure to the benefit of the parties hereto and their successors; provided, however, that this Agreement and the license granted hereunder shall not be assignable by Licensee except to a parent, subsidiary or affiliate of Licensee . . . ." (*Id.*) Section 12.4 contained a severability provision: "If any provision, term, condition, covenant, restriction, or other portion of this Agreement shall be held to be invalid,

illegal, or unenforceable by any court of competent jurisdiction, the remaining portion shall remain in force and effect." (*Id.*) Section 12.10 contained a choice of law provision that placed the ALA under New York law.

### D. The OLA and Its Terms

As stated previously, on November 28, 2005, Hartman and Optimum signed the OLA. (Dkt. No. 292-2 at 131 and *passim*.) Like the ALA, the OLA contained a number of provisions, several of which affect the pending motions. The fourth recital at the beginning of the OLA stated that Optimum "wishes to obtain Hartman's assistance in developing and implementing products and/or services that incorporate the technologies disclosed in Hartman's patents." (Dkt. No. 292-2 at 131.) Section 1.5 defined "Factory Implementation" as "implementation into chiller, pumping, and control systems and/or tower products as a part of the original factory production process." (*Id.* at 132.) Section 1.6 defined "Field Implementation" as "implementation into chiller, pumping, and control systems and/or tower products after the products have been delivered to the site where they will be used for HVAC purposes. Field Implementation and Factory Implementation shall be construed as mutually exclusive."

Before proceeding to other provisions of the OLA, the Court should pause to consider a point that Armstrong made in its motion papers. "The language dividing the potential market segments written into both the Armstrong License Agreement and the Optimum license agreement differ from the Retrofit/Non-Retrofit language used in the LOI [Binding Letter of Intent]. Both of the license agreements use 'Field Implementation' and 'Factory Implementation'

26

to divide the market. However, the definitions of these two terms differ between the two license

agreements. Kulik Decl. Exh. A and D." (Dkt. No. 318 at 5.) Responding to the point about

discrepancies in definitions in the ALA and OLA, "Optimum . . . disputes that the definitions of

'Field Implementation' and 'Factory Implementation' differed between the Armstrong License

Agreement and Optimum License Agreement, as evidenced by the stated definitions as well as

their use in the Armstrong License Agreement and Optimum License Agreement." (Dkt. No. 299

at 6–7.) As for Hartman's response, "[t]he language of the license agreements speak for

themselves, but they contain consistent definitions of field and factory. As noted above, the

retrofit/non-retrofit distinction had been proposed during negotiation of the ALA, but Armstrong

wanted some retrofit rights, which caused the parties to adopt the field/factory distinction

instead." (Dkt. No. 302 at 6.) The Court will address the significance of any differences later, but

for the sake of clarity, a side-by-side comparison of the definitions in the ALA and OLA is useful:

| Term | ALA | OLA |
|------|-----|-----|
| Factory Implementation | Implementing the Licensed Technologies into chiller, pumping, control systems and/or tower products as a part of the factory production process. | Implementation into chiller, pumping, and control systems and/or tower products as a part of the original factory production process. |
| Field Implementation | Implementing the Licensed Technologies into the chiller, pumping, control systems and/or tower products after the products have been delivered to the site. | Implementation into chiller, pumping, and control systems and/or tower products after the products have been delivered to the site where they will be used for HVAC purposes. Field Implementation and Factory Implementation shall be construed as mutually exclusive. |

Section 2.1 of the OLA gave Optimum a "worldwide, irrevocable, sublicensable, transferable, and exclusive license under the Loop Patents to make, have made, use, offer for sale, sell and import products and equipment (Loop Products), and to render services to customers, all in connection with Field Implementations, the only exception being DX Equipment per Section 3." (Dkt. No. 292-2 at 133.)  Under Section 2.2, Optimum was "not permitted under this Section 2, with the exception of that DX Equipment covered under Section 3, to make, have made, use, offer for sale, sell, or import any products for Factory Implementations." (*Id.*)  Under Section 2.7, "Hartman will not grant any license under the Loop Patents to any third party to permit Field Implementation of the Loop Products so long as the grant of this Section 2 remains exclusive, except as provided in Section 2.8 [a provision not relevant to the parties' motions]." (*Id.* at 134.)  Section 2.9 explained that the limited exclusivity of Section 2.7 "is intended to protect OEC against implementations of Loop Products that would compete with OEC's intended product offerings.  Such offerings include Field Implementation of the licensed technologies as applied to existing chiller plants or systems."

Section 3 generally gave Optimum an exclusive license for DX equipment, defined back in Section 1.3 as "'direct expansion' cooling equipment covered by a Loop Patent, *i.e.*, a packaged air-conditioning system that employs refrigerant coils exposed to air for cooling and heat rejection, commonly referred to as 'rooftop units,' 'heat pumps,' 'PTACS,' and 'unitary air conditioners.' DX Equipment stands in contradistinction to chilled-water or other fluid-based cooling systems generally of the type described in the Loop Patents." (*Id.* at 131.)  In Section 11.2, Hartman

promised that he made no inconsistent agreements or commitments with anyone else. (*Id.* at 140.) Section 12.5 was a severability provision. (*Id.* at 141.) Section 12.11 placed the OLA under Washington state law. (*Id.* at 142.)

A few points are worth noting for the sake of the record; the Court will address them later if it decides that they affect the outcome of the pending motions. First, the OLA lacks the referral obligation that appears in Section 3.3(e) of the ALA. Next, Section 2.1 of the OLA lacks the clause (in italics below) that composes the second half of its analog in the ALA:

|  | ALA | OLA |
|---|---|---|
| Section 2.1 | Licensor hereby grants to Licensee a license, to make, have made, use, sell, and otherwise distribute factory packaged chilled water systems, pumping and/or other mechanical products that incorporate the Licensed Technologies at the factory implementation level, *and to use and otherwise practice the Licensed Technologies in Licensed Products.* | Subject to all of the other terms and conditions of this Agreement, Hartman hereby grants to OEC a worldwide, irrevocable, sublicensable, transferable, and exclusive license under the Loop Patents to make, have made, use, offer for sale, sell and import products and equipment (Loop Products), and to render services to customers, all in connection with Field Implementations, the only exception being OX Equipment per Section 3. |

Hartman is the common denominator between the ALA and the OLA, and he played a substantial role in the negotiations for each document. (*See* Dkt. No. 293 at 2–3 ("The license agreements and the Field/Factory division of rights to the Licensed Technologies were the product of

substantial negotiations between myself, Brent Ross (Armstrong), and Nathan Rothman (Optimum) starting in 2004.").)  Hartman thus would have been aware that one company had a provision "to use and otherwise practice the Licensed Technologies in Licensed Products" while the other did not.  The reason for this difference is not clear, but the Court will address that later if necessary.

Finally, Optimum has offered the following perspective on the scope of its rights under the OLA compared to the scope of Armstrong's rights under the ALA:

> Pursuant to the OLA, Optimum received greater license rights than did Armstrong in at least three respects.  (Rothman Decl., ¶8; Appendix Exh. A).  First, Optimum received "the right to sublicense its rights under the Loop Patents." (OLA, § 2.3)  Armstrong does not have such sublicensing rights.  Armstrong's sublicensing rights are limited to the right to sublicense to Armstrong's parent or sister companies owned in whole or controlling part by Armstrong.  (Rothman Decl., ¶19; Appendix Exh. A) (ALA, § 2.2).

> Second, Optimum received an exclusive license under the LOOP Patents with respect to DX Equipment.  (OLA, § 3.1).  Armstrong has absolutely no rights with respect to the DX Equipment and the related market.  (Rothman Decl., ¶10; Appendix Exh. A).

> DX Equipment is air conditioning equipment that is air cooled as opposed to water cooled.  DX is short for Direct Expansion which means that the refrigerant expands (and produces a cooling effect) in a coil that is in direct contact with the conditioned air that will be delivered to the space.  DX Equipment is usually packaged as a unit and range in size from one-half refrigeration ton window units to as much as 150 refrigeration ton big boxes, which are usually installed on top of single or multiple story buildings less than 100,000 square feet in size.  (Rothman Decl., ¶11; Appendix Exh. A).

> Third, Optimum received a license not just with respect to the three LOOP Patents, but also with respect to six additional patents, referred to in the OLA as the "Equipment Patents."  (OLA, § 1.4).  (Rothman Decl., ¶12; Appendix Exh. A).

The Equipment Patents license gives Optimum rights with respect to patents incorporated in products referred to as TRAV, the Self-Ranging Valve, and Uniterm. (OLA, §§ 1.13, 1.15, 1.16). These products are used in that part of the building air conditioning system which controls the delivery of conditioned supply air to the occupied spaces in heating or cooling mode. (Rothman Decl., ¶13; Appendix Exh. A).

TRAV is short for Terminal Regulated Air Volume and is a control strategy for the equipment that controls air flow in the air distribution ductwork. While the LOOP Patents relate to the chilled water plant (i.e. the chillers, pumps and cooling towers) which makes the cold water that is circulated around the building, TRAV relates to the control of the air being blown through the duct work and over radiators and out into spaces in the building. (Rothman Decl., ¶14; Appendix Exh. A).

The Self-Ranging Valve adds an additional control element to the flow of water throughout the system. Uniterm is an individual comfort device that can be part of the overall system. (Rothman Decl., ¶15; Appendix Exh. A).

Armstrong did not obtain a license with respect to the six Equipment Patents or obtain any rights with respect to the DX Equipment, TRAV, the Self-Ranging Valve, or Uniterm. (Rothman Decl., ¶16; Appendix Exh. A).

(Dkt. No. 294-4 at 9–10.)

### E. *Factory Versus Field Implementation*

Understanding the parties' attempted distinction between factory implementation and field implementation is important because the distinction appears in many of the arguments that the parties have made. The parties themselves have made statements about the importance of the distinction. "The distinction between Field Implementation and Factory Implementation is central to the ALA and the OLA." (Dkt. No. 293 at 2; *see also* Dkt. No. 294-3 at 26 ("The Factory/Field Implementation distinction, however, is critical to correctly interpreting §3.2(b) and §3.3(d) of the ALA . . . .").)

31

*i. Novelty of the terms*

One factor that has affected the ability to understand the distinction is the novelty of the terms themselves. Armstrong expert John Conover ("Conover"), an engineer who worked nearly 40 years in the HVAC industry, has offered the following comment about factory implementation and field implementation:

> I note that in my experience the term "implementation" is not used in the industry. Rather, the familiar terms of the industry for bringing products or technology to this marketplace would be factory installed or field installed or factory integrated or field integrated, all of which have understood meanings in the field.

(Dkt. No. 317-1 at 5.)[6] Hartman has attacked Conover's commentary about the term implementation:

> Conover's acknowledgment that the contract terms do not have a common meaning in the industry confirms that he has no ability to speculate as to the meaning of defined terms adopted by the parties in the ALA. Nor is Hartman's reference to "retrofit" in e-mails relevant (absent a finding of ambiguity), and, as discussed above (*see* ¶¶ 12–13, 18 above), the industry term "retrofit" was not mutually exclusive of the contract terms used because retrofit is a project with existing mechanical equipment. These terms ("Field Implementation" and "Factory Implementation") have customized meanings that the parties operated under for nearly five years until Hartman announced that he was selling the LOOP Patents to Optimum. *Id.*; Docket No. 293 ¶ 19.

(Dkt. No. 302 at 9.)

*ii. Mutual exclusivity*

---

[6] The Court has given Conover's report little consideration, for summary-judgment purposes, to the extent that Conover has attempted a legal interpretation of terms in the ALA and the OLA. *Cf., e.g., F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d 1250, 1258 (2d Cir. 1987) (affirming exclusion of expert testimony about the enforceability of a contract because "[i]t is not for witnesses to instruct the jury as to applicable principles of law, but for the judge") (internal quotation marks and citation omitted). Consistent, however, with Federal Rule of Evidence 702, the Court has given some consideration to Conover's specialized knowledge about the HVAC industry.

Another factor affecting the novelty of the terms is whether the terms were intended to be mutually exclusive. Optimum has pointed out that "[t]he Optimum License Agreement expressly provided that 'Field Implementation and Factory Implementation shall be construed as mutually exclusive.' (OLA §1.6)." (Dkt. No. 294-3 at 25.) No such provision appears in the ALA; with Hartman as the common denominator between the two agreements, the Court cannot discern whether Hartman intended mutual exclusivity in one agreement and not the other.

   iii.  *Overlap with "retrofit" and "non-retrofit"*

Another factor to consider when assessing the terms factory implementation and field implementation is the extent to which those terms overlap with the concept of retrofit versus non-retrofit projects. Rothman offered some commentary on this subject during his deposition:

> Q. So back at this timeframe, according to this paragraph I just pointed you to, OEC's initial focus was the retrofit market as opposed to the new construction market.
>
> Do—do you recall why the retrofit market was the focus?
>
> A. No, I don't. I mean, specifically why? I don't recall. New construction, you gotta wait for the building to be finished and everything. And retrofit is an existing building and, therefore, the sales cycle would be shorter is all I can think of.
>
> And our particular—this is 2005. This is after all the agreements, I believe, were in place.
>
> Q. I'm sorry.
>
> Were you—
>
> A. I'm thinking to myself out loud.
>
> Q. Okay.

So I thought maybe there was another reason that you recall focusing on the retrofit market.

A. Well, our license at that time was for implementation in—in the field. And therefore, the building would have to be built for us to put our product on the equipment.

(Dkt. No. 357 at 7–8.) Rothman's discussion of "focusing" on retrofit projects does not

necessarily mean that he felt obligated to stay only with those projects. Rothman's testimony that

he focused on retrofit projects because of the restriction to field implementation could suggest that

"implementing the Licensed Technologies into the chiller, pumping, control systems and/or tower

products after the products have been delivered to the site" was easiest to understand and to carry

out within the context of retrofit projects. Nonetheless, the parties' supplemental briefing of

December 21, 2017 has persuaded the Court that any use of the term "retrofit" after 2005 was

informal shorthand for the general characteristics of a proposed project and not a formal attempt

to delineate segments of the market. As Hartman has explained,

Early on, as both Armstrong and Optimum became aware of each other and the markets they each aspired to serve, we had employed the common industry terms "retrofit" and "new" (or sometimes "non-retrofit") to delineate the market focus of each of the firms. Optimum's focus was on retrofit applications (*e.g.* chiller plants already assembled and operating), while Armstrong's focus was on new plants. But Armstrong also wanted the ability to sell their pumping systems beyond new plants. Existing chilled water plants require new equipment from time to time to replace old equipment and/or to expand the capacity of the plant. While simply applying optimization to a chilled water plant is considered a retrofit, replacement and upgrades of equipment in an operating plant as Armstrong intended are also considered retrofits. And Armstrong wanted to have access to retrofit projects that required new equipment. In addition, both firms wanted to have some level of exclusivity for their product offerings. It became clear to all of us that any delineation of markets using new and retrofit terminology would not be suitable.

34

* * *

   As I explained in my deposition, I discussed this issue informally with both
   Mr. Rothman and Mr. Ross. We all agreed that exclusivity should relate to *how* the
   technologies would be applied and not to the *type* of project involved. As a result,
   each firm could offer its solution for any project, but would be protected in so far
   as how they implemented the Hartman LOOP.

(Dkt. No. 354 at 4.) Armstrong did not directly address this point in its supplemental briefing, but

Optimum agreed with Hartman:

   In identifying the parties' intent, it is imperative to reject any attempt to
   use the contract language to divide the relevant license rights into "retrofit" vs.
   "new construction." That potential retrofit/new construction division of the
   parties' rights was considered—and absolutely rejected—by all parties. As the Court
   recognized, Armstrong wanted "to participate in the retrofit market as well" as new
   construction. (Dkt. No. 324 at 5). It was Optimum's plan, once it became
   established, to enter the new construction market for all its products. (Dkt. No.
   299 at 7, ¶20; Rothman Dep. at 41:11–42:14; 6/21/17 Opt. App., Exh. C). The
   retrofit/new construction division was therefore expressly rejected so that both
   Armstrong and Optimum had the license right to offer their respective method of
   implementation to both new construction and retrofit projects, depending on the
   project and the end user's desires and preferences, i.e., whether the customer
   wanted a factory implemented solution (Armstrong) or a field implemented
   solution (Optimum). For his part, Hartman repeatedly emphasized that he wanted
   to ensure that two competing bids could be made on as many projects as possible,
   because so much of the relevant market required competitively bid projects.
   Optimum's LOOP product offering did not compete directly with Armstrong's
   LOOP product, because once a customer settled on a method of implementation,
   based on its preference, it could only use one or the other of the two licensee's
   LOOP products.

(Dkt. No. 355 at 7–8.)

   iv.    *Is the Optimum product a "controller"?*

Yet another factor that arose in the motion papers concerned the nature of Optimum's

product—how and when the product did what it did. According to Optimum, "[t]he Licensed

Technologies manifest in algorithms that determine the optimal sequences of all the equipment

(chillers, pumps and cooling towers) in the chiller system.  (Rothman Decl., ¶36; Appendix Exh.

A).”  (Dkt. No. 294-4 at 11.)  Optimum’s choice of the word “manifest” suggests that it considers

its product to be only the abstract software code that is designed with the LOOP Technology in

mind.  Optimum does not consider its product to include any physical device within which its

software code would have to operate to be of any use.  “Optimum disputes the statement that the

Optimum ‘product’ is a controller or building control device or Tridium JACE.  Optimum’s

product is the Optimum LOOP Solution (among others), not the controller or device that enables

the solution.  (Erpelding Dep. at 41:21–42:4; 6/21/17 Opt. App., Exh. F).”  (Dkt. No. 299 at 16.)

Armstrong has rejected this Cartesian mind/body duality; it has contended that Optimum’s

product is not a product at all without its accompanying physical device and that the combined

software with a physical device makes Optimum’s product a “controller” that is set up in a factory

setting:

> Q. Okay.
>
> You mentioned two things in that answer that I’m not sure I know what
> they are.  What is a commissioning wizard?
>
> A. That’s—it’s just basically a—think of a—it’s just a function of the AX
> software that does what’s necessary to make—that’s what I referred to when we
> commissioned the JACE prior to shipment.
>
> So in that step I was referring to, there’s another function called “station
> transfer,” so it’s just a drop-down menu that says “station transfer,” and then you
> select the file that you want to transfer to that JACE and it does it.
>
> Q. Okay.
>
> Did you say it was a function of the AX software?

A. Yes.

Q. And that's Niagara AX?

A. Yes.

Q. Okay.

So the commissioning wizard is part of the Niagara platform that is loaded onto the JACE?

A. Correct.

Q. Thank you. Okay.

I think the other part, station transfer, you also—you just explained. The station transfer is what happens when using the commissioning wizard; is that correct?

MR. WHITE: Object to the form.

THE WITNESS: So no. The commissioning wizard commissions the JACE and makes it—that's—that's one thing to make the JACE functional, so once the JACE is functional, you can program anything you want onto it.

What we're doing in step 8 is we're just doing a station transfer, which is—it doesn't put any of the base software on the controller. That's already been configured and—and working. We're just transferring the program to do the optimization.

BY MR. KULIK:

Q. Okay.

So the OptimumLOOP program?

A. Correct.

Q. Okay.

Is that what it's called?

MR. WHITE: Object to the form.

THE WITNESS: I mean, it's referred—it's—I call it the optimization software.

(Dkt. No. 292-2 at 341–42.) The "Step 8" in the exhibit quoted above refers to part of a sequence

of events that Optimum used to bring its product into full use. (*Id.* at 343–44.) "OLC" in this

37

document means "Optimum LOOP Controller." Step 6 in the sequence consists of, "Configure and Ship OLC—Once Optimum Energy receives the IP address required for remote connection, we will configure and ship the OLC." (*Id.* at 343.) Step 8 consists of, "Install the OLC—After the OLC is powered up and connected to the network, notify DE. Optimum Energy will verify the remote connection and load the software into the controller." (*Id.*) The excerpt and the sequence that Armstrong included in its motion papers suggest subtleties that complicate the distinction between factory implementation and field implementation. From the above information, Optimum's product is useless without some kind of physical device that houses it and that is separate from any physical device already in an existing HVAC system. (*See* Dkt. No. 299 at 16 ("Although *the device is mandatory as an enabler of Optimum's solution*, Optimum does not market the device or quote the device separately . . . . Optimum does not dispute that the JACE that employs the LOOP Technologies are kept in Optimum's facility and preconfigured by Optimum to add software operating systems.") (emphasis added).) In other words, Optimum does not go to an existing HVAC system, open up whatever device is already controlling that system, delete the existing software in that device, and then install its own. Additionally, the above information confirms that something is happening at Optimum's office or factory before the product reaches its destination. *Something* is being installed at the factory level that is mandatory to making Optimum's product useful. Perhaps contrary to Armstrong's representation, however, there is more to the story. Delivery of Optimum's product entails not just one but two levels of software installation. Some sort of base software is installed immediately to allow for remote

38

connections from the HVAC facility back to Optimum's office or factory. The actual optimization

software then is downloaded to the HVAC facility remotely from Optimum's office or factory.

The Court will consider later whether the definitions of factory implementation and field

implementation ever contemplated such a nuanced, multi-step delivery process.

Meanwhile, Optimum has disputed that whatever happens at its office or factory during its

multi-step sequence would constitute factory implementation under the ALA or the OLA:

> Although Optimum uses the word "controller" for marketing and communication purposes in the trade and with building owners, the Tridium JACE is not a true "controller." The JACE certainly does not perform the same functions or possess the same defining characteristics as the Armstrong controller. (Rothman Decl., ¶40; Appendix Exh. A).

> A series of September 2006 e-mails between Peter Thomsen of Armstrong and Alain Descoins, boiler sales manager for R.F. MacDonald Co. of San Francisco, with copies to Rothman, regarding the San Jose Airport project confirm Armstrong's recognition that Optimum was using a Tridium "controller" and that it was not improper. (Rothman Decl., ¶¶73-76, Exh. J; Appendix Exh. A).

> Optimum's use of the Tridium JACE for implementing the Licensed Technologies was known to Armstrong in 2006, and has been a consistent feature of the Optimum method of Field Implementation as permitted under both the ALA and the OLA. (Rothman Decl., ¶85; Appendix Exh. A).

> Optimum is not a manufacturer of the products listed in ALA §3.2(b) and it does not manufacture pumps, chillers or any equipment employed in chilled water systems. (Rothman Decl., ¶60; Appendix Exh. A).

> Optimum has not incorporated the Licensed Technologies at the factory level into any products that include the manufacture or assembly of pumps, chillers, towers, chilled water plant controls or pumping or chilling systems. (Rothman Decl., ¶61; Appendix Exh. A).

(Dkt. No. 294-4 at 12–13.) Hartman has joined the argument by Optimum that Optimum's

product cannot be considered a "controller" because it makes no final decisions and thus exerts no

final control over an HVAC system:

>Armstrong mischaracterizes the testimony of Matthew Frey, who referred to the Optimum device as a "controller"—but did not testify that it is a "building control device." An add-on device that provides input or optimization recommendations to a BAS is not a "building controller." Docket No. 290-4 ¶¶ 114–116. Rather, the BAS is a building controller because it controls the building. *Id.*

(Dkt. No. 302 at 14–15.) Armstrong has rejected Hartman's contention as a *post hoc* rationalization designed to evade liability under certain sections of the ALA; Armstrong also created a distinction between a single device with exclusive control and what it called "a control product":

>Hartman's latest Declaration (Dkt. No. 298-3 at ¶ 22) attempts to convince the Court that Optimum's product is not a controller, "does not control anything," and is not a "chilled water plant control." He makes this assertion now because sections of the ALA were clearly written to protect Armstrong and its intended product line and product offerings from competition employing the Hartman LOOP—these sections all refer to a type of "control" product made or assembled by this prohibited competition. (Dkt. No. 296-10 at ¶ 14 and 18, Decl. of Brent Ross dated June 16, 2017; and Dkt. No. 292-3 at ¶ 15, and 23 to 26, Decl. of Peter Thomsen dated May 5, 2017). Armstrong's Brent Ross submits a declaration with this Reply that, at paragraph 13, addresses the insertion of the "control" term, and Exhibit 4 to that declaration lists the several places where Ross (as editor "bross") inserted the term in various forms. The sections prohibiting competition over the Hartman LOOP technology remain a part of the executed ALA.

>No other statement or evidence supports Hartman's assertion at ¶ 22 of his declaration that the Optimum product is not a "control" of anything. (Dkt. No. 298-3 at ¶ 22). The Declaration of Peter Thomsen dated June 19, 2017 (Dkt. No. 296-5 at ¶ 17) addressed Hartman's assertion. Plaintiff's Statement of Undisputed Facts (*see, for example,* Dkt. No. 292-6 at ¶ 42) addressed this by citing to testimony from Optimum's former CEO. Armstrong's Memorandum in Support of Partial Summary Judgment (Dkt. No. 292-5 at pages 15–16, and exhibits at Dkt No. 292-2, Ex. AA, see pages 191–192), citing again Optimum's CEO and its employee Clark Matthys, addressed Hartman's assertion. And submitted with this Reply is the

declaration of Armstrong's expert John W. Conover, who explains the general industry background for building "control" products and their manufacture and use. He also directly addresses Hartman's assertion at paragraphs 3-14 of Conover's declaration. Conover submits clear statements and video evidence from Hartman's own video presence on the internet, The Hartman Company's and Optimum's own webpages and documents, and background material on the Tridium JACE controller device that Optimum uses as its starting point for assembling its control product. Everything except Hartman's Declaration (Dkt. No. 298-3) accepts the fact that the Optimum JACE device employing the Hartman LOOP algorithms is a "control" product, a controller, a building control device, or a chilled water plant control. The clear evidence shows that the ALA protects Armstrong's product line from competition that uses the Hartman LOOP technology and from manufacturers or assemblers of a building control. Hartman is complicit in Optimum's current breach of the ALA and, by assigning the LOOP patents to Optimum, a manufacturer or assembler of building controls, Hartman also breached the ALA.

(Dkt. No. 309 at 3–4.) Armstrong elaborated further as part of its reply to Optimum:

Optimum is competing with Armstrong as a manufacturer or assembler of building controls, chilled water plant controls, or a related "control" type product that employ the Hartman LOOP technology. The Declaration of Armstrong's expert, John W. Conover, submitted with this Reply, makes this clear in several ways at paragraphs 1, 3-14 and 16. Many of Optimum's own statements and statements from Optimum's own website confirm that fact to one in the industry and to potential customers. The Optimum JACE devi[c]e is a "control" that is covered by one or more of the "control" products spelled out throughout the ALA.

Expert testimony is especially useful in this context as the "control" terms and products of the ALA are a trade terms, and the manufacture and use of these products refer directly to the customs, and practices of the industry. Expert testimony is useful evidence of trade terms, customs, and practices that that "illuminate the context for the parties' contract negotiations and agreements." *Metric Constructors, Inc. v. NASA*, 169 F.3d 747, 752 (Fed. Cir. 1999).

The declaration of Armstrong's expert John W. Conover explains the general industry background for building "control" products and their manufacture and use. Conover also directly addresses, at paragraphs 3–14 of his declaration, the latest assertions from Hartman concerning a "control" product and that Optimum's product allegedly does not control anything. Conover submits clear

statements and video evidence from Optimum's webpage interview of Hartman, content from The Hartman Company's and Optimum's own webpages and documents, and telling background material on the Tridium JACE controller device that Optimum uses as its starting point for assembling its control product.

From Conover's Exhibit 3 referred to at ¶ 11 of Conover's Declaration, on the seventh page, under the heading "Control System" the chilled water plant control characteristics of Optimum's "OptiMiser" Hartman LOOP product are explained in detail with the statement: "...the OptiMiser controller executes the optimization instructions which control the equipment speeds." Here the "equipment" would be the pumps and chillers of a chilled water plant. Conover Exhibit 3 goes on to say that the existing control system, the BAS, provides an interface supported by or able to communicate with the OptiMiser controller. These statements from the Conover Exhibit 3 and at least ¶ 11 of the declaration clearly indicates to anyone in the industry that the Optimum JACE device, here called the OptiMiser, is controlling the chilled water plant equipment and not the BAS. Reviewing the entire contents of the Conover declaration, it is clear that Hartman (Dkt. No. 298-3) is alone in his denial that the Optimum JACE device employing the Hartman LOOP algorithms are not controlling anything. The Optimum JACE device is a "control" product, a controller, a building control device, or a chilled water plant control. That Optimum's Opposition also states, without any support, that its JACE device does not control anything is not surprising.

In addition, the Declaration of Peter Thomsen dated June 19, 2017 (Dkt. No. 295-5 at ¶ 17) addressed Hartman's assertions on a "control" product. Plaintiff's Statement of Undisputed Facts (*see, for example*, Dkt. No. 292-6 at ¶ 42) addressed this also by citing to testimony from Optimum's former CEO. Armstrong's Memorandum in Support of Partial Summary Judgment (Dkt. No. 292-5 at pages 15–16, and exhibits at Dkt No. 292-2, Ex. AA, *see* pages 186–192), citing again Optimum's CEO and its employee Clark Matthys, also addressed Hartman's assertion.

Conover's declaration submitted with this Reply, at paragraph 17, also confirms what he earlier concluded in the Expert Reports prepared for this case. (*See* Dkt. No. 292-2 at Exhibits J and Z). The Optimum JACE is produced or assembled in Optimum's facility and the required configuration of the JACE for a specific building site does not occur in the

field. (Conover Decl. of July 18, 2017 at ¶ 17). Exhibit 8 of Conover's declaration explicitly states how Optimum prepares the JACE for customers as "Once Optimum Energy receives the IP address required for remote connection, we will configure and ship the OLC [Optimum Loop Controller]." Obviously, Optimum configures and ships from its own facility.

Paragraph 17 from Conover's Declaration explains how the "configuring" step is relevant to assembling the Optimum JACE device for a specific customer. Even if a remote upload of only Hartman LOOP algorithms is important at all, an upload that Optimum delays for no particular reason, the product is the same as a factory manufactured or assembled building control to anyone familiar with the industry or any customer in the industry. (Dkt. No. 292-2 at Exhibit Z). Any difference is illusory. (*See* Armstrong's Opposition to Hartman's Motion for Summary Judgment, Dkt. No. 296 at pages 16–18).

Optimum makes the unusual argument at page [12] of its Opposition Memorandum that the difference between "factory" and "facility" may somehow dictate the Court's decision on whether Optimum is manufacturing or assembling in a "factory." Armstrong submits that any building that is not the customer's building site where Optimum modifies a stock JACE device to make it functional for its purposes, configures a JACE for a particular building site, or prepares a JACE device by installing information related to a specific customer for the purpose of advancing a sale to that customer effectively operates as a "factory." No posted sign or plaque stating "Optimum Manufacturing Factory" on a building is required under the terms of the ALA.

(Dkt. No. 310 at 9–11.)

     *v.*   *Preparation of the Optimum product*

As can be seen above, the procedure for preparing Optimum's product is a subset of the

debate between the parties over whether the product constitutes a controller. Continuing with its

distinction between its optimization software and the physical housing for it, Optimum has offered

the following:

       Optimum has always used a Tridium JACE for every Field Implementation
of the Licensed Technologies that Optimum has delivered since the signing of its

License Agreement with Hartman in November 2005. This product has sometimes
been referred to as a "Tridium," an "OE Tridium," a "Tridium controller," or a
"Tridium JACE." (Rothman Decl., ¶72; Appendix Exh. A).

(Dkt. No. 294-4 at 11–12; *see also* Dkt. No. 318 at 11 ("The Optimum controller that employs the

Hartman LOOP algorithms that direct the sequencing of HVAC components are kept in

Optimum's facilities and preconfigured by Optimum to add software or operating systems from a

blank 'JACE' device prior to shipping to the building site.").) Optimum has distinguished its

product from other products based on what happens at that point with software installation. "In

Armstrong's case, it buys the controller and loads algorithms into the controller at its factory to

directly interface with all the chiller equipment in the plant. Armstrong then ships the controller

with equipment that has previously been agreed to, such as a minimum of a pumping package. In

short, Armstrong programs the controller with algorithms at its factory and its controller directly

controls the plant equipment. (Rothman Decl., ¶37; Appendix Exh. A)." (Dkt. No. 294-4 at 11.)

In contrast,

> The Optimum product is preconfigured in Optimum's factory or facility
> and then sent to a building site where the download of the Hartman LOOP
> software can occur based on the building IP address information and the other
> software previously installed in the JACE controller at Optimum's facility. Kulik
> Decl. Exh. Z (Supplemental Expert Report of John Conover, at page 6, and at Exh.
> 14).

> Mr. Clark Matthys also explained that the Hartman LOOP software that
> Optimum uses on its controllers could be loaded at the building site directly, but it
> is easier to load it remotely. Matthys Deposition at pages 188, 191-192.

> The details of Optimum's and JCI's preconfigured product offering and its
> installation indicate that it is a factory produced solution. Exhibit 10 of the
> Supplemental Expert Report of John Conover (Kulik Decl., Exh. Z), at page

OPT0195807.  The LOOP software is "deliver[ed] via the Optimum HVAC
Optimization Controller, an open protocol Tridium JACE controller that is
integrated with the building automation system via BACnet/IP." Kulik Decl. Exh.
Z at page 4.  Optimum and JCI understood the difference between the prior
methods for incorporating the Hartman LOOP solution in the field, where that
field solution "was delivered at the plant level on an engineering services model
with direct programming into the BAS." Kulik Decl. Exh. Z at Exh. 9 of the
Supplemental Expert Report, at page OPT0197785.

(Dkt. No. 318 at 12.)  Optimum agreed that it "sends a Tridium JACE to the project site, and the

controls contractor installs it.  Optimum verifies the contractor's work, and only then does

Optimum implement the Licensed Technologies in the field/at the site. (Rothman Decl., ¶38;

Appendix Exh. A)." (Dkt. No. 294-4 at 11.)  Optimum otherwise would describe its product

preparation a little differently, emphasizing again the difference between the physical device and

the optimization software:

Optimum does not dispute that the JACE that employs the LOOP
Technologies are kept in Optimum's facility and preconfigured by Optimum to add
software operating systems.  Optimum disputes that the LOOP Technologies are
loaded on to the JACE prior to the JACE being shipped to the building site.  The
LOOP Technologies are only loaded on to the JACE after the JACE has been
shipped to the building site.  (8/13/10 Rothman Decl., ¶¶20, 21, 38–40; Dkt. No.
27-2 at 6, 10; 5/5/17 Opt. App. Exh. A).  Optimum also disputes that the
Optimum LOOP solution "directs sequencing of HVAC components," as
Armstrong states.  (8/13/10 Rothman Decl., ¶38; Dkt. No. 27-2 at 10).  Armstrong
cites to a two-page document that was used during depositions as Matthys Exhibit
1, Erpelding Exhibit 15, and Frey Exhibit 21.  (OPT0195907-08; 6/21/17 Opt.
App., Exhs. B, F, G).  Ben Erpelding identified the document as a customer-facing
document that Optimum uses to help the customer understand expectations, due
dates, what is required of them, what is required for a successful outcome, and
what happens when things are not completed on time.  (Erpelding Dep. at 127:15–
128:18; 6/21/17 Opt. App., Exh. F).  Clark Matthys testified that this document
describes some (but not all) of the steps taken by Optimum on a typical project.
The following is a summary of Mr. Matthys' testimony on some of those steps.  (*See*
6/21/17 Opt. App., Exh. B).  Step 6 involves, in part, taking a blank JACE which

has no operating system on it, and installing a basic operating software system (not the LOOP Technologies) and the IP address for the specific project site. (Matthys Dep. at 22:21–26:21). Step 6 also includes shipping the JACE to the project site. (Matthys Dep. at 26:22–27:6). At that point, the JACE contains only the IP address and the basic operating software, not the LOOP Technologies. Every subsequent step in the process (*i.e.*, Steps 7–17) thus occurs after the JACE has been delivered to the jobsite. In Step 8, the JACE is physically connected to the building's network communication system that operates the building's BAS system and architecture. It is only then, at that point, that the optimization software, *i.e.*, the Optimum LOOP solution, is loaded. (Matthys Dep. at 29:12–33:3; 62:24–63:11; 99:9–22). The Optimum LOOP solution software can be loaded remotely or on the project site. (Matthys Dep. at 99:23–100:2; 154:18–155:17). In Step 9, Optimum works with the project site BAS control programmer to review Optimum's integration documents to make sure that the BAS control programmer understands what modifications they need to make in their system and what pieces of equipment might need to be installed for Optimum's LOOP solution to work. (Matthys Dep. at 33:5–16). Step 10 involves the BAS system transmitting its equipment points, which are data points that Optimum needs for the individual pieces of equipment, and other plant system data, to Optimum's JACE. (Matthys Dep. at 35:10–36:19). Step 11 involves the BAS system being able to read the data it receives from Optimum. (Matthys Dep. at 36:23–38:16). After Step 11, the BAS system can write data to Optimum's JACE and read data from the JACE back into its system but, at this point, the BAS is not actually doing anything with it, *i.e.*, it is not using that data to operate equipment. Step 12 involves making specific programming changes that allow the BAS system to follow Optimum's set points and operate the plant accordingly. (Matthys Dep. at 38:20–39:12). The specific programming that needs to be done on each project is different and the integration documents on each project are changed, because each site is different, and there are different things that need to be done on each site. Even if the building automation system is the same type, the building load profile, the mechanical equipment and plant configuration are always different. (Matthys Dep. at 40:4–41:23). Steps 13 and 14 are the points mapping testing and integration test. Steps 13 and 14 are still done by manual control *i.e.*, the data point for one value to another is changed manually and the software is not yet making that decision. (Matthys Dep. at 50:1–4). It is not until Step 15, and the cut-over test, that the Optimum software solution and the BAS software fully control the plant. (Matthys Dep. at 50:5–8).

Optimum disputes that the configuring or preconfiguring of the JACE that takes place prior to shipping makes it "functional" for a particular building site in the terms of implementing and operating the LOOP Technologies on a particular

building site. The configuring of the JACE that takes place prior to shipping
simply makes the JACE itself functional, as Mr. Matthys testified. (Matthys Dep. at
22:21–26:21; 6/21/17 Opt. App. Exh. B). Armstrong's statement is an inaccurate
characterization of Mr. Matthys' testimony. *See also* Response to ¶43 of
Armstrong's Statement.

(Dkt. No. 299 at 16–19.) Given that the loading of Optimum's optimization software is the only

part of the above process that is not done at Optimum's office or factory; and given that this

loading could be done in advance along with all of the preceding steps; the parties have disputed

the significance of Optimum's choice to do the loading remotely from the field. Is that choice just

a gesture to achieve technical compliance with the definition of field implementation? Armstrong

says yes:

> The alleged distinction between field and factory implementation
> purported by Optimum's actions allows it to choose whether a project will be
> "field" or "factory" based on when it pushes a button for a final download of
> standard software files. This is illusory and not a distinction in license rights at all.
> While once limiting Optimum's projects to "retrofit" only, Hartman and Optimum
> some time ago decided which projects they wanted to participate in regardless of
> any other facts or any specific terms in the Armstrong license agreement. The facts
> are clear that a complete software package for each site is stored and maintained at
> Optimum's facilities. The JACE device Optimum uses for installing the Hartman
> LOOP technologies are modified at Optimum's facilities, preconfigured with a site-
> specific IP address and functional software. This is "part of the factory production
> process" as recited in the definition of "Factory Implementation." Downloading
> the last piece of standard software is irrelevant. All the other steps in preparing a
> device for a specific building site must matter, as they are even more a part of the
> implementation process for that building site than merely starting the download of
> standard software. Optimum has provided and continues to provide factory
> produced, preconfigured devices (Optimum's modified JACE controllers) to
> customers for use with the patented Hartman LOOP technologies and
> intentionally hid the details of that use with Armstrong. Optimum's actions were
> intentional and designed to breach the Armstrong license agreement in both the
> sale of "Factory Implemented" products and in violating the protections from
> competition stated in multiple places in the license agreement. The terms of the

later executed Optimum license agreement between Optimum and Hartman has no impact on these breaches, as Armstrong is not a party to it and the terms were hidden from Armstrong until after this lawsuit was filed.

(Dkt. No. 303 at 5–6.)  Optimum regarded the distinction that Armstrong is making as a

distinction without a difference:

> Optimum's JACE does not directly control the chiller plant equipment. Optimum's JACE signals the existing BAS/BMS what the optimal control setting or set points are that would result in the best energy performance.  Using these optimal settings or set points, the BAS/BMS determines how to control the chiller plant equipment.  The system control function remains in the BAS/BMS. (Rothman Decl., ¶38; Appendix Exh. A).

> Thus, Optimum requires another company's BAS or BMS as it only implements the Licensed Technologies in the field, not in the factory, while Armstrong does not require a BAS or BMS because Armstrong's controller directly controls the chiller plant equipment.  (Rothman Decl., ¶39; Appendix Exh. A).

> When Optimum comes across applications where there is no BAS or BMS, Optimum is unable to offer its solution.  (Rothman Decl., ¶67; Appendix Exh. A).

(Dkt. No. 294-4 at 12.)

> vi.    *Meaning of "implement" or "implementation"*

Finally, an additional factor to consider is the meaning of the word "implement" or its

different forms—"implementing," as it appears in the ALA, or "implementation," the word that

appears in the OLA.  One of Hartman's comments did not quite define "implement" but

attempted to give the term context:

> Implementation of the Licensed Technologies requires certain mechanical equipment and a means of providing specific sequences in the Building Automation System ("BAS") that operates the equipment.

> Factory implementation means that the Licensed Technologies are implemented with certain mechanical equipment in the factory before it is shipped

to a customer, whereas Field Implementation means that the Licensed
Technologies are implemented with certain mechanical equipment after such
equipment is at the project site (i.e., in the field).

(Dkt. No. 293 at 2.) Hartman's comment—apart from Optimum's choice of the word "manifest"
when describing its technology—reminds the Court of the analogy that it posed to the parties at
oral argument: When would the Microsoft Windows 10™ operating system be considered
"implemented"? When a manufacturer such as Dell or Hewlett-Packard installs the software on a
hard drive that is packed into and then shipped out with a new computer? Or not until computer
users receive new computers at their homes, register their copy of Windows 10, install all of their
software titles and check for compatibility, and successfully connect the new computers with any
peripherals? Rothman has a statement in the record that makes "implement" sound like "install,"
"deliver," and maybe even "deploy":

> The Optimum business model was, from the outset, to implement the
> licensed Hartman LOOP technologies in a separate control device or appliance,
> such as the Tridium JACE product, that along with our software could be
> integrated with the Building Automation System (BAS) (also known as the Building
> Management System (BMS) as an add-on to facilitate field implementation of the
> Hartman technologies pursuant to our license. Optimum has consistently built its
> business on the concept of delivering the Hartman technologies on a control device
> or appliance, such as the Tridium JACE product, that is an add-on to the
> BAS/BMS and not a replacement for the chiller plant control provided by the
> BAS/BMS.

(Dkt. No. 27-2 at 6.) There are other ways to consider the Court's Windows 10 analogy. Without
making any findings to this effect, the Court is generally aware that some computer enthusiasts
like to custom-build their own desktop computers, ordering individual components like power
supplies and memory and assembling the final product themselves. When those enthusiasts

49

choose Windows 10, or any operating system, to power their computers, at what point would they consider Windows 10 "implemented"? And if those enthusiasts buy a "clean" copy of Windows 10 and set it up themselves, would that setup be a factory implementation because Windows 10 is designed at Microsoft to come off the shelf and adapt itself to a variety of hardware that it recognizes? Or would the setup be a field implementation because an otherwise commercially uniform product is being set up in the "field" of the enthusiasts' homes? Additionally, putting aside some of the push and pull that occurs between hardware and software manufacturers,[7] Windows 10 in theory is a stand-alone product that hardware manufacturers and computer users can install across a wide variety of hardware devices. What, if anything, happens when Microsoft partners with a hardware supplier like Pegatron to make a device—the Microsoft Surface™—that could be designed to fit hand-in-glove with Windows 10? To what extent is Optimum doing the same thing with the physical device that houses its optimization software?

### F.  *The PPA and Its Terms*

On February 9, 2010, Hartman entered the PPA with Optimum to sell the three patents comprising the LOOP Technology plus six others. (Dkt. No. 55-3 at 2.) Of note, Section 3.4 terminated the Optimum Agreement. Section 4.1 gave Optimum all of Hartman's rights in and obligations for the patents except for certain financial obligations that might have accrued as of the effective date of the agreement. Section 4.4 gave Optimum all of Hartman's rights in and

---

[7] *Compare, e.g.*, Julia Hawkins, *Microsoft's Change in Policies Allow New Processors to Work only with Windows 10*, Stock Watch (Jan. 17, 2016), *available at* LexisNexis *with* Woody Leonhard, *Microsoft plan to force PCs with newer processors to Windows 10 backfires*, InfoWorld Daily News (Apr. 13, 2017), *available at* LexisNexis.

obligations for the Armstrong Agreement except for certain financial obligations that might have accrued as of the effective date of the agreement. In Section 6.1, Hartman promised that he had full authority to sell the patents. In Section 6.3, Hartman asserted that he would not retain any rights in the patents and that Armstrong had not breached the Armstrong Agreement in any way up to that point. Section 10.3 set forth that Washington state law governed the Patent Agreement.

After signing, the Patent Agreement underwent four amendments. Optimum summarizes the amendments as follows:

> The PPA was the subject of four amendments, dated March 26, 2010, May 7, 2010, May 19, 2010 and March 18, 2011. (Rothman Decl., ¶24; Appendix Exh. A) (Hogue Decl. ¶¶2-3, Exhs. A, B). The first two amendments essentially extended the time for the closing of the agreement. (Rothman Decl., ¶24; Appendix Exh. A).

> The third Amendment of the PPA, dated May 19, 2010, reflected Hartman and Optimum's decision to proceed with closing on the six Equipment Patents as to which Armstrong does not have any license rights, and delay closing on the LOOP Patents. (Rothman Decl., ¶25; Appendix Exh. A).

> Although Armstrong's consent to the sale and assignment of the patents was not required, Hartman and Optimum initially contemplated obtaining Armstrong's consent nonetheless and the PPA therefore originally reflected that. When Armstrong objected to the sale and transfer of the patents, the provision for such consent was deleted in Amendment Three. (Rothman Decl., ¶27; Appendix Exh. A).

> On or about May 19, 2010, Hartman and Optimum closed on the sale of the six Equipment Patents from Hartman to Optimum for payments of $2 million. (Rothman Decl., ¶26; Appendix Exh. A) (Hogue Decl. ¶5).

> The fourth amendment to the PPA, dated March 18, 2011, expressly stated that the referral obligation and consulting obligation in §3.3(e) of the ALA was retained by Hartman and not assumed by Optimum. Thus, the Assignment of Armstrong License Agreement, dated March 18, 201[1], stated: "Hartman retains,

51

and acknowledges, his obligation to provide personal consulting and referral
services to Armstrong under section 3.3(e), 12.7, 12.8 and Exhibit A of the
Armstrong Agreement. For clarity, these obligations are not delegated to
Optimum." (Assignment of Armstrong License Agreement, dated March 18, 2011,
§2(a)). (Hogue Decl., ¶3, Exh. B).

        On or about March 18, 2011, Hartman and Optimum closed on the sale of
the three LOOP Patents from Hartman to Optimum pursuant to the PPA, as
amended. (Hogue Decl., ¶4).

(Dkt. No. 294-4 at 20–21.)

### G. Dealings Under the Agreements

Armstrong set to work developing a controller with LOOP Technology within months of

entering the ALA. (Dkt. No. 212-9.) Around February 7, 2006, Armstrong and Optimum

communicated about Armstrong's IPC 11550 controller, a "pre-fabricated configurable assembly."

(Dkt. No. 294-6 at 55.) Armstrong expressed hope that Optimum "can utilize our 'productized'

solution for the more simplistic retrofit projects that Optimum Energy encounters." (*Id.*)

Around September 2006, a potential client approached Armstrong and Optimum about

"three different scenarios" that would include the LOOP Technology in a project bid. (Dkt. No.

294-6 at 127–28.) Armstrong informed the potential client, in short, that there were only two

ways to bring the LOOP Technology into a project: Use Armstrong for an OEM "packaged

solution," or use Optimum for a field implementation to an existing system.

Around October 2006, a potential client approached Hartman with interest in the LOOP

Technology. (Dkt. No. 294-6 at 117.) Hartman promoted Armstrong as having "far away the most

cost effective implementation of the Hartman LOOP." (*Id.*) If the client wanted to pursue

installing technology in an existing building system then "[w]e suggest you discuss this with our retrofit technology partners, Optimum Energy Company."  (*Id.*)

Around March 2006, Hartman and Optimum became aware of an Armstrong sales representative in Los Angeles who was courting a potential client, Vertical Systems.  (Dkt. No. 294-6 at 131–53.)  "Vertical Systems incorporates Armstrong Pump products, including products that incorporate the Hartman Loop Technology, into the products and services that we offer our customers in Southern California.  Vertical Systems is a Manufacturer's representative firm, and we specialize in 'green solutions' for HVAC systems, and one of those green solutions we offer to customers is the Armstrong products."  (Dkt. No. 292-2 at 317.)  The sales representative told Vertical Systems that "[t]he Armstrong Hartman Loop controller is viable on retrofit projects without packaging with pumps, it does contain Hartman Loop Algorithms, it will be very cost effective compared to 'the alternative.'  I have re-confirmed that we are allowed to pursue HVAC market for these controls in whatever form they come."  (Dkt. No. 294-6 at 132.)  The reference in quotes to "the alternative" likely is a reference to Optimum.  The use of the word "re-confirmed" implies that someone in Armstrong made the choice to issue a confirmation.  The incident drew a response from Hartman that encouraged Armstrong and Optimum to repair whatever harm in client relations ensued and to recommit to the distinction between controller sales that are "part of a substantial pumping or plant package" and those that are retrofit applications.  (*Id.* at 135.)  Neither the word "package" nor the word "retrofit" appears in Section 2.1 of either the ALA or the OLA.  The incident also prompted a conversation and a disagreement over what would

53

happen in a hybrid scenario when a client bought some new equipment, combined it with some

existing equipment, and then wanted the LOOP Technology in charge. (*Id.* at 139.) The sales

representative who sparked the incident joined in the conversation when Armstrong clarified that

its controller never could be sold alone and, at a minimum, had to be sold with the pumps that it

would control. (*Id.* at 148.) The sales representative reacted somewhat incredulously to the

prospect of lost sales and left the door open to pursuing retrofit projects as follows:

> This means that on 80% of jobs (up from previous 70%) I predict that fall into the
> VFD and controls only—will always be on the Optimum Energy Path. It still will
> hold true that 20% of the plants will find some need for new pumping equipment,
> and controls and VFOs. That is where we will be a viable player in the Hartman
> Loop Market with Armstrong systems—on 20% of projects. This statement does
> take away a couple of options I considered viable, but still leaves us open as a
> retrofit product.

(*Id.* at 148.) Armstrong ultimately resolved the incident by sending a letter to its sales force that

included the following distinction:

> It is important that we remind and clarify to our sales channels that Armstrong's
> product development and agreement/license for the distribution of the Hartman
> LOOP control methodology is only appropriate for sale in conjunction with
> Armstrong products that are to be controlled by the technology. As a minimum
> this requires the sale of Armstrong pumps controlled by the IPC 11550.

(*Id.* at 151.) Armstrong felt obligated to issue the letter to hold its sales agents at bay. "The feeling

and the interpretation [was] that if we had not included that, our sales organization would push us

for positions that would not reflect the agreements that we had above and beyond the license

agreement with Optimum and Hartman." (Dkt. No. 319 at 256.) Interestingly, Hartman never

adopted Armstrong's position that pumps plus a controller sufficed for a factory-implemented new system:

> I think we all agree that a complete pumping package is the requirement for Armstrong to market its solution. I can tell you (and you probably already know) it is not very often that pumps are changed/upgraded without a change in chillers and/or other plant equipment. No question that the other equipment could be supplied by others. OEC is very supportive that when a plant needing such new equipment is encountered, the project needs to be referred to Armstrong. They are not in the equipment replacement business.
>
> What I don't want to see happen is Armstrong reps trying to replace pumps just to compete with OEC's marketing effort (the case at hand) nor OEC holding on to outdated plant equipment just to avoid the Armstrong solution. This will take cooperation, but I am sure based on my many years of experience that such situations are unlikely to develop on their own, so both Armstrong and OEC simply need to keep their true markets in focus to avoid such possible instances.

(Dkt. No. 319 at 451.) Ross, on behalf of Armstrong, signed off on Hartman's position, responding that "I agree with your comments Tom. Yes I wish to continue to work with Optimum and will do so. I don't see any reason for conflicts which can't be solved and will work hard to ensure we don't have any." (*Id.*) Armstrong now has submitted the following interpretation of the letter that it sent to its sales force:

> Optimum knew its JACE controller device was in direct competition with Armstrong's products. Since at least March of 2006, when Rothman and Hartman sent emails to Brent Ross about a project proposal for EMCOR in Los Angeles. Kulik Decl. Exh. H (Exhibits L and M of Document 27-5, pages 19–26). Hartman admitted to Armstrong's officers in a meeting in Toronto that he agreed that Armstrong's Hartman LOOP controllers could be sold as a stand-alone product under the terms of the Armstrong License Agreement. Thomsen Decl. at ¶ 19. Hartman made that admission after spending the night studying the Armstrong License Agreement. *Id.* While Armstrong's rights to sell a combination of products or a single product with the Hartman LOOP technology was never questioned, the instructions to Armstrong's sales representatives to sell Armstrong

pumps with the Armstrong controller in 2006 was for purposes of boosting the total sales of Armstrong products and helping the Hartman LOOP technology penetrate the market better. It was a temporary instruction that has long ago been rescinded. Thomsen Decl. at ¶ 20.

(Dkt. No. 318 at 13.) Optimum disagrees with this interpretation:

> Once the Armstrong License Agreement was signed, Armstrong continued to recognize and accept that a controller implementing the Licensed Technologies that is integrated with equipment at the building site was a "Field Implementation" under the Armstrong License Agreement. (3/16/16 Hartman Decl., ¶13; filed under seal; Appendix Exh. C).

> In a March 20, 2006 e-mail to Ross and Thomsen of Armstrong, with a copy to Rothman, Hartman stated that an Armstrong representative "has relayed some incorrect information about Armstrong's IPS offering. As we know, this controller is not to be sold without being a part of the substantial pumping or plant package." (Rothman Decl., ¶88, Exh. L; Appendix Exh. A).

(Dkt. No. 294-4 at 18.)

Around October 2006, Armstrong encountered real estate developers in China who expressed interest in having Armstrong's controller installed in "newer" but existing building systems. (Dkt. No. 319 at 114.) Armstrong approached Hartman for permission to pursue the projects, but Hartman encouraged Armstrong to negotiate with Optimum since these projects would be considered "retrofit" projects. (*Id.* at 113.) Armstrong clarified that "[t]he intent is not to participate in the retrofit market, but to get an IPC system installed for reference in that local market as soon possible. From Nathan's perspective we are obviously taking away from one of his opportunities . . . ." (*Id.*)

On November 29, 2006, Armstrong issued a document titled a Product Profile for its IPC 11550 controller. (Dkt. No. 319 at 477–79.) Armstrong distributed the Product Profile internally

56

to its employees and representatives.  The Product Profile ended with the disclaimer that "[o]rders for the IPC 11550 system must include an order for pumps that are part of the chilled water plant."  (*Id.* at 479.)  The first page, in contrast—under a heading titled "Target market(s)"—stated unequivocally that "[t]he IPC 11550 system is ideal for *both* the new construction *and* MRO/retrofit marketplaces."  (*Id.* at 477 (emphasis added).)

Around April 2008, Armstrong explored another opportunity in the "far east," possibly China again.  (Dkt. No. 319 at 467–68.)  The potential client had started building a large HVAC infrastructure when encountering Armstrong.  The client apparently decided that it would stick with whatever equipment it had purchased up to that point but wanted Armstrong equipment for the rest of the project.  Armstrong considered the overall project to be "factory packaged" (*id.* at 468) but nonetheless recognized that it might implicate the boundaries of the ALA.  Accordingly, Armstrong approached Hartman for permission "under this 'special circumstance' to essentially do a[n] 'implemention' [] portion of 'demand based control' and 'natural curve' technology into our proposal on this project, that does not include 'integrated equipment/control package.'"  (*Id.*)  Armstrong told Hartman explicitly that "we do want to proceed without engaging Optimum."  (*Id.*)  Armstrong also wanted Hartman's approval by the next day.  (*Id.*)  Hartman responded by describing a number of details that he would need to know about the project to assess its complexity.  Hartman concluded that "I do not see how we can resolve this issue contractually in the time span you desire.  The ONLY way I can see this could be done is to reach an agreement with Optimum that we could all sign off on as a one time change.  If you are not willing to do this,

then it seems to me that the process will have to be much more complex as what you are proposing

does seem to me to conflict with rights granted to Optimum." (*Id.* at 467.)  Incidentally, Hartman

has offered this thought about the times when Armstrong sought his permission to pursue a

project:

> Although Armstrong requested permission to offer a field implementation
> on several occasions (Docket No. 293 ¶¶ 12-13), Armstrong never, until this
> dispute arose in 2010, complained to Hartman that it believed that Optimum was
> engaged in improper competition/infringement.  *Id.*

(Dkt. No. 302 at 12.)

Around 2008 or 2009, a particular HVAC project went through that involved Vertical

Systems—a building project known as the 4221 Wilshire Boulevard project.  (Dkt. No. 292-2 at

318.)  According to Vertical Systems representative Brett Gaviglio ("Gaviglio"),

> We proposed a solution to the building's out-of-date equipment with
> products from Armstrong Pump Inc., including replacing all pumps and installing a
> new building control system.  We were able to demonstrate a cost savings to the
> Wilshire Boulevard owner and then completed all of the initial design work onsite.
> Another proposal that incorporated Optimum's control panel was also submitted
> to the building owner.

> The building owner subsequently gave the project to Optimum, or more
> particularly the proposal that included Optimum, and while pumps were provided
> by Armstrong, the central control device was provided by Optimum.  The
> difference in sales to Vertical Systems between our original budget proposal and the
> final purchase order was over $100,000, and part of this difference included the
> Armstrong controller and other components to be provided by Armstrong.

(*Id.*)  Armstrong interpreted the Wilshire Boulevard incident as follows:

> Armstrong soon found that it was up against Optimum for the same
> building prospects for new construction or new HVAC systems.  Kulik Decl., Exh.
> O (Decl. of Brett Gaviglio (Document 19-3)).  Mr. Gaviglio refers to one specific

project from 2008 where the proposal for the Armstrong products was supplanted by a bid from Optimum. The project was for a new chilled water system, including new pumps and a new building control system. *Id.*

Optimum considers Armstrong a direct competitor as stated in statements from its own employee, Clark Matthys.

Q. Okay. Are you aware of other companies that have competing optimization products or services?

A. So in general. I mean, competing—I mean, Armstrong, obviously, would be one.

Kulik Decl., Exh. P (Matthys Transcript at pages 72–73, referring to Exh. 5).

(Dkt. No. 318 at 8.) Optimum viewed the Wilshire Boulevard incident from a different perspective:

Optimum does not dispute that in 2008, both Armstrong, through a representative, Vertical Systems, and Optimum, acting on its own behalf, made proposals to EMCOR Services which was a building services contractor on the 4221 Wilshire Boulevard project. The Wilshire plant had an existing BAS/BMS that was functional. This was an existing plant where the pumps were being replaced. Both Armstrong's and Optimum's solutions were viable. The decision on which solution to select for the chiller plant retrofit on that project rested with EMCOR and the customer. Optimum had had a business relationship with EMCOR since at least 2006, and EMCOR was familiar with the Optimum service and its field implementation of the Hartman LOOP Technology based on prior projects in California involving Optimum and EMCOR. The cost of adding Optimum's field implementation was substantially less than tearing out the operating BMS/BAS and replacing it with Armstrong's system. Optimum provided a Field Implementation of the Hartman LOOP Technologies in accordance with its license. Optimum supplied the Tridium JACE 6 in accordance with Optimum's standard operating procedure. (*See* 8/13/10 Rothman Declaration, ¶¶ 77–85; Dkt. No. 27-2 at 21–22; 5/5/17 Opt. App., Exh. A). Optimum disputes Armstrong's statement that Armstrong "soon found it was up against Optimum" on this project, to the extent it implies that Armstrong was surprised that both Optimum and Armstrong's solutions could be available for the same project. (*See* 5/5/17 Optimum SOF ¶¶ 64–71). Also, Armstrong could not have been competing against Optimum for sales of equipment such as pumps or chillers.

Optimum disputes that Armstrong's quotation of Mr. Matthys' testimony is complete or accurate. Mr. Matthys' complete answer is: "So in general. I mean, competing—I mean, Armstrong, obviously, would be one. There's—JCI, I mean, you could say has one too. They have CPO-10. That's an optimization program. But in general, the main one that we know about is Siemens." (Matthys Dep. at 73:4-8). Optimum does not dispute that it considers Armstrong a direct competitor, at least as to some products, in some respects and in some situations. After all, both Armstrong and Optimum obtained a license in the same patents to offer solutions that attempt to do the same or similar thing by different means.

(Dkt. No. 299 at 11–13.)

In early 2009, an Armstrong sales representative in Ohio developed a potential sales lead with Lockheed Martin; "[t]he potential business here runs in the millions." (Dkt. No. 319 at 488.) However it happened, Lockheed's design contractor wound up talking to Hartman as well. Hartman followed the protocol of the ALA. "[W]hen they asked how I would recommend implementing the technology, I asked the individual if the plant they were considering it for was a new or an existing plant. He told me that it was a large existing plant. So, in accordance with our protocol, I referred them to OEC [*i.e.*, Optimum]." (*Id.* at 487.) Armstrong was upset that Hartman followed standard protocol. "I suspect that when you (Tom) received the call from the client (Lockheed), that it wasn't made clear that Armstrong had brought them to this point in their decision making . . . . There is probably a higher level sell that Optimum can make for the whole building networking of the entire building's energy systems, however, we see the IPC / Hartman LOOP as a key method of delivering an integrated plant solution to differentiate us—so we need assurance for the sales team to continue to use that strategy." (*Id.* at 487–88.)

Around December 2013, Armstrong announced a new controller called OPTI-VISOR aimed explicitly at retrofit projects in addition to new projects. "Armstrong OPTI-VISOR is a relational control solution for the operation of an all-variable-speed chiller plant. OPTI-VISOR is an excellent solution for retrofit in buildings with water cooled chiller plants, including those less than five years old, but is also suitable for new construction applications involving variable-primary flow chiller plants that have advanced building automation systems (BAS)." (Dkt. No. 252-6 at 2.)

Aside from their discussion of individual building projects, the parties have offered their thoughts about the extent to which they wound up competing against each other. Armstrong maintains that Hartman fostered competition in a way that it did not know at the time:

> Hartman was also keenly aware of the competition from Optimum as he would direct inquiries from The Hartman Company website and other contacts in the industry to only Optimum instead of Armstrong. Hartman did not mention that Optimum was essentially his "partner:"
>
> Q. You've mentioned that there was no referral requirement in the Optimum agreement. Were you sending the e-mails—well, several of the e-mails like we saw the last 45 minutes or so, to Mr. Rothman because Optimum Energy was your partner?
>
> A. Well, yes. Yes, that would be a fair statement ....
>
> Kulik Decl., Exh. Q (Hartman transcript page 361).

(Dkt. No. 318 at 8.) Hartman challenges Armstrong's characterization of any partnership and of any awareness of competition:

> Armstrong's assertion that Hartman "did not mention that Optimum was essentially his 'partner'" is false, and is not supported by page 361 of the Hartman transcript in any event (which merely shows that Hartman admitted that Optimum was his partner)—not that he had not previously mentioned that fact to Armstrong.

In fact, as previously set forth, Hartman informed Armstrong's Brent Ross that Optimum was his partner and that he intended to ultimately sell them the patents. Docket No. 290-4 ¶¶ 93, 96, 100, 103. Hartman was not "keenly aware" of competition, and as noted in ¶ 34 above, Armstrong never even suggested that Optimum was competing/infringing until this dispute arose. Hartman directed inquiries to his website to Optimum and/or Armstrong as he deemed relevant, but many inquiries did not fall within his referrals obligation under ALA § 3.3(e). Hartman Decl. ¶ 38. If an inquiry did not involve a request for new chillers or pumps, nothing prohibited Hartman from referring the inquiry to Optimum. *Id.*

(Dkt. No. 302 at 12–13.)

Two additional points of contention concern referrals and the possibility of a conflict between the OLA and the ALA. Armstrong has submitted the following in support of its point that Hartman did not fulfill his referral obligations:

> While there is no referral obligation in Optimum's license agreement, there is a clear and unambiguous requirement for Hartman, or the Licensor of the patents, to be diligent in referring to Armstrong customers requiring new chillers or pumps. Kulik Decl., Exh. A, at § 3.3(e). When asked about his protocol for determining if a referral to Armstrong was required, Hartman responded:
>
> Q. Okay. Do you know why you didn't recommend contacting Armstrong as well?
>
> A. Because we had a—the agreement with Armstrong was very specific about the terms under which I would contact them, and this did not meet those terms.
>
> Q. Okay. What was it about this e-mail exchange that led you to believe it did not meet those terms?
>
> A. Because the—the [Section 3.3(e)] referral requirement of the Armstrong agreement discusses—I don't know if I have the words exactly correct, and that is, plants that require new chillers or pumps. And there is no requirement for new chillers or pumps here.
>
> Q. So how do you know there was no requirement for new chillers or pumps in this case?

62

A. Because there is none stated.

Q. But you didn't ask?

A. Is that a question?

Q. Did you ask him if there were any new chillers or pumps anticipated in this project?

A. No.

Q. Would you typically ask that?

A. No.

Kulik Decl., Exh. R (Hartman transcript pages 339–340).

(Dkt. No. 318 at 9.)  To the extent that Armstrong has indicated that Optimum had or took over any referral obligations, "Optimum disputes that Armstrong's characterization of that § 3.3(e) obligation is complete or accurate.  As set forth in its motion for summary judgment, Optimum disputes that Optimum ever had such a referral obligation which was retained by Hartman."  (Dkt. No. 299 at 14.)  Optimum also has cited specific instances of referrals that occurred:

In an e-mail on December 7, 2005, just after the OLA had been signed, Rothman sent Brent Ross another e-mail referral concerning a possible project at the Hong Kong Jockey Club.  (Hanna Dep. Exh. 14; Appendix Exh. R); (Ross Dep. at 165:19–166:20; Appendix Exh. G).

In December 2009, Optimum declined to pursue a proposed project (Valley High School) that Optimum believed called for Optimum to exceed its license rights under the OLA.  (Hanna Dep. Exh. 14; Appendix Exh. S) (Hanna Dep. at 165:12–166:9; 167:14–168:18; Appendix Exh. E).

When Johnson Controls, Inc. was interested in further developing the Licensed Technologies to incorporate it in JCI's Metasys, Optimum told JCI that Optimum could not do that because Optimum did not have that license right. (Hanna Dep. at 176:24–177:4; 178:4–179:13; Appendix Exh. E).

(Dkt. No. 294-4 at 17.) Hartman has addressed Armstrong's referral argument as well:

> The ALA's referral obligation (§ 3.3(e)) speaks for itself. It is not as liberal as Armstrong suggests because Armstrong's analysis overlooks the actual language of the ALA, which refers to projects "that require new chillers or pumps." Although Armstrong excerpts Hartman's testimony, quoting selectively from pages 339–340, the examination on this project and Exhibit 56 starts on page 337. Hartman's testimony shows that he referred this inquiry to Optimum because it was from a building owner or manager with an existing operating plant and equipment, and thus it did not satisfy ALA § 3.3(e). Exhibit 56 and Hartman's testimony show that he did not learn, and knew from his years of industry experience that he would not learn with further inquiry, about any requirement for new pumps or chillers.

(Dkt. No. 302 at 13.) Armstrong has countered Optimum and Hartman's arguments about

referrals by pointing out that the ALA imposed a referral obligation on the "Licensor," and that

circumstances changed once the PPA made Optimum that Licensor:

> Ultimately, Hartman's intended sale of the Hartman LOOP patents to Optimum precipitated the filing of this lawsuit. With Optimum already in direct competition with Armstrong for building projects since at least 2008, Armstrong had no reason to believe that Optimum would honor the clearly stated obligations of the "Licensor" in the Armstrong License Agreement, despite Hartman's protests in writing that the obligation would be a benefit to Armstrong once Optimum was the Licensor. (Dkt No. 292-2 at Exhibit S). Furthermore, Hartman's actions in attempting to sell the patents to Optimum violated the promise he made in the Armstrong License Agreement §10.2 not to make agreements or commitments in violation of the Armstrong License Agreement.

(Dkt. No. 304 at 15–16.)

## III. DISCUSSION

### A. *Summary Judgment Generally*

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FRCP

56(a). "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment . . . . More important for present purposes, summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). "The party seeking summary judgment has the burden to demonstrate that no genuine issue of material fact exists. In determining whether a genuine issue of material fact exists, a court must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant . . . . Summary judgment is improper if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party." *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted).

When assessing summary judgment motions, courts can assess the record only for triable issues of fact; they cannot assess the underlying substance. "The function of the district court in considering the motion for summary judgment is not to resolve disputed issues of fact but only to determine whether there is a genuine issue to be tried. Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment. Any weighing of the evidence is the prerogative of the finder of fact, not an exercise for the court on summary judgment." *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996) (citations omitted); *see also Curry v. City of Syracuse*, 316 F.3d 324, 333 (2d Cir. 2003) ("If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable

inference could be drawn in favor of the opposing party, summary judgment is improper.")
(internal quotation marks and citation omitted). Disputes about credibility must rest on specific
events or other evidence in the record. "Although witness credibility is usually a question of fact
for the jury, broad, conclusory attacks on the credibility of a witness will not, by themselves,
present questions of material fact for trial. A plaintiff opposing summary judgment must still
identify affirmative evidence from which a jury could find that the plaintiff has carried her burden
of proving the pertinent intent." *Desia v. GE Life & Annuity Assur. Co.*, 350 F. App'x 542, 544–45
(2d Cir. 2009) (summary order) (internal quotation and editorial marks and citations omitted).

### B. Contract Law Generally

At least some of the parties' arguments rest very heavily on how the Court interprets the
language of key portions of the Armstrong Agreement. To help assess that contract, the Court
should take a little time to review applicable principles of contract interpretation. For substantive
principles, the Court will look at New York law in accordance with Section 12.10 of the
Armstrong Agreement. Federal cases cited below interpreted New York law unless otherwise
noted.

"The objective in any question of the interpretation of a written contract, of course, is to
determine what is the intention of the parties as derived from the language employed. At the same
time the test on a motion for summary judgment is whether there are issues of fact properly to be
resolved by a jury. In general the courts have declared on countless occasions that it is the
responsibility of the court to interpret written instruments. This is obviously so where there is no

ambiguity. If there is ambiguity in the terminology used, however, and determination of the intent

of the parties depends on the credibility of extrinsic evidence or on a choice among reasonable

inferences to be drawn from extrinsic evidence, then such determination is to be made by the jury.

On the other hand, if the equivocality must be resolved wholly without reference to extrinsic

evidence [then] the issue is to be determined as a question of law for the court." *Hartford Acc. &*

*Indem. Co. v. Wesolowski*, 305 N.E.2d 907, 909 (N.Y. 1973) (internal quotation marks and citations

omitted). "Contract language is unambiguous if it has a definite and precise meaning, unattended

by danger of misconception in the purport of the contract itself, and concerning which there is no

reasonable basis for a difference of opinion. Language whose meaning is otherwise plain is not

ambiguous merely because the parties urge different interpretations in the litigation. The court

should not find the language ambiguous on the basis of the interpretation urged by one party,

where that interpretation would strain the contract language beyond its reasonable and ordinary

meaning. The parties' rights under an unambiguous contract should be fathomed from the terms

expressed in the instrument itself rather than from extrinsic evidence as to terms that were not

expressed or judicial views as to what terms might be preferable. In its efforts to preserve the

parties' rights and the status quo, the court must be careful not to alter the terms of the agreement.

The parties having agreed upon their own terms and conditions, the courts cannot change them

and must not permit them to be violated or disregarded." *Metro. Life Ins. Co. v. RJR Nabisco, Inc.*,

906 F.2d 884, 889 (2d Cir. 1990) (internal quotation and editorial marks and citations omitted).

"However, when the contract language is ambiguous, meaning that there may be more than one reasonable interpretation, its construction will be left to the fact finder for a determination as a matter of fact. Nevertheless, even ambiguous contracts may be interpreted by a court as a matter of law where the parties fail to supply extrinsic evidence to support their respective interpretations. In such a case, a court must consider the available writings and the undisputed circumstances of execution so as to discern the parties' intentions. In short, summary judgment is appropriate where either, 1) the contract is unambiguous, 2) the contract is ambiguous but extrinsic evidence presented by the parties resolves any ambiguity, or 3) the contract is ambiguous but the opposing party fails to tender extrinsic evidence supporting its proposed interpretation." *82-11 Queens Blvd. Realty, Corp. v. Sunoco, Inc. (R & M)*, 951 F. Supp. 2d 376, 382 (E.D.N.Y. 2013) (internal quotation marks and citations omitted); *see also Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 906 (2d Cir. 1997) ("Contract terms are considered ambiguous if they are capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.") (internal quotation marks and citations omitted).

Ambiguities in a contract can be deep or shallow. Deeper ambiguities include whether the parties to a purported contract ever really reached a meeting of the minds on essential terms:

> [A] contract is a private 'ordering' in which a party binds himself to do, or not to do, a particular thing. This liberty is no right at all if it is not accompanied by freedom not to contract. The corollary is that, before one may secure redress in our courts because another has failed to honor a promise, it must appear that the

promisee assented to the obligation in question. It also follows that, before the power of law can be invoked to enforce a promise, it must be sufficiently certain and specific so that what was promised can be ascertained. Otherwise, a court, in intervening, would be imposing its own conception of what the parties should or might have undertaken, rather than confining itself to the implementation of a bargain to which they have mutually committed themselves. Thus, definiteness as to material matters is of the very essence in contract law. Impenetrable vagueness and uncertainty will not do.

Dictated by these principles, it is rightfully well settled in the common law of contracts in this State that a mere agreement to agree, in which a material term is left for future negotiations, is unenforceable.

*Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher*, 417 N.E.2d 541, 543 (N.Y. 1981) (internal quotation marks and citations omitted). "In determining whether the parties intended to enter a contract, and the nature of the contract's material terms, we look to the objective manifestations of the intent of the parties as gathered by their expressed words and deeds. Disproportionate emphasis is not to be put on any single act, phrase or other expression, but, instead, on the totality of all of these, given the attendant circumstances, the situation of the parties, and the objectives they were striving to attain." *Stonehill Capital Mgmt., LLC v. Bank of the West*, 68 N.E.3d 683, 689 (N.Y. 2016) (internal quotation and editorial marks and citations omitted). "Moreover, at some point virtually every agreement can be said to have a degree of indefiniteness, and if the doctrine is applied with a heavy hand it may defeat the reasonable expectations of the parties in entering into the contract. While there must be a manifestation of mutual assent to essential terms, parties also should be held to their promises and courts should not be pedantic or meticulous in interpreting contract expressions. Before rejecting an agreement as indefinite, a court must be satisfied that the agreement cannot be rendered reasonably certain by reference to an extrinsic standard that makes

its meaning clear. The conclusion that a party's promise should be ignored as meaningless is at best a last resort." *Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp.*, 548 N.E.2d 203, 206 (N.Y. 1989) (internal quotation marks and citations omitted).

### C. Armstrong's Principal Claims from the Amended Complaint (Dkt. No. 55) and the Counterclaims (Dkt. No. 68)

#### i. Breach of Contract Against Hartman

Count I of the amended complaint, and Armstrong's counterclaims, contain an allegation that Hartman breached the ALA. "To state a claim for breach of contract under New York law, the complaint must allege: (i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages." *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 114 (2d Cir. 2017) (internal quotation marks and citation omitted). Count I breaks down into a number of arguments about violations of different portions of the ALA. The Court will organize its analysis using the subheadings that appear in Armstrong's initial memorandum of law. (Dkt. No. 317 at 29–41.)

##### 1. Breach of Section 3.3(e): Diligence with Referrals

Armstrong begins this argument by explaining why, in its view, it negotiated to include Section 3.3(e) in the ALA:

> Armstrong's purpose in entering the agreement with Hartman for the use of the Hartman LOOP Technology was to gain new customers in the burgeoning "green" energy market by using a new technology to make building cooling systems more efficient. The fact that this new technology required variable speed drive pumps, pumps that Armstrong was ahead of the field in manufacturing and employing in the market and keen to sell more of, made the referral obligation even more useful to Armstrong. Thus the selection of the Hartman LOOP

70

Technology was intended to give Armstrong a differentiating factor over the competition in the control of cooling system aspect *and* provide a burgeoning potential customer flow for Armstrong's pumps. As Hartman had been promoting the technology with the trademarked Hartman LOOP name, Hartman would provide new leads of those looking for gains in efficiency and identifying the Hartman LOOP technology of a desirable way to accomplish that, and those looking for new pumps to upgrade their cooling system. Along with the exclusive rights to factory produce building controls and equipment that use the Hartman LOOP Technology, Hartman agreed to help Armstrong develop this new stream of customers by *diligently* referring *all potential applications* directly to Armstrong.

(Dkt. No. 317 at 29–30.) "Because of the substantial investments that Armstrong made—both in terms of its own research and product development activities and its commitment to pay substantial royalties to Hartman—Armstrong specifically contracted for and obtained several provisions in the license agreement granting Armstrong exclusive rights to manufacturer chilled water products incorporating the Hartman LOOP technology with a narrow carve-out for a potential license with Optimum. Thomsen Decl., at ¶ 8. The license agreement contract also obligated the owner of the patents or Licensor to diligently refer customers for new pumps or chiller products if Licensor learned of any." (Dkt. No. 318 at 3.) Armstrong has summarized the nature of Hartman's alleged breach as follows: "Hartman violated his own promises to Armstrong by not even asking customers if any pumps or chillers were contemplated, never telling Armstrong he would not ask, essentially forwarding potential customers without any concrete information to base a decision on if it was possibly a field or factory implementation. Of course a vast majority were forwarded solely to Optimum." (Dkt. No. 317 at 34.) As an example of Hartman's alleged breach, Armstrong has cited the deposition testimony from Hartman (Dkt. No. 318 at 9) suggesting that Hartman did not examine potential new business in a way that would be consistent

71

with "diligent" referrals. Armstrong has suggested that other deposition testimony from Hartman shows the lengths to which Hartman would go to make excuses for not referring potential clients to its own representatives. (*See* Dkt. No. 357-6 at 55-77.) The deposition testimony in question indicates that general email inquiries to Hartman's website are first screened by secretarial staff; after that, if "[i]t's not clear what their interest is, so I have no direction as to, it should go to one or the other, [then] I just sent it to both [Armstrong and Optimum]." (*Id.* at 56.) "Failing to ask any questions or at least the basic question about if the potential project might use new pumps or chillers is the opposite of 'diligent' and at best is an arbitrary decision to refer to Optimum instead of Armstrong. More likely it is bad faith and unfair." (Dkt. No. 317 at 17.)

Hartman and Optimum have responded to Armstrong's arguments in several ways. With respect to any argument about bad faith, "this Court should apply the rule that a cause of action for breach of the implied duty of good faith and fair dealing will be dismissed as duplicative of a breach of contract claim when both claims arise from the same facts and seek the identical damages for each alleged breach. Here, Armstrong seeks to assert, for the first time after seven years of litigation, a previously unalleged duty of good faith and fair dealing claim upon the same facts supporting its breach of contract claim. This theory, however, must be rejected as untimely— and, in any event, because it is redundant of the contract claim." (Dkt. No. 298 at 9.) Hartman objects to any labeling of Optimum's rights as a narrow carveout:

> The "carve-out" for Optimum was not "narrow"; indeed, Armstrong only licensed certain limited rights with respect to three of nine patents. *See, e.g.*, Docket No. 293 ¶36; Docket No. 291-3 fn. 5. Moreover, the Optimum "carve-out" confirms that Optimum could employ control devices as long as they were not

"plant controls" (and they are not manufactured or assembled by Optimum in any event). To the extent that Thomsen characterizes the ALA provisions, those provisions speak for themselves. Notably, Armstrong's Statement of Facts is not even consistent with Thomsen's selfserving Declaration where the Statement of Facts suggests that the ALA "obligated the owner of the patents or Licensor to diligently refer customers," (emphasis added) whereas the Thomsen Declaration that is cited as support states that "Armstrong specifically contracted for the Licensor's obligation to diligently refer customers." Thomsen Decl. ¶ 8.

(Dkt. No. 302 at 3–4 and n.1.) Hartman also rejects any suggestion that he never made any

referrals to Armstrong:

Armstrong alleged upon information and belief that Hartman violated § 3.3(e) of the ALA because "*no referrals* for applications for chillers or pumps have been received." At his deposition, however, *Thomsen acknowledged that Armstrong received referrals from Hartman* from the time the ALA was executed through the date of his deposition (*i.e.*, roughly ten years). In fact, Hartman made referrals to Armstrong before and after this lawsuit was filed.

Moreover, Thomsen also acknowledged in writing that the referral process necessarily involved interpretation by Hartman regarding customer needs. This admission alone defeats Armstrong's claim that Hartman breached the purported referral obligation absent evidence that Hartman acted arbitrarily or irrationally. Indeed, the nature of the referral obligation is limited to "potential applications . . . that require new chillers or pumps." Armstrong proffered *no evidence* that Hartman failed to "be diligent in referring to [Armstrong] all potential applications the Licensor learns about that require new chillers or pumps." Accordingly, Hartman should be granted summary judgment dismissing Armstrong's claim related to the alleged breach of § 3.3(e) of the ALA.

(Dkt. No. 290-3 at 22–23.) The acknowledgment of referral receipts to which Hartman cites

comes from the following deposition testimony of Peter Thomsen from Armstrong:

Q. Okay. If you can turn to the second page, where there's an e-mail from Tom Hartman to Marco Spinelli, S-P-I-N-E-L-L-I.

Is it fair to characterize that e-mail as providing contact information for both Optimum Energy and Armstrong Pump to Mr. Spinelli?

A. Yes.

* * * (Transcript page missing)

A. I do receive the occasional one, perhaps once a quarter, whereas prior, we would receive somewhere in the neighborhood of two to five a month.

Q. Okay. And you say prior. Prior to what?

A. Prior to the purchase of the patents by Optimum Energy.

Q. Okay. So from 2005 through—

A. Ballpark, 2010.

Q. — 2010? Ballpark 2010, you're saying?

A. '09, '10. In there.

Q. You received approximately two to five a month? Referrals?

A. Well, maybe spotty. Sometimes there would be two, five, then it may go a month without anything.

(Dkt. No. 319 at 265–66.) In turn, the email message referenced in this deposition excerpt

consists of a chain of messages involving Hartman, Thomsen, and someone named Marco Spinelli

of Enbridge Gas Distribution. (Dkt. No. 319 at 483–85.) Spinelli initiated contact with Hartman

and wrote as follows:

It was [a] pleasure speaking with you on March 1. It was interesting to learn about your "conservation power plant" idea and to gain a better understanding of the technology you have developed to improve the efficiency of central chiller plants.

As we discussed, please provide contacts at Optimum Energy and Armstrong. I'll be calling them in the next week to explore how we can work together.

(*Id.* at 485.) Hartman replied and provided contact information for Rothman and Thomsen, as

requested. After Spinelli contacted Thomsen, Thomsen wrote to Hartman to "thank you for forwarding or name to Marco—he is visiting us next week." (*Id.* at 483.)

Optimum has included with its motion papers an argument that it has no liability for any breach of Section 3.3(e) of the ALA. The Court does not read Count I of the amended complaint to allege a violation of that section by Optimum; that Count mentions Optimum as the other side of the patent sale and transfer but frames all of its allegations with phrases such as "Hartman breached" or "as a result of Hartman's breach." (*See* Dkt. No. 55 at 9–10; *see also id.* at 9 ("There is an actual and justiciable controversy between the parties as to whether Hartman has breached the Armstrong License Agreement.").) Nonetheless, and for the sake of completeness, Optimum has submitted the following argument about any liability that Armstrong might try to attach to it in connection with Section 3.3(e):

> In its 10/7/10 Decision and Order, the Court "rejected the argument that a sale of Hartman's retained patent rights will necessarily transfer to Optimum all of Hartman's contractual obligations under the License Agreement." (Dkt. No. 39 at 24) (emphasis in original). The Court also noted that, in addition, "Hartman has proffered a copy of his patent purchase agreement with Optimum, which expressly provides that Optimum 'does not assume and does not agree to assume any obligations or Liabilities accrued under the Armstrong Agreement or any other License at any time before or after the Closing Date.'" (Dkt. No. 39 at 24).

> Indeed, under settled New York and Washington law, Optimum would not have assumed Hartman's obligations and liabilities even if the PPA had been silent on that subject. "Under New York law . . . the assignee of rights under a bilateral contract is not bound to perform the assignor's duties under the contract unless he expressly assumes to do so." Moreover, the PPA was amended to expressly state and make crystal clear that the referral obligation in §3.3(e) was retained by Hartman and not assumed by Optimum. Thus, section 2(a) of the Assignment of Armstrong License Agreement, dated March 18, 2011, stated: "Hartman retains, and acknowledges, his obligation to provide personal consulting and referral

75

services to Armstrong under section 3.3(e), 12.7, 12.8 and Exhibit A of the Armstrong Agreement. For clarity, these obligations are not delegated to Optimum." (Hogue Decl., ¶3, Exh. B). Thus, Optimum has never had any referral obligation or duty pursuant to §3.3(e) of the ALA and is entitled to summary judgment with respect to any such claim.

(Dkt. No. 294-3 at 18–19.)

After reviewing the record and all of the parties' arguments, the Court sees three issues pertaining to Section 3.3(e) that require attention. The first issue is fairly easy to address, and it concerns Armstrong's suggestion of bad faith by Hartman. "Under New York law, parties to an express contract are bound by an implied duty of good faith, but breach of that duty is merely a breach of the underlying contract." *Fasolino Foods Co. v. Banca Nazionale del Lavoro*, 961 F.2d 1052, 1056 (2d Cir. 1992) (internal quotation marks and citations omitted); *see also L-7 Designs, Inc. v. Old Navy*, LLC, 647 F.3d 419, 434 n.17 (2d Cir. 2011) ("Because L-7's claim for breach of the implied covenant of good faith and fair dealing (Count IV) is based on the same facts as its claim for breach of contract, it should have been dismissed as redundant.") (citations omitted); *Harris v. Provident Life & Acc. Ins. Co.*, 310 F.3d 73, 80 (2d Cir. 2002) ("A claim for breach of the implied covenant will be dismissed as redundant where the conduct allegedly violating the implied covenant is also the predicate for breach of covenant of an express provision of the underlying contract.") (internal quotation marks and citation omitted). Here, Hartman allegedly acted in bad faith by not properly discharging his duty to be diligent in making referrals. Hartman's duty to be diligent comes from the plain text of Section 3.3(e) of the ALA. Any shortcomings or insufficient efforts by Hartman, therefore, are the predicate for a breach of both Section 3.3(e) and any

76

implied covenants relating to it, making the accusations redundant. Any claims about Section 3.3(e) will have to stand on the plain text alone. The Court thus recommends granting Hartman's and Optimum's motions, and denying Armstrong's motion, with respect to any allegation of a violation of implied duties under Section 3.3(e).

The next issue under Section 3.3(e) requires a little more attention but is fairly easy to address. That issue is who can be liable for a breach of Section 3.3(e). Optimum of course was not a party to the ALA and could not face liability based on the plain text of that agreement alone. Armstrong nonetheless made a counterclaim against Optimum for a violation of Section 3.3(e), on the basis that Optimum has become the "Licensor" mentioned in the ALA:

> The Armstrong License Agreement, at Section 3.3(e), contains express provisions for the Licensor of the patents to be diligent in referring all potential applications for new chillers or pumps to Armstrong.
>
> Upon information and belief, the Licensor has not referred all potential applications for new chillers or pumps to Armstrong as no referrals for applications for chillers or pumps have been received.
>
> Armstrong has suffered and will continue to suffer damages from Hartman's or Optimum's conduct in violating the provisions and prohibitions of the Armstrong License Agreement.

(Dkt. No. 68 at 9.) Armstrong argues now that Optimum faces liability based on its purchase of Hartman's patents under the PPA:

> With respect to the referral obligations in section 3.3(e), Optimum had no good faith reason for ignoring the obligations in the Armstrong License Agreement to refer potential clients to Armstrong. (Counter Statement ¶¶ 77, 91, and 93). In the first executed Patent Purchase Agreement, Optimum specifically agreed to assume all of the obligations of the Armstrong License Agreement. (Dkt. No. 292-2

at Exhibit B, page OPT285532 at ¶ 4.4).  By the third amendment to the Patent Purchase Agreement, Optimum had decided that not all of those obligations were to their liking and so ¶ 4.4 was deleted in its entirety and replaced with a clause that says nothing of the obligations Optimum assumes.  (Dkt. No. 292-2 at Exhibit B, page OPT285577 at ¶ 3(a)).  The "referral services" obligation in § 3(e) is specifically retained with Hartman, with no explanation.  (Dkt. No. 292-2 at Exhibit B, page OPT285596, ¶ 2(a), and page OPT285698).  This change and refusal to accept the clearly expressed obligation of the "Licensor," not an individual person but the entity that owns the patents, was a calculated move to avoid having to support Armstrong's business opportunities, which was a main part of the bargain Armstrong has been paying for under the Armstrong License Agreement.  The change in stance on referral obligations, according to Optimum, was based on the alleged "erroneously" drafted patent purchase document.

Q. Okay. (The License Agreement was marked Exhibit 17 for identification.)

Q. Let me mark as Frey No. 17 a document previously marked as plaintiff Exhibit 1.

A. Okay.

Q. Can you identify from this document what is the overly-broad wording that was referred to in the last exhibit, number 16?

MR. WHITE: Object to the form.

A. I can't specifically identify it, no.  I don't have a recollection of context of exactly what that was referring to.  I recall that we had wording issues.  I recall that we consulted with counsel about the wording issues and we modified some of the terms of the purchase agreement to resolve those issues.  That's all I recall.

Q. Do you recall if some of the terms involved factory implementation or field implementation as defined in this document?

MR. WHITE: Objection.

A. I don't recall.

Q. Do you recall if any of those discussions involved the language of 3.3b

78

referring to not in any way compete with the product offerings of licensee?

MR. WHITE: Objection, David, just to the extent that in some of his answers he's referred to discussions with counsel. So I don't want him to answer about that and I'm not saying that you're asking him about that. So I don't know if there is a way to solve both those concerns.

Q. Okay. So I'm not asking you to divulge any specific discussions you had with counsel. I'm just asking from the language in Frey 16 that talks about the overly-broad wording in the Armstrong license agreement in the documents designed for the board if that overly-broad wording included the language about not in any way competing with the product offerings of the licensee.

MR. WHITE: Objection.

A. The only specific recollection that I have is that we ended up modifying the purchase agreement to carve out the specific obligations of Hartman that were erroneously woven into the doc—the original draft. That's the only thing I can remember specifically that would relate to this area of questioning.

(Dkt. No. 292-2 at Exhibit CC).

Here, "overly-broad" apparently means an obligation that Optimum decided it would no longer assume, despite any express wording in the actual text of the Armstrong License Agreement. Notably, this description of "overly-broad language" discussed at the Optimum board of directors meeting differs from the explanation that Hartman gives about the obligations in the Armstrong License Agreement. Rather than overly broad, Hartman alleges that an order from this Court states that certain obligations "would remain with me." (Dkt. No. 292-2 at Exhibit DD). However, the only personal obligations for Hartman as an individual in the Armstrong License Agreement are the engineering consulting services he owes to Armstrong at § 12.7. The Court did order that these consulting services would remain with Mr. Hartman if the patents were transferred to a new Licensor/owner.

In refusing to acknowledge and assume the clear duty of the Licensor in the Armstrong License Agreement, Optimum violated the duty of good faith and fair dealing implied in all contracts under New York law. Violating that duty is a breach of the contract.

(Dkt. No. 303 at 14–15.)  Armstrong argues further that Optimum cannot pick and choose when it qualifies as the "Licensor" under the ALA:

> In addition, as noted above, "[i]t is well-settled, however, that an assignee of a patent takes title to the patent subject to existing licenses."  Dkt. No. 39, at page 9, citing *Boehringer Ingelheim Vetmedica, Inc. v. Merial, Ltd.*, 2010 U.S. Dist. LEXIS 6819 (D. Conn. Jan. 14, 2010) (citing *inter alia, L.L. Brown Paper Co. v. Hydroilloid, Inc.* 118 F.2d 674, 677 (2nd Cir.), *cert. denied*, 314 U.S. 653 (1941)); *see also In re Cybernetic Servs., Inc,.* 252 F.3d 1039, 1052 (9th Cir. 2001) ("It has long passed into the text books that ... an assignee acquired title subject to prior licenses of which the assignee must inform himself as best he can, and at his own risk.") (quoting *Keystone Type Foundry v. Fastpress Co.*, 272 F.2d 242, 245 (2nd Cir. 1921)).  Despite the Court's clearly stated law on this issue, Optimum claims it can pick and choose the obligations of the prior license it will be subject to and make a "crystal clear" disavowal of those obligations it will not, in writing.

Initially, Hartman and Optimum sought Armstrong's acknowledgement that the LOOP patents and the Armstrong license agreement were being transferred to Optimum alone.  Hartman told Rothman that there would be a problem removing the "personal services" obligations, which is how Rothman and Hartman referred to the Licensor obligations of section 3.3(e) to diligently refer all potential applications for pumps and chillers to Armstrong.  (Counter Statement Exhibit 27).  Only after that acknowledgement or consent from Armstrong was deemed not necessary did Optimum adopt specific language in the Patent Purchase Agreement attempting to call the section 3.3(e) referral obligation something it can disavow, as a personal obligation.  The provision for the consent of Armstrong was deleted in Amendment Three to the Patent Purchase Agreement.  Despite the express terms of the Armstrong License Agreement concerning the duties of the Licensor, and without any basis in law or any other explanation, the fourth amendment to the Patent Purchase Agreement, dated March 18, 2011, attempts to disavow the expressly stated referral obligations of the Licensor.

There is nothing personal about the term "Licensor."  It means the owner of the patents being licensed to a licensee.  Optimum stepped into those shoes when it bought the LOOP patents, whether Optimum likes the term or not, and at Optimum's own risk.  However, since purchasing the LOOP patents, Optimum has not fulfilled this referral obligation to Armstrong.  Optimum's intentional breaches and its bad faith position deprived Armstrong of important fruits of the deal struck in the Armstrong license agreement and have in the past and continue to harm

Armstrong by at least the lost opportunities and the unfair payment of the full royalties for a mere part of the performance promised by the Licensor—Optimum. Of course, the details and scope of these breaches and the resulting damages were not known when Armstrong's initial disclosures were submitted.

(Dkt. No. 303 at 22.)  Optimum responds that patent ownership and contractual obligations are

two different things:

Armstrong continues to argue that Optimum assumed the ALA § 3.3(e) referral obligation simply because "Optimum stepped into those shoes when it bought the LOOP patents, whether Optimum likes the term or not, and at Optimum's own risk." (6/21/17 Arm. Mem. at 2, 20).  But, as Optimum's Memorandum showed, the Court has already rejected that argument. (5/5/17 Opt. Mem. at 12–13; Dkt. No. 291-3 at 18–19).  In its 10/7/10 Decision and Order, the Court "rejected the argument that a sale of Hartman's retained patent *rights* will necessarily transfer to Optimum all of Hartman's contractual *obligations* under the License Agreement." (Dkt. No. 39 at 24) (emphasis in original).  The Court also noted that the Patent Purchase Agreement "expressly provides that Optimum 'does not assume and does not agree to assume any obligations or liabilities accrued under the Armstrong Agreement or any other License at any time before or after the Closing Date.'" (Dkt. No. 39 at 24).  Armstrong ignores that part of Optimum's Memorandum and continues to pretend that part of the Court's Decision and Order does not exist. (6/21/17 Arm. Mem. at 17–20).

Optimum's Memorandum also demonstrated that, "under settled New York and Washington law, Optimum would not have assumed Hartman's obligations and liabilities even if the PPA had been silent on that subject." (5/5/17 Opt. Mem. at 12–13; Dkt. No. 291-3 at 18–19).  Armstrong ignores that discussion and pretends that New York and Washington law does not exist. (6/21/17 Arm. Mem. at 17-20).

Optimum's Memorandum also showed that the PPA was amended to expressly state and make crystal clear that the referral obligation in § 3.3(e) was retained by Hartman and not assumed by Optimum. (5/5/17 Opt. Mem. at 13; Dkt. No. 291-3 at 19) (Hogue Decl., ¶13, Exh. B).  Armstrong has no answer to that point either.  Armstrong seems to imply—without citation—that the amendment could not provide for Hartman's retention of the referral obligation. But, as discussed above, settled New York and Washington law confirms that Hartman would have retained the referral obligation even if the PPA were silent on

that topic.

Armstrong cites a March 15, 2010 letter from Hartman to Armstrong that raises the possibility of the referral obligation being assumed by Optimum. (6/21/17 Arm. Mem. at 1, 18). But that did not happen. Optimum never assumed that referral obligation. Moreover, Armstrong neglects to advise the Court that Armstrong's March 23, 2010 response to that Hartman letter objected to Optimum's possible assumption of the referral obligation to Optimum.

Armstrong also neglects to advise the Court that on August 20, 2010, Armstrong expressly relied on its objection to Optimum's possible assumption of the § 3.3(e) referral obligation to seek a preliminary injunction to stop the sale of the LOOP Patents to Optimum. (*See* Dkt. No. 32 at 8). At that time, Armstrong told the Court, *inter alia*, that "no one should assume that Optimum, a direct competitor of Armstrong, will continue to honor the explicit terms of the ALA if it becomes the new owner of the patents. Those terms, for example, require the referral of potential pump customers to Armstrong. *See* ALA ¶ 3.3e." (*Id.*).

In other words, after telling the Court that it wanted the referral obligation to remain with Hartman, and after Hartman and Optimum agreed, Armstrong turns around and seeks to manufacture a claim by asking the Court to find that the referral obligation actually went to Optimum.

In fact, after claiming in 2010 that transfer of the referral obligation to Optimum would deprive Armstrong of "the benefit to Armstrong that was clearly envisioned when the License was signed," Armstrong now repeatedly claims that the non-transfer to Optimum has deprived Armstrong "of important fruits of the deal struck in the Armstrong License Agreement" and of "a main part of the bargain" under the ALA. (Compare 3/25/10 letter with 6/21/17 Arm. Mem at 2, 11, 20).

Armstrong will say anything when it suits its immediate purpose. In any event, it is simply indisputable that, as a matter of law, Optimum never had any referral obligation or duty pursuant to § 3.3(e) of the ALA and is entitled to summary judgment with respect to any such claim.

(Dkt. No. 307 at 7–10.) The above reference to "important fruits of the deal" refers to a response

by Armstrong that Optimum in effect altered the benefit of Armstrong's bargain and altered its

incentive to enter the ALA in the first place:

Optimum asserts that this Court has already ruled that the referral obligation of ALA § 3.3(e) is a "personal service" citing Dkt. 39 at 24. There is nothing at Dkt. 39 page 24 that even suggests that. The Court at that page was referring to the retained patent rights of Hartman. The Decision and Order (Dkt. No. 39) contains no reference to or consideration of § 3.3(e) of the ALA as Optimum asserts.

Even if the Court did discuss § 3.3(e), the relevant facts were not at that time before the Court to hear and consider for a full briefing on the merits. One relevant fact unknown at that time being the earlier version of Optimum's Patent Purchase Agreement (PPA), which included an express provision for Optimum to assume all obligations of the owner of the patents, or Licensor. (*See* Kulik Reply Decl. dated July 18, 2017, Exhibit 3, excerpt of the PPA § 4.4, page OPT285532). Another relevant fact is that Hartman suggested the specific benefits to Armstrong if Optimum assumes the referral obligation—"If this agreement is assigned, this requirement will be in Armstrong's favor as Optimum will become the Licensor and will be required to do so (which they are not now)." (Dkt. No. 295-2, *see* Exhibit 28, Hartman Ex. 45, page HAR07013). Armstrong has also addressed the correspondence between Hartman and Optimum's Nathan Rothman on the consent of Armstrong for the transfer of the ALA in the Memorandum Opposing Optimum's Motion for Summary Judgment, which is still more evidence not considered by the Court at the time. (Dkt. No. 295 at pages 18 and 19).

Optimum says at page 16 of its Opposition (Dkt. No. 297) that the ALA set up a contractual duty with "Hartman." Optimum also claims state law allows it to unilaterally change the explicit terms of the ALA to make Hartman personally responsible for the obligation to refer customers. There is no support anywhere for changing the terms of the existing patent license. In fact, the ALA at § 12.1 includes a provision that a writing signed by both parties is required to alter the terms of the license agreement.

The ALA § 3.3(e) says "Licensor" not Hartman.

3.3(e) During the exclusive grant period, *Licensor* shall be *diligent* in referring to the Licensee *all potential applications the Licensor learns about that require new chillers or pumps*. Only if Licensee declines to pursue such projects, or the Owner declines Licensee's proposed solution will Licensor permit other potential licensees over which Licensor exerts control to pursue such projects. Armstrong License Agreement at § 3.3(e) (emphasis added).

The terms clearly differ from the consulting services that specifically list Hartman's and his Senior Engineer's (Ron Anderson) hourly rate. At the time of execution, Thomas Hartman d/b/a The Hartman Company was the Licensor. Once the LOOP patents were sold, that role changed to the new assignee— Optimum Energy LLC. "It is well-settled, however, that an assignee of a patent takes title to the patent subject to existing licenses."

(Dkt. No. 310 at 6–7.)

After reviewing the record and all of the above arguments, a few points are in order. With respect to Judge Skretny's Decision and Order of October 7, 2010,[8] Armstrong's contention that it "contains no reference to or consideration of § 3.3(e) of the ALA as Optimum asserts" is true in the narrow, literal sense that the Decision and Order does not contain the character string "3.3(e)" in it. Sometimes, though, context matters. The part of page 24 of the Decision and Order that has drawn the parties' attention addresses the fourth reason why Armstrong wanted a preliminary injunction blocking the sale of patents to Optimum. Among other reasons, Armstrong had argued that it would suffer irreparable harm because "(4) the patent sale will strip Armstrong of Hartman's consulting services because Hartman's obligations under the License Agreement will transfer to Optimum." (Dkt. No. 39 at 23; 745 F. Supp. 2d at 241.) That fourth reason *is the entire predicate of Armstrong's allegations about anybody violating Section 3.3(e).* In that context, Judge Skretny did in fact address Section 3.3(e) and said no, "neither the License Agreement nor the proposed Hartman/Optimum patent purchase agreement support the conclusion that a sale of Hartman's patent rights will result in a transfer of his personal obligations under the License Agreement." (Dkt. No. 39 at 25; 745 F. Supp. 2d at 242.) Armstrong suggests that Judge Skretny did not have

---

[8] Dkt. No. 39, *also available as Armstrong Pump, Inc. v. Hartman*, 745 F. Supp. 2d 227 (W.D.N.Y. 2010).

in 2010 all of the facts that are in the record now, but further factual development would affect whether appropriate referrals wound up being made by somebody. Factual development would not affect the pure legal operation of the patent sale documents.

Even if the Court needs to revisit the relationship between the ALA and the PPA, nothing has changed. Armstrong has argued repeatedly about how "an assignee of a patent takes title to the patent subject to existing licenses." *Boehringer Ingelheim Vetmedica, Inc. v. Merial, Ltd.*, No. CIV. 3:09CV212 (AWT), 2010 WL 174078, at *9 (D. Conn. Jan. 14, 2010). The paragraph in that case preceding Armstrong's quote reads as follows:

> In addition, the court concludes that, as a result of the ′882 Assignment, PSC does not have the right to bring an infringement action with respect to the ′882 Patent because the ′882 Patent is an assignment and not a mere license. The ′882 Assignment effects a transfer of the "entire right, title and interest" and "[a]ny and all rights of enforcement with respect to the Patents, including all rights to sue and recover for past, present and future infringement thereof, and any and all causes of action ...." First Amd. Compl., Ex. E at 1. The only right retained by PSC was in connection with the oral "grantback" by Merial to PSC pursuant to which PSC has the right to practice the ′882 Patent to the extent necessary for purposes of the 2001 and 2004 License Agreements. Thus, there was a complete transfer of the right to sue for infringement and the retained rights do not "substantially interfere with the full use of the exclusive rights under the patent."

*Id.* In *Boehringer*, a company called (in abbreviated form) PSC owned a patent that it licensed to a company called BIV but later sold to a company called Merial. When Merial later sued BIV for patent infringement, BIV tried to claim that the patent sale was void because it occurred without its permission and affected its license rights. The court disagreed and found the sale proper. Armstrong's quote appears where the court tells BIV that it does not need a declaratory judgment that the patent sale did not affect its license rights; Merial took the patent with any existing

licenses intact. Here, no one is arguing that Optimum bought the LOOP Technology patents without also taking on the license given to Armstrong under Section 2.1 of the ALA. Hartman is not arguing that he is unwilling or not obligated to continue providing the services and referrals that he promised under the ALA. (*See, e.g.*, Dkt. No. 290-3 at 24 ("In other words, Hartman expressly retained and did not delegate his referral and consulting obligations.").) The net result is that Armstrong passionately is fighting for something that Hartman never wanted to take away and agrees with providing.

In contrast to the situation in *Boehringer* and its proper analogy to Section 2.1 of the ALA, Section 3.3(e) of the ALA is a contractual obligation of Hartman's[9] that is independent of the patents in themselves. Under New York law, contractual obligations are freely assignable absent express provisions to the contrary. *See Pravin Banker Assocs., Ltd. v. Banco Popular Del Peru*, 109 F.3d 850, 856 (2d Cir. 1997) (citations omitted). The only express provision about assignment in the ALA appears in Section 12.3, which limited Armstrong, not Hartman. Section 12.1 prohibits alterations of the ALA but does not address assignments to other parties. Without express

---

[9] And the obligation does specify Hartman personally. Armstrong has argued that the obligations of Section 3.3(e) automatically passed to Optimum because the plain text of that section specified that the "Licensor" would be diligent, and to Optimum now is the Licensor. This argument fails. The opening paragraph of the ALA explicitly defines Hartman as the "Licensor." Armstrong might have had a better argument if Optimum had assumed some of the obligations of the ALA and not others, thereby introducing a discrepancy into the ALA that no one originally intended. As it stands, Optimum avoided that possibility by purchasing only the patents and not any of the responsibilities in the ALA. *Cf. Medcor Pharma LCC v. Fleming*, No. CV 12-291-JJB, 2013 WL 11605546, at *3 (M.D. La. May 9, 2013) (distinguishing Judge Skretny's Decision and Order and separating technology licensing from technology assignment, the latter being "subjected to contract principles").

provisions in place, Hartman and Optimum were free to make an arrangement, manifested in the fourth amendment to the PPA (Dkt. No. 294-1 at 7), that transferred ownership of the patents to Optimum while leaving with Hartman the obligation to provide diligent referrals. The only other argument that Armstrong could make here—and it has hinted at this argument—is that it somehow lost the benefit of the bargain with respect to the unique way in which Hartman alone could make referrals. *See, e.g., In re Wright*, 157 F. 544, 546 (2d Cir. 1907); *In re Schick*, 235 B.R. 318, 323 (Bankr. S.D.N.Y. 1999) ("Generally, a right is not assignable if assignment would materially change the duty of the obligor, increase his burden or risk or impair the chance of receiving a return performance or reduce its value.") (citations omitted). Even then, though, that argument would make more sense in a scenario in which Hartman were trying to pawn off his obligations under Section 3.3(e) to Optimum. That scenario is not present here. Hartman has argued vigorously that he has not breached Section 3.3(e), but at no time has he argued that Section 3.3(e) no longer applies to him. Armstrong's argument, in the end, is the answer to a question that no one asked.

If Hartman has not lived up to his obligations under Section 3.3(e) then so be it, and the Court will address that separate issue below. At this point, though, the Court has to conclude that any violations of Section 3.3(e) would lie with Hartman, not Optimum. The Court accordingly recommends granting Optimum's motion with respect to any allegations in the amended complaint concerning Section 3.3(e). The Court correspondingly recommends denying Armstrong's motion on the same point as against Optimum.

The final issue to consider under Section 3.3(e) is more difficult because it is more fact-intensive—whether a triable issue of fact exists concerning Hartman's fulfillment of his referral obligations. As the Court has quoted extensively in the preceding pages, the record contains testimony that Hartman delegated at least some preliminary screening of inquiries to secretarial staff and then passed those inquiries routinely to both Armstrong and Optimum. (*See* Dkt. No. 357-6 at 55–77.) Hartman himself gave testimony suggesting that he routed potential referrals to Armstrong or Optimum based on whatever the potential client told him, at face value, with little or no inquiry about details. (Dkt. No. 318 at 9.) Armstrong has asserted that Hartman made no referrals at all, but its own representative has testified that the assertion is wrong—Armstrong received perhaps two to five referrals a month between 2005 and 2010 and an occasional referral thereafter, even after litigation commenced. (Dkt. No. 319 at 265–66.) Despite all of the arguments and exhibits in a record that approaches 4,000 pages, no one appears to have furnished the Court with objective industry information that would put the number of referrals in context. Over the last, say, 10 years, on average, how many individuals or corporations engaged in new or retrofit HVAC projects each year? Of those projects, how many involved LOOP Technology? Two to five referrals a month would look quite a bit different compared to, for example, 10 total LOOP Technology projects per month or 1,000 total projects per month. The Court has no frame of reference for the number of referrals and has no idea how to determine—let alone determine as a matter of law—whether the number of referrals should be considered "diligent." *Cf. Bear, Stearns Funding, Inc. v. Interface Grp.-Nevada, Inc.*, 361 F. Supp. 2d 283, 296 (S.D.N.Y. 2005) (denying

summary judgment and finding a question of fact over whether a party used "diligent efforts to market and sell"); *Summagraphics Corp. v. Sanders Assocs. Inc.*, No. CIV. B-88-352 (PCD), 1991 WL 1296544, at *8 (D. Conn. Mar. 13, 1991) (denying summary judgment and finding a question of fact as to the "exercise of reasonable diligence" to discover patent infringement); *see also Burns v. Prudden*, 588 F.3d 1148, 1152 (8th Cir. 2009) (in the context of determining equitable tolling, "diligence is a fact-intensive question" requiring remand); *Coal Res., Inc. v. Gulf & W. Indus., Inc.*, 865 F.2d 761, 774 (6th Cir.), *opinion amended on denial of reh'g sub nom. Coal Res., Inc., No. 11 v. Gulf & W. Indus., Inc.*, 877 F.2d 5 (6th Cir. 1989) ("The leases, however, do not define diligent development and mining. And we have earlier, in this opinion, explained that the payment of minimum royalties did not, as a matter of law, satisfy the duty to diligently mine the Virginia property. As this court explained in its earlier opinion, it is a question of fact for the jury whether the duty to diligently mine under the leases, as incorporated into the Assumption of Obligations clause, was for the purpose of generating substantial payments to CRI under 'the multiple.'") (citation omitted). The quality of the referrals runs into a similar difficulty. Nothing in Section 3.3(e) suggests a procedure for cultivating referrals. To this Court's untrained eye, the Spinelli correspondence cited above does seem rather uninspired—a potential client asks for contact information for *both* Armstrong and Optimum, and Hartman provides it in rather terse fashion. The Court, however, could not form a more intelligent opinion of the Spinelli correspondence without weighing factual evidence, a task reserved for factfinders at trial. *Cf. U.S. ex rel. Veltz v. Allegany Rehab. Assocs., Inc.*, No. 01-CV-190S, 2011 WL 1042194, at *6 (W.D.N.Y. Mar. 18, 2011)

89

(denying summary judgment where "it is a question of fact whether Allegany worked diligently to correct its software problems, or whether, as Veltz contends, it made a business decision not to purchase and install new software").  When Armstrong points to Hartman's use of secretarial staff or his decision to take inquiries at face value, it is essentially impugning Hartman's honesty and motivation to fulfill his obligations.  *Cf. Am. Int'l Grp., Inc. v. London Am. Int'l Corp.*, 664 F.2d 348, 353 (2d Cir. 1981) ("Subjective issues such as good faith are singularly inappropriate for determination on summary judgment.") (citation omitted).  Armstrong's indirect attack comes too close to the principle that courts should not weigh evidence or assess witness credibility at the summary judgment stage.  At the same time, Hartman and Optimum have not pointed to any legal principle that overrides the factual questions noted above.

Since Armstrong made a claim that was never subjected to Rule 12 dismissal, and since neither side has demonstrated the propriety of judgment as a matter of law, Armstrong's claim against Hartman under Section 3.3(e) must go to trial for ultimate resolution.  Accordingly, the Court recommends denial of all parties' motions with respect to Armstrong's allegations, in Count I of the amended complaint and its counterclaims, that Hartman violated Section 3.3(e) of the ALA.

### 2.  Breach of Sections 3.2(b) and 3.3(d) of the ALA

This subset of Count I originated with the following paragraph from the amended complaint:

> By entering the agreement to transfer the rights to Optimum, Hartman
> breached the Armstrong License Agreement, including without limitation, the

90

restrictions not to grant certain rights to other parties, the express prohibitions against granting certain rights to Optimum, the provision giving Armstrong the right of first refusal on the improvements, and the provision against entering inconsistent agreements. For example, the Patent Purchase Agreement at section 4 assigns to Optimum all right, title and interest in the Patents, defined at page 2 of the Patent Purchase Agreement, which includes the Patents licensed to Armstrong as well as the pending improvement applications, for which Hartman promised a right of first refusal to Armstrong at section 8 of the Armstrong License Agreement. The Patent Purchase Agreement was executed by Hartman on February 10, 2010.

(Dkt. No. 55 at 9.) The above accusation was against Hartman. In its counterclaims, Armstrong

expanded the accusation to include Optimum and asserted the following:

> The Armstrong License Agreement contains express prohibitions against granting certain rights to Optimum and other parties similarly situated as competitors to Armstrong's product offerings, including, for example: the promise not to grant rights to manufacturers and assemblers of cooling systems and chilled water plant controls at section 3.2(b) of the Armstrong License Agreement; the promise not to grant rights to a party that implements the Hartman Loop Technology in any way that competes with Armstrong's product offerings in section 3.3(d) of the Armstrong License Agreement; and the promise not to enter agreements inconsistent with the grant of rights to Armstrong in section 10.2 of the Armstrong License Agreement.

(Dkt. No. 68 at 8.) Armstrong has focused on how emergent competition from Optimum and

others created the breach:

> As explained in the expert reports of John Conover and the exhibits to them, various documents from Johnson Controls show how the CPO30 product and [its] use by Optimum are directly competing against Armstrong's control products. Expert testimony here is useful extrinsic evidence of trade terms, customs, and practices that "illuminate the context for the parties' contract negotiations and agreements." *Metric Constructors, Inc. v. NASA*, 169 F.3d 747, 752 (Fed. Cir. 1999). The expert report dated February 28, 2014, refers to the Johnson Controls CPO30 product, and the expert report dated July 29, 2014, goes into details on how this CPO30 is part of "factory implemented" product. Kulik Decl. Exhs. J and Z. Crucially, this is the same definition used in the Armstrong License Agreement—"as part of the factory production process." As explained by Mr.

91

Conover at pages 6–7 of the report dated July 29, 2014 (Kulik Exh. Z), the simple task of downloading the Hartman LOOP software to a controller that has already preconfigured for a building site by Optimum, at its own facilities, is one that is performed over the internet and essentially with the click of a button. The Optimum product, as Mr. Conover also explains, directly competes with Armstrong's controller products as one in the HVAC trade would consider them equivalent controllers.

As Optimum is a competitor to Armstrong's products, any assignment of the patents and pending patent applications to Optimum is breach of §§ 3.2(b) and 3.3(d). In § 3.2(b), Hartman agreed that he would not license the Hartman Loop Technology "to any other manufacturer or assembler of pumps or for cooling systems and equipment that employ chilled water distribution." Kulik Decl., Exh. A at § 3.2(b). Hartman, however, carved out a narrow exception with regard to Optimum, but then he added limitations specifically to prevent Optimum or anyone from competing with Armstrong. In particular, Hartman reserved the right to grant a license to Optimum for the purpose of incorporating the licensed technology into certain products; critically, however, Hartman excluded from that license any "products . . . that include the manufacture or assembly of pumps chillers, towers, chilled water plant controls or pumping or chiller systems that could compete with [Armstrong's] intended product offering" from the Optimum carve out . . . ."

(Dkt. No. 317 at 35–36.) Optimum has responded by emphasizing that the reference in Section

3.2(b) to "intended product offering" is narrow:

[T]he reference in §3.2(b) to "intended product offering" is not a general blanket prohibition, but rather is a limitation on an exception, and that limitation, by its plain terms, is itself quite narrow. It does not prevent Hartman from granting license rights with respect to any and all products that could compete with Armstrong's products. Instead, by its express terms, it applies only to products incorporating the LOOP Technologies:

- That include the manufacturer or assembly of;

- pumps, chillers, towers, chilled water plant controls or pumping or chiller systems; and

- that could compete with Armstrong's intended product offering.

Armstrong's interpretation fails because it focuses only on the third bullet point and completely ignores, and would render superfluous, these other terms and provisions in that same part of §3.2(b). Indeed, Armstrong's interpretation would also mean that the limitation in subsection [3] would completely swallow and eliminate the exception in subsection [2] and fails for that reason as well.

(Dkt. No. 294-3 at 28.) Optimum argued further that its interpretation of Section 3.2(b) was

important to avoid a conflict with the language of Section 3.3(b):

Section 3.3(b) does *not* state that Hartman's retention of Field Implementation rights is limited to only Field Implementation products that do not compete with Armstrong's products. Indeed, the reservation of rights by Hartman in §3.3(b) does not contain any limitations with respect to competition with Armstrong. The fact that Armstrong's interpretation of §3.2(b) is flatly inconsistent with the plain terms of §3.3(b) further confirms that Armstrong's claim fails.

(Dkt. No. 294-3 at 29.) Hartman picked up on Optimum's argument and emphasized the nature

of Optimum's product:

Armstrong emphasized the italicized text above—focusing on "controls" to the exclusion of the phrase that modifies that word, "chilled water plant controls." Optimum's product is not a "chilled water plant control" because it does not operate or "control" the chilled water plant. Rather, Optimum acquires (does not manufacture) a computer called a JACE, which is manufactured by Tridium; the JACE is an add-on device that works with a "plant controller" that is manufactured by parties other than Optimum. This provision is also inapplicable because Optimum does not manufacture or assemble plant controls (let alone manufacture or assemble the Jace device that it distributes). The phrase "that could compete with the Licensee's intended product offering" qualifies the prior language, "products excluding those that include the manufacture or assembly of pumps, chillers, towers, chilled water plant controls or pumping or chiller systems." As explained previously, this text is an exception to an exception.

In other words, to fall within the narrow non-competition restriction, the product must: "include the manufacture or assembly of" specified equipment (none of which is manufactured or assembled by Optimum). The product distributed by Optimum (note that "distribution" is not included in the provision) is not

manufactured or assembled by Optimum—nor is it one of the enumerated items because it is not a "chilled water plant control."

Armstrong's non-compete theory ignores other provisions of the ALA that defeat its interpretation. For example, ALA § 3.3(b) provides that Hartman retained rights to field implementation for "hydronic systems" that are "not integrated into the chiller, pumping, control or tower products until they are field assembled." Armstrong ignores this language, which permits competing hydronic systems where the Licensed Technologies are field implemented.

(Dkt. No. 298 at 15–17.)

Armstrong responded as follows to the ongoing dispute about the nature of Optimum's

product:

Optimum obviously knows [its] product is a controller. (Counter Statement ¶¶ 56, 9, and 51). The Optimum controller employing the Hartman LOOP algorithms that direct the sequencing of HVAC components are kept in Optimum's facilities and preconfigured by Optimum to add software or operating systems from a blank "JACE" device prior to shipping to the building site. The details of the processes were explained by Optimum's Clark Matthys.

Q. Thank you. Okay. I think the other part, station transfer, you also—you just explained. The station transfer is what happens when using the commissioning wizard; is that correct?

THE WITNESS: So no. The commissioning wizard commissions the JACE and makes it—that's—that's one thing to make the JACE functional, so once the JACE is functional, you can program anything you want onto it. What we're doing in step 8 is we're just doing a station transfer, which is—it doesn't put any of the base software on the controller. That's already been configured and—and working. We're just transferring the program to do the optimization.

Q. Okay. So the Optimum LOOP program?

A. Correct.

Q. Okay. Is that what it's called?

MR. WHITE: Object to the form.

94

THE WITNESS: I mean, it's referred—it's—I call it the optimization software.

(Dkt. No. 292-2 at Exhibit T).

As shown in "step 6" of Exhibit 1 to the Matthys deposition, the step of preconfiguring the JACE to make it functional for a particular building site occurs at Optimum's facility prior to shipping. In other words, it occurs in Optimum's factory. Matthys stated "that had already been configured" before the LOOP algorithms are downloaded. The final download of standard software with the LOOP algorithms is a step that could be completed anywhere, and merely choosing where to push the download button cannot alone be what turns the factory step of "configuring" and making the JACE functional for Optimum's services into a Field Implementation.

(Dkt. No. 303 at 25.) Armstrong also addressed Hartman's arguments about its intended product offering:

As stated in the accompanying Declaration of Brent Ross, Armstrong's "intended product offerings" always included a controller, and a controller as a stand-alone product. (Ross Declar. ¶¶ 6–9). Actually, the stand-alone controller was the first and foremost product offering listed in Armstrong's senior management documents from the relevant time periods of 2004 and 2005. (Ross Declar. ¶¶ 6–9; and Thomsen Oppos. Declar. ¶¶ 10–11). Accordingly, regardless of what Hartman suggests he remembers in 2010 about Armstrong's product offering from that 2004 to 2005 period, the documentary evidence show that Armstrong always intended to offer a standalone controller as one option for the Hartman LOOP products they sold. (Counter-Statement ¶¶ 60 and 64). The facts also show that Armstrong never suggested a "plant on a skid" as a focus for the Hartman LOOP. (Ross Declar. ¶ 8).

Ross also explained the negotiations and intent in adding language to the license agreement that protects Armstrong's Hartman LOOP factory product offerings from competition. (Ross Declar. ¶ 18). As discussed above, the Armstrong product offering was a Hartman LOOP controller, such as the IPC 11550. Ross points to an email exchange shortly before the license agreement was executed. That evidence shows he inserted language to protect Armstrong from others who make building controls. The fact that a potential third party was unknown, as the license agreement terms say only a licensee of "Optimum Energy

95

or others" at 3.2(b), was a specific concern. These added protections, like the building control protections, were designed to protect Armstrong from industry giants like Johnson Controls and Honeywell. Hartman did not object, and those provisions were adopted into the final license agreement. As Ross explains, the section 3.3 and section 3.3(d) language is not dependent upon "factory implementation," as is section 3.3(a), and the language explicitly protects Armstrong's product offerings. (Ross Declar. ¶ 18) (*see also* Counter-Statement at ¶¶ 38, 39, 76, 123, 146).

(Dkt. No. 304 at 26–27). Optimum believes that Armstrong has avoided directly addressing the

most important aspect of the issue that it chose to raise—the plain language of Sections 3.2(b) and

3.3(d):

The amended complaint alleged that the Optimum License Agreement violated Armstrong's rights under §§ 3.2(b) and 3.3(d) of the ALA. Optimum's Memorandum showed, in detail, that the Optimum License Agreement is perfectly, facially, consistent with the Armstrong License Agreement and § 3.2(b) and § 3.3(d) of the ALA in particular. (5/5/17 Opt. Mem. at 21–26; Dkt. No. 291-3 at 27–32).

Armstrong has no answer. In fact, while Armstrong's amended complaint made § 3.2(b) and § 3.3(d) the heart of its alleged contractual inconsistencies, Armstrong's opposition runs away from § 3.2(b) and § 3.3(d). Armstrong's opposition contains only a few conclusory references to ALA § 3.3(d) and even fewer to ALA § 3.2(b). (6/21/17 Arm. Mem. at 3, 10-11, 26-27). Moreover, those few references do not address Optimum's Memorandum, but rather are just citations offered in general support of Armstrong's "competition" interpretation. Optimum's opposition to Armstrong's Motion already showed, in detail, why Armstrong's "competition" interpretation fails as a matter of law, based on the four corners of the license agreements, including ALA § 3.2(b) and § 3.3(d). (6/21/17 Opt. Mem. at 20–23; Dkt. No. 297 at 25–28).

(Dkt. No. 307 at 13.) Armstrong's reply to Optimum focused on alleged inconsistencies in some

of Hartman's deposition testimony:

The ALA also contain[s] sections that protect Armstrong's new or intended Hartman LOOP products from competition that also uses the Hartman LOOP.

96

Hartman continues to assert that Armstrong's intended product line at the time the agreement was signed was "a chiller plant on a skid." (Hartman SOF, Dkt. No. 290-4, at ¶ 60, citing Hartman Decl. ¶ 7, n. 1). But Hartman's own deposition transcript shows his recollection of this "fact" differs over time. (Kulik Reply Decl. dated July 18, 2017, at Exhibit 1; compare Hartman Tr. 189:17 to 190:21 to Hartman Tr. 289:10 to 290:5). Hartman's testimony first mentions "pumps and controls," then only mentions "factory packaged plant solutions." Both Armstrong's Ross and Thomsen have addressed this in their recent declarations. (Reply Decl. of Brent Ross dated July 17, 2017, at ¶ ¶ 13 and 17; Decl. of Brent Ross dated June 16, 2017, Dkt. No. 295-10, at ¶¶ 6–9; Decl. of Peter Thomsen dated June 19, 2017, ¶¶ 10–11, Dkt. No. 296-5). These declarations refer to a written Armstrong management project team "charter" that explicitly states that the first goal of the Hartman LOOP project for Armstrong was a stand-alone control offering. Armstrong's intended product line at the time the ALA was executed most certainly including a stand-alone control product (the IPC 11550) and was never limited to a "chiller plant on a skid" as alleged. There is no justification for arguing that Armstrong is somehow limited to selling a Hartman LOOP controller to some combination of products never mentioned in the ALA.

(Dkt. No. 310 at 5–6.) Armstrong replied to Hartman as follows:

> Similarly, the language protecting Armstrong's new Hartman LOOP products and controls from competition is clear and found in part in sections 3.3 preamble, 3.3(d) and 3.2(b) of the ALA. The language of 3.3(d) does not require or rely on the factory implementation or field implementation distinction but instead protects Armstrong's offerings of products that use the Hartman LOOP technologies. The language here cannot be explained away by attempting to show it is somehow inconsistent with a particular interpretation of some other part of the ALA. A reading of the contract that renders any portion of it meaningless or superfluous is unsupportable. *Suffolk Cnty. Water Auth. v. Village of Greenport*, 21 A.D.3d 947, 948 (2d Dept. 2005); *Beal Savings Bank v. Sommer*, 8 N.Y.3d 318, 324 (2007). The sections of the ALA protecting Armstrong from competition by Hartman LOOP products, and manufacturers or assemblers of those products, should be read as written.

(Dkt. No. 309 at 9.)

After reviewing the record and considering all of the parties' arguments, the Court believes

that the heart of the matter here comes back to the prior discussion (*supra*) of the nature of

Optimum's product and whether it constitutes a "controller." Eliminating double and triple

negatives from the relevant language, Section 3.2(b) prohibited Hartman from "from licensing the

Licensed Technologies or the Licensed Patents to Optimum Energy Corporation or others for the

purpose of incorporating the Technologies into products . . . that include the manufacture or

assembly of pumps, chillers, towers, chilled water plant controls or pumping or chiller systems that

could compete with the Licensee's intended product offering." (Dkt. No. 55-1 at 4.) Several terms

in this quoted language have more play in the joints than perhaps Hartman and Optimum wanted

to see. The first term is "incorporating the Technologies into products." "Incorporating" suggests

that Optimum's output, whatever it is, is not the totality of the item that potentially causes

problems with licensing or with competition. *Cf., e.g., Roberts v. Capital One, N.A.*, ___ Fed. Appx.

___, No. 17-1762, 2017 WL 5952720, at *2 (2d Cir. Dec. 1, 2017) (summary order) (finding that

an ambiguity over the term "overdraft" in an agreement to "infects several other provisions of both

agreements that employ the defined term 'Overdraft,' effectively incorporating its lack of clarity by

reference"); *Bernhard-Thomas Bldg. Sys., LLC v. Weitz Co., LLC*, No. 3:04-CV-1317 CFD, 2011 WL

5222682, at *2 (D. Conn. Oct. 31, 2011) ("The Subcontract between BT and Weitz contains

several provisions incorporating the Prime Contract."); *see also Incorporate*, Black's Law Dictionary

(10th ed. 2014) ("2. To combine with something else <incorporate the exhibits into the

agreement>."). The term also does not clamp down on whose "products" have to be the ones

under consideration. As a result, if Optimum's output knowingly[10] were at least a component of

---

[10] Some level of knowledge or intent by Hartman and Optimum would be required by the term "purpose,"

any product from any company that met the remaining criteria of Section 3.2(b) then Optimum would be in violation. Creating something that is a component or is at least combined with another company's product is exactly what Optimum has admitted that it does. Optimum does not sell its optimization software on an installer disc. HVAC managers cannot buy any such installer disc and plant Optimum's software into whatever BAS or other controller they have, the way computer owners could buy a copy of Windows 10 off the shelf and install it into their existing computers to replace Windows 7. Optimum has admitted that its optimization software is useless unless it is incorporated into a new, physical device that is prepped for remote download at the factory level. The Court's understanding of "incorporating" dovetails with the appearances of the terms "include" and "controls." "Include" is a non-exhaustive term. *See, e.g., Fed. Land Bank of St. Paul v. Bismarck Lumber Co.*, 314 U.S. 95, 100 (1941) ("[T]he term 'including' is not one of all-embracing definition, but connotes simply an illustrative application of the general principle.") (citations omitted); *White v. Nat'l Football League*, 756 F.3d 585, 595 (8th Cir. 2014) ("While at times the expression of one thing excludes others not expressed, when a statute uses the word 'includes' rather than 'means' in defining a term, it does not imply that items not listed fall outside the definition.") (internal quotation and editorial marks and citations omitted). As long as "controls" are a part of or among products that fulfill the other criteria in Section 3.2(b) then those products are in violation.

---

to avoid problems with, for example, licensing under false pretenses.

The flexible terms in Section 3.2(b) render all of the parties' arguments a Battle of the

Technicalities.  Technically, as Hartman and Optimum have argued repeatedly and strenuously,

Optimum's optimization software is delivered remotely and reaches the customer in the field.  But

technically, as Armstrong has argued and as the Court has observed, Optimum cannot sell its

software literally alone; it sells a packaged product that includes a physical device that is prepped

for remote download at the factory level.  *Cf. Shipco 2295, Inc. v. Avondale Shipyards, Inc.*, 825 F.2d

925, 930 (5th Cir. 1987) (reviewing cases, in the tort context, that "support the view that the

product in this context means the finished product bargained for by the buyer rather than

components furnished by a supplier"); *accord Myrtle Beach Pipeline Corp. v. Emerson Elec. Co.*, 843 F.

Supp. 1027, 1057 (D.S.C. 1993).  Technically, as Hartman and Optimum have argued repeatedly

and strenuously, Optimum's final combined product is not what the Court might call a

"mandatory controller"—that is, HVAC customers do have the option of programming their BAS

devices to override or otherwise to ignore whatever Optimum's product suggests.  But technically,

HVAC customers also have the option of programming their BAS devices to do exactly whatever

Optimum's product suggests, which would make Optimum's product what the Court will call a

"permissive controller."  There is no legal principle that compels a single resolution to the

characterization of Optimum's product.  Questions of fact surround 1) whether Optimum's

product should be considered the optimization software alone, and whether that optimization

software nonetheless became incorporated into a Tridium JACE controller that otherwise violates

Section 3.2(b); 2) whether Optimum's product includes the physical device that Optimum has said

100

is necessary to house it, which then would push the overall product closer to being some kind of controller; and 3) whether the reference to "controls" in Section 3.2(b) accounts for any distinction between mandatory and permissive controllers. On top of these questions, the parties cannot reach any agreement about what appears to have been a fairly known and open intention by Armstrong to develop a stand-alone controller. (*See* Dkt. No. 303 at 295 ("The project goal is to have a target market coordinated release for IPC as a stand alone offering, and as a sub-component of an IPP chiller plant on a skid for April 2005 and July 2005 respectively. This must include: a demonstration of the proto-type in a simulation manner, a sales plan agreed by COB global, a service support mechanism / infrastructure."); *id.* at 309 ("Hartman is well aware that Armstrong's IPC product, later called the IPC 11550, was never a piece of mechanical equipment. Marketing materials for the IPC 11550, which is a computer-based controller not mechanical equipment, were freely available at industry conferences and on Armstrong's website. In fact, Hartman participated in the development of Armstrong's IPC product as a consultant to Armstrong. No one in the industry would refer to the IPC 11550 as mechanical equipment. Again, any suggestion from Hartman or others that Armstrong's rights are somehow limited to the Hartman LOOP incorporated into 'mechanical equipment' is plainly wrong.").) Answering these questions would require assessing information about the HVAC industry and assigning weight to some documents and deposition transcripts over others. In the end, a reasonable factfinder could decide—and just as easily not decide—that Armstrong intended a stand-alone controller as a product offering; that Optimum's product is the integrated software/housing package and not just the optimization

101

software alone; that Optimum's product could compete with stand-alone controllers from Armstrong; and that Hartman and Optimum thus violated Section 3.2(b).

The Court's assessment of Section 3.2(b) sets up a very short mention of Section 3.3(d). In short, Section 3.3(d) allows licensing of the LOOP Technology "when the implementation of such Licensed Technologies do not in any way compete with the product offerings of the Licensee." (Dkt. No. 55-1 at 5.) As the Court noted above, questions of fact surround Armstrong's plans for a stand-alone controller. Questions of fact also surround the nature of Optimum's overall product. How a factfinder addresses Section 3.2(b) likely will lead to the same outcome for Section 3.3(d). A factfinder thus will need to address both sections together.

Accordingly, the Court recommends denying all parties' motions with respect to the portion of Count I of the amended complaint, and the counterclaims, accusing Hartman and Optimum of violating Sections 3.2(b) and 3.3(d) of the ALA.

### 3. Breach of Section 3.3(a) of the ALA

Armstrong has made an accusation of a violation of Section 3.3(a) of the ALA; the accusation comes from a combination of Count I of the amended complaint and Armstrong's counterclaims. Armstrong appears to be making this accusation against Hartman only, though the use of the disjunctive "or" is confusing. (*See* Dkt. No. 68 at 9 ¶ 146 ("Armstrong has suffered and will continue to suffer damages from Hartman's *or* Optimum's conduct in violating the provisions and prohibitions of the Armstrong License Agreement.") (emphasis added).) The core of

Armstrong's argument here combines aspects of arguments about the patent sale and about the

nature of Optimum's product:

> When Hartman assigned the title of the patents, Hartman assigned all of the rights associated with that intellectual property. Included in this bundle of rights being conveyed to Optimum were the rights that Hartman had reserved for itself. Though Hartman granted Armstrong certain license rights regarding its patents, Hartman retained the right to practice its patents. *See Cook,* 208 F. Supp. 2d at 879 ("Any right not specifically granted by the licensor remains with the licensor ..."). Hartman, however, promised Armstrong that Hartman would not grant those reserved rights in the licensed patents "to any third party involved in the manufacture of pumps, any factory packaged chilled water systems, chillers, building controls or cooling towers." Kulik Decl., Exh. A at § 3.3(a) (emphasis added). The § 3.3(a) provision specifically recites "or the Licensed Patents" which clearly indicates a separate circumstance that Hartman is prevented from doing. By assigning the patents to Optimum, however, Hartman conveyed and Optimum received all rights that Hartman had under the patents, including the full rights to practice the patents. Thus, by assigning the patents to Optimum, Hartman breached section 3.3(a) of the License Agreement wherein Hartman agreed to not assign those rights to another manufacturer. Optimum clearly and admittedly produces its JACE controller in its own facilities. This JACE controller is a "building control" according to Optimum's own statements and Johnson Controls' statements about its function. That this manufacture would also be deemed a factory implemented solution is fairly clear from the fact that it is a preconfigured product for a specific building site and that pre-configuration occurs in Optimum's facilities.

> That this assignment is inconsistent with the License Agreement is also reflected in the § 3.3 preamble, in which the parties expressly stated their intent: "The limited exclusivity is intended to protect Licensee against implementation of the Licensed Technologies *that would compete with their intended product offerings*." Kulik Decl., Exh. A at § 3.3 (emphasis added). Obviously, Optimum believes that it is in competition with Armstrong from its own employee Clark Matthys. *See* Kulik Decl., Exh. P. An assignment is more than a mere license but encompasses all the rights any license could transfer. This assignment violates the promises that Hartman made to Armstrong in not licensing the Hartman LOOP patents (the Licensed Patents) to a manufacturer of controls.

(Dkt. No. 317 at 38–39.)

103

Hartman has responded on two levels. As a matter of law, Hartman contends that Judge

Skretny already dismissed Armstrong's claim under Section 3.3(a):

> Judge Skretny dismissed Armstrong's breach of contract claim "based on an
> alleged breach of sections 3.2(b) and 3.3(a) of the License Agreement." *Armstrong
> Pump, Inc. v. Hartman*, 745 F. Supp. 2d 227, 234 (W.D.N.Y. 2010).

(Dkt. No. 290-3 at 15 n.45). In the alternative, Hartman makes this factual argument about

assignment of rights and about the nature of Optimum's product:

> Judge Skretny dismissed Armstrong's breach of contract claim "based on an
> alleged breach of sections 3.2(b) and 3.3(a) of the License Agreement."
> Accordingly, it is not clear why Armstrong believes it can resurrect this claim.

> And even if construed again, Armstrong's argument that Hartman breached
> ALA § 3.3(a) continues to miss the mark because it ignores ALA § 12.3—which
> limits Armstrong's ability to assign its rights and obligations under the agreement
> while containing no such restriction for Hartman.

> Moreover, Armstrong again emphasizes the word "controls" but seeks to
> divorce it from the surrounding language that qualifies it: "building controls."
> Again, Optimum's product is not a "building control." Optimum's solution
> includes an add-on device that provides input (i.e., suggested optimization levels) to
> a building control. Armstrong seeks to render an unambiguous term ambiguous by
> ignoring the actual contract language used. Optimum is not a manufacturer; the
> product it supplies does not provide building control. Optimum is therefore not
> "another manufacturer" as argued by Armstrong. And Armstrong's further
> argument that the JACE is a "factory implemented solution" ignores the definitions
> of "Factory Implementation" and "Field implementation" as discussed in
> Hartman's moving papers.

(Dkt. No. 298 at 20–21.) Armstrong does not address either of Hartman's arguments directly in

its reply papers but includes this language emphasizing its initial points about the patent sale and

about Optimum's product:

With respect to the sale of the LOOP patents, the Patent Purchase Agreement (PPA) and the assignment of the ALA to Optimum, Hartman knew the first version of the PPA stated Optimum would assume all obligations of the Licensor (*See* Armstrong's Motion for Partial Summary Judgment at page 27, Dkt. No. 292-5, citing the PPA at OPT285532, § 4.4; *see also* Kulik Reply Decl. dated July 18, 2017, at Exhibit 3). He prodded Armstrong into agreeing with the patent sale by touting in a letter to Armstrong the "benefits" to Armstrong of Optimum's new referral obligation. (Dkt. No. 292-5, at page 26 of Armstrong Motion for Partial Summary Judgment). Then he later signed the assignment paper transferring the rights in the ALA to Optimum, who did not accept the referral obligation of the Licensor in the ALA. (Decl. of Burt Hogue dated May 3, 2017, Dkt. No. 291-2 at Ex. B, Assignment of Armstrong License Agreement at § 2(a)). Obviously, Hartman knew that § 2(a) of the assignment of the ALA rescinded Optimum's earlier assumption of all the obligations in the ALA, specifically rescinding the referral obligation of § 3.3(e). There is no legal justification for rescinding this obligation. The sale of the LOOP patents and the assignment of the ALA is again a breach of Hartman's promise not to enter any inconsistent agreements, as the Licensor is no longer obligated to diligently refer customers to Armstrong according to the purported terms of the assignment of the ALA § 2(a).

Hartman alleges anew, with no support, that Armstrong asked that Hartman retain the referral obligations. However, a written document signed by both parties is required to modify the terms of the ALA (*see* § 12.1 of the ALA). Since no such writing exists, and no evidence exists that a writing was ever contemplated, the existing terms of the ALA effectively bound the parties initially and continue to bind the parties, including Optimum, today.

(Dkt. No. 309 at 6–7.)

As an initial matter, the Court needs to make an important distinction between Judge Skretny's prior Decision and Order and the violation of Section 3.3(a) that Armstrong is alleging now. In his Decision and Order, Judge Skretny addressed the purely legal question of "whether Hartman has expressly or impliedly promised not to practice the patented technologies at the factory implementation level, as he claims, or whether he has retained that right, as Armstrong

believes." (Dkt. No. 39 at 10; *see also* 745 F. Supp. 2d at 234.) Judge Skretny ultimately reached this conclusion:

> Because the License Agreement grants to Armstrong the sole right to practice the technologies in the manner described in section 2.1 of the License Agreement, Hartman's assignment of the patents necessarily will be subject to that right. As a matter of law, then, the intended assignment will include only the rights Hartman could have exercised without violating the License Agreement. Accordingly, Hartman's motion to dismiss is granted to the extent Armstrong's breach of contract claim is based on an alleged breach of sections 3.2(b) and 3.3(a) of the License Agreement.

(Dkt. No. 39 at 11; 745 F. Supp. 2d at 234.) Judge Skretny thus eliminated the portion of Armstrong's argument that rehashes the issue about transfer of patent rights versus transfer of contractual obligations. Judge Skretny, however, never addressed the factual question of the nature of Optimum's product, nor could he have, since that question was not before him. The argument about Optimum's product thus survives the prior Decision and Order.

The argument about Optimum's product also survives summary judgment under Section 3.3(a) for largely the same reasons that it survives summary judgment under Sections 3.2(b) and 3.3(d). Section 3.3(a), in full, states the following:

> As long as the license grant remains exclusive, Licensor shall not grant a license for factory implementation of the Licensed Technologies or the Licensed Patents as they apply to hydronic elements to any third party involved in the manufacture of pumps, any factory packaged chilled water systems, chillers, building controls or cooling towers.

(Dkt. No. 55-1 at 5.) Technically, Hartman—during his time as the owner of the patents and thus as the "Licensor"—never gave Optimum a license of any kind that explicitly said, "Go ahead and engage in factory implementation." At the same time, though, the record contains extensive

106

evidence that Hartman and Optimum knew all along that Optimum would develop and deliver a product in the final form that it took. As the Court discussed above, Hartman and Optimum very much want to divorce the optimization software from the Tridium JACE physical device that housed it. To borrow the Court's prior analogy, the attempt to separate the software from the physical device would be more plausible if the optimization software had worked more like Windows 10 or any number of software titles: Buy the installer disc, install the software in whatever computer you like, and call the software company if necessary for customer support. Optimum's optimization software simply did not work that way. As Optimum has conceded, the software was inoperable in the field without a physical device that was first prepared at the factory level. Optimum's final product, therefore, contains elements of both factory and field implementation, and a factfinder will have figure out how to reconcile the dual nature of that product with an ALA that overwhelmingly contemplates a binary world of factory or field implementation, with nothing in between. As also mentioned before, a factfinder also will have to figure out the significance of the option that Optimum customers had—to program their BAS devices to follow the Optimum product's suggestions. A reasonable jury thus could decide that Optimum's product qualifies as a "building control" under Section 3.3(a). A reasonable jury further could conclude that Hartman and Optimum effectively had an agreement to make a product in this way.

For the above reasons, the Court recommends denying the parties' motions with respect to Section 3.3(a).

## 4.  Breach of Section 8 of the ALA

This implied part of Armstrong's allegations against Hartman requires only a brief discussion.  There is no part of the amended complaint or of Armstrong's counterclaims that sets forth a "short and plain statement," FRCP 8(a)(2), that Hartman breached Section 8 of the ALA, how he did so, or why.  The closest that Armstrong came to such an allegation is the following paragraph of the amended complaint:

> By entering the agreement to transfer the rights to Optimum, Hartman breached the Armstrong License Agreement, including without limitation, the restrictions not to grant certain rights to other parties, the express prohibitions against granting certain rights to Optimum, the provision giving Armstrong the right of first refusal on the improvements, and the provision against entering inconsistent agreements.  For example, the Patent Purchase Agreement at section 4 assigns to Optimum all right, title and interest in the Patents, defined at page 2 of the Patent Purchase Agreement, which includes the Patents licensed to Armstrong as well as the pending improvement applications, for which Hartman promised a right of first refusal to Armstrong at section 8 of the Armstrong License Agreement. The Patent Purchase Agreement was executed by Hartman on February 10, 2010.

(Dkt. No. 55 at 9.)  Section 8 also appears nowhere in Armstrong's motion papers.  Perhaps for the sake of completeness, Optimum addressed any lingering claims under Section 8 it its motion papers:

> "To establish a tortious interference with contract claim under New York law, requires that 'the plaintiff must show the existence of its valid contract with a third party, defendant's knowledge of that contract, defendant's intentional and improper procuring of a breach, and damages.'"  *High Falls Brewing Co., LLC v. Boston Beer Corp.*, 513 Fed. Appx. 12, 13 (2d Cir. 2013) (quoting *White Plains Coat & Apron Co. v. Cintas Corp.*, 8 N.Y.3d 422, 426, 835 N.Y.S.2d 530 (2007)).  Armstrong is unable, as a matter of law, to prove a number of these elements, much less all of them, with respect to its claim that Optimum tortiously interfered with the ALA through the Patent Purchase Agreement.  In particular, as a result of the March 18, 2011 Amendment, specifically addressing this Court's ruling to

preserve Armstrong's right of first refusal, Armstrong cannot show that the PPA breached Armstrong's ALA right of first refusal in patent improvements. (See Assignment of Armstrong License Agreement, Recital G; §§3(a)–(d), §4; Hogue Decl., Exh. B).

> As a result, Armstrong's claim is moot and/or meritless, and Optimum is entitled to summary judgment dismissing Armstrong's claim that Optimum tortiously interfered with Armstrong's contractual right of first refusal in patent improvements under §8 of the ALA, through the sale and assignment of the three LOOP Patents from Hartman to Optimum.

(Dkt. No. 294-3 at 17–18.) Hartman made a similar argument in its motion papers:

> Hartman did not breach ALA § 8, which granted Armstrong a right of first refusal co-extensive with its license rights for any improvements developed more than two years after execution of the ALA. First, amendment of the Patent Purchase Agreement preserved Armstrong's rights under § 8, thus rendering any such claim moot. Second, nothing in the record suggests that Hartman ever offered an improvement to anyone before offering such to Armstrong. And, in fact, Hartman never offered any improvement to any party other than Armstrong. Accordingly, under the plain meaning of this provision, Hartman did not breach the ALA by failing to honor Armstrong's right of first refusal in patent improvements.

(Dkt. No. 290-3 at 21–22.) When Armstrong did not respond to Optimum's argument, Optimum

included the following in its reply papers:

> Armstrong does not dispute Optimum's entitlement to summary judgment dismissing Armstrong's claim that Optimum tortiously interfered with Armstrong's contractual right of first refusal in patent improvements under § 8 of the ALA, through the sale and assignment of the three LOOP Patents from Hartman to Optimum. (See 5/5/17 Opt. Mem. at 11–12; Dkt. No. 291-3 at 17–18).

(Dkt. No. 307 at 7.) Hartman included a similar cursory paragraph it its reply papers:

> Armstrong ignores Hartman's point that he never offered any patent improvement to any other party and that Armstrong declined to make him an offer for the patent improvement that he offered to it. Armstrong's opposition does not

mention ALA § 8 or "improvements," thus abandoning the claim. Hartman is
entitled to summary judgment.

(Dkt. No. 308 at 9.)

The Court has little to add to what Hartman and Optimum have put in their motion

papers. The legal interplay of Hartman's contractual obligations and the patent sale is addressed

elsewhere. Factually, Armstrong has not submitted any actual occurrence of LOOP Technology

improvements, let alone improvements offered to others first. The Court adopts Hartman's and

Optimum's arguments and recommends granting their motions with respect to any claims that

might be pending under Section 8 of the ALA.

### 5. Breach of Section 10.2 of the ALA

Armstrong accuses Hartman and Optimum of breaching Section 10.2 of the ALA. The

accusation comes from the following portion of Armstrong's counterclaims:

> The Armstrong License Agreement contains express prohibitions against
> granting certain rights to Optimum and other parties similarly situated as
> competitors to Armstrong's product offerings, including, for example: the promise
> not to grant rights to manufacturers and assemblers of cooling systems and chilled
> water plant controls at section 3.2(b) of the Armstrong License Agreement; the
> promise not to grant rights to a party that implements the Hartman Loop
> Technology in any way that competes with Armstrong's product offerings in section
> 3.3(d) of the Armstrong License Agreement; and the promise not to enter
> agreements inconsistent with the grant of rights to Armstrong in section 10.2 of the
> Armstrong License Agreement.

(Dkt. No. 68 at 8; *see also id.* at 9 ("Armstrong has suffered and will continue to suffer damages

from Hartman's or Optimum's conduct in violating the provisions and prohibitions of the

Armstrong License Agreement.").)  In its motion papers, Armstrong makes the following argument

for summary judgment in its favor based on Section 10.2:

> Hartman promised Armstrong that it would not "make any agreements with or commitments to third parties that are inconsistent with the grant of rights hereunder."  Kulik Decl. Exh. A at § 10.2.  By assigning Optimum the very patents and pending applications that are the subject of the License Agreement, Hartman not only gave Optimum rights in contravention of the promises Hartman made to Armstrong, Hartman significantly harmed Armstrong's business.

> Indeed, Armstrong had already lost sales to Optimum as a result of its unauthorized competition since before this lawsuit was filed.  For example, during the 4221 Wilshire Boulevard Project, the specifications for the HVAC system were developed according to Armstrong's product line.  Kulik Decl., Exh. O (Declaration of Brett Gaviglio at ¶ 3).  Optimum subsequently made a directly competing proposal that incorporated Optimum's control panel.  *Id.* at ¶¶ 3, 6. The building owner subsequently gave the project to Optimum.  *Id.* at ¶ 7.  The difference in sales between the original budget proposal and the final purchase order was over $100,000, and part of this difference included the Armstrong controller and other components to be provided by Armstrong.  *Id.* at ¶ 7.

(Dkt. No. 317 at 39–40.)  Hartman has responded to Armstrong's arguments as follows:

> The ALA represents the "entire agreement" between Hartman and Armstrong under the merger clause contained in § 12.1 of the ALA.  Armstrong claims that the OLA is inconsistent with the ALA, in violation of § 10.2 of the ALA.  The Complaint focuses on Optimum's "transferable right to make products (LOOP Products) at section 2.1," of the OLA, which, according to Armstrong, violates §§ 3.2(b) and/or 3.3(d) of the ALA.  Armstrong's interpretation, however, is not supported by the plain text of the agreements.  Rather, mutually exclusive rights were conferred upon Armstrong and Optimum under the agreements.  The ALA defines "Factory Implementation" as "implementing the Licensed Technologies into chiller, pumping, control systems and/or tower products as a part of the factory production process."  And it defines "Field Implementation" as "implementing the Licensed Technologies into the chiller, pumping, control systems and/or tower products after the products have been delivered to the site." The OLA contains conforming definitions of "Field Implementation" and "Factory Implementation."

* * *

When ALA §§ 3.2(b) and 3.3 are viewed together, they illustrate that: (1) the "competition" referenced in § 3.3 was other hydronic "factory integrated chiller, pumping or cooling tower equipment with controls" offering, or pumping systems offering that included the Licensed Technologies; (2) as such, Hartman agreed in §§ 3.2(b) and 3.3(a) that he would not grant a license for Factory Implementation of the Licensed Technologies as they apply to hydronic elements to any other party; (3) nevertheless, under § 3.3(b), Hartman retained *full rights* to Field Implementation of the Licensed Technologies, a right that he could license to Optimum as referenced in § 3.2(b); (4) Armstrong has no license for Field Implementations but may request permission to perform such implementations, which Hartman will review on a case by case basis, as set forth in § 3.3(c); (5) Hartman retained full rights for any implementation that does not compete with Armstrong's offering, such as non-hydronic (air) chillers, as set forth in § 3.3(d); and (6) Hartman will be diligent in referring projects that require new chillers or pumps to Armstrong, as set forth in § 3.3(e).

Armstrong's assertion that Optimum is not permitted to compete with Armstrong is incorrect for the reasons set forth in the Declaration of Nathan Rothman in August 2010. Indeed, the Field/Factory methods of implementation were designed to compete in order to provide several options that each included the Licensed Technologies, especially in competitive-bid contexts. The "non-compete" language that Armstrong seeks to rely upon in ALA § 3.2(b) simply confirms the Factory/Field distinction, *i.e.*, that Optimum's products would not "include the manufacture or assembly of pumps, chillers, towers, chilled water plant controls or pumping or chiller systems" because that is the type of equipment Armstrong produces for its Factory Implementation offering.

(Dkt. No. 290-3 at 15–16, 19–20.) Optimum took note of how any alleged violation of Section 10.2 would manifest itself in terms of violations of other sections of the ALA; Optimum consequently addressed Section 10.2 only by asserting that "Armstrong also claimed that each of these breaches would also constitute a breach of ALA §10.2, which prohibited Hartman from entering into agreements that are inconsistent with the ALA." (Dkt. No. 294-3 at 15 n.8.) Hartman noticed the connection between Section 10.2 and other sections as well when he wrote

that "Armstrong argues that Hartman's assignment of the LOOP Patents breached ALA § 10.2 because Optimum is a 'competitor.' To the extent that Armstrong references its previous breach of contract arguments (*i.e.*, ALA §§ 3.2(b) and 3.3(a), (d), and (e)), they must be rejected for the reasons set forth above." (Dkt. No. 298 at 22.)

Armstrong did not mention Section 10.2 in its reply to Hartman, choosing to focus on the substantive provisions of other sections of the ALA. Armstrong did include the following in its reply to Optimum:

> Optimum, as the current assignee and Licensor, has breached the ALA by failing to refer potential customers to Armstrong. (Dkt. No. 292-3 at ¶ 29; Decl. of Peter Thomsen dated May 5, 2017). Furthermore, by entering into the PPA in a manner that deprives Armstrong of the benefits of ALA § 3.3(e), Optimum has breached § 10.2 of the ALA by entering into an agreement with Hartman that is inconsistent with the commitments of the ALA. Optimum also failed to exercise the good faith and fair dealings required of parties to a contract under New York law in fulfilling this obligation and intentionally modifying the terms of the PPA to rescind the referral obligation. *Sec. Plans, Inc. v CUNA Mut. Ins. Soc.*, 769 F.3d 807, 810–11 (2d Cir. 2014) ("the implied covenant of good faith and fair dealing that, as a matter of law, accompanies contracts concluded under New York law"). These failures constitute a material breach that deprived Armstrong of important benefits of the deal struck in the Armstrong License Agreement and have in the past and continue to harm Armstrong by lost opportunities and the unfair payment of the full royalties for a mere part of the performance.

(Dkt. No. 310 at 8.) Hartman addressed Section 10.2 more fully in its reply to Armstrong:

> Despite claiming that Hartman breached ALA § 10.2 by executing an "inconsistent" agreement, Armstrong proffers no comparison of terms that would suggest that the OLA or PPA are inconsistent with the ALA. The extent of Armstrong's ALA § 10.2 analysis are (1) a summary bullet arguing that Hartman could not sell the patents "while allowing Optimum to continue breaching at least sections 3.3(a) and 3.3(d);" and (2) a conclusory assertion that Hartman's sale of the patents "violated the promise he made" in ALA § 10.2 "not to make agreements or commitments in violation of" the ALA. Armstrong, however, proffers no analysis

113

of the ALA or how Hartman's agreements with Optimum are purportedly inconsistent. This omission alone implicitly concedes an inability to refute Hartman's analysis of ALA § 10.2 and the fact that neither the OLA nor the PPA are inconsistent with the ALA.

To the extent that Armstrong is arguing that ALA § 3.3(a) and (d) are inconsistent with the PPA, it offers no comparison of terms. And for good reason. Nothing in the PPA is inconsistent with Armstrong's rights under the ALA. Indeed, Judge Skretny held that the assignment of the patents could "include only the rights Hartman could have exercised without violating the License Agreement." Judge Skretny also held that "Armstrong's licensing rights are precisely the same no matter who holds title to the patent." Armstrong continues to ignore that ALA § 12.3 limited Armstrong's ability to assign its rights and obligations under the ALA but did not so restrict Hartman.

And even if Armstrong's cursory ALA § 10.2 "analysis" were construed to suggest that the OLA was inconsistent with ALA §§ 3.3(a) and (d) (an argument not made by Armstrong) it would fail because, as discussed below, Hartman licensed different rights (*i.e.*, field and factory) to Optimum and Armstrong respectively. Whether or not Optimum later acted in a manner that Armstrong now contends infringed its rights has nothing to do with Hartman's execution of the OLA in 2004.

Moreover, with respect to the first assertion, Armstrong makes the conclusory claim that Optimum breached ALA § 3.3(a) and (d). As a non-party, Optimum could not breach the ALA. Armstrong apparently meant to argue that Optimum was infringing its rights under the ALA. But Armstrong does not claim infringement, and never pursued any infringement claim against Optimum despite its ability to do so under ALA § 5.3. Finally, Armstrong cites nothing in the record to support its conclusory assertion that Hartman "allowed" Optimum to infringe its rights.

With respect to the second assertion, Armstrong offers no analysis of the "promise" that was made, let alone breached. Again, Armstrong does not address the contract language because it knows that any such effort would be futile. Instead, Armstrong seeks to use inflammatory and conclusory jargon in an effort to confuse the issues. Accordingly, Hartman is entitled to summary judgment dismissing Armstrong's ALA § 10.2 claim.

(Dkt. No. 308 at 6–8.)

After reviewing the parties' arguments in the entirety of the record, the Court sees three reasons to dispense with any allegations that Armstrong has made under Section 10.2. First, there is no claim under Section 10.2 against Optimum. The signings of the OLA and the PPA are the only post-ALA events that could have triggered a breach of Section 10.2. Optimum was not a signatory to the ALA at the time of the signing of the OLA. Optimum could not have been considered a party to the ALA in any way until it entered the PPA and bought the LOOP Technology patents. That means, under the most generous possible construction of Armstrong's argument, that Optimum would have had to enter an inconsistent agreement about licensing or contractual services after the date of the PPA. Armstrong has not pointed to any such agreement that occurred; any dealings that Optimum had with other companies, at most, had the potential to create factual breaches and not legally inconsistent agreements. Second, to borrow language from the world of constitutional law, Armstrong has not put forth any evidence that the ALA, the OLA, and the PPA are *facially* inconsistent. Armstrong's arguments are akin to an *as-applied* challenge in constitutional law. Judge Skretny and this Court already have addressed the separation between the patent sale and Hartman's contractual obligations. That Hartman appears to have made some successful referrals over the years suggests that there are scenarios under which the ALA, the OLA, and the PPA would not clash. That means that Armstrong's arguments about lost sales, poor referrals, intended product offerings, and improper competition are really about factual breaches of established rights and obligations—a challenge to how Hartman and Optimum applied the various agreements on a day-to-day basis. Finally, as a practical matter, the Court has noticed that

115

all of Armstrong's arguments under Section 10.2 are really arguments about violations of more

substantive parts of the ALA that the Court already has addressed.  The repetition and

Armstrong's argument persuades the Court that, while a violation of Section 10.2 that does not

violate other sections of the ALA might be theoretically possible, that is not the case here.  Here,

the potential violation of Section 10.2 *is* the potential violation of other sections of the ALA.

Armstrong's allegations under Section 10.2 thus are entirely duplicative of the other allegations

that the Court would send to trial.

Armstrong should have the right at trial to ask Judge Skretny for a separate jury charge

about Section 10.2 if events at trial create some reason to do so.  Otherwise, Armstrong has failed

to make a legal or factual case about Section 10.2 in itself.  The Court accordingly recommends

denying Armstrong's motion and granting Hartman's and Optimum's motions with respect to

Section 10.2 of the ALA.

ii.   *Tortious Interference Against Optimum*

In Count II of the amended complaint, Armstrong makes the following accusations against

Optimum in support of a claim of tortious interference with the ALA:

> Despite its knowledge of the Armstrong License Agreement and the
> exclusivity provisions contained therein, Optimum has executed agreements and
> been in negotiations with Hartman to buy Hartman's patents despite the express
> license provisions to the contrary.
>
> With the knowledge of the terms of the Armstrong License Agreement,
> Optimum manipulated definitions and terms in its own license agreement with
> Hartman to make the grant of rights to Optimum inconsistent with the rights that
> Hartman had previously licensed to Armstrong.  Optimum's interference has
> caused a loss in sales to Armstrong and specifically a loss in sales of products

intended to be used with the Hartman Loop Technology.  Optimum's interference has damaged Armstrong's ability to capitalize on its investments.

Optimum's interference has caused Hartman to breach the Armstrong License Agreement.  In particular, by entering the agreement to transfer the rights to Optimum (the Patent Purchase Agreement), Hartman breached the Armstrong License Agreement, including without limitation, the restrictions not to grant certain rights to others and the provision against entering inconsistent agreements.

Optimum's interference has also allowed manufacturers of pump and cooling systems and equipment to directly compete with Armstrong in the market for the Hartman Loop Technology.  At sections 3.2(b) and 3.3(d), the Armstrong License Agreement prevents Hartman from granting rights to others where those rights allow the implementation of the Hartman Loop Technology that competes with, or could compete with, Armstrong's product offerings.

(Dkt. No. 55 at 11–12.)  In its motion papers, Armstrong opens its argument about Count II with

further discussion about Optimum's knowledge of the ALA and of direct competition:

Optimum knew of and participated in the meetings and conversations on the terms of the Armstrong License Agreement with Hartman through its execution date.  Kulik Decl. Exh. H ¶ 2.  At that time, Optimum had no product and was merely a research and development company.  Kulik Decl. Exh. H, at ¶ 6.  Thus, while Optimum was still in an early development stage and still had no license to use the Hartman LOOP Technology, Optimum and Optimum's CEO had full knowledge of the Armstrong License Agreement and all of its terms and definitions.  These terms include the terms in sections 3.3 (a), (b) and (d) that prevent Hartman from licensing to others in competition with Armstrong and its intended product line, and prevent a license that would in any way compete with Armstrong's product line.

Optimum knew its JACE controller device was in direct competition with Armstrong's products since at least March of 2006.  That is when Rothman and Hartman sent emails to Brent Ross about a project proposal for EMCOR in Los Angeles.  Kulik Decl. Exh. H, at Rothman Exhibits L and M.  What is clear from this exchange is that the parties Armstrong and Optimum disagree on what "factory implementation" means.  At numbered point 2 of the Exhibit M, Rothman asserts, without any reference to the terms of the Armstrong License Agreement, that factory relates to a "factory built package" and that a sale to a project with an

117

existing plant is outside of Armstrong's scope of rights.  Brent Ross first stated the clear response "WE DISAGREE HERE."  *Id.*

(Dkt. No. 317 at 41–42.)

Optimum has provided substantive, factual responses to the arguments from Armstrong that the Court has quoted above.  What draws the Court's immediate attention, however, is Optimum's legal argument that the entirety of Count II is untimely:

> New York's three-year statute of limitations set forth in CPLR § 214(4) applies to Armstrong's claim for tortious interference with contract.  *Cohane v. NCAA*, 2005 WL 2373474, *7 (W.D.N.Y. Sept. 26, 20115), *affirmed in part for substantially the reasons stated below*, 215 Fed. Appx. 13, *15 (2d Cir. 2007).  "Under New York law, tortious interference with contract is not a continuing tort for statute of limitation purposes."  *Id.* at *8.  A discovery rule does not apply to the accrual of the claim for statute of limitations purposes.  *Kronos, Inc. v. AVX Corp.*, 81 N.Y.2d 90, 94, 595 N.Y.S.2d 931, 934 (N.Y. 1993).  Instead, the statute of limitations runs when there "is a legal right to relief.  Stated another way, accrual occurs when the claim becomes enforceable, *i.e.*, when all elements of the tort can be truthfully alleged in a complaint."  *Id.*

> In this case, Armstrong's claim became enforceable, and all the elements of the tort could be alleged, upon the execution of the Optimum License Agreement on November 28, 2005.  At that point, Armstrong had been damaged through the loss of its alleged exclusive rights by Hartman's granting those same rights to Optimum in the Optimum License Agreement.  As a result, Armstrong's claim accrued, and the statute of limitations began to run, on November 25, 2005.  Since this lawsuit was not commenced until May 28, 2010, and the first amended complaint was filed on March 8, 2011, Armstrong's claim for tortious interference with contract as to the Optimum License Agreement is barred by the three-year statute of limitations set forth in CPLR 214(4).

(Dkt. No. 294-3 at 20.)  Armstrong responded to Optimum with a single paragraph that reads like an argument for tolling based on discovery of the alleged tort:

> Optimum asserts that claims against it for interference with contract are time barred since Armstrong knew about Optimum's activities since 2005.  This is

118

flatly incorrect. The Declaration of Peter Thomsen submitted with this opposition state the facts on what Armstrong knew and what Optimum refused to tell Armstrong. Thomsen explains that as soon as Armstrong learned that an "appliance" was being used from Optimum's website, Armstrong began questioning Optimum's activities. (Thomsen Oppos. Declar. ¶¶ 4-6, 15 and 17). Optimum never shared any details of how it was implementing the Hartman LOOP or using the JACE device. (Counter Statement ¶ 56 and 57). Optimum's suggestion that Armstrong knew facts concerning Optimum's practices are erroneous. There is no evidence that Optimum ever provided any details of its installation or implementation process for the Hartman LOOP technology until forced to during this lawsuit.

(Dkt. No. 303 at 23.) Optimum noticed the brevity of Armstrong's response:

Optimum's Memorandum showed that New York's three-year statute of limitations set forth in CPLR § 214(4) bars Armstrong's claim for tortious interference with contract. (*See* 5/5/17 Opt. Mem. at 14-15; Dkt. No. 291-3 at 20-21). As Optimum explained, Armstrong's claim for tortious interference (which is not a continuing tort or subject to a discovery rule) accrued and the statute of limitations began to run, upon the execution of the Optimum License Agreement on November 28, 2005. Since this lawsuit was not commenced until May 28, 2010, Armstrong's claim is time-barred.

Armstrong's response is a single paragraph, without citation to any law. Armstrong responds that "Optimum asserts that claims against it for interference with contract are time barred since Armstrong knew about Optimum's activities since 2005. This is flatly incorrect." (6/21/17 Arm. Mem. at 20).

But Armstrong misstates the grounds for Optimum's motion—as Armstrong surely knows. As noted above, Optimum's Memorandum showed that (1) a discovery rule does not apply to Armstrong's claims and (2) Armstrong's claims accrued on November 28, 2005 when Hartman and Optimum entered into the OLA. (*See* 5/5/17 Opt. Mem. at 14-15; Dkt. No. 291-3 at 20-21). Armstrong's opposition does not, and cannot, directly dispute either point. Instead, Armstrong has not only mischaracterized Optimum's motion but also incorrectly implies that its claims are subject to a discovery rule.

Optimum is entitled to summary judgment dismissing Armstrong's tortious interference with contract claims as barred by the statute of limitations. For that

reason, the Court need not address Optimum's three additional grounds for summary judgment on the tortious interference claim that are discussed below.

(Dkt. No. 307 at 10–11.)

The Court must consider the timeliness of Count II first, since that issue potentially renders all of Armstrong's other arguments moot. Under New York law, and with exceptions not relevant here, an action to recover damages for an injury to property must be commenced within three years. N.Y. CPLR 214(4) (Westlaw 2018). CPLR 214(4) covers claims for tortious interference with existing contracts. *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 907 N.E.2d 268, 273 (N.Y. 2009); *see also, e.g., Kronos, Inc. v. AVX Corp.*, 612 N.E.2d 289, 290 (N.Y. 1993). "[A] tort cause of action cannot accrue until an injury is sustained. That, rather than the wrongful act of defendant or discovery of the injury by plaintiff, is the relevant date for marking accrual. The Statute of Limitations does not run until there is a legal right to relief. Stated another way, accrual occurs when the claim becomes enforceable, i.e., when all elements of the tort can be truthfully alleged in a complaint." *Kronos*, 612 N.E.2d at 292 (citations omitted). "The tort of inducement of breach of contract, now more broadly known as interference with contractual relations, consists of four elements: (1) the existence of a contract between plaintiff and a third party; (2) defendant's knowledge of the contract; (3) defendant's intentional inducement of the third party to breach or otherwise render performance impossible; and (4) damages to plaintiff. Since damage is an essential element of the tort, the claim is not enforceable until damages are sustained." *Id.* (citations omitted). "But inducing another to break a contract does not become a legal wrong upon which an action may be based until damage is suffered as a result, and that

120

occurs only when the breach happens." *Fury Imports, Inc. v. Shakespeare Co.*, 625 F.2d 585, 588 (5th Cir. 1980) (citations omitted). The damages in question have to be actual damages, meaning economic loss. *See Int'l Imaging Materials, Inc. v. Sony Chemicals Corp. of Am.*, No. 91-CV-407S, 1993 WL 384959, at *5 (W.D.N.Y. Aug. 25, 1993) (citations omitted). There is a limited exception to the actual damages rule that allows for a claim of nominal damages, presumed to accrue at the moment of breach. *See Finley v. Atl. Transp. Co.*, 115 N.E. 715, 718 (N.Y. 1917) ("Whenever there is a breach of a contract or the invasion of a legal right the law infers some damage.") (citation omitted); *Hirsch Elec. Co. v. Cmty. Servs., Inc.*, 536 N.Y.S.2d 141, 143 (App. Div. 1988) ("[I]t is a well-settled tenet of contract law that even if the breach of contract caused no loss or if the amount of loss cannot be proven with sufficient certainty, the injured party is entitled to recover as nominal damages a small sum fixed without regard to the amount of the loss, if any.") (citation omitted). Nominal damages "are allowed in tort only when needed to protect an important technical right." *Kronos*, 612 N.E.2d at 292 (internal quotation marks and citation omitted).

The accrual of a tortious interference claim upon injury with actual damages allows for virtually no exceptions, because the tort is not a continuing tort. *See Bloomfield Bldg. Wreckers, Inc. v. City of Troy*, 364 N.E.2d 1130, 1131 (1977) (citations omitted); *Spinap Corp. v. Cafagno*, 756 N.Y.S.2d 86, 87 (App. Div. 2003) ("Since tortious interference with contract is not a continuing tort, it does not avail the plaintiff to argue that Cafagno continued to solicit its customers up until the time of the filing of the complaint . . . .") (citations omitted); *see also Rosemeier v. Schenker Int'l, Inc.*, 895 F. Supp. 65, 66 (S.D.N.Y. 1995) ("The cause of action accrues at the time the injury is

sustained, rather than the date of defendant's alleged wrongful act or the date of discovery of the injury by the plaintiff."). The only very narrow exception that sometimes is available comes from the doctrine of equitable estoppel "where plaintiff was induced by fraud, misrepresentations or deception to refrain from filing a timely action. Moreover, the plaintiff must demonstrate reasonable reliance on the defendant's misrepresentations." *Zumpano v. Quinn*, 849 N.E.2d 926, 929 (2006) (citations omitted).

Here, Armstrong has alleged that the creation and signing of the OLA was the act of inducement, and that inconsistencies between the ALA and the OLA constituted the first breach. The alleged tension between the ALA and the OLA, and the alleged improper competition that resulted, would suffice to establish nominal damages as of late 2005 to vindicate Armstrong's contractual rights. In the alternative, Armstrong has alleged loss of sales, which would complete the elements for tortious interference by filling in actual damages. Armstrong does not assign any date to its lost sales, but the record contains documents submitted by Armstrong to establish that Optimum was profiting from improper competition no later than March 2007. (*See* Dkt. No. 357-6 at 238.) Armstrong filed its original complaint on May 28, 2010. (Dkt. No. 1.) As a result, even if the Court ignored the accrual of nominal damages in late 2005 and gave Armstrong the benefit of the doubt about possible lost sales in 2006, documentary evidence shows lost sales appearing in Optimum's finances more than three years before Armstrong filed the original complaint. And the Court should not forget that Armstrong has made other allegations, such as inadequate referrals, that date back to late 2005. Under these circumstances, Armstrong had enough timely

knowledge that something might have been amiss that it will not be able to qualify for equitable tolling.

Count II thus is untimely in its entirety, meaning that the Court need not consider the substantive factual arguments from the parties. The Court accordingly recommends granting Optimum's motion with respect to Count II of the amended complaint.

### D. Armstrong's Declaratory Judgment Counterclaim for Patent Invalidity (Dkt. No. 68 at 9, Dkt. No. 111 at 9)

On April 17, 2014, the parties filed a joint stipulation "regarding patent issues." (Dkt. No. 175.) The most important parts of the joint stipulation were the following assertions:

> With respect to United States Patent Numbers 5,946,926; 6,185,946; and 6,257,007 (the "LOOP Patents"), Armstrong will not introduce evidence in support of its counterclaims for patent invalidity (Dkt. 111: Second Amended Answer to Defendant Optimum Energy LLC's Counterclaims, ¶¶ 147–156).

> Sales of the current and past model versions of Armstrong's IPC11550 and Opti-Visor products require a license under the LOOP Patents. Optimum and Hartman will not introduce evidence regarding allegations of infringement of the LOOP Patents by the IPC11550 or Opti-Visor.

> Armstrong is required by license to mark the IPC11550 and Opti-Visor with the LOOP Patent numbers. Such marking by Armstrong is authorized by 35 U.S.C. § 287 and such marking does not violate 35 U.S.C. § 292. Optimum will not file a claim asserting that such marking violates 35 U.S.C. § 292.

(*Id.* at 1–2.) While the parties were too clever to use the word "withdrawal" in their joint stipulation, this document came less than a year after the Court helped Judge Skretny resolve all of the claim construction issues that the parties had raised. Regardless of the avoidance of the word "withdrawal," the Court always has interpreted the joint stipulation to mean that the parties' two-

year detour into patent issues was over, and that the case once again was a contract case. The Court finds support for this interpretation from the absence, in Armstrong's principal motion papers, of any argument regarding patent invalidity.

Accordingly, the Court recommends granting Optimum's motion regarding any counterclaim from Armstrong that is technically still pending regarding patent invalidity. The Court correspondingly recommends dismissing Optimum's third and fourth counterclaims regarding patent infringement. (Dkt. No. 57 at 20–22.) The parties have blown raspberries at each other regarding the possibility of attorney fees or sanctions (*see, e.g.*, Dkt. No. 294-3 at 14; Dkt. No. 303 at 20); they can take up that matter with Judge Skretny later if they wish.

### E. *Optimum's Counterclaims for Declaratory Judgment (Dkt. No. 57)*

On March 22, 2011, Optimum filed first, second, and fifth counterclaims against Armstrong alleging improper field implementation and seeking "a declaration of the respective rights of Optimum and Armstrong under the Optimum License Agreement and the Armstrong License Agreement, including a declaration that the rights given by Hartman to Optimum in the Optimum License Agreement are not inconsistent with, and do not violate or breach, Armstrong's rights under the Armstrong Licence Agreement." (Dkt. No. 57 at 13–19, 22–23.) These counterclaims have not been subjected to any motions for summary judgment, and they at least partially overlap other issues that the Court has addressed above. Accordingly, the Court will leave to the parties and to Judge Skretny how these counterclaims should be addressed at trial, if at all.

### F. *Optimum's Argument to Limit Armstrong to Nominal Damages*

Optimum has included in its motion a request to limit Armstrong to only nominal damages at trial. "Armstrong is limited to nominal damages, as a matter of law, for two independently sufficient reasons. First, because Armstrong failed to make the required Rule 26(a)(1)(A)(iii) disclosures with respect to damages, Armstrong should be precluded from offering any damages evidence and therefore limited to nominal damages. Second, any claim by Armstrong for lost profits and/or consequential damages fails as a matter of law because such a claim is too speculative and too uncertain." (Dkt. No. 294-3 at 38.) Hartman has joined the argument. (Dkt. No. 290-3 at 30.) Armstrong has opposed the argument as follows:

> Optimum cited *Design Strategy, Inc. v. Davis*, 469 F.3d 284 (2d Cir. 2006) for the support of its argument that Armstrong should be barred from presenting evidence of lost profit damages. *Design Strategy* does not apply here. In *Design Strategy*, the sanctioned party did not provide any documents relating to a damages calculation until one-and-a-half years after discovery closed and shortly before trial. 469 F.3d at 296. That is simply not the case here, where the parties have engaged in extensive discovery.

* * *

> Throughout the years, Armstrong has been making royalty payments for the use of the licensed Hartman LOOP patents while first Hartman and then also Optimum have in bad faith refused to perform its obligations under the clear language of the Armstrong License Agreement. The changing and inconsistent protests from Hartman and Optimum that certain obligations are "personal" or "over-broad" or "erroneous" cannot wash away the loss in potential market penetration that Armstrong was entitled to have a fair share at winning. Under the circumstances here, fairness dictates that the annual minimum royalty of $100,000 per year from year three (2007) through today (2017) be returned to Armstrong. Hartman and Optimum's deliberate, intentional breach and their acts in keeping their activities and breach secret from Armstrong at all costs suggest nothing less. Armstrong's payments of the additional royalties per tonnage more than

compensates for the partial use of the Hartman LOOP technology that Armstrong has been afforded.

(Dkt. No. 303 at 30, 31–32.)  In its reply, Optimum asserted that Armstrong has not disputed the inability to calculate consequential damages.  Optimum also added the following:

> Armstrong tacitly admits, as it must, that it completely failed to comply with Rule 26(a)(1) as to its damages claims in its initial disclosures.  Armstrong also fails to discuss any of the four factors set forth in *Design Strategy, Inc. v. Davis*, 469 F.3d 284 (2d Cir. 2006), for determining whether the non-compliance with Rule 26(a)(1) warrants preclusion.

> First, Armstrong offers no explanation for its failure.  Second, Armstrong does not dispute Optimum's contention that damages claims have not been central to Armstrong's case.  Third, Armstrong makes no attempt to dispute that Optimum would suffer severe prejudice if Armstrong could present damages categories, calculations, documents and evidence at this date.  Fourth, Armstrong does not contest that the possibility of a continuance favors preclusion.

> Instead, Armstrong simply asserts that "*Design Strategy* does not apply here." (6/21/17 Arm. Mem. at 27).  According to Armstrong, that is because the sanctioned party in *Design Strategy* did not provide any documents relating to damages until one-and-a-half years after the close of discovery while "the parties have engaged in extensive discovery" in this case.  (6/21/17 Arm. Mem. at 27). Armstrong is wrong.  For one thing, the sanctioned party in *Design Strategy* had actually identified some categories of damages in its initial disclosures.  Armstrong's initial disclosures identified none.

> More fundamentally, *Design Strategy* squarely rejected precisely the defense Armstrong offers here—that the sanctioned party's production of documents from which its opponent can derive and calculate the claimed damages is sufficient to avoid preclusion.  The Second Circuit held that "by its very terms Rule 26(a) requires more than providing—without any explanation—undifferentiated financial statements; it requires a 'computation,' supported by documents."  469 F.3d at 295.  Indeed, Armstrong's position would render Rule 26(a)(1) meaningless; a party could ignore Rule 26(a)(1)'s requirements and later point to discovery responses as excusing its non-compliance.  Rule 26(a)(1) is designed to prevent sand-bagging and that is exactly what Armstrong has attempted here.  Optimum had no notice of Armstrong's damages claims until it moved for summary judgment on them.

126

Armstrong next makes the claim that "the case law that has developed since *Design Strategy* has applied a less strict outcome than Optimum advances here." (6/21/17 Arm. Mem. at 27). But Optimum's Memorandum cited five additional cases precluding damages claims for failure to comply with Rule 26(a)(1) and *all* five cases post-date *Design Strategy*. (5/5/17 Opt. Mem. at 35–36; Dkt. No. 291-3 at 41–42 (citing *Reid Construction Data*, *Spontana*, *Jacquez*, *Kodak Graphic* and *24/7 Records*)).

Not surprisingly, Armstrong makes no mention of any of those five cases and instead relies on three other obviously distinguishable cases. (6/21/17 Arm. Mem. at 27–28). One of the cases, *Safespan Platform Systems, Inc. v. EZ Access, Inc.*, 2011 WL 7473467 (W.D.N.Y. Dec. 30, 2011), did not even involve non-compliance with Rule 26(a)(1). Moreover, discovery, including expert disclosure, had not closed in *Safespan*. In *SEC v. CKB168 Holdings Ltd.*, 2016 WL 2853527 (E.D.N.Y. May 13, 2016), the court, which was ambivalent about whether there even was a Rule 26(a)(1) violation, found that there was no prejudice, in part, because the disclosure had been made within the discovery period. That is not the case here. The third case, *Emilio v. Sprint Spectrum L.P.*, 2017 WL 946333 (S.D.N.Y. Feb. 1, 2017), is even further removed. In *Emilio*, the party had identified the category of damages and the category of documents in it is initial disclosures and the party had not provided a computation because it was not seeking to recover damages but only reduce or offset damages to which the putative class members were awarded.

(Dkt. No. 307 at 16–18.) Meanwhile, Hartman had added the following argument in its response

to Armstrong's motion:

Armstrong appears to suggest that it lost sales to Optimum, but never actually makes this claim—which should be rejected in any event. First, Armstrong still has not quantified the alleged number of lost sales, let alone proffered evidence of such. And any such alleged lost sales would be speculative under Kenford Co. v. Cnty. of Erie, 67 N.Y.2d 257 (1986). Second, Armstrong offers no reason to believe that Optimum's revenue somehow indicates what Armstrong's lost profits would have been if it had made those sales (a contingency that itself contains numerous assumptions). Armstrong seeks to build an infringement claim that has not been asserted in any pleading. Indeed, Judge Skretny has already noted that "past conduct by Optimum sounds in patent infringement, a claim not asserted in this case."

Armstrong also argues that its royalty payments should be returned for the purported breach of the ALA. In other words, Armstrong contends that the Licensed Technologies it has used since 2004 are worth next-to-nothing and that it really paid for protection from competition from Optimum—despite the fact that all parties knew during contract negotiations that the Licensed Technologies had to be available from multiple sources. This position is not only absurd (the ALA is a technology transfer license, not a non-compete agreement), but it is not supported by the *Merrill Lynch* decision cited by Armstrong (or any other authority that Hartman is aware of). Moreover, a return of royalties has no basis in the ALA (and is essentially a request for partial rescission, *i.e.*, allowing Armstrong to practice the Licensed Technologies without charge). Armstrong basically complains that it was denied exclusivity in the area of factory implementation. But ALA § 3.2(c) provides that, where Armstrong has exclusivity for pumping systems only (it does not allege that Optimum sold pumping systems), it would nonetheless be required to pay $50,000 per year (*i.e.*, one-half of the Minimum Annual License Fee).

(Dkt. No. 298 at 29–30.)

"Except as exempted by Rule 26(a)(1)(B) or as otherwise stipulated or ordered by the court, a party must, without awaiting a discovery request, provide to the other parties . . . a computation of each category of damages claimed by the disclosing party—who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered . . . ." FRCP 26(a)(1)(A)(iii). The Federal Rules Advisory Committee has explained this obligation as follows:

A party claiming damages or other monetary relief must, in addition to disclosing the calculation of such damages, make available the supporting documents for inspection and copying as if a request for such materials had been made under Rule 34. This obligation applies only with respect to documents then reasonably available to it and not privileged or protected as work product. Likewise, a party would not be expected to provide a calculation of damages which, as in many patent infringement actions, depends on information in the possession of another party or person.

128

146 F.R.D. 401, 631–32. "But the obligation to supplement under Rule 26(e) may often mandate later disclosure once additional information is obtained." 8A Charles Alan Wright et al., Federal Practice & Procedure (Civil) § 2053 (3d ed. and 2017 Supp.). "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." FRCP 37(c)(1). "The sanction is automatic in the sense that there is no need for the opposing party to make a motion to compel disclosure, as authorized by Rule 37(a)(3)(A) in order to compel a further disclosure, as a predicate for imposition of the sanction of exclusion. It resembles the sanction authorized by Rule 37(b)(2)(A)(ii), prohibiting use of certain matters as evidence. It applies not only at trial, but also with respect to any motion, such as a motion for summary judgment, or at a hearing." 8B Charles Alan Wright et al., Federal Practice & Procedure (Civil) § 2289.1 (3d ed. and 2017 Supp.). When assessing possible sanctions under Rule 37(c)(1), courts should keep in mind the main goal of discouraging trial-by-gotcha. "While the rule does not indicate the level of specificity that is required to disclose a 'computation' properly, courts examining this issue have held that Rule 26(a)(1)(A)(iii) requires more than merely setting forth the figure demanded. Rule 26(a)(1) contemplates an estimate of damages and some analysis. The purpose of Rule 26 disclosures is to avoid surprise or trial by ambush." *Mikulec v. Town of Cheektowaga*, 302 F.R.D. 25, 29 (W.D.N.Y. 2014) (internal quotation marks and citations omitted).

What Armstrong actually disclosed, or did not disclose, is helpful in determining whether a

sanction should apply. The following is the entirety of Armstrong's computation of damages from

its initial disclosures:

> While Armstrong's damages are continuing to escalate, Armstrong can
> identify the following at this time:
>
> - Armstrong's actual damages resulting from Hartman's breach of contract;
>
> - Armstrong's actual damages resulting from Optimum's intentional
> interference with Armstrong's license agreement;
>
> - Armstrong's attorneys fees;
>
> - expenses and costs in defending against Defendants' allegations; and
>
> - exemplary damages, interest, and costs assessed at trial or by this Court.
>
> Armstrong reserves the right to amend this response to assert additional
> damages revealed during the discovery process, and Armstrong also reserves the
> right to verify its damage calculation through the use of expert opinions and
> testimony.

(Dkt. No. 294-15 at 6.) Of these five bullet points, the second bullet point will become moot if

Judge Skretny adopts this Court's recommendation to grant Optimum summary judgment as to

Count II of the amended complaint. The third through fifth bullet points are items that

Armstrong would not have known at the start of the case; in fact, costs and fees usually are

determined at the end of the case, and their determination at the end of the case do not generate

surprise or prejudice except perhaps in very unusual circumstances. In contrast to Armstrong's

motion papers, the initial disclosures say nothing about royalty payments; royalty payments thus

should be dismissed under Rule 37(c)(1). *Cf. Rienzi & Sons, Inc. v. N. Puglisi & F. Industria Paste*

*Alientari S.P.A.*, No. 08-CV-2540 DLI JMA, 2011 WL 1239867, at *3 (E.D.N.Y. Mar. 30, 2011)

(granting preclusion where "excuses do not explain why Puglisi did not inform Rienzi that it would

seek this type of [consequential] damages, even if a definite figure was not available. Indeed,

Puglisi never identified this category of damages in its initial disclosure."). The real concern is

what to do about the first bullet point. If Judge Skretny adopts this Court's recommendations

then the core of the case at trial will be the nature of referrals under Section 3.3(e) of the ALA,

along with the possibility of improper factory implementation and competition under Sections

3.2(b) and 3.3(d). At the start of the case, when Armstrong had to deliver its initial disclosures,

details about referrals and about Optimum's final product would have been largely in Hartman

and Optimum's control. The initial disclosures, therefore, do not trouble the Court that much.

What does trouble the Court is what appears to be a complete lack of supplementation under Rule

26(e). At some point in the past seven—now almost eight—years, Armstrong surely acquired

enough information in discovery to be able to attempt at least a rough calculation of damages,

based on 1) some number of specific projects that Hartman referred to Optimum that reasonably

should have been referred to Armstrong; and 2) the total number of products that Optimum sold

and the projects associated with them, working on the presumption that each product was

improper and that each project thus was tainted. *Cf. Design Strategy, Inc. v. Davis*, 469 F.3d 284,

295 (2d Cir. 2006) ("[B]y its very terms Rule 26(a) requires more than providing—without any

explanation—undifferentiated financial statements; it requires a 'computation,' supported by

documents.); *AFL Telecommunications LLC v. SurplusEQ.com Inc.*, 946 F. Supp. 2d 928, 945 (D.

Ariz. 2013) ("AFL made additional damages disclosures in writing during the discovery process

related to expert opinions, satisfying Rule 26(e)(1)(A) and AFL's disclosure obligations.").

Armstrong never submitted this type of calculation to Hartman or Optimum. *Cf. Marvin Lumber & Cedar Co. v. Norton Co.*, 113 F.R.D. 588, 593 (D. Minn. 1986) ("While it is clear that plaintiffs in civil actions often are unable to finally calculate their damages until discovery is received from the defendant, they are under some obligation to answer such discovery requests well prior to the discovery deadline. To have it otherwise would obviously and unfairly prejudice a defendant in its trial preparation.") (citations omitted). To do so at this point would risk reopening discovery after so many years and potentially engaging in more discovery disputes, none of which could be considered justifiable or harmless. Armstrong made vague references in its motion papers to providing adequate discovery, but strangely, its only substantive argument was about royalty payments that were never previously disclosed at all. *Cf. Kodak Graphic Commc'ns Canada Co. v. E.I. Du Pont de Nemours & Co.*, No. 08-CV-6553-FPG, 2013 WL 5739041, at *3 (W.D.N.Y. Oct. 22, 2013) ("By its plain terms, Rule 26 requires more than simply providing a mountain of documents to your opponent. Instead, it requires a *computation* of damages to be provided."); *see also Safespan Platform Sys., Inc. v. EZ Access, Inc.*, No. 06CV726A, 2011 WL 7473467, at *4 (W.D.N.Y. Dec. 30, 2011) (denying a motion to preclude in part because plaintiff did not "present a novel theory late in the proceedings"), *report and recommendation adopted*, No. 06-CV-726-A, 2012 WL 777305 (W.D.N.Y. Mar. 8, 2012). On top of that, the Court notices that Armstrong's first bullet point in its initial disclosures mentions only *Hartman's* breach of contract. Optimum, per this Court's

132

recommendations, would go to trial for a possible breach of Sections 3.2(b) and 3.3(d), but Armstrong disclosed no calculations about that conduct at all.

Under these circumstances, the Court finds Armstrong's computation of damages to be impermissibly deficient. For the reasons above and adopting Hartman's and Optimum's analysis, the Court recommends granting Hartman's and Optimum's motions with respect to limiting Armstrong to nominal damages only, in the event that a jury does find breaches of the ALA and does wish to vindicate Armstrong for those breaches.

### G. Armstrong's Request for an Accounting

The memorandum of law for Armstrong's principal motion papers concludes as follows:

> For all the reasons discussed above, the Court should grant Armstrong's Motion for Summary Judgment against Hartman and Optimum and: issue an order enjoining Optimum from practicing, offering for sale, or selling any controller that is factory produced or implemented or competes with Armstrong's Hartman LOOP products; award appropriate damages to Armstrong; excuse Armstrong's future payments under the Armstrong License Agreement; order a full accounting of the total damages Armstrong has suffered since January 2006, the first year royalty payments were due; and an order instructing Optimum and Hartman to pay Armstrong's attorney fees.

(Dkt. No. 317 at 46.) As can be seen, the concluding paragraph includes a request for an accounting. The amended complaint does not contain the word "accounting" and includes no short and plain statement of the need for an accounting. Armstrong's counterclaims make no mention of an accounting. Armstrong's motion seeks an accounting in no place other than the concluding paragraph. Hartman has responded to Armstrong's request as follows:

> Armstrong is not entitled to an accounting because, "to sustain an action for accounting under New York law a party must establish four elements: (1)

133

relations of a mutual and confidential nature; (2) money or property entrusted to the defendant imposing upon him a burden of accounting; (3) that there is no adequate legal remedy; and (4) in some cases, a demand for an accounting and a refusal." Armstrong does not satisfy any of these requirements.

First, the "right to an accounting is premised upon the existence of a confidential or fiduciary relationship and a breach of the duty imposed by that relationship respecting property in which the party seeking the accounting has an interest." In *Wilson v. Dynatone Publ'g Co.*, Judge Engelmayer recently recognized that, "[u]nder New York law, a claim for an accounting of profits, an equitable remedy, requires that the plaintiff establish that he or she is entitled to an accounting. That, in turn, requires a showing—and in the context of a pleading, plausible allegations—of a fiduciary relationship between the plaintiff and defendant and of the defendant's breach of that fiduciary duty." Here, however, Armstrong has pled no fiduciary relationship with Hartman (or Optimum), let alone proffered evidence of such a relationship. A licensee-licensor relationship is not a fiduciary one. As Judge Stanton held in *Dayan Enterprises*, a licensor-licensee contractual relationship was not fiduciary in nature because, under "New York law, an arms-length licensor/licensee type relationship, without more, is not fiduciary in nature." Likewise, the ALA is a licensing agreement that established an arms' length business relationship between Hartman and Armstrong, and nothing more. This is fatal to Armstrong's request for an accounting.

Second, Armstrong did not entrust property or money to Hartman. And Armstrong neither alleges nor proffers evidence in support of this element. Nor does Armstrong identify in its motion papers what property or money was entrusted to Hartman, who simply received royalty payments in exchange for Armstrong's ability to use the Licensed Technologies and incidental obligations designed to foster the success of the Licensed Technologies in the market.

Third, as Judge Stanton held in *Dayan Enterprises*, a damages suit arising from a license agreement "provides an adequate legal remedy." Likewise, as *Dayan* noted after construing a decision of the Second Circuit, an "accounting [is] improper absent a fiduciary relationship and because plaintiff could discover 'by means of familiar discovery devices' any information it needed to establish damages for its breach of contract claim." Likewise here.

Finally, Armstrong's belated effort to request an accounting at this stage seven years into the litigation would skip: (A) pleading a fiduciary relation and/or even requesting an accounting; and (B) any discovery on the issue. In fact,

Armstrong has not disclosed evidence of damages or theories on damages until now. Armstrong seeks to use this belated request for an accounting to remedy its failure to disclose or seek discovery of such items through available discovery procedures.

(Dkt. No. 298 at 30–33.) Armstrong described its request for an accounting in a little more detail in its reply papers:

> Under the circumstances of Optimum's knowledge of this obligation and then its acts in refusing to honor that obligation as Licensor, Armstrong is entitled to an accounting of the fair value of the business for new pumps and chillers represented by Optimum's sales since the effective transfer of the LOOP patents or the execution of the PPA. In particular, if Optimum has entered into other agreements after becoming the Licensor of the LOOP patents, agreements such as the earlier Master Agreement for Professional Services with Johnson Controls, Inc. (JCI), where Optimum is obligated to certain referral requirements for customers of pumps or chillers to JCI instead of Armstrong, further information about those obligations and activities will be required to fairly assess the damages to Armstrong. (Dkt 292-2 *see* Exhibit W; at § 8.1 of the Master Agreement By and Between JCI and Optimum Energy).

(Dkt. No. 310 at 8–9.)

The discussion about a possible accounting need not take long. Hartman's analysis about the need for a fiduciary relationship is persuasive and adopted. Armstrong's request runs into two simpler problems, though. Procedurally, placing critical requests for the fair value of an industry in the last sentence of a memorandum of law, in the last motion of a nearly eight-year-old case, is not a particularly good idea:

> The plaintiffs also request an accounting by Roberts, although they do not explicitly set forth what they request to be accounted for. In fact, the plaintiffs do not request an accounting in their moving papers, but only generally describe this relief in their Memorandum of Law in support of their motion. It is also unclear to the Court what information the plaintiffs expect to uncover through an accounting that they will not uncover during discovery. At this point, without a clearer

135

statement from the plaintiffs, the Court finds that an accounting would not be appropriate. The Court therefore denies the plaintiffs' request for an accounting without prejudice to renew with a clearer statement of the relief requested.

*Silverman Partners, L.P. v. First Bank*, 687 F. Supp. 2d 269, 294 (E.D.N.Y. 2010). On a practical level, if Judge Skretny adopts this Court's recommendations then only nominal damages will be available to Armstrong. Nominal damages do not warrant equitable relief:

> The necessary prerequisite to the right to maintain a suit for an equitable accounting, like all other equitable remedies, is, as we pointed out in Beacon Theatres, the absence of an adequate remedy at law. Consequently, in order to maintain such a suit on a cause of action cognizable at law, as this one is, the plaintiff must be able to show that the 'accounts between the parties' are of such a 'complicated nature' that only a court of equity can satisfactorily unravel them. In view of the powers given to District Courts by Federal Rule of Civil Procedure 53(b) to appoint masters to assist the jury in those exceptional cases where the legal issues are too complicated for the jury adequately to handle alone, the burden of such a showing is considerably increased and it will indeed be a rare case in which it can be met.

*Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 478 (1962). For these reasons, the Court recommends denying Armstrong's motion to the extent that it can be construed to include a formal request for an accounting.

## IV.    CONCLUSION

The Court respectfully recommends granting the parties' pending motions (Dkt. Nos. 290, 291, 292) in part and denying them in part as explained above. If Judge Skretny adopts this Court's recommendations then, to summarize, this case will go to trial on the following claims:

- Armstrong's claim against Hartman for a violation of Section 3.3(e) of the ALA;

- Armstrong's claim against Hartman and Optimum for a violation of Sections 3.2(b) and 3.3(d) of the ALA;

- Armstrong's claim against Hartman and Optimum for a violation of Section 3.3(a) of the ALA; and

- Optimum's first, second, and fifth counterclaims for declaratory judgment, if Judge Skretny chooses to address them separately.

## V.   OBJECTIONS

A copy of this Report and Recommendation will be sent to counsel for the parties by electronic filing on the date below.  Any objections to this Report and Recommendation must be electronically filed with the Clerk of the Court within 14 days.  *See* 28 U.S.C. § 636(b)(1); FRCP 72.  "As a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point."  *Cephas v. Nash*, 328 F.3d 98, 107 (2d Cir. 2003) (citations omitted).

SO ORDERED.

\_\_*/s Hugh B. Scott*_____
Honorable Hugh B. Scott
United States Magistrate Judge

DATED: January 18, 2018